FILED
2013 Apr-03  AM 11:08
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **ARTHUR LEE GILES,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. CV-06-S-348-S** |
| | ) | |
| **GRANT CULLIVER, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION

This opinion addresses the petition filed by Arthur Lee Giles pursuant to 28 U.S.C. § 2254, seeking relief in the nature of *habeas corpus* from his state court conviction for capital murder and resulting death sentence. The case presents an unusually lengthy state court history. The petitioner was initially charged and convicted in the Circuit Court of Blount County, Alabama in 1979, for the double murder of Willene and Carl Nelson in the course of a robbery committed during the early morning hours of November 10, 1978.[1] He was sentenced to death by electrocution. The original proceedings were conducted under Alabama's previous death-penalty statute, Alabama Code § 13-11-2(a)(10) (1975).[2] On direct appeal, the

---

[1] *See, e.g., Giles v. State*, 440 So. 2d 1237 (Ala. Crim. App. 1983); *see also Jones v. State*, 520 So. 2d 543 (Ala. Crim. App. 1984) (Aaron Jones was Arthur Lee Giles's co-defendant).

[2] Following the Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980), the statute was replaced in 1981 by Ala. Code § 13A-5-40. Subsection (a) of that statute specifies those

conviction and sentence were overturned on the authority of *Beck v. Alabama*, 447 U.S. 625 (1980), and Giles was granted a new trial. *See Giles v. State*, 405 So. 2d 50 (Ala. Crim. App. 1981). His second trial, conducted in 1982, in compliance with the opinion of the Alabama Supreme Court in *Beck v. State*, 396 So. 2d 645 (Ala. 1980), also resulted in a conviction for capital murder and a sentence of death by electrocution. The second *conviction* was affirmed, but the Alabama Supreme Court set aside Giles's *sentence* of death and ordered a new sentencing hearing. *See Giles v. State*, 554 So. 2d 1073 (Ala. Crim. App. 1984), *rev'd in part sub nom. Ex parte Giles*, 554 So. 2d 1089 (Ala. 1987). Venue was changed in 1991 to Morgan County. After considerable deliberations, the Morgan County jury empaneled to conduct the new sentencing hearing informed the court that it had "reached an impasse" and was unable to reach a unanimous verdict. Eleven jurors voted to recommend the death penalty, and one voted for life imprisonment without parole.

> The judge then questioned the jurors, individually, whether further deliberations would be fruitless. Concluding that further deliberations would not produce a unanimous verdict, the judge dismissed the jury. That result represented a de facto recommendation of life without the possibility of parole, as [the Alabama Supreme Court] interpreted §§ 13-11-1 to -9 in *Beck v. State*[, 396 So. 2d 645 (Ala. 1980)]. However,

---

criminal acts that are defined by Alabama law as "capital offenses." Subsection (a)(10) states that "[m]urder wherein two or more persons are murdered by the defendant by one act or pursuant to one scheme or course of conduct" is a capital offense. Ala. Code §§ 13A-5-40(a)(10) (1975) (2005 Replacement Vol.) (alteration supplied).

at a subsequent sentencing hearing, the trial judge sentenced Giles to death.

*Ex parte Giles*, 632 So. 2d 577, 578-79 (Ala. 1993) (alterations supplied).[3]

Unlike the course of his case on direct appeal from both his 1979 and 1982 convictions and sentences, Giles's post-conviction litigation proceeded in a more routine manner. He filed a petition for post-conviction relief pursuant to Rule 32 of the Alabama Rules of Criminal Procedure in the Circuit Court of Blount County, Alabama during February of 1996. Following a hearing, that court entered a 138-page opinion denying relief on August 14, 2000. *See id.* at 970. The Alabama Court of Criminal Appeals affirmed on April 30, 2004, and the Alabama Supreme Court denied *certiorari* review on February 18, 2005. See *Ex parte Giles*, 906 So. 2d 991 (Ala. 2005). This action followed.

As indicated by the following table of contents, this opinion will first review the conduct for which petitioner was convicted in 1982 (his second trial) and his subsequent re-sentencing in 1991 (his third sentencing), as well as the pertinent procedural history that led to the *habeas* petition filed in this court. After a brief

---

[3] *See also*, *e.g.*, *Giles v. State*, 906 So. 2d 963, 969-70 (Ala. Crim. App. 2004) ("11 voted for the death penalty and 1 voted for life imprisonment without parole. Under the former death-penalty statute all 12 jurors had to agree in order to return a death recommendation; therefore, the jury recommended a sentence of life imprisonment without the possibility of parole. Thereafter, as required by the law at the time of the murders the circuit court considered the jury's recommendation of life imprisonment without the possibility of parole; it overrode the jury's recommendation and sentenced Giles to death. His death sentence was affirmed on appeal.") (citing *Giles v. State*, 632 So. 2d 568 (Ala. Crim. App. 1992), *aff'd*, 632 So. 2d 577 (Ala. 1993)).

discussion of procedural preconditions to *habeas* relief, this court will address each of petitioner's claimed grounds for relief.

## Table of Contents

I.      THE OFFENSE CONDUCT — 1982 CONVICTION . . . . . . . . . . . . . . . . . . . . . . . . 12

II.     SENTENCING ORDER— 1991 RE-SENTENCING . . . . . . . . . . . . . . . . . . . . . . . 13

III.    PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A.      State Court Direct Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B.      State Court Collateral Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.     INTRODUCTION TO THE DISCUSSION OF PETITIONER'S SUBSTANTIVE
        CLAIMS:  *The Scope of Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        A.      **Exhaustion of State Court Remedies**:  *The First Condition Precedent to
                Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        B.      **The Procedural Default Doctrine**:  *The Second Condition Precedent to
                Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                1.      *General Principles* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

                2.      *Overcoming Procedural Defaults* . . . . . . . . . . . . . . . . . . . . . . . 32

                        a.      *The "Cause and Prejudice" Standard* . . . . . . . . . . . . . . . . 33

                        b.      *The "Fundamental Miscarriage of Justice" Standard* . . . . . . . . 39

        C.      **Selected Exhaustion and Procedural Default Issues Pertinent to
                Giles's *Habeas* Claims** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        D.      **The Statutory Overlay**:  *The Effect of the Antiterrorism and Effective
                Death Penalty Act of 1996 on Federal* Habeas *Review* . . . . . . . . . . . . . . . . . . 50

                1.      *The Meaning of § 2254(d)(1)[a]'s "Contrary To" Clause* . . . . . . . . . . . 54

                2.      *The Meaning of § 2254(d)(1)[b]'s "Unreasonable Application"
                        Clause* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

4

3. *Evaluating Factual Determinations of State Courts* . . . . . . . . . . . . . . . . 58
*Under §§ 2254(d)(2) and (e)(1)*

E. **The Burden of Proof and Heightened Pleading Requirements for** *Habeas* **Petitions** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

F. **Introduction to Ineffective Assistance of Counsel Claims** . . . . . . . . . . . . . . 65

1. *The Performance Prong* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

2. *The Prejudice Prong* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

3. *The Deference Accorded State Court Findings of Historical Fact When Evaluating Ineffective Assistance of Counsel Claims* . . . . . . . . . . 72

V. **DISCUSSION OF CLAIMS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 72

A. **Claims Arising Out of the 1982 Guilt-Phase Trial** . . . . . . . . . . . . . . . . . . . . . 72

1. *The Capital Murder Conviction Was Obtained Under Unconstitutional Alabama Death Penalty Law* . . . . . . . . . . . . . . . . . . . . 73

a. The Alabama Supreme Court Illegally Re-wrote the State's Death Penalty Law After *Beck v. Alabama* and Improperly Gave the Law Retroactive Effect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

2. *Denial of a Fair Trial By Impartial Judge and Jury* . . . . . . . . . . . . . . . . . 83

a. The Trial Court Improperly Refused to Change Venue; Counsel Ineffective for Failing to Adequately Research and Prepare Motions or Obtain Change of Venue. . . . . . . . . . . . . . . 83

(i). *The Trial Court Improperly Refused to Change Venue* . . . 83

(ii). *Counsel Ineffective for Failing to Adequately Research Pretrial Motions or Obtain Change of Venue* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

b. Trial Judge Improperly Refused to Recuse. . . . . . . . . . . . . . . . 93

c. Jury Selection Method Was Unconstitutional and Underrepresented Blacks . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 97

d. Counsel Ineffective for Failing to Challenge State's

Removal of Sole Black Juror. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 100

e.    Counsel Ineffective for Failing to *Voir Dire* On Racial Bias. . . . 101

f.    Trial Court Failed to Excuse Jurors Who Knew of Giles's
      Prior Conviction and Death Sentence; Counsel Ineffective
      for Failing to Secure a Fair and Impartial Jury. . . . . . . . . . . . . 105

      (i).    *Trial Court Failed to Excuse Jurors Who Knew of
              Giles's Prior Conviction and Death Sentence*. . . . . . . . 105

      (ii).   *Counsel Ineffective for Failing to Secure
              a Fair and Impartial Jury.* . . . . . . . . . . . . . . . . . . . . . . . 112

g.    Trial Court Failed to Remove Prospective Juror Doris
      Layfield For Cause. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

h.    Giles Was Prejudiced By Presence of Co-Defendant Aaron
      Jones in the Courtroom. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114

3.    *Petitioner Was Denied Effective Assistance of Counsel.* . . . . . . . . . . . . 117

a.    Guilt Phase Trial Counsel Ineffective for Failing to
      Present a Mental Health Defense. . . . . . . . . . . . . . . . . . . . . . . . . 117

b.    Counsel Were Ineffective for Failing to Challenge State's
      Competency Exam and Failing to Investigate Mental Health
      Issues. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 119

c.    Counsel Ineffective for Failing to Investigate Carl Nelson's
      Drug Dealing to Arthur Giles. . . . . . . . . . . . . . . . . . . . . . . . . . . . 120

d.    Counsel Ineffective for Failing to Investigate Giles's PCP
      Use and Present Expert Testimony on its Impact. . . . . . . . . . . . 122

e.    Counsel Ineffective for Failing to Investigate the Issues Self-Defense
      of and Intoxication and Seek a Jury Instruction
      On Manslaughter. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 151

f.    Counsel Ineffective for Abandoning Defense and
      Conceding Guilt. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

4.    *Petitioner's Conviction Was Tainted by Prosecutorial Misconduct.* . . . . 158

6

a.    Double Murder Indictment Obtained by False and Misleading Testimony that Willene Nelson's Death Was Caused by her Gunshot Wound . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

b.    Prosecutor's *Voir Dire* Comment About Appeal Diminished Juror Responsibility. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 161

c.    State Suppressed Evidence that Petitioner Repeatedly Invoked his *Miranda* Rights While Interrogation Continued . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 163

d.    State Suppressed Exculpatory Evidence of Carl Nelson's Recent Drug Prosecution and an "Anonymous Informer". . . . . . 166

e.    State Suppressed Evidence of "Marijuana Theory" for Crime .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 171

f.    State Suppressed Analysis of Co-Defendant Jones's Bloody Clothes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 173

g.    State Presented Misleading Testimony on Bloody Clothes and Trial Court Erred In Refusing to Declare Mistrial. . . . . . . . 174

h.    State Suppressed Witness Statements that Giles Was Innocent of Willene Nelson's Stabbing Death. . . . . . . . . . . . . . 176

i.    Counsel Ineffective for Failing to Review Previous Witness Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

j.    State Suppressed Exculpatory Evidence Despite Defense Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 185

k.    State Presented Inconsistent Prosecutions of Co-Defendants Giles and Jones. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 186

l.    State Improperly Argued Punishment at Guilt Phase and Counsel Was Ineffective for Failing to Object. . . . . . . . . . . . . 187

m.    Improper Closing Argument by State Included Personal Opinion and Vouching by District Attorney. . . . . . . . . . . . . . . 188

5.    *Due Process and Reliable Determination of Guilt Denied by Court's Rulings and Jury Instructions*. . . . . . . . . . . . . . . . . . . . . . . . . . 190

7

a.     Counsel Ineffective for Failing to Object to Jury Instruction on Reasonable Doubt as "Moral Certainty"................ 190

b.     Presumed Malice Jury Instruction........................ 197

c.     Instructions Denied Jury the Opportunity to Render Individual Verdicts for Each Victim; Counsel Failed to Challenge Instructions............................................ 201

d.     Jury Instruction On Accomplice Liability Violated Fifth, Sixth, and Fourteenth Amendments............................ 202

**B.  Claims Arising Out Of the 1991 Sentencing Retrial**....................... 203

1.     *Death Sentence Obtained Under an Unconstitutional Alabama Death Penalty Law*................................................. 203

a.     Petitioner Denied Due Process in Third Sentencing Trial Because Law of the Case Required Life Without Parole Sentence; Counsel Ineffective For Failing to Object to Remand for Third Sentencing. ........................... 203

b.     The 1981 Death Penalty Law Did Not Authorize Upward Judicial Override, and Overrides Do Not Apply to Conduct That Occurred Before July 1, 1981 ...................... 209

c.     Upward Judicial Override Allowed in *Ex Parte Hays* Should Not Be Applied Retroactively. .......................... 209

2.     *Petitioner Denied a Fair Trial By An Impartial Judge and Jury*. ..... 216

a.     Jury Selection Method Was Unconstitutional and Jury Pool Underrepresented Blacks................................ 216

b.     Court Improperly Excused Black Venire Member. .......... 220

c.     Trial Court Improperly Allowed the State More Peremptory Strikes. ............................................. 223

d.     Juror Sharon Elliott Lied In *Voir Dire* About Not Being a Crime Victim, Prejudiced Other Jurors, and Was Unable to Listen to Evidence.................................... 225

e.     Juror Jeffrey Lipscomb Was Unqualified for Jury Service

and Trial Court Failed to Remove Him for Cause. . . . . . . . . . . 229

f.   A Trial Court Officer Informed Juror Lipscomb of Giles's Prior
     Death Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 236

g.   Trial Court Improperly Denied *Voir Dire* on Non-Statutory
     Mitigating Evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238

h.   Counsel Ineffective for Failing to *Voir Dire* Juror Bobby
     Sanders on Bias. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 242

i.   Prospective Juror Lavine Woodall Improperly Excluded Without
     Clarifying Death Penalty Position. . . . . . . . . . . . . . . . . . . . . . 242

j.   Jury Foreperson Relied on Scripture in Deliberations. . . . . . . 245

3.   *Petitioner Denied Effective Assistance of Counsel.* . . . . . . . . . . . . . . . 249

     a.   Counsel Ineffective for Failing to Investigate Petitioner's
          Childhood. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 249

     b.   Counsel Ineffective for Failing to Challenge State's
          Competency Exam, Failing to Investigate and Present
          Mental Health Issues, and Failing to Secure Funds
          For Expert. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 271

     c.   Guilt Phase Trial Counsel Ineffective for Failing to
          Investigate and Present a Mental Health Defense. . . . . . . . . . . 273

     d.   Counsel Ineffective for Failing to Investigate the
          Nelson/Giles Relationship. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 274

     e.   Trial Court Improperly Limited Defense Cross-Examination
          on Carl Nelson's Drug Charges. . . . . . . . . . . . . . . . . . . . . . . . . 279

     f.   Counsel Ineffective for Failing to Investigate Giles's PCP
          Use. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 280

     g.   Counsel in 1991 Ineffective for Failing to Learn and Apply
          Mitigation Law. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

     h.   Counsel in 1991 Ineffective for Presenting
          False Testimony Detracting from Mitigation Issues. . . . . . . . . 282

9

i.      Counsel in 1991 Ineffective for Presenting Evidence of
        Giles's Prior Death Sentence. . . . . . . . . . . . . . . . . . . . . . . . . . . . 282

j.      Counsel Ineffective for Failing to Secure Giles's Presence
        at "Critical Stage" of the Trial. . . . . . . . . . . . . . . . . . . . . . . . . . 285

k.      Counsel Ineffective for Failing to Articulate Why Giles's
        Life Should Be Spared. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 286

l.      Counsel Ineffective for Failing to Object to "Heinous,
        Atrocious and Cruel' Aggravator. . . . . . . . . . . . . . . . . . . . . . . . . 288

4.      *Petitioner Was Sentenced to Death By Prosecutorial
        Misconduct.* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 289

        a.      Prosecutor's *Voir Dire* Reference to "Advisory Verdict"
                Diminished Juror Responsibility. . . . . . . . . . . . . . . . . . . . . . . 289

        b.      State Suppressed Evidence that Interrogation Continued
                After Petitioner Repeatedly Invoked His *Miranda* Rights.. . . . . 291

        c.      State Suppressed Exculpatory Evidence of Carl Nelson's
                Recent Drug Prosecution and an "Anonymous Informer". . . . . . 291

        d.      State Suppressed Evidence of "Marijuana Theory" for
                the Crime. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

        e.      State Suppressed Analysis of Co-Defendant
                Jones's Bloody Clothes. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 292

        f.      State Suppressed Witness Statements that Giles Was
                Innocent of Willene Nelson's Stabbing Death.. . . . . . . . . . . . . 293

        g.      State Presented Inconsistent Prosecutions of Co-Defendants
                Giles and Jones. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 293

        h.      Counsel Ineffective for Failing to Review Previous
                Witness Testimony.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 294

        i.      State Suppressed Exculpatory Evidence Despite
                Defense Requests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 295

        j.      Improper Closing Argument By State Included Personal
                Opinion and Vouching By District Attorney. . . . . . . . . . . . . . 295

k.      State's Improper Closing Argument At Sentencing
        Warned Jury Not to Extend Sympathy and Used
        Prejudicial Photographs.................................. 295

5.      *Due Process and Reliable Determination of Sentence Denied by*
        *Court's Rulings and Jury Instructions*........................... 296

        a.      Sixth Amendment Right to Counsel Violated by Alabama
                Limits On Court Appointed Compensation................. 296

        b.      Trial Court Failed to Grant Funds For a Psychologist Or
                Mitigating Expert...................................... 298

        c.      Trial Court Improperly Refused Residual Doubt Jury
                Instruction. .......................................... 299

        d.      Trial Court Improperly Refused Life Option Jury Instruction... 302

        e.      Trial Court Improperly Denied Giles's Right to Address
                Jury................................................... 303

        f.      Trial Court Improperly Relied on Pre-Sentence Report
                Containing Hearsay; Defense Counsel Ineffective for
                Failing to Object to and Exclude Pre-Sentence Report,
                Offer Contradictory Evidence, or Raise Issue on Appeal. ...... 305

                (i).    *Trial Error*................................... 306

                (ii).   *Trial and Appellate Counsel Ineffective.* ............ 308

        g.      Trial Court Improperly Diminished Giles's Significant
                Mitigating Evidence; Counsel Ineffective for Failing
                to Object to Court's Refusal to Find *Skipper* Evidence
                Mitigating............................................. 310

                (i).    *Trial Court Improperly Diminished Significant*
                        *Mitigating Evidence*........................... 310

                (ii).   Re-sentencing Counsel Were Ineffective Because
                        *They Failed to Object When the Trial Court*
                        *Failed to Find* Skipper *Evidence*................... 315

        h.      Trial Court Improperly Found Aggravator "Great Risk

of Death to Many". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 316

    i.    Alabama Courts Denied Petitioner Fundamental Due
        Process by Abdicating Decision-making and Leaving the
        Writing of the Court's Opinion to the Attorney General. . . . . . 320

    j.    To Execute Arthur Giles After 30 Years on Death Row Is
        Cruel and Unusual Punishment. . . . . . . . . . . . . . . . . . . . . . . . 323

**VI.**    **CONCLUSION**. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 325

=================================================

## I.  THE OFFENSE CONDUCT — 1982 CONVICTION

The following summary of the evidence of the offense of conviction is taken

from the opinion of the Alabama Supreme Court on direct appeal from Giles's 1991

re-sentencing trial.  *Ex parte Giles*, 632 So. 2d 577 (Ala. 1993).

> The operative facts forming the basis for Giles's conviction have already been set forth in a number of opinions.  The facts are that at approximately 3:27 a.m. on November 10, 1978, Arthur [Lee] Giles and Aaron Jones, armed with handguns and a knife, entered a home occupied by Carl and Wil[l]ene[4] Nelson; their three children, Tony, 13-year-old Brenda, and 10-year-old Charlie; and Carl's mother, 86-year-old Annie Nelson, with intent to rob the family.  Giles entered Tony's bedroom and turned on the light.  Some conversation followed, which awakened Carl Nelson, who then ordered Giles out of the house.

> Tony followed Giles as he exited through the rear door of the house.  As Tony stepped onto the porch, Giles shot him in the chest.  Giles then reentered the house, but not before shooting Tony a second time as he lay on the porch.

---

[4] Throughout the long history of Giles's case, Mrs. Nelson's given name has sometimes been misspelled, as here, "Wilene."

Once back inside the house, Giles encountered Annie Nelson, who had awakened and was standing in the doorway of Charlie's bedroom. He shot her in the face. Giles then proceeded to another bedroom, occupied by Carl, Willene, and Brenda. There, he shot Willene and Carl Nelson — Willene in the left shoulder, and Carl through the left arm and the heart. Brenda, who was lying on her mother's bed, covered her face with a pillow. Giles pulled the pillow away from her face and shot her in the left eye.

Carl and Willene, both of whom were still alive, were then stabbed repeatedly. Charlie ran into the melee and leaped onto the bed with Brenda, where he was subsequently stabbed twice in the back. Brenda, notwithstanding her pleas for mercy, was also stabbed.[FN1]

> FN1. The only factual dispute concerned the identity of the man who stabbed each family member. Jones stated, and Giles denied, that Giles stabbed some of the members. Brenda, however, testified unequivocally that Giles was the man who stabbed her and Willene.

After Giles and Jones had left the house and driven away, Tony, who had managed to crawl underneath his father's truck for safety, went to the house in search of his family. Inside, he found all the family members covered with blood, having been shot, stabbed, or both. Carl and Willene were dead. Carl had been shot twice and stabbed eight times. Willene had been shot once, stabbed 17 times, and "slashed" 12 times. A number of them had also been bludgeoned about their heads. Tony managed to get medical attention for himself and the other survivors.

*Ex parte Giles*, 632 So. 2d at 578-79 (alterations supplied).

===============================================

## II.  SENTENCING ORDER — 1991 RE-SENTENCING

13

The following summary of the findings made at the 1991 re-sentencing trial are taken directly from the material portions of the trial court's sentencing order. (*See* C.R. Vol. 56, Tab. 83).

<u>SENTENCING ORDER</u>

The conviction of the defendant for the offense of capital murder having been affirmed by the Court of Criminal Appeals but having been remanded to the Circuit Court of Blount County for a new sentencing hearing and thereafter being transferred to the Circuit Court of Morgan County, a sentence hearing was held before a jury beginning February 5, 1991. On February 6, 1991, after having deliberated for several hours the judge stating that the jury was hung with eleven votes for the death penalty and one vote for life in prison without parole.

Thereupon, the Court discharged the jury and entered a jury verdict for life without parole.

This being the day set for the sentencing hearing before the Court, the defendant being present with counsel, Hon. Thomas Prickett and Hon. Herb Sparks and the State being represented by Hon. Van Davis, District Attorney and Assistant District Attorney Hon. Lamar Williamson for the Thirtieth Judicial Circuit, the Court asked the State to state the aggravating circumstances it relied upon and arguments for the same and then asked the Defendant to do the same with regard to mitigating circumstances. They were both then asked if either had anything else to offer to the Court at this hearing.

After this neither [the State nor the defendant] offered anything and the Court announced that it would take the matter under advisement until 2:00 p.m.

After consideration of the evidence presented at the jury phase of the sentence hearing, and the presentence investigation report[,] and after hearing and considering the arguments both for aggravating

14

circumstances and mitigating circumstances in this case, the Court makes the following findings concerning those circumstances:

I.      AGGRAVATING CIRCUMSTANCES

[Paragraphs A. and B. omitted]

C.   As to aggravating circumstance number three enumerated under 13A-5-49 of the Code of Alabama,[5] the Court finds that this aggravating circumstance did exist in that the defendant knowingly created a great risk of death to many persons.  And the basis for that finding is that at least five people were shot in concert with the accomplice in this case, and that numerous stab wounds were inflicted on the deceased victims, and that two people were killed from pistol wounds and/or stabbing, and that the pistol wounds and stab wounds on the other victims could have easily caused their death.  Therefore, the Court finds that the defendant knowingly created a great risk of death to many persons.

D.  As to the aggravating circumstance number four under 13A-5-49 of the Code of Alabama,[6] the Court finds that this offense was committed while the defendant was engaged, or was an accomplice, in the commission of, or an attempt to commit or flight after committing[, or] attempting to commit, a robbery.  The court bases this finding upon the testimony and the evidence that the defendant went into the home of Carl and Willene Nelson in the early morning hours of November 10, 1978, and from the defendant's confession which was entered into evidence at the sentence phase of this hearing before the jury, the defendant made the statement that his intention in going to the home of the Nelsons was for the purpose of robbery and, also from this evidence, that the pistol of the deceased Carl Nelson was forcibly taken from the deceased Carl Nelson.

---

[5] "The defendant knowingly created a great risk of death to many persons; . . . ."  Ala. Code § 13A-5-49(3) (1975) (2005 Replacement Vol.).

[6] "The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping; . . . ."  *Id.* § 13A-5-49(4).

[Paragraphs E., F., and G. omitted].

H.  As to aggravating circumstance eight 13A-5-49,[7] the Court does find that the capital offense in this case was especially heinous, atrocious or cruel as compared to other capital offenses.  To support this finding the court relies on the testimony given at the jury phase of the sentence hearing which related that the two deceased victims and the other four family members present on that occasion were repeatedly slashed and stabbed with a knife, that all but one of the six people present were also shot with pistols and that the two deceased victims were forced to undergo slow agonizing deaths, presumably conscious of the suffering of the other members of the family in at least one instance.

II.  MITIGATING CIRCUMSTANCES

A.   As to the mitigating circumstances enumerated under Section 13A-5-51 of the Code of Alabama, the Court finds that mitigating circumstance number one *does exist*[8] and that there is no evidence to show that the defendant has any significant history of prior criminal activity.

B.   As to mitigating circumstance number two under said section,[9] the Court *does not find* that this mitigating circumstance existed in that there is no evidence to support a finding that the capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

C.   As to mitigating circumstance number three under said section,[10] the Court finds that this mitigating circumstance *does not*

---

[7] "The capital offense was especially heinous, atrocious, or cruel compared to other capital offenses; . . . ." *Id*. § 13A-5-49(8).

[8] "The defendant has no significant history of prior criminal activity; . . . ." Ala. Code § 13A-5-51(1).

[9] "The capital offense was committed while the defendant was under the influence of extreme mental or emotional disturbance; . . . ." *Id*. § 13A-5-51(2).

[10] "The victim was a participant in the defendant's conduct or consented to it;" *Id*. § 13A-5-51(3).

16

*exist* in that there is no evidence that the victims were participants in the defendant's conduct or consented to it.

D.  As to mitigating circumstance four under said section,[11] the Court finds that this circumstance *does not exist* in this case in that the evidence shows according to the defendant's own statement entered into evidence during the jury phase of this sentence hearing, that he participated to a substantial degree in the capital offense of which he has been convicted.  This is also born [sic] out by the testimony of the surviving members of the family who testified at the jury phase of this sentence hearing, and the Court finds that his participation was not minor.

E.  As to mitigating circumstance number five under said section,[12] the Court finds that this mitigating circumstance *does not exist* in that there is no sufficient evidence to support a finding that the defendant was under extreme duress or substantial domination of another person, though evidence did show that his accomplice was a man of some twenty-five years of age.  It has not been shown that he was under the domination of that person or under any extreme duress.

F.  As to mitigating circumstance number six under said statute,[13] the Court finds that this mitigating circumstance *did not exist* in that there is no evidence to support a finding that the capacity of the defendant to appreciate the criminality of his conduct or conform his conduct to the requirements of the law was substantially impaired.  There was some evidence concerning his having taken some type of alcohol or consuming it or being under the influence of it sometime earlier.  But from the defendant's own statement which was given not a great length of time after the commission of the capital offense at which time he appeared to have remembered the details of the offense with a

---

[11] "The defendant was an accomplice in the capital offense committed by another person and his participation was relatively minor; . . . ."  *Id*. § 13A-5-51(4).

[12] "The defendant acted under extreme duress or under the substantial domination of another person; . . . ."  *Id*. § 13A-5-51(5).

[13] "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired; . . . ."  *Id*. § 13A-5-51(6).

great deal of specificity and not only that but he obviously realized the criminality of his conduct.  That can be gathered from the statements he made during that statement.  This is further corroborated by the testimony of his grandmother who testified that a relatively a [sic] short time before and after this event that the defendant appeared to be normal from which it may be inferred that he was free from the influence of any drug or intoxicant, and that his ability to appreciate what he was doing was not impaired.

G.  As to mitigating circumstance number seven of 13-5-51 of the code regarding the age of the defendant at the time of the crime,[14] the Court finds that this mitigating circumstance *does exist* in that the defendant [was] nineteen years of age at the time.

H.  In addition to the mitigating circumstance listed under 13A-5-51 the defendant has argued as [a] mitigating circumstance the fact that a long time has lapsed since the commission of the capital offense and this date.  And the Court does find that a long time has elapsed between those two times, *but does not find that it is a mitigating circumstance or that it is entitled to any weight*.

I.  As far as the remorse of the defendant is concerned, this has not necessarily been proved to the Court's satisfaction[,] although there was at least one witness who testified to the change in attitude of the defendant.  The Court *does not find that this has been sufficiently established*.

J.  As to cooperation of the defendant with the authorities after the crime by giving a statement, it might be and is noted by the court that at the time the statement was given the defendant already realized four of the victims of the crime had survived and were able to identify him.

Having considered all of the statutory aggravating circumstances and the statutory mitigating circumstances and the additional mitigating circumstances and evidence offered by the defendant, the Court now finds and is convinced beyond a reasonable doubt that the aggravating

---

[14] "The age of the defendant at the time of the crime."  Ala. Code § 13A-5-51(7).

circumstances as heretofore stated and brought before this Court outweigh any mitigating circumstances as presented by the evidence.

It is the order and judgment of the Court that for the offense of double murder, a capital offense, you be sentenced to death in the electric chair.

(C.R. Vol. 56, Tab. 83) (alterations and emphasis supplied).[15]

==================================================

## III.  PROCEDURAL HISTORY

### A.    State Court Direct Review

The following summary of the procedural history of Giles's case on direct review is taken from the opinion of the Alabama Supreme Court on appeal from Giles's 1991 re-sentencing trial:

> In separate trials, Jones and Giles were both convicted, pursuant to Ala. Code 1975, § 13-11-2(a) (10), for the capital murders of Carl and Willene Nelson, and both men were sentenced to death by electrocution. *Jones v. State*, 403 So. 2d 1 (Ala. Crim. App. 1981), *on return to remand*, 520 So. 2d 543 (Ala. Crim. App. 1984), *affirmed, Ex parte Jones*, 520 So. 2d 553 (Ala.), *cert. denied, Jones v. Alabama*, 488 U.S. 871, 109 S. Ct. 182, 102 L. Ed. 2d 151 (1988); *Giles v. State*, 405 So. 2d

---

[15] ***Nota bene***:  This court will utilize the following method of citation to the record that has been transmitted to this court.  References to specific pages of the court record on direct appeal are designated "**C.R.**__," and references to the transcript on direct appeal are designated "**R.**__." References to the court record of the Rule 32 proceedings are designated "**Rule 32 C.R.**__", and references to the transcript on collateral appeal are designated "**Rule 32 R.**__." This court will strive to list any page number associated with the court records by reference to the numbers at the bottom of each page of a particular document, if those numbers are readily discoverable for purposes of expedient examination of that part of the record.  Otherwise, the page numbers that are referenced will correspond to those printed in the upper right-hand corner of the record.  Additionally, if there is an easily identifiable tab number close to any cited material, this court will make reference to that number for the reader's benefit.

50 (Ala. Crim. App. 1981), *on return to remand*, 554 So. 2d 1073 (Ala. Crim. App. 1985), *sentence reversed*, *Ex parte Giles*, 554 So. 2d 1089 (Ala. 1987), *on second return to remand*, *Giles v. State*, 632 So. 2d 568 (Ala. Crim. App. 1992). The Court of Criminal Appeals reversed both convictions and remanded for new trials in light of the bifurcated procedure outlined by this Court in *Beck v. State*, 396 So. 2d 645 (Ala. 1980). *Jones*, 403 So. 2d 1; *Giles*, 405 So. 2d 50. Following a second trial, Jones was again convicted and sentenced to death. 520 So. 2d 543. This Court affirmed Jones's second conviction and death sentence. 520 So. 2d 553.

Giles's second trial, which occurred in December 1982, also resulted in a conviction and sentence of death, both of which were affirmed by the Court of Criminal Appeals. 554 So. 2d 1073. This Court affirmed the judgment of the Court of Criminal Appeals as to Giles's conviction. 554 So. 2d 1089. As to the sentence, however, we reversed and remanded, holding that the trial court had "impermissibly suggested to the jury that [it] favored a death sentence in the case." *Id.* at 1092.

Following the sentencing hearing conducted on the second remand, the jury, after considerable deliberations, informed the court that it had "reached an impasse." The judge then questioned the jurors, individually, whether further deliberations would be fruitless. Concluding that further deliberations would not produce a unanimous verdict, the judge dismissed the jury. That result represented a de facto recommendation of life without the possibility of parole, as we interpreted §§ 13-11-1 to -9 in *Beck v. State*. However, at a subsequent sentencing hearing, the trial judge sentenced Giles to death.

The Court of Criminal Appeals affirmed the sentence. *Giles v. State*, 632 So. 2d 568 (Ala. Crim. App. 1992).

*Ex parte Giles*, 632 So. 2d 577, 578-79 (Ala. 1993).

The Supreme Court of Alabama affirmed Giles's death sentence on October 29, 1993, finding no reversible error. *Id.* The United States Supreme Court denied

Giles's petition for writ of *certiorari* on February 27, 1995.  *See Giles v. Alabama*, 512 U.S. 1213 (1995).

## B.    State Court Collateral Review

Giles filed a petition seeking relief from his judgment of conviction and death sentence in accordance with Rule 32 of the Alabama Rules of Criminal Procedure on February 2, 1996.  (Rule 32 C.R. Vol. 35, Tab. 61).[16]  Discovery proceedings began in May of 1997, and lasted for approximately one year.  Giles filed several discovery motions on May 12, 1997, requesting exculpatory material from prosecution files and institutional files.  (Rule 32 C.R. Vol. 36, at 230-60).  The motions were granted on June 24, 1997.  *Id.* at 320-22; 324-25.  Documents containing notes made by the district attorney during *voir dire* and trial were produced *in camera* on October 10, 1997.  *Id.* at 384-85.  Giles filed a motion to compel on October 30, 1997, in which he admitted that he received some prosecution files in late September of 1997, but no institutional files as required by the discovery order.  *Id.* at 389-93.  Giles stressed that the requested materials, including those produced *in camera*, were essential to a determination of the efficacy of his *Brady* claims.  The motion to compel was granted on November 3, 1997.  *Id.* at 398.  On May 5, 1998, Giles submitted a letter to the Rule 32 trial court, stating that he had just discovered additional (but

---

[16] *See supra* note 15.

unidentified) *Brady* material, and that he could fully investigate the material within thirty days. *Id.*, Vol. 37, at 524. The request for time to review the material was renewed by motion on May 22, 1998. *Id.* at 539-42.

On May 22, 1998, the post-conviction court afforded Giles $3,000 to retain an expert. *Id.* at 542. Giles's counsel used the funds to hire Jan Vogelsang, a social worker, who conducted a psycho-social assessment. Rule 32 R. Vol. 33, Tab. 60, at 24-25.

Giles filed a first amended petition on February 24, 1998. *Id.*, Vol. 37, Tab. 64.

Post-conviction Rule 32 evidentiary hearings were held on August 24 and 25, 1998. (Rule 32 R. Vol. 33, Tab. 60, at 1-199; *id.*, Vol. 34, at 200-255). The Rule 32 court entered a partial dismissal order in connection with the first amended petition on August 26, 1998, identifying and dismissing certain substantive claims pursuant to Rule 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure because the claims either were or could have been raised and addressed at trial or on direct appeal. (Rule 32 R. Vol. 37, at 557-62).

Giles filed a second amended petition on October 23, 1998. (Rule 32 C.R. Vol. 40, Tab. 68). That pleading amended two previous claims, and added juror misconduct claims. Giles also made three additional allegations in support of a

previous *Brady* claim.[17]   Further, he slightly modified his ineffective assistance of

counsel claims as to his conviction and sentence.  (Rule 32 C.R. Vol. 40, Tab. 68, at

7-10).[18]   Finally, he alleged that, during his 1991 re-sentencing trial, jurors Jeffrey

Lipscomb,[19] Sharon Elliott,[20] and James Hurst[21] engaged in misconduct by failing to

answer truthfully and "disclose crucial evidence."  (Rule 32 C.R. Vol. 40, Tab. 68,

at 11-18).

---

[17] In the first amended petition, Giles alleged that the prosecution failed to produce documents to show that there had been an unidentified informant associated with the prosecution of Carl Nelson for drug-related charges a few months before his murder.  *See* doc. no. 37, Tab. 64, at 5.  In the second amended petition, Giles added the allegations that newly discovered evidence showed that the prosecution had harbored a "marijuana theory" for the crime, that Blount County law enforcement officers were aware that Giles was not a stranger to Blount County, and that notes from an interview with Brenda Nelson revealed that she saw Aaron Jones stab her mother to death. *See* doc. no. 40, Tab. 68, at 4-6.

[18] As in Giles's first amended petition, nearly all of the forty ineffective assistance of counsel claims contained in his second amended petition are stated in one sentence.  *Id.,* Tab. 68, at 7-10. For example, claim 7 reads: "Counsel failed to present expert testimony on the impact of prolonged PCP use and its propensity to induce violent and bizarre outbursts and to over-react to perceived threats."  *Id.* at 4.

[19] Giles alleged that juror Lipscomb failed to answer truthfully that he was a convicted felon whose voting rights had not been restored.  Rule 32 C.R. Vol. 40, Tab. 68, at 11-15.

[20] Giles alleged that juror Elliott failed to disclose that she had a relative in law enforcement, and that approximately one year before Giles's trial, she was the victim of a vicious stabbing from which she almost died.  Rule 32 C.R. Vol. 40, Tab. 68, at 16.  Elliott discussed her stabbing with other jurors while the jury was sequestered, and her impartiality was heavily affected by her experience.  *Id.* at 17.

[21] Giles alleged that juror Hurst, the foreperson, recited scripture to the jury during deliberations.  Rule 32 C.R. Vol. 40, Tab. 68, at 18.  He claims that Hurst told the jurors that even thieves were crucified next to Jesus, in an effort to persuade the jurors to recommend a death sentence*. Id.*

The final evidentiary hearing was completed on November 2, 1998, ten days after Giles filed his second amended petition. (Rule 32 R. Vol. 34, at 256-86). The Rule 32 court's final order recites that additional

> evidence was submitted to this Court by deposition. The deposition testimony of John Carroll, Herbert Sparks, Bernard Harcourt, Dennis Balske,[22] Fitzhugh Burttrum, Melinda Faye Fisher, Dr. Thomas L. Smith, Dr. James C. Thompson, Annie Gay Norris,[23] and Sharon Elliott was filed with the court. All of these depositions, along with their attacked [sic] exhibits, except for the deposition of Sharon Denise Elliott with attached exhibits, are admitted into evidence and have been considered by the court as evidence in this case.[24]

> The final hearing in this matter was had on November 2, 1998. At the close of that hearing, it was agreed that the depositions listed above which had not already been submitted to the court would be taken and submitted by December 2, 1998.[25] After the close of evidence, it was agreed that parties would submit final briefs or proposed orders upon receiving transcripts of the Ru1e 32 trial.[26] Giles also indicated

---

[22] At this juncture, the Rule 32 court placed footnote 3, which reads: "There were two depositions of Dennis Balske submitted."

[23] At this juncture, the Rule 32 court placed footnote 4, which reads: "The custodian of the records at Bryce Hospital."

[24] At this juncture, the Rule 32 court placed footnote 5, which reads: "The deposition of Sharon Elliott was taken for the purpose of preserving testimony on the issue of juror misconduct in the 1991 sentencing trial and was not considered by this Court. As explained, *infra*, the claims of juror misconduct during the 1992 sentencing hearing are moot because Giles won that part of his trial when the jury recommended a sentence of life without parole."

[25] The record shows that between the November 2, 1998 hearing and March 1, 1999, various exhibits and numerous depositions were submitted to the trial court as evidence. Rule 32 C.R. Vol. 34 (unnumbered, but designated "Clerk's Record," and located at the end of the volume).

[26] The transcript verifies the trial court's invitation to both parties to send proposed orders. Rule 32 R. Vol. 34, at 386. Moreover, the court record reveals that on September 15, 1999, the post-conviction court entered a scheduling order instructing Giles to file a proposed final order or brief, or both, by October 15, 1999. *Id.*, Vol. 37, at 590. The State was afforded thirty days after the filing of Giles's proposed order and brief to file its own proposed order and brief. *Id.* On October

that he would submit a final amended petition with his brief or proposed order to cover evidence not previously pleaded and further agreed that the State would file its final answer after the final amended petition. No subsequent amended petition has been filed.

In November 1999, the parties notified the court that the Rule 32 trial transcripts were completed. In December, 1999,[27] Giles'[s] attorney, Ms. Angela Wessels, notified the Court that her brief was being mailed. That brief has never been received by the court, and according to the State, has never been received by the State.[28] The State submitted its final answer to the Second Amended [sic] to Petition and its Motion to Dismiss certain claims along with its proposed final order on August [8], 2000.

(Rule 32 C.R. Vol. 56, Tab. 87, at 24-25) (alterations supplied).

---

15, 1999, Giles's counsel filed, and the trial court granted, a joint motion to suspend the time for filing briefs until the evidentiary hearing transcripts were complete. *Id.* at 591-92.

[27] On November 29, 1999, counsel for Giles wrote a letter to the trial judge representing that, as of November 22, 1999, she had a completed copy of the Rule 32 transcript. Rule 32 C.R. Vol. 37, at 599. Counsel informed the trial court that "Petitioner's brief and final petition will be filed with the court by December 21, 1999." *Id.*

[28] On August 8, 2000, the State filed a "Motion to Accept Documents for Filing," and requested the court to accept an Answer to Giles's second amended petition, a Motion for Partial Dismissal, and a Proposed Order. Rule 32 C.R. Vol. 37, at 606-07. The State represented the following:

At the November 2, 1998 hearing in this matter, Ms. Angel [(sic)] Wessels, counsel for Giles, informed the undersigned that she intended to file a third amended petition. This last amended petition was to conform the pleading to the proof offered. The petition was presumably to set out additional or more complete grounds of ineffective assistance of counsel and possibly additional *Brady* claims. It was agreed that the undersigned would wait to answer the amended petitions until after all amendments were filed. That [sic] State had already fully answered two petitions in this proceeding.

Since that time, counsel for Giles has failed to file an additional amended petition.

*Id.* at 606 (alteration supplied).

The judgment denying Giles's Rule 32 petition was entered on August 14, 2000.  (Rule 32 C.R. Vol. 56, Tab. 87).  Giles filed a third amended Rule 32 petition on the same date.  (*Id.*, Vol. 42, Tab. 69, at 519-642; *id.,* Vol. 43, at 643-845).  The third amended petition was not considered by the Rule 32 court, however, because it had been filed after the entry of the trial court's judgment denying Giles's Rule 32 petition.

The Alabama Court of Criminal Appeals affirmed the trial court's judgment on April 30, 2004.  *See Giles  v. State*, 906 So. 2d 963 (Ala. Crim. App. 2004).  In doing so, the Court also refused to consider Giles's third amended petition.

> [T]he third amended petition was "filed" on the date it was received —
> the same date that the circuit court's order denying relief was stamped
> filed in the circuit clerk's office — August 14, 2000.  The third amended
> petition was not filed before the entry of judgment.[29]  Therefore, we
> will not consider the allegations contained in that petition because they
> were never properly before the circuit court.  *See Allen v. State*, 825 So.
> 2d 264 (Ala. Crim. App. 2001), *aff'd*, 825 So. 2d 271 (Ala. 2002).[FN7]
>
> > FN7.  We note that this third amended petition was filed
> > well outside the filing deadline set by the circuit court.

---

[29] Earlier in the opinion, the Alabama Court of Criminal Appeals had observed that "Rule 32.7(b), Ala. R. Crim. P., states:  'Amendments to pleadings may be permitted at any stage of the proceedings prior to *entry of judgment*."  *Giles v. State*, 906 So. 2d 963, 972 (Ala. Crim. App. 2004) (emphasis in original).

*Id.* at 972-73 (additional footnote omitted).  The Supreme Court of Alabama denied

*certiorari* review on February 18, 2005.  *Ex parte Giles*, 906 So. 2d 991 (Ala. 2005).

This *habeas* petition followed.

## IV.  INTRODUCTION TO THE DISCUSSION OF PETITIONER'S SUBSTANTIVE CLAIMS: *The Scope of Federal* Habeas *Review*

A federal district court is empowered to entertain a petition for writ of *habeas*

*corpus* filed pursuant to 28 U.S.C. § 2254(a) by "a person in custody pursuant to the

judgment of a State court" if, and only if, the petitioner alleges that "he is in custody

in violation of the Constitution or laws or treaties of the United States."  Claims

pertaining solely to questions of state law fall outside the parameters of this court's

authority to provide relief under § 2254.

### A.  Exhaustion of State Court Remedies:  *The First Condition Precedent to Federal* Habeas *Review*

"Before a federal court may grant habeas relief to a state prisoner, the prisoner

must exhaust his remedies in state court.  In other words, the state prisoner must give

the state courts an opportunity to act on his claims before he presents those claims to

a federal court in a habeas petition."  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842

(1999) (citing *Ex parte Royal*, 117 U.S. 241, 251 (1886); 28 U.S.C. § 2254(b)(1)[30]).

---

[30] The cited statutory provision reads as follows:

(b)(1) An application for a writ of habeas corpus on behalf of a person in

*See also Duncan v. Henry*, 513 U.S. 364, 365 (1995) (observing that the exhaustion-of-state-remedies doctrine requires a state prisoner to "fairly presen[t] federal claims to the state courts in order to give the State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights").  As explained by the Eleventh Circuit:

> In general, a federal court may not grant habeas corpus relief to a state prisoner who has not exhausted his available state remedies.  28 U.S.C. § 2254(b)(1)(A) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").  "When the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction. . . . *The role of federal habeas proceedings, while important in assuring that constitutional rights are observed, is secondary and limited.  Federal courts are not forums in which to relitigate state trials.*"  *Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).
>
> Exhaustion of state remedies requires that the state prisoner "fairly presen[t][31] federal claims to the state courts in order to give the

---

custody pursuant to the judgment of a State court shall not be granted unless it appears that—

> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

[31] The phrases "fairly presented" and "properly exhausted" are synonymous.  *O'Sullivan v.*

State the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (citing *Picard v. Connor*, 404 U.S. 270, 275-76 (1971) (internal quotation marks omitted). The Supreme Court has written these words:

> [T]hat the federal claim must be fairly presented to the state courts . . . . it is not sufficient merely that the federal habeas applicant has been through the state courts. . . . Only if the state courts have had the first opportunity to hear the claim sought to be vindicated in a federal habeas proceeding does it make sense to speak of the exhaustion of state remedies.

*Picard*, 404 U.S. at 275, 92 S. Ct. at 512. *See also Duncan*, 513 U.S. at 365, 115 S. Ct. at 888 ("Respondent did not apprise the state court of his claim that the evidentiary ruling of which he complained was not only a violation of state law, but denied him the due process of law guaranteed by the Fourteenth Amendment.").

> *Thus, to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues.* "It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 5-6, 103 S. Ct. 276, 277, 74 L. Ed. 2d 3 (1982) (citations omitted).

*Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (first alteration in original,

emphasis and bracketed footnote supplied).

## B.   The Procedural Default Doctrine: *The Second Condition Precedent to Federal* **Habeas** *Review*

### 1.   *General principles*

---

*Boerckel*, 526 U.S. 838, 848 (1999) (observing that the question is "not only whether a prisoner has exhausted his state remedies, but also whether he has *properly* exhausted those remedies, *i.e.*, whether he has fairly presented his claims to the state courts.").

When a state prisoner fails to present a federal constitutional claim in the state courts in a timely and proper manner, and the state courts refuse to address the merits of the claim based on state procedural rules or principles, a federal *habeas* court also is precluded from addressing the claim *unless* the state prisoner shows *both* cause for, *and* actual prejudice as a result of, failing to comply with the state's procedural rules; *or* presents evidence showing that the federal court's failure to consider the claim would result in a fundamental miscarriage of justice. *See*, *e.g.*, *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991); *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Wainwright v. Sykes*, 433 U.S. 72, 81-88 (1977).

The so-called "procedural default doctrine" bars *habeas* review of state court rejections of a state prisoner's federal constitutional claims when three circumstances converge: *i.e.*, (*i*) the last state court to review the claim (*ii*) states clearly and expressly that its disposition of the claim rests on a state-law procedural rule; and (*iii*) the state-law ground "is *independent* of the federal question and *adequate* to support the judgment." *Coleman*, 501 U.S. at 729-30 (emphasis supplied); *see also*, *e.g.*, *Harris*, 489 U.S. at 262-63; *Johnson v. Singletary*, 938 F.2d 1166, 1173 (11th Cir. 1991).

A state-law bar is deemed to be "*independent* of the federal question" when it "rests solidly on state law grounds [that are] not intertwined with an interpretation of

federal law." *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001) (emphasis and alteration supplied) (quoting *Card v. Dugger*, 911 F.2d 1494, 1516 (11th Cir. 1990)). A state-law bar is considered "*adequate* to support the judgment" when it is "firmly established and regularly followed," *Hurth v. Mitchem*, 400 F.3d 857, 858 (11th Cir. 2005) (emphasis supplied),[32] *and*, it is not "applied in an arbitrary or unprecedented fashion" that is "'manifestly unfair' in its treatment of the petitioner's federal constitutional claim." *Judd*, 250 F.3d at 1313 (quoting *Card*, 911 F.2d at 1517).

Federal deference to a state court's clear finding of procedural default under its own rules is so strong that a state court "need not fear reaching the merits of a federal claim in an *alternative* holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law." *Harris,* 489 U.S. at 264 n.10 (emphasis in original).[33]  *See also*, *e.g.*, *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (same); *Hall v. Wainwright*, 733 F.2d 766, 777 (11th Cir. 1984) ("A state court is entitled to express

---

[32] *See also*, *e.g.*, *Lee v. Kemna*, 534 U.S. 362, 376 (2002); *Hill v. Jones*, 81 F.3d 1015, 1023 (11th Cir. 1996); *Cochran v. Herring*, 43 F.3d 1404, 1408, *modified on reh'g*, 61 F.3d 20 (11th Cir. 1995).

[33] Indeed, the fact that a state court may reject a claim on the basis of both a state procedural rule and federal law is of no moment.  As the Supreme Court observed in *Harris v. Reed*, *supra*, "a state court may reach a federal question without sacrificing its interests in finality, federalism, and comity."  489 U.S. at 264 n.10.

its views on federal constitutional issues without waiving its procedural default rules.").

### 2.   *Overcoming procedural defaults*

There are only three circumstances in which a state-law ground will not bar a federal *habeas* court from considering a federal constitutional claim that was procedurally defaulted in state court:  (*i*) the *habeas* petitioner shows *both* cause for, *and* actual prejudice as a result of, failing to comply with the state's procedural rules; or (*ii*) the petitioner shows that failure to consider his claim will result in a "fundamental miscarriage of justice"; or (*iii*), as discussed in the preceding section in connection with the "adequacy" of a state bar, the petitioner demonstrates that the state-law ground was not "firmly established and regularly followed." *See Edwards v. Carpenter*, 529 U.S. 446, 455 (2000) (Breyer, J., concurring); *see also*, *e.g.*, *Coleman*, 501 U.S. at 749-50 (holding that a state procedural default "will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice") (citations and internal quotation marks omitted); *Murray v. Carrier*, 477 U.S. 478, 496 (1986) ("[W]here a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the

absence of a showing of cause for the procedural default.") (alteration supplied);
*Smith v. Murray*, 477 U.S. 527, 537 (1986) (same); *Davis v. Terry*, 465 F.3d 1249,
1252 n.4 (11th Cir. 2006) ("It would be considered a fundamental miscarriage of
justice if 'a constitutional violation has probably resulted in the conviction of one
who is actually innocent.'") (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995) (in
turn quoting *Murray*, 477 U.S. at 496)).

### a.     *The "cause and prejudice" standard*

The "cause *and* prejudice" standard clearly is framed in the conjunctive and,
therefore, a petitioner must prove both parts.  To show "cause," a petitioner must
prove that "some objective factor external to the defense impeded counsel's efforts
to comply with the State's procedural rule."  *Murray v. Carrier*, 477 U.S. 478, 488
(1986).   Examples of "objective" impediments to compliance with state-law
substantive or procedural rules include, but are not limited to, such factors as:  (*i*) the
novelty of the claim, *see Reed v. Ross*, 468 U.S. 1, 16 (1984) ("[W]here a
constitutional claim is so novel that its legal basis is not reasonably available to
counsel, a defendant has cause for his failure to raise the claim in accordance with
applicable state procedures.") (alteration supplied);  (*ii*) *constitutionally* ineffective
assistance of counsel, *see McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) ("Attorney
error short of ineffective assistance of counsel . . . does not constitute cause and will

not excuse a procedural default."); or (*iii*) some interference by state officials that make compliance impracticable. *See Murray*, 477 U.S. at 488 (citing *Brown v. Allen*, 344 U.S. 443, 486 (1953)).[34]

As noted in *McClesky*, while "[a]ttorney error [on *direct* appeal] that constitutes ineffective assistance of counsel" has long been accepted as "cause" sufficient to overcome a procedural default, the errors of post-conviction counsel on *collateral* review constitute neither a basis for a proper constitutional claim, nor cause and prejudice sufficient to overcome a procedural default. *Coleman,* 501 U.S. at 754 (alterations supplied). In accordance with the Supreme Court's rationale in *Coleman*,

---

[34] The Supreme Court elaborated on the "cause" prong of the standard in *Amadeo v. Zant*, 486 U.S. 214 (1988), stating:

> In *Wainwright v. Sykes*, 433 U.S. 72 (1977), this Court adopted the "cause and prejudice" requirement of *Francis v. Henderson*, [425 U.S. 536 (1976)], for all petitioners seeking federal habeas relief on constitutional claims defaulted in state court. The *Sykes* Court did not elaborate upon this requirement, but rather left open "for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard." 433 U.S. at 87. Although more recent decisions likewise have not attempted to establish conclusively the contours of the standard, they offer some helpful guidance on the question of cause. In *Reed v. Ross*, 468 U.S. 1 (1984), the Court explained that although a "tactical" or "intentional" decision to forgo a procedural opportunity normally cannot constitute cause, *id*., at 13-14, "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met." *Id*., at 14. The Court later elaborated upon *Ross* and stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray v. Carrier*, 477 U.S. 478, 488 (1986). We explained that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, . . . would constitute cause under this standard." *Ibid*.

*Amadeo*, 486 U.S. at 221-22 (alteration in original).

and based upon the fact that "there is no right to counsel in state collateral proceedings," a petitioner cannot allege the constitutional ineffectiveness of his post-conviction counsel as "cause" to overcome a claim that was procedurally defaulted during collateral proceedings. *Id.* at 757.

Even so, the United States Supreme Court narrowly modified *Coleman's* long-standing principle in *Martinez v. Ryan*, _ U.S. _ , 132 S. Ct. 1309 (2012), after studying "[t]he precise question [of] whether ineffective assistance in an initial-review on a claim of ineffective assistance at trial may provide cause for a procedural default in a federal *habeas* proceeding." *Id.* at 1315.  The *Martinez* Court held that

> [t]o protect prisoners with a potentially legitimate claim of ineffective assistance of trial counsel, it is necessary to modify the unqualified statement in *Coleman* that an attorney's ignorance or inadvertence in a postconviction proceeding does not qualify as cause to excuse a procedural default.  This opinion qualifies *Coleman* by recognizing a narrow exception:  *Inadequate assistance of counsel at initial-review collateral proceedings may establish cause for a prisoner's procedural default of a claim of ineffective assistance at trial*.

*Id.* (alteration and emphasis supplied).  The Court also explained that the phrase "initial-review collateral proceedings" was meant to refer only to post-conviction proceedings at the trial court level, and only in those circumstances

> [w]hen an attorney [error makes it] likely that no state court at any level will hear the prisoner's claim.  This Court on direct review of the state proceeding could not consider or adjudicate the claim. *See*, *e.g.*,

*Fox Film Corp. v. Muller*, 296 U.S. 207, 56 S. Ct. 183, 80 L .Ed. 158 (1935); *Murdock v. Memphis*, 20 Wall. 590, 22 L. Ed. 429 (1875); *cf. Coleman*, *supra*, at 730-731, 111 S. Ct. 2546.  And if counsel's errors in an initial-review collateral proceeding do not establish cause to excuse the procedural default in a federal habeas proceeding, no court will review the prisoner's claims.

> The same is not true when counsel errs in other kinds of postconviction proceedings.  While counsel's errors in these proceedings preclude any further review of the prisoner's claim, the claim will have been addressed by one court, whether it be the trial court, the appellate court on direct review, or the trial court in an initial-review collateral proceeding. *See*, *e.g.*, *Coleman*, *supra*, at 756, 111 S. Ct. 2546.

*Martinez*, 132 S. Ct. at 1317 (alterations supplied).

The holding in *Martinez* is not "a constitutional ruling"; instead, it is an "equitable ruling." *Id.* at 1320.  Thus, a petitioner still has no independent constitutional right to post-conviction counsel, and any cause and prejudice allegations concerning the inadequacies of post-conviction counsel can be asserted only to overcome the procedural default of an ineffective assistance of trial counsel claim when the default occurred at the Rule 32 court level.  Even in that instance, the alleged error by post-conviction counsel must be of such a degree as to offend the

*Strickland* standard.[35]  *Martinez*, 132 S. Ct. at 1318 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).

The Supreme Court's holding in *Martinez* does not apply to errors made by post-conviction counsel in any other collateral proceedings, or on any issue other than failure to raise an ineffective assistance of trial counsel claim.   Thus, if post-conviction counsel raised an ineffective assistance of trial counsel claim before the Rule 32 court, but failed to raise the same claim on collateral appeal, neither *Coleman* nor *Martinez* allows the petitioner to argue ineffective assistance of collateral appeal counsel as cause and prejudice for a state-law default.  Indeed, the *Martinez* Court instructed that:

---

[35] Under *Strickland*, the "benchmark" for judging an ineffective assistance of counsel claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result."  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components.  *First*, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  *Second*, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.  *Unless a defendant makes both showings*, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland*, 466 U.S. at 687 (emphasis supplied).  *See also, e.g., Williams v. Taylor*, 529 U.S. at 390 (same); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

The rule of *Coleman* governs in all but the limited circumstances recognized here. The holding in this case does not concern attorney errors in other kinds of proceedings, including appeals from initial-review collateral proceedings, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts. *See* 501 U.S., at 754, 111 S. Ct. 2546; *Carrier*, 477 U.S., at 488, 106 S. Ct. 2639. It does not extend to attorney errors in any proceeding beyond the first occasion the State allows a prisoner to raise a claim of ineffective assistance at trial, even though that initial-review collateral proceeding may be deficient for other reasons.

*Martinez*, 132 S. Ct. at 1320.

In addition to proving the existence of "cause" for the default, a *habeas* petitioner must show "prejudice." He must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original); *see also McCoy v. Newsome*, 953 F.2d 1252, 1261 (11th Cir. 1992) (*per curiam*). In the event that the cause appears in the form of a *Martinez* exception, the reviewing court must apply a specialized prejudice standard that requires the petitioner to demonstrate "that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Martinez*, 132 S. Ct. at 1318-19 (citing for comparison *Miller-El v. Cockrell*, 537 U.S. 322 (2003) (describing standards for certificates of appealability to issue)) (alteration supplied).

38

### b.    The *"fundamental miscarriage of justice" standard*

In a "rare," "extraordinary," and "narrow class of cases,"[36] a federal court may consider a procedurally defaulted claim in the absence of a showing of "cause" for the procedural default if either: (*i*) a "fundamental miscarriage of justice" has "probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537-38 (1986) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982), and *Murray v. Carrier*, 477 U.S. 478, 496 (1986)), or (*ii*) the petitioner shows "by *clear and convincing evidence* that[,] but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323, 327 & n.44 (1995) (alteration supplied, emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)); *see also, e.g., Smith*, 477 U.S. at 537-38.

### C.    Selected Exhaustion and Procedural Default Issues Pertinent To Giles's *Habeas* Claims

---

[36] *See Schlup v. Delo*, 513 U.S. 298, 321 (1995) ("To ensure that the fundamental miscarriage of justice exception would remain '*rare*' and would only be applied in the '*extraordinary* case,' while at the same time ensuring that the exception would extend relief to those who were truly deserving, this Court explicitly tied the miscarriage of justice exception to the petitioner's innocence.") (emphasis supplied); *McClesky v. Zant*, 499 U.S. 467, 494 (1991) ("Federal courts retain the authority to issue the writ of habeas corpus in a further, *narrow class of cases* despite a petitioner's failure to show cause for a procedural default. These are extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime. We have described this class of cases as implicating a fundamental miscarriage of justice.") (emphasis supplied) (citing *Murray v. Carrier*, 477 U.S. 478, 485 (1986)).

Many of Giles's *habeas* claims are impacted by the Alabama Rules of Criminal Procedure.  Although it will generally be sufficient to discuss those rules in the context of Giles's claims, several rules merit special attention.  The following rules implicate the state court's refusal to consider Giles's third amended Rule 32 petition, and its application of the pleading specificity requirement to his second amended Rule 32 petition:

> **Rule 32.3.**  The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief.  The state shall have the burden of pleading any ground of preclusion, but once a ground of preclusion has been pleaded, the petitioner shall have the burden of disproving its existence by a preponderance of the evidence.
>
> . . . .
>
> **Rule 32.6(b) Specificity**.  The petition must contain a clear and specific statement of the grounds upon which relief is sought, *including full disclosure of the factual basis of the grounds.*  A bare allegation that a constitutional right has been violated and mere conclusions of law shall not be sufficient to warrant any further proceedings.
>
> . . . .
>
> **Rule 32.7(b) Amendment of Pleadings**.  Amendments to pleadings may be permitted at any stage of the proceedings *prior to entry of judgment.*
>
> . . . .
>
> **Rule 32.7(d) Summary disposition**.  If the court determines that the petition is not sufficiently specific, *or* is precluded, *or* fails to state a claim, *or* that no material issue of fact or law exists which would

> entitle the petitioner to relief under this rule *and* that no purpose would
> be served by any further proceedings, the court may either dismiss the
> petition or grant leave to file an amended petition.  Leave to amend shall
> be freely granted.  Otherwise, the court shall direct that the proceedings
> continue and set a date for hearing.

Ala. R. Crim. P. 32.3, 32.6, 32.7 (emphasis supplied).  Giles does not deny that the

foregoing rules constitute adequate and independent state procedural grounds for

purposes of federal review.  (Doc. no. 57, at 67-93).  Even so, he contends that the

rules were unreasonably applied when the state court refused to consider his third

amended Rule 32 petition, and when it dismissed claims contained in his second

amended Rule 32 petition for failure to satisfy the relevant pleading standard.[37]  *Id.*

Upon reviewing the third amended petition, the Alabama Court of Criminal

Appeals entered the following findings of fact and conclusion of law:

> [T]he third amended petition was "filed" on the date it was received —
> the same date that the circuit court's order denying relief was stamped
> filed in the circuit clerk's office — August 14, 2000.  The third amended
> petition was not filed before the entry of judgment.[38]   Therefore, we
> will not consider the allegations contained in that petition because they
> were never properly before the circuit court.  *See Allen v. State*, 825 So.
> 2d 264 (Ala. Crim. App. 2001), aff'd, 825 So. 2d 271 (Ala. 2002).[FN7]

---

[37] As discussed in greater detail below, the pleading specificity requirement of Rule 32.6(b)
is now regarded by *federal* law as an adjudication "on the merits," which does not implicate the
procedural-default doctrine.  *See Borden v Allen*, 646 F.3d 785, 816 (11th Cir. 2011); *Powell v.
Allen*, 602 F.3d 1263 (11th Cir. 2010).

[38] As observed in note 29, *supra*, the Alabama Court of Criminal Appeals had noted at an
earlier point in the same opinion that "Rule 32.7(b), Ala. R. Crim. P., states:  'Amendments to
pleadings may be permitted at any stage of the proceedings prior to *entry of judgment*."  *Giles v.
State*, 906 So. 2d 963, 972 (Ala. Crim. App. 2004) (emphasis in original).

> FN7.  We note that this third amended petition was filed
> well outside the filing deadline set by the circuit court.

*Giles v. State*, 906 So. 2d 963, 973 (Ala. Crim. App. 2004) (additional footnote

omitted).

Giles focuses upon the fact that his third amended Rule 32 petition was filed

on the same day that the trial court entered its final judgment, and argues that it,

therefore, was "unreasonable" for the Alabama Court of Criminal Appeals to

determine that the petition was filed *after* the trial court entered its judgment, and that

the petition was not properly presented to the trial court.  (Doc. no. 57, at 80).  He

suggests that Alabama should have a "simultaneous filing" rule that would give

precedence to his third amended petition over the trial court's final judgment.  *Id.* at

84-85 (citing two district court opinions from Illinois and California, and three state

court opinions from Arizona, Arkansas, and Ohio — all jurisdictions in which Giles

contends such a rule was applied).

This court rejects Giles's suggestion because the State of Alabama does not

have such a procedural rule, or any authority supporting such a rule.[39]  This court is

---

[39] This court also rejects Giles's contention that his claims are not procedurally defaulted because the trial court continued to exercise jurisdiction over his case for a period of thirty days after the judgment was entered, and could have considered his third amended petition as a matter of discretion.  Doc. no. 57, at 88.  First, the Alabama Court of Criminal Appeals did not rely on that procedural rule when it refused to consider Giles's third amended petition.  Second, Giles filed the petition long after the allotted time period for doing so.  The trial court allowed the parties to file their final briefs upon the filing of the transcripts of the Rule 32 hearing that was held on November 2, 1998.  When the transcripts were filed in November of 1999, the trial court gave the parties until

neither bound by, nor persuaded by, the opinions from other federal district and state courts cited by Giles.  In any event, this court is bound by the holding of the Alabama Court of Criminal Appeals on the question of whether Alabama law requires certain assumptions about filings made on the same day.  To the extent that the Court of Criminal Appeals found, as a fact, that the lower court's judgment was entered before Giles's third amended petition was filed, that finding is entitled to a presumption of correctness that can be overcome only by "clear and convincing evidence" to the contrary.  *See* 28 U.S.C. § 2254(e)(1).  Giles has offered no such evidence.

As for Giles's argument that the refusal to allow him to amend his petition was arbitrary in view of Alabama's liberal amendment rule, one need only refer to the post-conviction procedural history of this case to find that the argument is without merit.  As early as November 2, 1999, when the transcripts of the last evidentiary hearing became available, Giles represented that he would file a third amended petition, and the trial court gave him the opportunity to do so.  However, Giles failed to file the petition within the time allowed.[40]  When the deadline for filing the

---

a date in December of 1999 to file their briefs, including Giles's third amended petition.  However, it was not until August 14, 2000, more than 8 months after the expiration of the trial court's deadline, that Giles ultimately filed the petition.  Thus, even if the trial court had relied on the discretionary rule, it would have been reasonable for the court to refuse to exercise its discretion to consider Giles's third amended petition.

[40] Based on the reasons stated above, and on the discussion of the *Brady* claims later in this opinion, this court further rejects Giles's argument that even if this court agrees that it was reasonable for the state court to refuse to consider his third amended petition, that reasoning does not extend to the *Brady* claims he raised in the third amended petition, and the motion filed

proposed third amended petition expired, the Rule 32 court was entitled to assume that Giles had decided not to file the petition, and to take the evidence on file under submission.  Thus, the state appellate court reasonably determined that Giles did not present his third amended petition to the Rule 32 court before it entered a final judgment.

With regard to Giles's second amended petition, the Rule 32 court determined that a number of his claims were not pled with the specificity required by Rule 32.6(b).  In response, Giles argues that, if his claims were not sufficiently pled pursuant to Rule 32.3 and Rule 32.6(b), the trial court would not have afforded him an evidentiary hearing and the opportunity to present evidence pursuant to Rule 32.7(d).  (Doc. no. 57, at 68).  He asserts that Alabama has interpreted the interplay between those rules as follows:

> At the pleading stage of Rule 32 proceedings, a Rule 32 petitioner does not have the burden of proving his claims by a preponderance of the evidence.  Rather, at the pleading stage, a petitioner must provide only "a clear and specific statement of the grounds upon which relief is sought."  Rule 32.6(b), Ala. R. Crim. P.  *Once a petitioner has met his burden of pleading so as to avoid summary disposition pursuant to Rule 32.7(d), Ala. R. Crim. P., he is then entitled to an opportunity to present evidence in order to satisfy his burden of proof.*

---

therewith, in which he alleged that the *Brady* claims were based on newly discovered evidence of actual innocence.  Doc. no. 57, at 89-93.

*Id.* (quoting *Coleman v. State*, 927 So. 2d 883, 886 (Ala. Crim. App. 2005), in turn quoting *Ford v. State*, 832 So. 2d 641, 644 (Ala. Crim. App. 2001) (emphasis supplied by Giles)).

Giles reads *Coleman* and *Ford* out of context. In both cases, the trial court denied a post-conviction petition summarily and without a hearing because the court improperly concluded that the petitioner had not met his Rule 32.3 burden of *proving* his claims. The appellate court reversed, and noted that a Rule 32 petitioner has no burden of *proof* at the pleading stage, and that it was error for the Rule 32 court to dismiss a petition on the basis of insufficient *proof* in the absence of an evidentiary hearing.

Nonetheless, Rule 32.7(d) authorizes a trial court to summarily dismiss a Rule 32 petition that does not plead the facts of the claim with specificity. *Coleman* and *Ford* do not eliminate the specificity requirement; indeed, in both cases, the appellate court found that the claims *had* been pled with specificity so as to avoid summary dismissal under Rule 32.7(d). In other words, those courts used Rule 32.7(d) to distinguish between a petitioner's burden of *proof* and his burden of *pleading*, and to clarify that a court should not dismiss a claim based on the misguided notion that a burden of *proof* applied at the pleading stage.

45

Certainly, Rule 32.7(d) provides that the trial court will not set an evidentiary hearing unless the petitioner meets his burden of pleading his claims with specificity. Although this court *generally* agrees with Giles that, to hold an evidentiary hearing on certain claims, and to thereafter dismiss the claims for insufficient specificity, is a "peculiar" application of the rule (Doc. no. 57, at 72), it must be remembered that Giles did not file his second amended Rule 32 petition until approximately one week before the November 2, 1998 evidentiary hearing, which did not give the State much time to formulate an answer to it.

Moreover, Giles represented at the hearing that he intended to file a third amended petition to conform his pleadings to the evidence not then adduced. The Rule 32 court directed Giles to do so, and the State, thus, did not file an answer to the second amended petition. When the third amended petition did not materialize, the trial court reviewed the second amended petition, and concluded that it lacked specificity. Under the circumstances, the fact that the court held an evidentiary hearing within a week of the filing of the second amended petition cannot be construed as a finding that the second amended petition satisfied the specificity requirements of Rule 32.[41]

---

[41] Based on its own experience, this court observes that canceling a hearing involving a high-security prisoner shortly before it is due to occur is not lightly done. A great deal of logistical effort goes into such a hearing: witnesses must be subpoenaed, calendar conflicts among lawyers and witnesses must be resolved, courtroom security must be arranged, and, not least of all, arrangements

Likewise, this court is not persuaded that the Rule 32 court applied the state procedural rules unreasonably. Although the trial judge was lenient with Giles throughout the presentation of his post-conviction case, Giles made representations that did not materialize, and he failed to comply with court orders. Therefore, this court finds that the record does not support Giles's reliance on Rule 32.7(d) for the argument that the Rule 32 court's decision to proceed with the evidentiary hearing is irrefutable proof that the claims alleged in his second amended petition must have been pleaded with sufficient specificity to pass muster under Rule 32.6(b).

Although the parties dispute whether the state courts' reliance on the pleading specificity requirement of Rule 32.6(b) was an adequate basis for invoking the doctrine of procedural default as to certain claims in this *habeas* action, it is now clear that, for purposes of *federal* law, a determination that a claim fails to meet the pleading specificity requirement of that rule is a decision "on the merits" of the claim, and does not implicate the doctrine of procedural default. In *Powell v. Allen*, 602 F.3d 1263 (11th Cir. 2010), the Eleventh Circuit addressed a *habeas* claim that was rejected by the state courts because the petitioner (Powell) "failed to plead facts on

---

must be made through the Department of Corrections to transport the prisoner to the hearing. Once these efforts are undertaken, a court may well choose to proceed with the hearing, rather than cancel it at the last minute due to the filing of an amended petition. That choice has nothing to do with the sufficiency of the last-minute petition, and everything to do with managing the logistical problems that are inherent in a prisoner hearing.

which an ineffective assistance claim could be based and, for that reason, denied

Powell's claim and request for an evidentiary hearing." *Id.* at 1272 (citing Ala. R.

Crim. P. 32.6). The Eleventh Circuit then explained the effect of the state court's

ruling:

> We thus review the Rule 32 court's rejection of Powell's claim *as a holding on the merits*. *Judd* [*v. Haley*], 250 F.3d at 1313; *Stokes v. Anderson*, 123 F.3d 858, 860 (5th Cir. 1997) (finding no procedural bar from state court ruling on similar pleading rule because the ruling "require[d] some evaluation, however cursory, of the merits of a petitioner's claim").

*Powell*, 602 F.3d at 1273 (emphasis and first alteration supplied, second alteration in

original). That holding was reiterated and bolstered in *Borden v Allen*, 646 F.3d 785

(11th Cir. 2011). Citing *Powell,* and comparing Rule 32.6(b) to Rule 2 of the federal

*Rules Governing Section 2254 Cases*, the Eleventh Circuit panel in the *Borden* case

concluded that

> an Alabama court's consideration of the sufficiency of the pleadings concerning a federal constitutional claim contained in a Rule 32 petition necessarily entails a determination on the merits of the underlying claim; *we cannot construe such a rule to be a state procedural bar that would preclude our review*. We therefore must review the merits determination of the Court of Criminal Appeals under the deferential standards set forth in AEDPA [*i.e.*, the Antiterrorism and Effective Death Penalty Act of 1996], discussed below.

*Borden*, 646 F.3d at 816 (emphasis and alteration supplied).

Furthermore, the *Borden* court compared the state courts' dismissal of a Rule 32 claim on the ground that it had not been pled with the specificity required by Rule 32.7(d) to a motion to dismiss based upon Rule 12(b)(6) of the Federal Rules of Civil Procedure, which is considered an adjudication "on the merits." *See id*. at 812-13; *see also, e.g.*, *Federated Department Stores, Inc., v. Moitie*, 452 U.S. 394, 399 n.4 (1981) (stating that dismissal under Rule 12(b)(6) is a "judgment on the merits"); *NAACP v. Hunt*, 891 F.2d 1555, 1560 (11th Cir. 1990) (stating that dismissal under Rule 12(b)(6) is an adjudication on the merits for claim preclusion purposes).

The *Borden* court also rejected the contrary language in *Jenkins v. Bullard*, 210 F. App'x 895, 900-01 (11th Cir. 2006), an earlier, *unpublished* opinion in which the Eleventh Circuit stated: "As to the third part of the procedural default rule, Rules 32.3 and 32.6(b) have been firmly established and regularly followed by the Alabama courts." *See Borden,* 646 F.3d at 808 n.27. The *Borden* court held:

> *A ruling by an Alabama court under Rule 32.6(b) is also a ruling on the merits*. Here, the Alabama Court of Criminal Appeals, in disposing of claims in the Amended Petition under Rule 32.6(b), necessarily considered the sufficiency of such claims, focusing in on the factors for determining whether the petition presented a case sufficient to warrant relief under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In short, the Alabama Rules of Criminal Procedure authorize summary dismissal of claims under Rule 32.7(d) for failure to fact plead with sufficient specificity as required by Rule 32.6(b) and the form petition, much as the § 2254 Rules and the § 2255 Rules permit summary dismissal of claims under Rule 4 for failure to fact plead under Rule 2 and the federal form petition. Because

49

> such dismissals under the federal rules constitute rulings on the merits,
> we hold that a summary dismissal of a federal claim by Alabama courts
> for failure to comply with Rule 32.6(b) is similarly a ruling on the
> merits.

*Borden,* 646 F.3d at 812-13.

Thus, this court will treat every instance in which the Alabama courts determined that Giles's second amended Rule 32 petition failed to plead a claim with specificity under Rule 32.6(b) as an adjudication on the merits of his claim, as opposed to a basis for the application of the procedural default doctrine. How that adjudication is assessed in light of the deference to state court resolution of claims that is required by the Antiterrorism and Effective Death Penalty Act of 1996 will be discussed below.

**D.    The Statutory Overlay:** ***The Effect of the Antiterrorism and Effective Death Penalty Act of 1996 on Federal* Habeas *Review***

The writ of *habeas corpus* "has historically been regarded as an extraordinary remedy." *Brecht v. Abrahamson*, 507 U.S. 619, 633 (1993). That observation is especially true when federal courts are asked to engage in collateral *habeas* review of state court convictions pursuant to 28 U.S.C. § 2254.

> Direct review is the principal avenue for challenging a [state court]
> conviction. "When the process of direct review . . . comes to an end, a
> presumption of finality and legality attaches to the conviction and
> sentence. The role of federal habeas proceedings, while important in
> assuring that constitutional rights are observed, is secondary and limited.
> *Federal courts are not forums in which to relitigate state trials*."

*Id*. (alteration and emphasis supplied) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983)).  "Those few who are ultimately successful [in obtaining federal *habeas* relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." *Fay v. Noia*, 372 U.S. 391, 440-41 (1963) (alteration supplied).

"Accordingly, it hardly bears repeating that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment." *Brecht*, 507 U.S. at 634 (citations, quotation marks, and footnote omitted).  That result is based upon a fundamental fact of federalism — that is, the various

> States possess primary authority for defining and enforcing the criminal law.  In criminal trials they also hold the initial responsibility for vindicating constitutional rights.  Federal intrusions into state criminal trials frustrate both the States' sovereign power to punish offenders and their good-faith attempts to honor constitutional rights.

*Engle v. Isaac*, 456 U.S. 107, 128 (1982) (alteration supplied).[42]

These principles were reinforced by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which amended *habeas* law.[43]  In addition to other

---

[42] "The reason most frequently advanced in our cases for distinguishing between direct and collateral review is the State's interest in the finality of convictions that have survived direct review within the state court system." *Brecht*, 507 U.S. at 635 (citing *Wright v. West*, 505 U.S. 277, 293 (1992); *McCleskey v. Zant*, 499 U.S. 467, 491 (1991); *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

[43] AEDPA was signed into law by President Clinton on April 24, 1996.  *See* Pub. L. No. 104-132, 110 Stat. 1214 (1996).  This petition was filed after that date.  Accordingly, the *habeas* statutes as amended by AEDPA apply to the claims asserted in this case.  *See id*. § 107(c), 110 Stat. at 1226; *McNair v. Campbell*, 416 F.3d 1291, 1297 (11th Cir. 2005) (applying AEDPA to *habeas* petitions filed after Act's effective date); *Hightower v. Schofield*, 365 F.3d 1008, 1013 (11th Cir.

substantive changes to preexisting statutes and decisional precedents, the Act requires federal courts to give greater deference to state court determinations of federal constitutional claims than was accorded such decisions under previous law. For example, 28 U.S.C. § 2254(e)(1) "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 403-04 (2000)). Section 2254(e)(1) mandates that district courts *presume* the factual determinations of state courts to be correct, unless the *habeas* petitioner rebuts the presumption of correctness with clear and convincing evidence.[44] *See* 28 U.S.C. §

---

2004) (same). *See also Martin v. Hadix*, 527 U.S. 343, 356 (1999) (discussing retroactivity of AEDPA amendments to § 2254). *Cf. Lindh v. Murphy*, 521 U.S. 320, 327 (1997) (holding that AEDPA's amendments do not apply to *habeas* petitions filed prior to the Act's effective date); *Johnson v. Alabama*, 256 F.3d 1156, 1169 (11th Cir. 2001) (same); *Thompson v. Haley*, 255 F.3d 1292, 1295 (11th Cir. 2001) (same).

[44] This court is aware of authority from the Eleventh Circuit holding that the interplay between the presumption of correctness accorded to factual determinations under § 2254(d)(2) and the burden of proof that must be met to overcome the presumption under § 2254(e)(1) remains an open question. *See Cave v. Secretary for the Department of Corrections*, 638 F.3d 739, 747 n.6 (11th Cir. 2011) ("[T]his brief discussion simply reprises what we have previously observed: in no case have we had the opportunity to articulate exactly how § 2254(d)(2) interacts with § 2254(e)(1).") (alteration supplied). Yet, in the earlier case of *Ward v. Hall*, 592 F.3d 1144 (11th Cir. 2010), the Eleventh Circuit very clearly wrote, "[W]e must presume the state court's factual findings to be correct *unless the petitioner rebuts that presumption by clear and convincing evidence*." *Id.* at 1177 (alteration supplied) (citing § 2254(e)(1); *Parker v. Head*, 244 F.3d 831, 835-36 (11th Cir. 2001)) (emphasis and alteration supplied). The Eleventh Circuit also wrote unequivocally that "28 U.S.C. § 2254(e)(1) commands that for a writ to issue because the state court made an 'unreasonable determination of the facts,' the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.' 28 U.S.C. § 2254(e)(1)." *Cave*, 638 F.3d at 1155-56 (alteration in original).

2254(e)(1);[45] *see also*, *e.g.*, *Fugate v. Head*, 261 F.3d 1206, 1215 (11th Cir. 2001) (observing that § 2254(e)(1) provides "a highly deferential standard of review for factual determinations made by a state court").

Moreover, when a state court fairly addresses the merits of a federal constitutional claim and adequately explains the basis for its decision, a federal court cannot grant *habeas* relief, *unless* it determines that the state court's adjudication of the claim either:

> (1) resulted in a decision that was [a] contrary to, or [b] involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

---

[45] The cited statute provides that: "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

28 U.S.C. § 2254(d) (bracketed alternations supplied).[46]  The "contrary to" and
"unreasonable application of" clauses of § 2254(d)(1) [a] & [b] have been interpreted
as "independent statutory modes of analysis." *Alderman v. Terry*, 468 F.3d 775, 791
(11th Cir. 2006) (citing *Williams v. Taylor*, 529 U.S. 362, 405-07 (2000)).[47]  When
analyzing the resolution of a claim by a state court, therefore, a federal *habeas* court
must not conflate the two separate modes of analysis.

1.      *The meaning of § 2254(d)(1)[a]'s "contrary to" clause*

A state court determination can be "contrary to" clearly established Supreme
Court precedent in at least two ways:

> *First*, a state-court decision is contrary to this Court's precedent if the
> state court arrives at a conclusion opposite to that reached by this Court
> on a question of law.  *Second*, a state-court decision is also contrary to
> this Court's precedent if the state court confronts facts that are

---

[46] Section 2254(d)(1)'s reference to "clearly established federal law, as determined by the
Supreme Court of the United States," has been interpreted by the Supreme Court to mean only "the
*holdings*, as opposed to the *dicta*, of [the Supreme Court's] decisions as of the time of the relevant
state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (O'Connor, J., majority opinion)
(emphasis and alteration supplied); *see also, e.g.*, *Carey v. Musladin*, 549 U.S. 70, 74 (2006) (same);
*Osborne v. Terry*, 466 F.3d 1298, 1305 (11th Cir. 2006) (same); *Warren v. Kyler*, 422 F.3d 132, 138
(3rd Cir. 2005) ("[W]e do not consider those holdings as they exist today, but rather as they existed
as of the time of the relevant state-court decision.") (internal quotation marks and citation omitted,
alteration supplied).

[47] *See also Williams*, 529 U.S. at 404 (O'Connor, J., majority opinion) ("Section 2254(d)(1)
defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect
to a claim adjudicated on the merits in state court.  Under the statute, a federal court may grant a writ
of habeas corpus if the relevant state-court decision was either (1) "*contrary to* . . . clearly
established Federal law, as determined by the Supreme Court of the United States," or (2) "*involved
an unreasonable application of* . . . clearly established Federal law, as determined by the Supreme
Court of the United States.") (emphasis and ellipses in original).

> materially indistinguishable from a relevant Supreme Court precedent
> and arrives at a result opposite to ours.

*Williams*, 529 U.S. at 405 (emphasis supplied).  *See also*, *e.g.*, *Brown v. Payton*, 544

U.S. 133, 141 (2005) (same); *Early v. Packer*, 537 U.S. 3, 8 (2002) (*per curiam*)

(same); *Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

The Eleventh Circuit has observed that the majority opinion in *Williams* does

not limit the construction of § 2254(d)(1)'s "contrary to" clause to the two examples

set forth above.[48]   Instead, the statutory language "simply implies that 'the state

court's decision must be substantially different from the relevant precedent of [the

---

[48] Indeed, as one commentator has observed, the possible permutations are not just two, but at least four in number:

> The word "contrary" denotes incompatibility or logical inconsistency.  Two propositions are incompatible with one another if both cannot be true or correct.  Thus, a state court decision is contrary to federal law if that decision and the applicable federal law cannot both be true or correct.  Given this premise, there appears to be four possible combinations of state court adjudications and resulting decisions that are pertinent to this textual inquiry:
>
> • the state court applies the correct federal standard and arrives at a correct outcome;
>
> • the state court applies an incorrect federal standard and arrives at an incorrect outcome;
>
> • the state court applies an incorrect federal standard and arrives at a correct outcome; and,
>
> • the state court applies the correct federal standard and arrives at an incorrect outcome.

Allan Ides, *Habeas Standards of Review Under 28 U.S.C. § 2254(d)(1): A Commentary on Statutory Text and Supreme Court Precedent*, 60 WASH. & LEE L. REV. 677, 685 (2003) (footnotes omitted).

Supreme] Court.'" *Alderman*, 468 F.3d at 791 (alteration supplied) (quoting *Williams*, 529 U.S. at 405).

### 2.    *The meaning of § 2254(d)(1)[b]'s "unreasonable application" clause*

A state court's determination of a federal constitutional claim can result in an "unreasonable application" of clearly established Supreme Court precedent in two ways:

> *First*, a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case. *Second*, a state-court decision also involves an unreasonable application of this Court's precedent if the state court either unreasonably extends a legal principle from our precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.

*Williams*, 529 U.S. at 407 (emphasis supplied). *See also*, *e.g., Putman v. Head*, 268 F.3d 1223, 1240-41 (11th Cir. 2001) (same).

As explained by the majority opinion in *Williams*, however, "an *unreasonable* application of federal law is different from an *incorrect* application." *Williams*, 529 U.S. at 410 (emphasis in original). A federal *habeas* court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, *that application must also be unreasonable*." *Id*. at 411(emphasis supplied). In other words, the question is *not* whether the state court "correctly" applied

56

Supreme Court precedent when deciding the federal constitutional issue, but whether the state court's determination was "reasonable," *even if incorrect*. *Id*. at 409 ("[A] federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.") (alteration supplied). *See also*, *e.g.*, *Bell*, 535 U.S. at 694 (observing that the "focus" of the inquiry into the reasonableness of a state court's determination of a federal constitutional issue "is on whether the state court's application of clearly established federal law is objectively unreasonable," bearing in mind that "an unreasonable application is different from an incorrect one").[49]

As the foregoing authorities demonstrate, the reasonableness of the application of Supreme Court precedent by a state court is evaluated under an objective standard. *See, e.g., Harrington v. Richter*, _ U.S. _ , 131 S. Ct. 770, 785-87 (2011). A *habeas* petitioner "must show that the state court's ruling on the claim being presented in

---

[49] The Eleventh Circuit has observed that § 2254(d)(1)'s "unreasonable application" provision is the proper statutory lens for viewing the "run-of-the-mill state-court decision applying the correct legal rule." *Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006).

> In other words, if the state court identified the correct legal principle but unreasonably applied it to the facts of a petitioner's case, then the federal court should look to § 2254(d)(1)'s "unreasonable application" clause for guidance. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was *objectively* unreasonable."

*Id*. (quoting *Williams*, 529 U.S. at 409).

federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87. In other words, as long as the state court resolution of a claim is debatable among fairminded jurists, it is not objectively unreasonable. *Id.* at 786 (citing *Yarborough v. Alvarado,* 541 U.S. 652, 664 (2004)).

"By its very language, [the phrase] 'unreasonable application' refers to mixed questions of law and fact, when a state court has 'unreasonably' applied clear Supreme Court precedent to the facts of a given case." *Neelley v. Nagle*, 138 F.3d 917, 924 (11th Cir. 1998) (citation and footnote omitted, alteration supplied), *overruled on other grounds by Parker v. Head,* 244 F.3d 831 (11th Cir. 2001). The phrase "mixed questions of constitutional law and fact" refers to those decisions that "require the application of a legal standard to the historical-fact determinations." *Townsend v. Sain*, 372 U.S. 293, 309 n.6 (1963). It is not enough that the federal reviewing court may disagree with the state court decision. Relief will be granted "'only if a state court decision is so clearly incorrect that it would not be debatable among reasonable jurists.'" *Neeley*, 138 F.3d at 924 (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996)); *see also Harrington*, 131 S. Ct. 770.

3.     ***Evaluating factual determinations of state courts under §§ 2254(d)(2) and (e)(1)***

58

Subsection 2254(d)(2) regulates federal court review of state court findings of fact. That provision limits the available relief to decisions "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). It must be remembered, however, that factual determinations made by a state court are "presumed to be correct," and that the *habeas* petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1); *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010) (holding that the presumption of correctness applied to findings of fact can be overcome only by a showing of clear and convincing evidence); *but see Cave v. Secretary for the Department of Corrections*, 638 F.3d 739, 747 n.6 (11th Cir. 2011) (observing that the application of the clear and convincing evidence standard under § 2254(e)(1) to the presumption of correctness under § 2254(d)(2) has never been addressed by the Eleventh Circuit).

## E.     The Burden of Proof and Heightened Pleading Requirements for *Habeas* Petitions

*Habeas* review "exists only to review errors of constitutional dimension." *McFarland v. Scott*, 512 U.S. 849, 856 (1994); *see also* 28 U.S.C. § 2254(a).[50]

---

[50] The cited statute provides that: "The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court *only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.*" 28 U.S.C. § 2254(a) (emphasis supplied). It follows that claims pertaining solely to questions of state law fall outside of

Further, "[w]hen the process of direct review . . . comes to an end, a presumption of finality and legality attaches to the conviction and sentence." *Barefoot v. Estelle*, 463 U.S. 880, 887 (1983) (alteration supplied). Two consequences flow from those propositions. *First*, the *habeas* petitioner bears the burden of overcoming the presumption of "legality" that attaches to the state court conviction and sentence, and of establishing a factual basis for why federal post-conviction relief should be granted. *See, e.g.*, 28 U.S.C. §§ 2254(d) and (e)(1);[51] *Hill v. Linahan*, 697 F.2d 1032, 1036 (11th Cir. 1983) ("The burden of proof in a habeas proceeding is always on the petitioner.") (citing *Henson v. Estelle*, 641 F.2d 250, 253 (5th Cir. 1981)).

*Second*, the *habeas* petitioner must meet "heightened pleading requirements." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citations omitted); *Borden v Allen*, 646 F.3d 785, 810 (11th Cir. 2011) (observing that § 2254 requires "fact pleading,"

---

this court's authority to provide relief under § 2254.

[51] Section 2254(d) provides that the state courts' adjudication of a *habeas* petitioner's claims can be overturned only if the petitioner carries the burden of demonstrating that a particular determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law," or that the ruling "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Further, § 2254(e)(1) provides that,

> [i]n a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254(e)(1) (alteration supplied).

60

not merely notice pleading).  The assertion of a ground for relief without sufficient factual detail does not satisfy either the petitioner's burden of proof under 28 U.S.C. § 2254(e)(1), or his burden under Rule 2(c) of the *Rules Governing Section 2254 Cases in the United States District Courts*, which requires the petitioner to "specify all the grounds for relief available," and to "*state the facts supporting each ground*." 28 U.S.C. § 2254 app. Rule 2(c), *Rules Governing Section 2254 Cases in the United States District Courts* (emphasis supplied).[52]  *See also* 28 U.S.C. § 2242 (stating that an application for writ of *habeas corpus* "shall allege *the facts* concerning the applicant's commitment or detention") (emphasis supplied).

The heightened requirements for a *habeas* petitioner to plead "facts" in support of each ground for relief deviate from the "notice pleading" rule that applies in other federal civil actions.  *See* Fed. R. Civ. P. 8; *see also*, *e.g.*, *McFarland v. Scott*, 512 U.S. at 860 (O'Connor, J., concurring in judgment in part) (observing that a "habeas petition, unlike a [civil] complaint, must allege the factual underpinnings of the petitioner's claims") (alteration supplied); Advisory Committee Notes to Rule 4 of the *Rules Governing Section 2254 Cases in the United States District Courts* ("[N]otice pleading is not sufficient, for the petition is expected to state facts that

---

[52] *Accord* Rule 2(b) of the *Rules Governing Section 2255 Proceedings for the United States District Courts*.

point to a 'real possibility of constitutional error.'") (quoting *Aubut v. Maine*, 431 F.2d 688, 689 (1st Cir. 1970)).

In short, a *habeas* petitioner must include in his statement of each claim sufficient facts to justify a decision for the petitioner if the alleged facts are proven true. *See, e.g.*, *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (petition must "state facts that point to a 'real possibility of constitutional error'") (quoting advisory Committee Note 4, *supra*). *Cf. Diaz v. United States*, 930 F.2d 832, 835 (11th Cir. 1991) (holding in a § 2255 case that, despite the liberal construction due a *pro se* movant's allegations, dismissal was appropriate because the movant did not allege "facts that, if proven, would entitle him to relief").[53]  "Citation of the controlling constitutional, statutory, or other bases for relief for each claim also should be stated." 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 11.6, at 654 (5th ed. 2005).  As another district judge has stated:

> It is not the duty of federal courts to try to second guess the meanings of statements and intentions of petitioners.  Rather the duty is upon the individual who asserts a denial of his constitutional rights to come forth with a statement of sufficient clarity and sufficient supporting facts to enable a court to understand his argument and to render a decision on the matter.

---

[53] *Cf. Hill v. Lockart*, 474 U.S. 52, 60 (1986) ("Petitioner did not allege in his habeas petition that, had counsel correctly informed him about his parole eligibility date, he would have pleaded not guilty and insisted on going to trial.  *He alleged no special circumstances that might support the conclusion that he placed particular emphasis on his parole eligibility in deciding whether or not to plead guilty*.") (emphasis supplied).

*Nail v. Slayton*, 353 F. Supp. 1013, 1019 (W.D. Va. 1972).

Those heightened requirements are especially applicable when, as here, the petitioner is represented by counsel. The court, therefore, takes this opportunity to express its consternation with the manner in which Giles has organized and presented his claims. In an inordinately high percentage of the claims, this court has been forced to trudge through a mass of incorrect information before reaching an accurate understanding of the claim Giles purports to raise (or, in some cases, denies that he raised, despite the fact that the claim plainly appears in his petition). (*See, e.g.*, Claim I(C)(10) and Claim I(A)(1)).

Further, Giles utilizes the same alphanumeric organizational system in both his petition and initial supporting brief, thus leading the reader to believe, for example, that the argument regarding Claim I(D)(23) in the supporting brief will address Claim I(D)(23) in the petition. It does not, however, for two reasons. First, Giles chooses not to brief some of his *habeas* claims. Further, Giles attempts to add arguments to his initial brief that were not pleaded as claims in his *habeas* petition. In both instances, Giles continues to use his initial numbering system without alteration or interruption.

Further, while Giles's 129-page reply brief does address respondent's procedural and substantive defenses, Giles fails to identify the claims discussed in his

table of contents.  However, although some claims were subject to multiple defenses, and therefore to multiple replies, Giles fails to cross-reference his responses, and repeatedly neglects to identify claims by alphanumeric number, or in so doing misidentifies them.  This court finally resorted to conducting word searches of the PDF file of Giles's brief in an effort to ensure that all of Giles's replies (wherever they might be found) were given full credit.[54]

Additionally, Giles's pleadings contain numerous misstatements concerning facts and citations.  Although some errors are attributable to mistakes, the sheer number of such mistakes has made the judicial review process more difficult.  Other errors are certainly misrepresentations, if not outright falsehoods.  As a result, the claims in Giles's petition and the arguments in his initial brief are cryptic and incomplete.

This court is dismayed at the state of the pleadings, especially because Giles was directed by the magistrate judge to file an amended petition and initial brief, as well as a reply brief, for the express purpose of clearly stating the claims to be addressed.  A clear and concise petition and supporting briefs are always necessary.

---

[54] This court observes that respondent compounded the problem by foregoing Giles's alphanumeric organizational system in its entirety, and identifying Giles's claims as A-ZZZ.  *See* doc. nos. 52 and 53.  That choice left this court struggling to determine which claim corresponded to which defense.  Even so, it is the organization and quality of Giles's claims that determine whether he is due to be granted relief.

The procedural history of Giles's case, which included three trials, makes organization and clarity imperative.

Despite the deficiencies of counsel for Giles, this court must proceed with an analysis of his arguments. Because Giles has scattered his claims of ineffective assistance of counsel randomly throughout the petition, the court will devote the next sub-section of this Memorandum Opinion to a general discussion of the proper standard for claims of ineffective assistance of counsel. The court will later refer to that discussion in the analysis of each separate claim.

## F.    Introduction To Ineffective Assistance Of Counsel Claims

The Supreme Court's "benchmark" for judging an ineffective assistance of counsel claim is "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The Court's opinion in *Strickland* established a two-pronged standard for judging under the Sixth Amendment the effectiveness of attorneys who represent criminal defendants at trial or on direct appeal.[55]

---

[55] Ineffective assistance of counsel claims are specifically limited to the performance of attorneys who represent a defendant at trial or on direct appeal from the conviction. *See* 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."). *See also Coleman v. Thompson*, 501 U.S. 722, 752 (1991) ("There is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings.") (citations omitted).

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. *First*, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. *Second*, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Id*. at 687 (emphasis supplied); *see also*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 390 (2000) (same); *Grayson v. Thompson*, 257 F.3d 1194, 1215 (11th Cir. 2001) (same).

As expressly stated in the preceding quotation, the two parts of the *Strickland* standard are conjunctive, and a petitioner bears the burden of proving *both* "deficient performance" *and* "prejudice" by "a preponderance of competent evidence." *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (*en banc*). Thus, a court is not required to address one prong of the *Strickland* standard when a *habeas* petitioner makes an insufficient showing on the other. *See*, *e.g.*, *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

   1.    *The performance prong*

"The burden of persuasion is on the petitioner to prove by a preponderance of the evidence that counsel's performance was unreasonable." *Stewart v. Secretary, Department of Corrections*, 476 F.3d 1193, 1209 (11th Cir. 2007) (citing *Chandler*, 218 F.3d at 1313). To satisfy the performance prong of the *Strickland* standard, a defendant must prove that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The standard for gauging attorney performance is "reasonableness under prevailing professional norms." *Id*. at 688; *see also*, *e.g.*, *Williams v. Taylor*, 529 U.S. 362, 390-81 (2000) (same); *Darden v. Wainwright*, 477 U.S. 168, 184 (1986) (same); *Chandler*, 218 F.3d at 1313 (same). "The test of reasonableness is not whether counsel could have done something more or different," but whether counsel's performance "fell within the broad range of reasonable assistance."

Further, courts must "recognize that 'omissions are inevitable, but the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" *Stewart*, 476 F.3d at 1209 (quoting *Chandler*, 218 F.3d at 1313 (in turn quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987))). The Sixth Amendment does not guarantee a defendant the most skilled attorney within the relevant jursidction, but only counsel who performed within reasonable professional

norms.  "The test has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done.  We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."  *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir.1992).

Reasonableness is judged from the perspective of the attorney at the time of the alleged error and in light of all of the relevant circumstances.  *See*, *e.g.*, *Johnson v. Alabama*, 256 F.3d 1156, 1176 (11th Cir. 2001) (giving lawyers "the benefit of the doubt for 'heat of the battle' tactical decisions"); *Mills v. Singletary*, 161 F.3d 1273, 1285-86 (11th Cir. 1998) (noting that *Strickland* performance review is a "deferential review of all of the circumstances from the perspective of counsel at the time of the alleged errors").

> Under this standard, there are no "absolute rules" dictating what reasonable performance is or what line of defense must be asserted. [*Chandler*, 218 F.3d] at 1317.  Indeed, as we have recognized, "[a]bsolute rules would interfere with counsel's independence — which is also constitutionally protected — and would restrict the wide latitude counsel have in making tactical decisions."  *Putman v. Head*, 268 F.3d 1223, 1244 (11th Cir. 2001).

*Michael v. Crosby*, 430 F.3d 1310, 1320 (11th Cir. 2005) (first alteration supplied, second alteration in original).

Judicial scrutiny of counsel's performance is "highly deferential," because representation is an art, and an act or omission that is unprofessional in one case may

be sound or even brilliant in another. *See Strickland*, 466 U.S. at 697. Indeed, reviewing courts are instructed to "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689.

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; *that is*, *the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy*. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (emphasis supplied) (citations and internal quotation marks omitted); *see also*, *e.g.*, *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994) ("When reviewing whether an attorney is ineffective, courts 'should always presume strongly that counsel's performance was reasonable and adequate.'") (quoting *Atkins v. Singletary,* 965 F.2d 952, 958 (11th Cir. 1992)).

"Based on this strong presumption of competent assistance, the petitioner's burden of persuasion is a heavy one: 'petitioner must establish that no competent counsel would have taken the action that his counsel did take.'" *Stewart*, 476 F.3d

69

at 1209 (quoting *Chandler*, 218 F.3d at 1315).  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers*, 13 F.3d at 386.

## 2.    *The prejudice prong*

"A petitioner's burden of establishing that his lawyer's deficient performance prejudiced his case is also high." *Van Poyck v. Florida Department of Corrections*, 290 F.3d 1318, 1322 (11th Cir. 2002).  *See also*, *e.g.*, *Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (holding that a *habeas* petitioner "must affirmatively prove prejudice, because '[a]ttorney errors come in an infinite variety and are as likely to be utterly harmless in a particular case as they are to be prejudicial.'") (quoting *Strickland*, 466 U.S. at 693)) (alteration in *Gilbreath*).

"It is not enough for the [*habeas* petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." *Strickland*, 466 U.S. at 693 (alteration supplied); *see also Gilreath v. Head*, 234 F.3d 547, 551 (11th Cir. 2000) (same); *Tompkins v. Moore*, 193 F.3d 1327, 1336 (11th Cir. 1999) (same).  "Instead, when a petitioner challenges a death sentence, 'the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded

that the balance of aggravating and mitigating circumstances did not warrant death.'"
*Stewart*, 476 F.3d at 1209 (quoting *Strickland*, 466 U.S. at 695).

Stated somewhat differently, a *habeas* petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see also Williams*, 529 U.S. at 391 (same). The petitioner must present evidence proving "that trial counsel's deficient performance deprived him of 'a trial whose result is reliable.'" *Brown v. Jones*, 255 F.3d 1272, 1278 (11th Cir. 2001) (quoting *Strickland*, 466 U.S. at 687).

In other words, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (quoting *Eddmonds v. Peters*, 93 F.3d 1307, 1313 (7th Cir. 1996) (in turn quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986))) (internal quotation marks omitted) (alteration supplied); *see also*, *e.g.*, *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) (holding that "a defendant must show that counsel's errors were so serious that they rendered the defendant's trial unfair or unreliable, not merely that the outcome would have been different").

### 3. *The deference accorded state court findings of historical fact when evaluating ineffective assistance of counsel claims*

State court findings of historical fact made in the course of evaluating an ineffective assistance of counsel claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)(2) and (e)(1). *See, e.g.*, *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001). To overcome a state court finding, the petitioner must carry a burden of proving contrary facts by "clear and convincing evidence."

Additionally, a federal court's deference to a state court's resolution of an ineffective assistance of counsel claim involves two layers of analysis. First, under the AEDPA, the federal court may grant relief on an ineffective assistance claim only if the state court resolution of the claim involved an "unreasonable application" of *Strickland* to the facts of the case. Second, *Strickland* also requires a determination of whether counsel's conduct was professionally unreasonable. These two assessments cannot be conflated. *See Harrington v. Richter*, _ U.S. _ , 131 S. Ct. 770, 786 (2011). Thus, *habeas* relief on an ineffective assistance of counsel claim that was actually decided by the state courts is only proper if a federal court determines that it was "objectively unreasonable" for the state courts to find that counsel's conduct was not "professionally unreasonable."

## V. DISCUSSION OF CLAIMS

## A. Claims Arising Out of the 1982 Guilt-Phase Trial

72

1.    *The capital murder conviction was obtained under an unconstitutional Alabama death penalty law*

    a.    **The Alabama Supreme Court illegally re-wrote the State's death penalty law after *Beck v. Alabama* and improperly gave the law retroactive effect (Doc. no. 44, at 1-6) (Doc. no. 45, at 1-2) (Doc. no. 57, at 28-30)**

The amended petition alleges that petitioner was indicted for capital murder under Alabama's 1975 death-penalty statute, which included a "preclusion clause" that prevented the jury from considering lesser-included offenses to the capital murder charge.  (Doc. no. 45 ¶¶ 26-29).  The United States Supreme Court declared the "preclusion clause" unconstitutional in 1980.  *See Beck v. Alabama*, 447 U.S. 625 (1980).  On remand, the Alabama Supreme Court severed that provision, and construed the imposition of the death sentence to be permissive rather than mandatory, despite statutory language stating that, upon conviction, the death sentence "shall" be imposed.  *See Beck v. State,* 396 So. 2d 645, 660 (Ala. 1980).

Arthur Lee Giles contends that his 1982 conviction for capital murder is based on an unconstitutional rewriting of Alabama's statutory law by the State's Supreme Court, applied retroactively to a crime that occurred in 1978.  His amended petition alleges that:

> By declaring [the statutory phrase] "shall fix the punishment at death" to be permissive language, the Alabama Supreme Court not only eliminated a mandatory death penalty, they created an alternative [sentence] of life imprisonment without parole.  The court completely

altered the true intent of the Alabama Legislature — which was to create a mandatory death penalty upon the conviction of capital murder — by declaring "shall" [fix the punishment at death] to be permissive language, construed as "may."

Thus, at the time of this crime in 1978 there was not a constitutional capital statute in Alabama.

(Doc. no. 45 ¶¶ 28-29) (first and second alterations supplied, third alteration in original). In substance, Giles argues that the Alabama Supreme Court lacked the authority to modify the mandatory language of the death-penalty statute, or to apply the modification retroactively to his 1978 crime. Thus, petitioner argues that his prosecution in 1982 was a violation of the *Ex Post Facto* Clause of the United States Constitution.

Giles asserts that he "raised [this claim] on *direct appeal*." (Doc. no. 45, at 1) (alteration and emphasis supplied) (citing C.R. Vol. 29, Tab. 46, at 2; *id.*, Vol. 30, Tab. 51, at 28-30). However, those citations to the record refer to portions of Giles's brief on direct appeal from his *1991 re-sentencing trial*, and that brief contains arguments pertaining to the Alabama death-penalty statute in the context of the *re-sentencing*.[56] Further, the argument advanced at the cited portions of the record is *not* the same as that now asserted in the present *habeas* petition. On direct appeal from his 1991 re-sentencing trial, petitioner argued that the Alabama Supreme Court's

---

[56] Giles makes no effort to clear up the confusion in his initial supporting brief. *See* doc. no. 44, at 1-6.

1986 decision in *Ex parte Hays*, 518 So. 2d 768 (Ala. 1986), which construed the capital punishment statute to allow the *upward* judicial override of a jury's recommendation that a defendant be sentenced to life without parole, should not apply retroactively to his 1982 conviction.   Nothing in that argument directly addressed a concern about retroactively rewriting the mandatory nature of the statutory language "shall fix the punishment at death" to make it permissive.

Respondent classifies the claim as procedurally defaulted because it was not raised in state court. (Doc. no. 52, at 3).[57]   In the alternative, respondent contends that the claim is not subject to *habeas* review because it presents only a question of state law.  *Id.* at 3-4.

This court notes that the claim was cryptically asserted in Giles's appellate brief following his 1982 trial and conviction.  (Vol. 28, Tab. 40, at 25).  His 1983 appellate brief reads in part as follows:

VII.

THE TRIAL OF DEFENDANT UNDER ALABAMA'S REWRITTEN DEATH PENALTY STATUTE VIOLATED HIS RIGHTS AS GUARANTEED BY THE EIGHTH AND FOURTEENTH

---

[57] After expressing his confusion regarding the claim, respondent adds, "[t]o the extent that Giles is arguing (as he did on re-sentencing appeal) that the trial court's override was arbitrary and standardless," he is not entitled to § 2254(d) relief.  Doc. no. 52, at 4-6 (citing *Giles v. State*, 632 So. 2d at 573) (alteration supplied).  Giles did not make that argument on appeal from his 1982 trial, and he does not argue it as support for the above *habeas* claim.  Even if he had done so, the claim would be moot because the Alabama Supreme Court reversed his 1982 death sentence.

AMENDMENTS TO THE CONSTITUTION OF THE UNITED STATES.

In *Beck v. State*, *supra.*, the Alabama Supreme Court rewrote the Alabama death penalty statutes. This allows for the imposition of capital punishment upon persons under sentence of death who are being tried in accordance with *Beck v. Alabama*, *supra*. Defendant submits that the Alabama Supreme Court's action usurped the power of the legislature, thus violating Art. III, §§ 42 and 43 of the Alabama Constitution of 1901 and the Eighth and Fourteenth Amendment fo [sic] the United States Constitution.

(C.R. Vol. 28, Tab. 40, at 25) (footnote omitted). At the end of this claim, Giles added footnote 6, which reads:

Defendant is aware that this Court is bound by the holding of the Alabama Supreme Court in *Beck v. State*, *supra*. Thus, he realizes that his conviction will not be reversed by this Court or the Alabama Supreme Court on this issue. . . . However, the issue is presented here to preserve it for prospective federal habeas corpus review.

*Id.* at 25 n.6. Thus, this issue was raised in the direct appeal following petitioner's conviction in the 1982 trial.

The Alabama Court of Criminal Appeals was the last court to explicitly address that claim on the merits.[58] In its 1984 opinion, that court wrote:

---

[58] Although petitioner raised the claim in his petition for writ of *certiorari* to the Alabama Supreme Court in 1984, that court affirmed petitioner's *conviction*, while reversing his *sentence*, because the trial court's jury instruction impermissibly suggested to the jury that the court favored a death sentence. *See Ex parte Giles*, 554 So. 2d 1089 (Ala. 1987). The Alabama Supreme Court did not explicitly discuss the "rewrite" issue, but its decision affirming the conviction by necessity implies a decision on that issue.

The appellant contends, for the record, that the Alabama Supreme Court's "rewrite" of the Alabama death penalty statute in *Beck v. State*, 396 So. 2d 645 (Ala. 1980), was an unconstitutional usurpation of the legislature's power, but he concedes, and we agree, that this issue has been decided against him by *Clisby v. State*, 456 So. 2d 86 (Ala. Cr. App. 1982), *affirmed in part, reversed in part and remanded on other grounds*, 456 So. 2d 95 (Ala. 1983), and its progeny.

*Giles v. State*, 554 So. 2d 1073, 1076 (Ala. Crim. App. 1984).  The Alabama Supreme Court upheld its "reconstruction" of the Alabama death penalty statute after *Beck v. Alabama* in *Ex parte Clisby*, 456 So. 2d 95 (Ala. 1983), saying:

The trial was conducted in accordance with *Beck v. State*, 396 So.2d 645 (1981), following the decision of the United States Supreme Court in *Beck v. Alabama*, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).  Clisby challenges the constitutionality of the death penalty statute as construed by *Beck*.  The judicial reconstruction accomplished in *Beck* was procedural and therefore constitutional, as we noted in *Beck*:  "Under the separation of powers doctrine, this Court cannot change the offense, but a change in procedure to comport with constitutional requirements is not impermissible."

*Ex parte Clisby*, 456 So. 2d at 98.

With the foregoing historical facts in perspective, the court finds that Giles cannot rely on his brief on appeal from his 1991 re-sentencing trial to show that he raised the *habeas* claim on appeal from his 1982 conviction.  In that sense, respondent is correct that Giles did not raise the *habeas* claim in state court.  Further, this court notes that Giles did not allege during the 1982 appeal that the statutory rewrite "improperly gave the law retroactive effect," as stated in the title of the claim.

77

Accordingly, to the extent that Giles is now attempting to allege that he fairly raised a claim based on the *Ex Post Facto* Clause of the United States Constitution in connection with his 1982 conviction, the claim is procedurally defaulted and due to be dismissed.

Obviously, however, Giles did raise a semblance of the claim on direct appeal from his 1982 conviction, and this court will examine his allegations within those confines. Giles asserts that he was indicted under Alabama's 1975 death penalty statute. (Doc. no. 45, at 1 n.2 (citing §§ 13-11-1 through 13-11-9, Code of Alabama, 1975)). Two years before his 1982 trial, the United States Supreme Court struck down a provision of the 1975 statute that "precluded the jury from convicting a capital defendant of any lesser-included offense, and remanded the case to the Alabama Supreme Court." (Doc. no. 44, at 1 (citing *Beck v. Alabama*, 447 U.S. 625 (1980))).

Giles complains that the Alabama Supreme Court should have declared the entire statute unconstitutional, and referred "the task of drafting a constitutional death penalty law" to the Alabama Legislature. *Id.* at 4. Instead, the court "rewrote" the statute by construing it in permissive terms. *Id.* (quoting *Beck v. State*, 396 So.2d at 660) ("We may now construe the requirement that the jury fix the penalty at death to be permissive instead of mandatory.")). The court also created a bifurcated trial

system under the guise of working "procedural" reforms.  *Id.* (citing *Beck v. State*, 396 So.2d at 662)[59].

Giles contends that the institution of the latter process went far beyond the parameters of the *Beck* holding and amounted to judicial usurpation of the legislative function.  To Giles, those alterations violated Alabama statutory and constitutional law.  (Doc. no. 44, at 1 (citing Ala. Code § 1-1-16 (1975); *id.,* at 4 (citing Ala. Const. art. III, §§ 42-44, and Amend. 382)).  He argues that, "at the time of this 1978 crime there was not a constitutional death penalty law in existence.  Under these circumstances, Giles's retrial after 1979, and after the decision in *Beck*, should have been under a non-capital statute."  (Doc. no. 44, at 5).

Giles's attacks on the Alabama Supreme Court's authority to alter Alabama statutory law by construction fail to state a federal *habeas* claim.  A federal *habeas* petitioner is not entitled to *habeas* relief for alleged violations of state law, only federal rights.  *See Hays v. State of Alabama*, 85 F.3d 1492, 1500 (11th Cir. 1996) ("Petitioner is due no relief on the grounds that Alabama has misinterpreted its own law.") (citing *Pulley v. Harris*, 465 U.S. 37, 41-43 (1984) ("A federal court may not

_____

[59] In the cited portion of the *Beck* opinion, the Alabama Supreme Court created the hybrid sentencing process in order to guarantee that Alabama's death penalty law satisfied Eighth and Fourteenth Amendment concerns:  namely, individualized sentencing, which necessarily included consideration of aggravating and mitigating circumstances.  This, of course, was a change from the 1975 statute, which mandated death upon conviction of the capital offense.  The change made, however, is procedural, having nothing to do with how the capital offense or its elements are defined.

issue the writ on the basis of a perceived error of state law.")).  Accordingly, to the extent that Giles alleges the change violated Alabama statutory and constitutional law, the claim is due to be dismissed pursuant to 28 U.S.C. § 2254(a).

This court also has considered whether there is a federal nature to the claim, and has identified two matters that bear discussion.  First, this court notes that the federal law that Giles mentioned in his briefs on direct appeal from his 1982 conviction (*i.e.*, the Eighth and Fourteenth Amendments to the United States Constitution) is neither mentioned nor argued in the *habeas* pleadings he filed in this court.  He *does*, however, string cite that portion of the Alabama Supreme Court's opinion in *Beck v. State* in which that Court *created* Alabama's hybrid sentencing process based upon Eighth and Fourteenth Amendment constitutional concerns:  *i.e.*, 396 So. 2d at 661-62.  Even if Giles is attempting to assert an Eighth and Fourteenth Amendment claim by way of that string citation, the point is essentially irrelevant because the Supreme Court upheld the constitutionality of Alabama's hybrid sentencing scheme.  *See Harris v. Alabama*, 513 U.S. 504 (1995).  For purposes of this opinion, this court finds that Giles failed to properly raise and argue an Eighth and Fourteenth Amendment basis for his claim.  Alternatively, any such claim is without merit.

In addition, Giles asserts "that the Alabama Supreme Court's statutory construction of 'shall' is contrary to all controlling precedent," including that of the United States Supreme Court. (Doc. no. 44 at 2). He declares that the Supreme Court "has time and again reaffirmed that 'shall' imposes a mandatory requirement." *Id.* (quoting *Martin v. Hunter's Lessee*, 14 U.S. 304, 328 (1816) ("The language of this Article [III] throughout is manifestly designed to be mandatory upon the legislature.")) (alteration in brief); *National Association of Home Builders, et. al., v. Defenders of Wildlife, et. al.*, 551 U.S. 644, 661-62 (2007) (construing the phrase "shall approve" in a section of the Clean Water Act, and pointing to the definition of "shall" found in *Black's Law Dictionary* at 1375 (6th ed. 1990) (*i.e.*, "As used in statutes . . . [shall] is generally imperative or mandatory") (alteration supplied). Giles did not raise that argument in the state courts, it is not mentioned in the *habeas* petition he filed here, and it is not included as part of his express explanation of the nature of this claim in his reply brief. Giles only argued that the Alabama Supreme Court defied Article III of the Alabama Constitution when it rewrote Alabama's death penalty statute. As such, and to the extent that Giles now is attempting to declare that the Alabama Supreme Court's actions are contrary to federal precedent, such a claim is procedurally defaulted and due to be dismissed.

To the extent that Giles is arguing that the Alabama courts retroactively applied the rewritten death penalty statute at his 1982 trial, in violation of the *Ex Post Facto* Clause of the United States Constitution,[60] that claim also is due to be dismissed. The claim was not raised on direct appeal from his 1982 trial. Moreover, in his reply brief, Giles admits that the claim was raised for the first time on direct appeal from his 1991 *re-sentencing trial*. (Doc. no. 57, at 29 (citing C.R. Vol. 29, Tab. 46, at 2-17)). Even assuming that Giles presented an *ex post facto* claim to the Alabama courts in a proper fashion, the claim still is without merit. The "rewrite" of the statute in *Beck* related entirely to the procedures to be used to determine whether a convicted capital defendant should be sentenced to death. *Cf. Dobbert v. Florida*, 432 U.S. 282, 292-94 (1977) (finding that similar changes to Florida's capital murder statutes were procedural and not substantive, thus having no *ex post facto* impact). The changes did not increase the harshness of the potential death sentence, but, in fact, eliminated the *mandatory* death sentence existing in 1978 (at the time of petitioner's offense), and made it permissive. The change did not lessen the burden of proof required of the State to obtain a capital conviction or sentence. If anything, the procedural

---

[60] The United States Constitution contains two clauses that forbid the enactment of *ex post facto* laws: *i.e.*, a law that applies retroactively, especially in a way that negatively affects a person's rights, such as by criminalizing an action that was legal on the date it was committed. The first such clause applies to Congress, and the second to the states. *See* U.S. Const. art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed."); and, art. I, § 10, cl. 1 ("No State shall . . . pass any Bill of Attainder, or ex post facto Law, . . . .") (1787).

changes wrought by the Alabama Supreme Court were ameliorative.  There is no *ex post facto* implication to the court's "rewriting" of the 1975 act, and the claim is due to be denied.

### 2.    *Denial of a fair trial by impartial judge and jury*

**a.    The trial court improperly refused to change venue; counsel ineffective for failing to adequately research and prepare motions or obtain change of venue (Doc. no. 44, at 6-7) (Doc. no. 45, at 2-3) (Doc. no. 57, at 1-2, 51)**

#### (i).    *The trial court improperly refused to change venue*

Giles alleges that the results of a public opinion survey taken one month before his 1982 retrial "clearly warranted" a change of venue due to pretrial prejudice, but "the motion [for change of venue] was denied."  (Doc. no. 44, at 6 (citing *United States v. Campa*, 459 F.3d 1121, 1150 (11th Cir. 2006) (holding that, "to establish a presumption of juror prejudice necessitating [a] change of venue, a defendant must demonstrate that (1) widespread, pervasive prejudice and prejudicial pretrial publicity saturates the community, and (2) there is a reasonable certainty that the prejudice prevents the defendant from obtaining a fair trial") (alteration supplied))).

Further, Giles contends that *voir dire* only confirmed the results of the survey because all but two of the 49 jurors had prior knowledge of the case, and the jurors were not questioned about "whether they had formed an opinion in the case, whether

they believed the defendant was guilty, or whether what they had heard about the case would influence them."  (Doc. no. 45, at 3 (citing *Murphy v. Florida*, 421 U.S. 794, 800 (1975) (holding that "[t]he constitutional standard of fairness requires that a defendant have a panel of impartial, indifferent jurors") (internal quotation omitted, alteration supplied))).

On direct appeal, the Alabama Court of Criminal Appeals examined the survey and *voir dire* before it rejected Giles's claim that he had proven that he was entitled to a change of venue.  The appeals court explained:

> The appellant contends that the trial court erred in denying his motion for a change of venue.  We disagree.
>
> In support of his motion the appellant presented the results of an opinion survey conducted by William M. Kimmelman, a professor with the University of Alabama in Birmingham.  Kimmelman testified that a random sample of the 27,000 potential jurors in Blount County, Alabama, was selected for the survey.  The results revealed that 85 percent of the 397 potential jurors surveyed had heard about the double murder of Willene and Carl Nelson, either from friends, co-workers, or relatives, or through the news media, but only 17 percent of those interviewed felt that they were "very familiar" with the details and events surrounding the crime.  Kimmelman admitted that only 16 percent of those who had heard about the crime had heard something within the 18 months immediately preceding the November 5, 1982,

survey.[61]  The survey did not reveal any clear, unambiguous evidence of prevailing prejudice against the appellant.

With the results of this survey in mind, the trial court deferred ruling on appellant's motion until after *voir dire* of the prospective jurors at trial.  In light of the survey results the trial court permitted a thorough and sifting *voir dire* of all prospective jurors, including panel interviews and individual *voir dire*.  The results of these *voir dire* examinations encompass nearly 400 pages of the record on this appeal.

We have thoroughly reviewed the *voir dire* testimony and have made several conclusions therefrom.  Nearly all of the prospective jurors had heard of the widely publicized double murder at the Nelson home, but few remembered any details of the incident.  Some of the prospective jurors had read about appellant's first trial and were aware of his previous conviction and a few knew that he had been sentenced to death.  One prospective juror indicated that he had a fixed opinion against the appellant, and he was, for that reason, dismissed from the venire.  None of the other prospective jurors expressed any prejudice against the appellant, although a few felt that their prior knowledge of the crime might affect their verdicts.  The morning after the individual *voir dire* had been completed, but before the trial court had ruled on the "challenges" of particular prospective jurors, all of the members of the venire indicated that they could lay aside any prior knowledge of the case and return a verdict based upon the evidence presented in court.

The trial court then dismissed a number of prospective jurors "for cause" in response to challenges by either the appellant or the state.  In finally denying appellant's change of venue motion, the trial court

---

[61] Giles does not dispute the accuracy of the Alabama Court of Criminal Appeals' recitation of the public opinion survey's content.  He does add that the survey "revealed that over half of those who had heard about the case (55%) felt the defendant was either definitely (36%) or probably (19%) guilty."  Doc. no. 44, at 6 (citing R. Vol. 12, Tab 2, at 13).  He also states that "[f]orty-four percent (44%) of the respondents in the survey admitted that they believed blacks were more prone to violence than whites."  *Id.* at 23-25 (alteration supplied).  That statement has nothing to do with the question of a change of venue due to pervasive, prejudicial pretrial publicity, and, as such, is immaterial to the issue before this court.

concluded that those prospective jurors remaining on the venire, after dismissal of those properly challenged, could give the appellant a fair trial.

There was no evidence of any actual prejudice against the appellant among those persons who eventually served on appellant's jury.

The trial court's denial of appellant's change of venue motion was a determination which, absent abuse, was within its sound discretion. *Ex parte Magwood* ( *Magwood v. State* ), 426 So. 2d 929 (Ala. 1983), *affirming*, 426 So. 2d 918 (Ala. Cr. App. 1982), and cases therein cited; *Lopez v. State*, 415 So. 2d 1204 (Ala. Cr. App. 1982).  Under the circumstances outlined above there was no abuse of discretion and, therefore, no error by the trial court.  *See*, *Magwood v. State*, *supra*; *Anderson v. State*, 362 So. 2d 1296 (Ala. Cr. App. 1978); *Moulds v. State*, 426 So .2d 942 (Ala. Cr. App. 1982).

Appellant's public opinion survey, if accurate, demonstrated that publicity of the instant crime was widespread in Blount County, Alabama, especially during the months immediately following the incident, and that the residents of Blount County were generally aware of the double murder in their county.  However, the survey was inconclusive, and did not reveal any inherent or pervasive prejudice against the appellant that mandated a change of venue.  *See*, *Callahan v. State*, 471 So. 2d 447 (Ala. Cr. App. 1983), and cases cited therein. To the contrary, the survey revealed that most of the people surveyed remembered little about the crime and, in fact, had heard nothing about it for the eighteen months preceding the survey.  Clearly, the passage of time had diminished any prejudicial effects of the widespread publicity.[FN2]  *See*, *Magwood v. State*, *supra*; *see also*, *Robinson v. State*, 430 So. 2d 883 (Ala. Cr. App. 1983), and cases therein cited.

FN2.  Appellant's trial, his second trial for the instant offense, occurred more than four years after the crime and almost three and one-half years after his first trial.

Furthermore, individual *voir dire* of the prospective jurors at trial revealed that only one member of the venire had a fixed opinion against the appellant. That prospective juror was properly challenged and dismissed. The other members of the venire, although some were also challenged and dismissed, indicated either that they had little or no knowledge of the crime or that they could lay aside any preconceived notions about appellant's guilt and render a verdict based on the evidence presented in court. These circumstances demonstrate compliance with the juror fairness and impartiality standards outlined in *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975). *See*, *Anderson v. State*, *supra*, and cases therein cited; *Moulds v. State*, *supra*. As in *Murphy*, *Anderson*, and *Moulds*, the appellant, herein, has failed to prove that, due to inherent or actual prejudice, he did not receive a fair and impartial trial. The trial court was, therefore, justified in denying his change of venue motion.

*Giles v. State*, 554 So. 2d 1073, 1076 -78 (Ala. Crim. App. 1984).

Giles argues the state court's decision is based upon an unreasonable determination of the facts in light of the evidence before it, and an unreasonable application of federal law. Since Giles relies heavily on the Supreme Court's opinion in *Murphy v. Florida*, *supra*, this court will begin with the holding in that case, which reads in pertinent part as follows:

The constitutional standard of fairness requires that a defendant have 'a panel of impartial,' 'indifferent' jurors.' *Irvin v. Dowd*, 366 U.S. at 722, 81 S. Ct. at 1642. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside

his impression or opinion and render a verdict based on the evidence presented in court.' *Id.*, at 723, 81 S. Ct. at 1642.

At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' *Ibid.*

*Murphy,* 421 U.S. at 799-800.

Giles does not contend that the Alabama Court of Criminal Appeals made unreasonable factual findings concerning the content of the survey, although he disagrees with the conclusions drawn from it. He does take issue with the factual findings made by the state court in connection with *voir dire*. He asserts that it was unreasonable for the court to find that, apart from one excused juror, "'[n]one of the other prospective jurors expressed any prejudice against the appellant,'" because "none of the prospective jurors were ever asked during *voir dire* if they had formed an opinion in the case or believed Mr. Giles to be guilty." (Doc. no. 44 at 7 (quoting *Giles*, 554 So. 2d 1075)) (emphasis omitted, alteration in original). Further, in his reply brief, Giles states that "[t]he trial court never asked any of the prospective jurors the elementary question of whether they had formed opinions or impressions based on their knowledge of Giles's prior conviction and death sentence." (Doc. 57 at 2-4) (alteration supplied).[62]

---

[62] Pages 3 and 4 contain argument pertaining to Claim I.A.2.f.i in this memorandum opinion. That claim is "*Trial Court Failed to Excuse* [14] *Jurors who Knew of Giles's Prior Conviction and*

To overcome the presumption of correctness that attends the state court's findings of fact, Giles must show by clear and convincing evidence that such findings are unreasonable in light of the record. He has not done so. A thorough examination of the *voir dire* (spanning 400 pages of the trial record and 3 days of the trial) reveals the qualification of the entire venire by the trial court, panel *voir dire*, individual *voir dire*, detailed challenges for cause, and rulings on those challenges for cause. (R. Vol. 12, Tab. 3, at 62-199; *id.*, Vol. 12, 201-399; *id.*, Vol. 13, 300-486). The record shows that jurors were repeatedly asked by counsel and, at times, by the trial court judge, whether they had knowledge of the case, and whether they had formed an opinion in the case, or believed that Giles was guilty.[63] Extensive panel *voir dire* and individual *voir dire* were conducted by counsel, who repeatedly asked questions designed to uncover whether the prospective jurors could be impartial if they had heard about the case through pretrial publicity, and whether the prospective jurors were aware of Giles's previous conviction and sentence. Moreover, the questioning was conducted in such a manner that no juror could be tainted by another juror's

---

*Death Sentence*" in the petition. (alteration supplied). However, the claim is without merit. *See infra*.

[63] For specific references in the trial record, *see* R. Vol. 12, Tab. 3, at 61, 62, 94-95, 102-03, 138-39, 163-64, 166-67, 187, 189-92, 195-99, 200; R. Vol. 13, at 201-06, 208-10, 213-20, 227-29, 233, 235-36, 238-39, 244-45, 249-50, 255-56, 261-62, 267-68, 275-76, 281-82, 285-86, 290-91, 296-97, 299-305, 307, 311-12, 315-16, 317-19, 327-28, 331-32, 335-36, 340-41, 343-45, 347-48, 354-56, 359, 363-64, 367-68, 372-74, 377-79, 384-85, 387-89, 393-94, 396-97; R. Vol. 14, at 401-04, 408-09, 411-13, 418-20, 424-25, 429-30, 436-37.

knowledge of a prior conviction or sentence.  The appellate court properly found that the *voir dire* ensured Giles a fair and impartial jury, and its factual findings are entitled to due deference.  *Murphy*, 421 U.S. at 799-800.

Giles also cannot show that the state appellate court's decisions regarding *voir dire* were based on an unreasonable determination of the facts.  Thus, the remainder of Giles's claim boils down to a survey which showed that 85% of those surveyed had heard about Giles's case, and more than half of those individuals felt that he was either guilty or probably guilty of the offense.  Giles does not reveal whether those feelings were derived entirely from pretrial publicity.  Even if they were, there is no evidence showing the pretrial publicity was prejudicial.  It was not unreasonable for the state court to determine that the survey was ambiguous or inconclusive, especially in light of the responses given by the *actual* jurors questioned during *voir dire*, as opposed to the responses of hypothetical jurors questioned during the course of the public opinion survey.

Further, Giles cannot show that the state appellate court's legal conclusions are contrary to, or an unreasonable application of, clearly established federal law.  A change of venue is not mandated simply because "potential jurors have been exposed to the facts of the case."  *Meeks v. Moore*, 216 F.3d 951, 960 (11th Cir. 2000).

In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

*Irvin v. Dowd*, 366 U.S. 717, 722-23 (1961) (emphasis supplied) (citations omitted).

*See also*, *e.g.*, *Mills v. Singletary*, 63 F.3d 999, 1011-12 (11th Cir. 1995) (holding that the jury was not prejudiced, even though 70 of 84 venirepersons had some knowledge of the case, 55 of those 74 had seen at least one article about the case, and 24 were stricken for bias, because the media coverage of the capital murder case had primarily been factual). Clearly, the Alabama Court of Criminal Appeals relied upon *Murphy*, the correct authority, for the rule it applied.

Giles's claim hinges on the results of the survey and statements made at *voir dire*. However, both show only that a large percentage of individuals acknowledged exposure to, and may have had an opinion on, the circumstances of the case. Those facts, standing alone, are "essentially irrelevant," because the question is "whether the jurors at [petitioner's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035 (1984).

The record confirms that only one venireperson harbored a fixed opinion of petitioner's guilt based upon his exposure to pretrial publicity, and that the venireperson was removed for cause.

After careful review of the record and briefs, this court concludes that the resolution of that claim by the state courts was neither contrary to, nor an unreasonable application of, Supreme Court precedent.  There is no evidence that the trial court's denial of petitioner's motion to change venue, or the state appellate court's affirmance of that ruling, was contrary to, or involved an unreasonable application of, clearly established federal law, or that it constituted an unreasonable determination of the facts in light of the evidence presented in state court.  *Habeas* relief for the claim should be denied.

### (ii).   *Counsel ineffective for failing to adequately research pretrial motions or obtain change of venue*

Giles agrees that he failed to raise this claim on collateral appeal.  (Doc. no. 57, at 51).  Accordingly, it is procedurally defaulted and due to be dismissed.  He has not presented any basis for concluding that there is cause and prejudice to excuse the default, nor has he shown his actual innocence of either of the capital murders or his legal ineligibility for the death sentence.

But even if this claim were not procedurally defaulted, it would be denied as meritless, because petitioner has failed to show that counsel's efforts to obtain a change of venue were professionally unreasonable. Counsel advocated strongly for a change of venue, including conducting individual *voir dire* to stress the level of familiarity with the case possessed by potential jurors. Under *Strickland v. Washington*, 466 U.S. 668 (1984), petitioner has not shown that counsel acted unreasonably, or that any other course of conduct would have resulted in a changed venue.

### b. Trial judge improperly refused to recuse (Doc. no. 44, at 7) (Doc. no. 45, at 3)

Giles claims that he was denied a fair trial and sentencing because the same judge presided over his 1979 and 1982 trials. (Doc. no. 45, at 3). He argues that the trial judge's bias affected the guilt phase of his 1982 trial, because the judge made a statement to the venire that he realized that they probably did not want to be there. *Id.* at 4 (quoting R. Vol. 12, Tab. 3, at 49)[64]. The judge also denied several pre-trial motions that he had allowed to Giles in 1979. *Id.* (citing R. Vol. 12, Tab. 2, at 45)[65].

---

[64] That statement was made as part of the judge's initial discussion to the venire regarding their duty as citizens to participate in jury service.

[65] Giles fails to describe the motions that were denied and how bias could be inferred from the denial. At least one motion was simply a motion to renew all motions filed in the 1979 trial. That is a conclusory allegation that is insufficient to raise a question of bias on the part of the trial judge.

Giles asserts that the most crucial indicator of the trial judge's bias was the denial of his motion for forensic reports concerning Aaron Jones's bloody clothes[66] — information that, Giles contends, would have shown that co-defendant Jones was responsible for Willene Nelson's stabbing. *Id.* at 4-5.

When Giles raised this claim on direct appeal, the only allegations he asserted in support of an accusation that the trial judge lacked impartiality pertained to the sentencing phase of the trial. (C.R. Vol. 28, Tab. 40, at 23-24). Specifically, Giles asserted that the trial judge must have been biased against him because, at his 1979 trial, the judge found two mitigating circumstances, even though the defense presented no mitigating evidence. *Id.* Yet, in the face of extensive mitigating evidence presented at the 1982 retrial, the trial judge found only one mitigating circumstance. *Id.*

When that contention was raised on direct appeal, the Alabama Court of Criminal Appeals made the following findings of fact and conclusions of law:

> Appellant's argument that the trial judge should have recused himself simply because he had sentenced the appellant to death by electrocution at appellant's first trial for the instant offense is also without merit. *See, Whisenhant v. State*, 482 So. 2d 1225 (Ala. Cr. App. 1982), affirmed in part, remanded with directions on other grounds, 482 So. 2d 1241 (Ala. 1983). Contrary to appellant's argument, the trial judge's findings with regard to mitigating circumstances do not reveal, or even imply, any prejudice against the appellant.

---

[66] Giles provides no citation to the record for that assertion.

*Giles v. State*, 554 So. 2d 1073, 1076 (Ala. Crim. App. 1984).

Giles tacitly admits in his reply brief that his bias complaints against the trial judge on direct appeal pertained exclusively to *sentencing issues*. (Doc. no. 44, at 7) (asserting that the trial court changed its finding). Even so, he contends that the state appellate court's decision is an unreasonable application of *Santobello v. New York*, 404 U.S. 257, 262-63 (1971), a case in which "the Supreme Court required the assignment of a new judge for re-sentencing in a non-capital case" because "the 'interests of justice' demanded, at a minimum, 'resentenc[ing] by a different judge.'" (Doc. no. 44, at 7-8) (alteration in original).

The court will not consider the factual basis Giles now presents as support for that claim because he did not present it in a timely manner to the state courts, despite having the opportunity to do so. To the extent that Giles now argues that proof of the trial judge's bias against him lies in the judge's rulings on pretrial discovery, his failure to argue that to the state courts renders the claim procedurally defaulted for federal *habeas* purposes. Additionally, any allegations of judicial bias pertaining to his 1982 death *sentence* are moot, in that the sentence was reversed, and he was afforded a re-sentencing trial before a different judge in 1991.

Further, even reading that claim to allege that the trial judge lacked impartiality during the guilt phase of trial, and not just the sentencing phase, petitioner has not

pointed to any evidence suggesting a lack of impartiality.  The mere fact that different

rulings occurred in the 1982 trial than had occurred in the 1978 trial does not

establish bias on the part of the judge.  Even if this court might disagree, it was not

objectively unreasonable for the state courts to fail to read *Santobello* as requiring

recusal simply because the same judge had presided at petitioner's 1978 trial and

sentencing.  Petitioner's selected citation to *Santobello* is *dictum*, not the holding in

the case.  *Santobello* held that the defendant was entitled to a new sentencing hearing

because the prosecutor breached a plea agreement under which the defendant agreed

to plead guilty in exchange for the prosecutor's agreement that the state would not

recommend a punishment during the sentencing hearing.  The Supreme Court held:

> On this record, petitioner 'bargained' and negotiated for a
> particular plea in order to secure dismissal of more serious charges, but
> also on condition that no sentence recommendation would be made by
> the prosecutor.  It is now conceded that the promise to abstain from a
> recommendation was made, and at this stage the prosecution is not in a
> good position to argue that its inadvertent breach of agreement is
> immaterial.  The staff lawyers in a prosecutor's office have the burden
> of 'letting the left hand know what the right hand is doing' or has done.
> That the breach of agreement was inadvertent does not lessen its impact.
>
> We need not reach the question whether the sentencing judge
> would or would not have been influenced had he known all the details
> of the negotiations for the plea.  He stated that the prosecutor's
> recommendation did not influence him and we have no reason to doubt
> that.  Nevertheless, we conclude that the interests of justice and
> appropriate recognition of the duties of the prosecution in relation to
> promises made in the negotiation of pleas of guilty will be best served

by remanding the case to the state courts for further consideration.  The ultimate relief to which petitioner is entitled we leave to the discretion of the state court, which is in a better position to decide whether the circumstances of this case require only that there be specific performance of the agreement on the plea, *in which case petitioner should be resentenced by a different judge*, or whether, in the view of the state court, the circumstances require granting the relief sought by petitioner, *i.e.*, the opportunity to withdraw his plea of guilty.  We emphasize that this is in no sense to question the fairness of the sentencing judge; the fault here rests on the prosecutor, not on the sentencing judge.

*Santobello*, 404 U.S. at 262-63 (emphasis supplied, footnote omitted).  *Santobello* does not stand for a blanket constitutional proposition that a new judge is required every time there is a re-sentencing.  The Alabama courts' failure or refusal to read *Santobello* as petitioner suggests was not objectively unreasonable under 28 U.S.C. § 2254(d), and its resolution of the claim is entitled to deference.  The claim is procedurally defaulted, meritless, and due to be dismissed.

### c.    Jury selection method was unconstitutional and underrepresented blacks (Doc. no. 44, at 8) (Doc. no. 45, at 5) (Doc. no. 57, at 37-38)

Petitioner alleges that, at the time of his 1982 trial, the Blount County Circuit Court used the "beat committee" system for selection of potential jurors, and that such a system of seletion resulted in an unconstitutional under-representation of African-Americans in the jury pool.  Respondent answers that the claim is procedurally defaulted because it could have been, but was not, raised at trial or on direct appeal.

(Doc. no. 52, at 11 (citing Ala. R. Crim. P. 32.3(a)(3) and (5)).  Alternatively, respondent asserts that the Alabama Court of Criminal Appeals properly refused to consider the claim because it was raised for the first time in the third amended Rule 32 petition that was not filed before the trial court's entry of judgment denying Rule 32 relief.  (Doc. no. 52, at 11); (Doc. no. 53, at 14 (citing *Giles v. State*, 906 So. 2d 963, 972-73 (Ala. Crim. App. 2004)).

Giles does not dispute respondent's answers.  (Doc. no. 57, at 37-38).  Instead, he contends that the Rule 32 court took testimony on the matter during a post-conviction evidentiary hearing, even though the issue had not been pled in the *second* amended petition.  *Id.*  Petitioner sought to file a *third* amended petition after the evidentiary hearing to conform the pleadings to the evidence presented during the Rule 32 hearing.  Nevertheless, the Alabama Court of Criminal Appeals held that the third amended petition was not filed before the trial court entered judgment denying Rule 32 relief and, thus, the claim was not properly pled as a basis for Rule 32 relief. As explained in Part IV.C of this opinion, *supra*, Giles was afforded a fair and reasonable amount of time to amend his Rule 32 petition after the hearing in order to conform his pleadings and arguments to the evidence that was presented during the post-conviction evidentiary proceedings.  He did not do so in a timely manner, however, and the Alabama courts determined as a matter of Alabama law that he had

not amended his petition to include that claim in a timely fashion.  Giles has not offered any "cause and prejudice" explanation for his failure to file the claim in a timely manner.   Therefore, the claim is procedurally defaulted and due to be dismissed.

Alternatively, the evidence that Giles himself presented at the Rule 32 evidentiary hearing shows that the claim is entirely without merit.  Giles complains that jury selection in Blount County in 1982 was conducted by "beat committee," a system in which "political leaders" identified and selected county residents for jury duty, and one that has been found to be subject to abuse.  (Doc. no. 44, at 8-9 (citing *Davis v. Zant*, 721 F.2d 1478, 1484 (11th Cir. 1983); *Castaneda v. Partida*, 430 U.S. 482 (1977)).  But Giles's own evidence, presented through the testimony of juror Wayne Gallegly, shows that factual predicate to be untrue.  As Chairman for the Blount County Republican Party, Gallegly testified that the beat committee selection process had been used in the past, but that it was not used in this case:

> I can tell you when he [Giles] was tried in 1982 that it [selection of prospective jurors] was done on our driver's license number.  In the earlier year the beat committee would give names to people and they would check, but not in this case.  It had already gone to — I don't know when the exact time was, but I do know that — I know it was done by driver's license in 1982.

(R. Vol. 34, at 380-81 (alterations supplied)).  Gallegy also remembered that, while the attorneys were thanking jurors for their service after the conclusion of the 1982 retrial, someone asked how the prospective jurors had been selected, and was informed that jurors were selected by driver's license number.  *Id.* at 381. Accordingly, the claim is both procedurally defaulted and without merit.

> ### d.   Counsel ineffective for failing to challenge state's removal of sole black juror (Doc. no. 44, at 9) (Doc. no. 45, at 6) (Doc. no. 57, at 30)

Giles admits that the claim is procedurally defaulted because it was not raised in state court.  (Doc. no. 57, at 30).  He has not attempted to offer any "cause and prejudice" explanation for his failure to do so, nor does he argue a fundamental miscarriage of justice in relation.  As such, the claim is due to be dismissed.

Even if the claim were considered on the merits, it still should be denied.  Giles contends that his 1982 trial attorneys were ineffective because they failed to make a *Batson* objection to the peremptory striking of juror Addie Alexander, the only African-American prospective juror included in the venire.  On the date of Giles's 1982 retrial, however, *Batson* had not been announced by the Supreme Court, and would not be for another four years.  *See Batson v. Kentucky*, 476 U.S. 79 (1986). Counsel cannot be faulted for not anticipating the Supreme Court's decision.

Even if a *Batson* standard were applied, it is plain that a reasonable attorney could have concluded that a *Batson* objection to striking Ms. Alexander would have been futile.  During *voir dire*, she answered that she felt it was "okay" for people to occasionally smoke marijuana:  a criminal offense under the laws of Alabama.  (*See* R. Vol. 12, Tab 3, at 159).  A reasonable defense attorney could have seen that response as giving the prosecution a legitimate, non-racial reason to strike Ms. Alexander, thereby making a *Batson* objection meritless and futile.  Under the circumstances, it cannot be said that Giles's trial counsel were ineffective for failing to object to the peremptory strike.  The claim is due to be denied for all of those reasons.

### e.   Counsel ineffective for failing to *voir dire* on racial bias (Doc. no. 44, at 10) (Doc. no. 45, at 6-7) (Doc. no. 57, at 38-40)

Giles admits that he attempted to raise this claim in his third amended Rule 32 petition, but the state court did not address it because that was filed after entry of the judgment denying Rule 32 relief.  (Doc. no. 44, at 10) (Doc. no. 45, at 6).  The claim is procedurally defaulted because it has not been presented to the state courts, and any attempt to do so now would be untimely and successive under Rule 32.  Accordingly, it is due to be dismissed.

Even if Giles were to rely on the Supreme Court's decision in *Martinez v. Ryan*, _ U.S. _, 132 S. Ct. 1309 (2012), to argue that the ineffectiveness of his post-conviction counsel constitutes "cause" to overcome the procedural default of the claim, he must demonstrate that post-conviction counsel's failure offended the *Strickland* standard, and that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit. *Martinez* at 1319 (citing *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (describing standards for issuing certificates of appealability)). For the reasons that follow, Giles cannot demonstrate the necessary cause and prejudice to overcome the procedural default of this claim.

In his amended petition, Giles asserts that the victims were white, and that he was a young black male being tried in a rural Alabama county in 1982. (Doc. no. 45, at 6). He asserts that counsel were aware of "[t]he need to conduct *voir dire* on . . . racial bias" because the results of the Blount County survey they conducted to support their motion for a change of venue showed that 44% of those polled "believed blacks were more prone to violence that whites." *Id.* at 6-7 (citing R. Vol. 12, Tab. 2 at 23-25) (alteration supplied).[67] Giles also asserts that his case was "racially

---

[67] Conversely, that means that 56% of the persons polled did not believe that blacks were more prone to violence than whites.

102

sensitive," because one of the victims had called Giles a "nigger," and had threatened him only moments before Giles shot the victim. (Doc. no. 44, at 10).

Giles further alleges that two statistical studies published in 1998 and 2008 by the Equal Justice Initiative, which is headquartered in Montgomery, Alabama, demonstrated that black defendants were more likely to receive the death penalty when a white person was the victim, and that black people were "significantly underrepresented in the juries that convicted and sentenced them to death." (*Id.* at 7) (citations omitted). He argues that Supreme Court precedent requires "*voir dire* on racial bias . . . in capital cases involving the murder of a white person by a black defendant." (Doc. no. 44, at 10 (citing *Mu'min v. Virginia*, 500 U.S. 415, 424 (1991), and *Turner v. Murray*, 476 U.S. 28, 37 (1986)). Giles concludes that "the failure by the court and defense counsel to *voir dire* on racial bias" deprived him of his Sixth Amendment right to a fair and impartial jury. (Doc. no. 45, at 7).

Neither *Mu'Min* nor *Turner* hold as a matter of federal constitutional law that trial counsel is required to conduct *voir dire* on racial bias. Instead, those cases only require the trial judge to address racial bias during *voir dire if requested by trial counsel*.[68] Here, counsel did not make such a request, or conduct racial bias *voir dire*,

---

[68] For example, the Supreme Court's opinion in *Turner v. Murray* held that a "defendant cannot complain of a judge's failure to question the venire on racial prejudice unless the defendant has specifically requested such an inquiry." 476 U.S. 28 at 36.

but neither those facts, nor the reasons Giles presents to argue that racial *voir dire* was necessary, convince the court that such omissions were "outside the range of reasonable professional judgment." *See Strickland*, 466 U.S. at 690.[69]

Even if trial counsel's failure to conduct racial *voir dire* was improper, Giles has not established that he suffered actual prejudice as a result. None of his statistics pertain to the particular venire in his case, nor does he point to any evidence showing that the empaneled trial (petite) jurors who actually decided his guilt were racially biased. Additionally, the evidence against Giles at the guilt phase of his trial was overwhelming. Further, any contention that he suffered prejudice at the penalty phase of trial is moot, because his death sentence was reversed on appeal. Thus, state post-conviction counsel's failure to preserve that ineffective assistance of trial counsel

---

[69] In a November 8, 1998 deposition, defense attorney Dennis Balske acknowledged his concern about the interracial aspect of the crime. In the context of questioning concerning *voir dire*, Balske testified: "Yes, the victims were white. The whole county, Oneonta County [sic], is white. There are no blacks in the entire county and both defendants were black." R. Vol. 59, Balske Dep. I, at 67. When asked if he conducted *voir dire* on the issue of racial bias, Balske answered: "I couldn't tell you." *Id*. No further questions were asked about the matter.

In an October 1998 deposition, John Carroll was asked general questions about his practice of conducting *voir dire*, but none of the questions pertained to racial bias in the context of Giles's case. R. Vol. 59, Carroll Dep. at 635-36. He acknowledged that certain questions were typically asked of the jury, such as whether they knew the victims or the prosecutor. Carroll also added, "With this caveat, and that is every case is different. But that certainly would — the kinds of questions you've just posed to me would be the kinds of questions that would ordinarily be asked. Whether there is in a specific case why those questions weren't asked, there might be such a case." *Id.*

claim during the Rule 32 proceedings cannot establish cause and prejudice to overcome the default under *Martinez*.

  **f. Trial court failed to excuse jurors who knew of Giles's prior conviction and death sentence; counsel ineffective for failing to secure a fair and impartial jury (Doc. no. 44, at 11-15) (Doc. no. 45, at 7-11) (Doc. no. 57, at 2-4, 30, 51, 55-56)**

   **(i). *Trial court failed to excuse jurors who knew of Giles's prior conviction and death sentence***

  Giles alleges that "the jury venire included fourteen (14) members who had prior knowledge of Petitioner's prior conviction and death sentence." (Doc. no. 57, at 3).  Trial counsel challenged the fourteen prospective jurors for cause, but the trial court denied the challenges.  (Doc. no. 45, at 7).  Giles admits that only "two out of the fourteen — namely, Henry Martin and S.J. Summers — were eventually seated as trial jurors.  (Doc. no. 45, at 7) (citing R. Vol. 14, at 454).  The record reveals that jurors Martin and Summers knew only about Giles's prior conviction, but did not know about his prior death sentence.  (R. Vol. 13, Tab. 3, at 245, 344).

  When this claim was raised on direct appeal from the 1982 conviction, the Alabama Court of Criminal Appeals held:

   The appellant further contends that the trial court erred by not dismissing "for cause" those prospective jurors who had previously heard about his conviction or sentence resulting from his first trial for this offense.  Although we agree that such prior knowledge might have

been prejudicial, we do not agree that all jurors with such knowledge should have been automatically excluded from the venire.

The trial court permitted, and participated in, a thorough and sifting, individual, *voir dire* examination of each prospective juror. The trial court carefully reviewed all challenges of these prospective jurors and excluded those who were, arguably, incapable of giving the appellant a fair and impartial trial. We have carefully reviewed the *voir dire* testimony and have determined that there was nothing improper in the trial court's refusal to strike prospective jurors solely because they had heard of appellant's prior conviction or sentence. *See Whisenhant v. State*, 482 So. 2d 1225 (Ala. Cr. App. 1982), *affirmed in part, remanded with directions on other grounds*, 482 So. 2d 1241 (Ala. 1983). After the trial court had dismissed "for cause" a number of prospective jurors properly challenged by either the state or the appellant, it concluded that the remaining members of the venire could give the appellant a fair and impartial trial, that they could lay aside opinions and impressions based on prior knowledge and render a verdict based on the evidence presented in court. Under the circumstances the trial court's conclusion was appropriate, and in compliance with standards outlined in *Murphy v. Florida*, 421 U.S. 794, 95 S. Ct. 2031, 44 L. Ed. 2d 589 (1975),[FN3] and followed in *Whisenhant v. State*, *supra*.

> FN3. Appellant's reliance on *United States v. Williams*, 568 F.2d 464 (5th Cir. 1978), for resolution of this issue is misplaced for those reasons outlined in *Whisenhant v. State*, *supra*.

Two members of the venire with prior knowledge of appellant's first conviction for this offense did serve on the jury. However, the *voir dire* testimony of these two jurors demonstrated that both had only a vague recollection of the prior conviction, that neither knew of the prior sentence, that neither was prejudiced against the appellant, that such prior knowledge would not affect their judgments in the instant trial, and that they could give the appellant a fair and impartial trial. There is no evidence of the existence of any actual jury prejudice against the appellant.

*Giles v. State*, 554 So. 2d 1073, 1079-80 (Ala. Crim. App. 1984).

Giles contends that the state appellate court "unreasonably applied" the Supreme Court's decision in *Murphy v. Florida*, 421 U.S. 794 (1975). (Doc. no. 44, at 15). He contends that *Murphy* "is a case about pre-trial publicity, not knowledge of a prior conviction for the same offense the defendant is about to be tried. . . . [T]he jurors had knowledge of defendant's criminal history of *other crimes*, not the offense they were to sit in judgment on." *Id.* (emphasis in original, alteration supplied). Giles also argues that the *Murphy* Court

> upheld the seating of jurors with prior knowledge of the defendant's other criminal convictions because the trial court conducted a *voir dire* that examined whether that knowledge would influence them in the present case. *Murphy*, 421 U.S. at 800. Thus, Murphy was protected by the kind of comprehensive *voir dire* that was completely absent in this case.

(Doc. no. 44, at 15).

The resolution of this claim by the Alabama courts was not objectively unreasonable under § 2254(d). To begin with, this court rejects Giles's assessment of *Murphy*. The Supreme Court's holding in that case was stated as follows:

> The constitutional standard of fairness requires that a defendant have 'a panel of impartial, 'indifferent' jurors.' *Irvin v. Dowd*, 366 U.S. at 722, 81 S. Ct. at 1642. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

107

'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' *Id.*, at 723, 81 S. Ct. at 1642.

At the same time, the juror's assurances that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' *Ibid*.

*Murphy v. Florida*, 421 U.S. 794, 799-800 (1975). In other words, *Murphy* held that the proper inquiry on a juror-impartiality claim is whether a juror can put aside a *preconceived notion about the guilt or innocence* of the accused; it does not require that the juror be completely "ignorant of the facts and issues involved." *Id.* The touchstone is whether the juror can exercise his duties fairly and impartially, notwithstanding some knowledge of either the defendant or the facts of the case. *Murphy* does not draw the artificial distinction between "prior criminal history" and knowledge of the defendant's prior conviction that Giles suggests. Moreover, the *Murphy* Court placed the burden to prove a juror's lack of impartiality on the shoulders of the defendant — not the trial court. Thus, the state court did not unreasonably apply *Murphy* to the facts of Giles's case.

108

The proper legal perspective from which to examine the present claim begins with the understanding that:

> The right to a jury trial "guarantees to the criminally accused a fair trial by a panel of impartial 'indifferent' jurors. *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S. Ct. 1639, 6 L. Ed. 2d 751 (1961); *see Ross v. Oklahoma*, 487 U.S. 81, 85, 108 S. Ct. 2273, 101 L. Ed. 2d 80 (1988) ("It is well settled that the Sixth and Fourteenth Amendments guarantee a defendant on trial for his life the right to an impartial jury."). *Claims that the jury was not impartial must focus on the jurors who actually sat. See Ross*, 487 U.S. at 86, 108 S. Ct. 2273; *Heath v. Jones*, 941 F.2d 1126, 1133 (11th Cir. 1991) (holding that habeas petitioner can only raise the trial court's denials of challenges for cause of those venire members who eventually sit on the jury).

*Spivey v. Head*, 207 F.3d 1263, 1273 (11th Cir. 2000) (emphasis supplied). While Giles argues at length about the *voir dire* of the twelve venirepersons who *did not sit* on his jury, those individuals are immaterial to his *habeas* claim. This court's focus must be on the two jurors who actually sat on the trial jury (Martin and Summers), and whether the trial court deprived Giles of a fair and impartial jury when it refused to strike those two jurors for cause. The state court made a factual finding that *voir dire* showed that Martin and Summers had only a vague knowledge of Giles's prior conviction, and neither had knowledge of his prior death sentence. The court found that neither juror was prejudiced against Giles, and both could be fair and impartial. Those findings are entitled to a presumption of correctness, unless overcome by clear

and convincing evidence presented by the *habeas* petitioner.   *See* 28 U.S.C. §

2254(e)(1).

> "The decision to excuse a [prospective] juror for cause upon a
> suggestion of partiality is within the sound discretion of the trial judge."
> *United States v. Taylor*, 554 F.2d 200, 202 (5th Cir. 1977).   The trial
> judge must consider whether the prospective juror has such a fixed
> opinion, based on his bias, that he "could not judge impartially the guilt
> of the defendant." *Patton v. Yount*, 467 U.S. 1025, 1035, 104 S. Ct.
> 2885, 2891, 81 L. Ed. 2d 847 (1984).   Whether an individual is so
> partial that he must be disqualified is "plainly [a question] of historical
> fact." *Id.* at 1036, 104 S. Ct. at 2891.   Thus, on federal habeas corpus
> review, a state court's determination as to the partiality of a particular
> juror is entitled to a presumption of correctness.   28 U.S.C. § 2254(d)
> (1988).   In reviewing such a finding, then, we will not set it aside
> "unless the error is manifest." *Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.
> Ct. 1639, 1643, 6 L. Ed. 2d 751 (1961) (*quoting Reynolds v. United
> States*, 98 U. S. 145, 156, 25 L.Ed. 244 (1878)).   In other words, "the
> question is whether there is fair support in the record for the state
> court['s] conclusion that the jurors here would be impartial." *Patton*,
> 467 U. S. at 1038, 104 S. Ct. at 2892-93.

*Depree v. Thomas*, 946 F.2d 784, 788 (11th Cir. 1991) (footnote omitted, alterations

in original).   That rule is further bolstered by the presumption of correctness that

attaches to a state court's findings of fact now incorporated into the AEDPA at 28

U.S.C. §§ 2254(d)(2) and (e)(1).

Giles does not deny that the record shows that Martin and Summers expressed

only a vague knowledge of his prior conviction.   He also does not contend that those

jurors were not instructed upon, and asked whether they could fulfill, their obligation

110

to decide the case on the evidence and the law.  He does not allege that the jurors

denied that they could do so, or even that they equivocated on the issue.  What Giles

argues is that there is no support for the state court's conclusion because — in his

opinion — the *trial court* did not conduct a *more comprehensive voir dire* of those

jurors.  It is not the responsibility of the trial court to *voir dire* jurors, however.

> As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, *it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  See Reynolds v. United States*, 98 U.S. 145, 157, 25 L. Ed. 244 (1879).  *It is then the trial judge's duty to determine whether the challenge is proper*.  This is, of course, the standard and procedure outlined in *Adams*, but it is equally true of any situation where a party seeks to exclude a biased juror.  *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984) (where a criminal defendant sought to excuse a juror for cause and the trial judge refused, the question was simply "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed").

*Wainwright v. Witt*, 469 U.S. 412, 423-24 (1985) (emphasis suppied, alteration in

original).  Indeed, in the context of *habeas* review, the burden is on the petitioner to

show affirmatively that the evidence before the trial court at the time the trial judge

determined that the jurors were adequately impartial was not sufficient to support the

judge's conclusion.  Petitioner has not done so.  For example, he has offered no

evidence to show that, despite the statements that each of the two jurors made during

*voir dire*, they were, in fact, biased against him. He has not shown that the *voir dire* deprived him of the opportunity to explore the degree of knowledge, or the potential for bias, that the two jurors may have possessed. Rather, the record shows that Giles was allowed to individually *voir dire* both jurors, and to question them regarding the extent of their knowledge concerning his prior conviction and sentence.[70] Giles has failed to show that the trial court's refusal to grant his challenges for cause as to jurors Martin and Summers was a manifest error based on the record before it, or that the finding of fact made by the court that they were not biased and could be impartial was unreasonable in light of the evidence gleaned from the *voir dire*. The claim is due to be denied.

> **(ii).** ***Counsel ineffective for failing to secure a fair and impartial jury***

Despite allegations to the contrary in both his petition and initial brief (doc. no. 44, at 16; and doc. no. 45, at 8, 11), Giles insists that his *habeas* petition does not raise a claim of ineffective assistance of trial counsel for failure to secure a fair and impartial jury, and that it does not raise a claim of ineffective assistance of appellate

---

[70] The court notes that, at the beginning of the individual *voir dire*, Giles's lawyers expressed concern about the dilemma they faced. While wanting to explore the possibility that jurors might be aware of their client's earlier conviction and death sentence, they also wanted to avoid inadvertently revealing that information to any who did not know about it. For that reason, the lawyers proceeded carefully with *voir dire*, terminating it whenever it appeared that a juror lacked knowledge or had only limited knowledge.

counsel for failure to challenge the trial court's denial of defense counsels' challenges for cause. (Doc. no. 57, at 51, 55-56). At page 51 of his reply brief to the respondent's answer, Giles says flatly: "This claim does not appear in Mr. Giles' [sic] habeas petition." (*Id.* at 51). Further, at pages 55-56, he states: "This claim does not appear in Mr. Giles' [sic] habeas corpus petition. It is unclear why the State is addressing a claim that was raised in the Rule 32 appeal, but is not presently before this court." (*Id.* at 55-56). Based upon the foregoing representations, this court finds that Giles has not raised the claims stated in the first sentence of this section — or, in the alternative, that he has expressly abandoned such claims.[71]

---

[71] The court notes that, in one paragraph of the amended petition, Giles asserts that trial counsel failed to secure a fair and impartial jury because they did not request that the jury venire be sequestered during the *voir dire* process so that the venire could not talk amongst themselves about such a well-publicized case and the previous conviction and death sentence. Doc. no. 45, at 9. As stated above, Giles insists that he did not raise the claim, but nonetheless argues against the state's contention that the sequestration declarations were not raised in state court by citing to his *initial* Rule 32 petition. Doc. no. 57, at 30 (citing R. Vol. 35, at 43). A review of the page cited by Giles in the initial petition reveals only a one-sentence assertion that counsel failed to secure a fair and impartial jury, with no supporting factual allegations. There is no semblance of that claim in the second amended Rule 32 petition, and it certainly was not raised on collateral appeal. There is no mention of sequestration anywhere in his post-conviction pleadings. More importantly, Giles already has insisted that he *did not raise* this claim in his *habeas* petition. Even if he had done so, any contention that counsel was constitutionally ineffective is completely without merit because, as set out in section V.A.R.f.i, *supra.*, only two of the jurors actually seated even knew about his prior conviction. Thus, as to Giles's ineffective assistance of counsel assertion with regard to sequestration, the court finds that the claim was not raised in the *habeas* petition, or, in the alternative, has been expressly abandoned by Giles, or, in the alternative, is without merit.

### g. Trial court failed to remove prospective juror Doris Layfield for cause (Doc. no. 44, at 16[72]) (Doc. no 45, at 11) (Doc. no. 57, at 4, 51)

Giles agrees that this claim was not raised on collateral appeal and, therefore, is procedurally defaulted. (Doc. no. 57, at 4, 51). He has not attempted to offer "cause and prejudice," or to argue a fundamental miscarriage of justice to excuse the default. Accordingly, the claim is procedurally defaulted and due to be dismissed.

The claim also is meritless because any error in failing to excuse juror Layfield for cause was harmless beyond a doubt. Doris Layfield was juror number 35. (*See* R. Vol. 14, at 440). Although not excused for cause by the trial court, she was peremptorily stricken *by the prosecution*. (*See* R. Vol. 14, at 452). Thus, juror Layfield did not serve on Giles's jury, and her removal did not cost Giles a peremptory strike because the state removed her first. The claim is due to be denied.

### h. Giles was prejudiced by the presence of co-defendant Aaron Jones in the courtroom (Doc. no. 44, at 18-19) (Doc. no. 45, at 12)

The claim is procedurally defaulted because it was raised for the first time in the present *habeas* petition. The claim — as distinct from a claim that trial counsel

---

[72] Giles also tried to embed an ineffective assistance of counsel claim in his initial brief. *See* doc. no. 44 at 16-17. The ineffectiveness allegations will not be considered because they were not properly pled in the *habeas* petition itself, and Giles makes no mention of them in his reply brief. Alternatively, even if the allegations in Giles's initial brief were considered to be a properly pled ineffectiveness claim, Giles never raised such a claim in state court and, as such, it is procedurally defaulted.

were ineffective for failing to object to Jones's presence[73] — was never presented to the state courts.  Consequently, it cannot now be presented, and it is procedurally defaulted.

The version of this claim that was argued in the state courts alleged that trial counsel were ineffective for failing to object to Jones's presence, not that his presence alone constituted a violation of Giles's rights.  Giles has not attempted to show "cause and prejudice," or a fundamental miscarriage of justice to excuse the default. Accordingly, the claim is due to be dismissed.

But even assuming the claim had been properly raised in state court, it still is meritless.  The Rule trial 32 court made findings of fact concerning the circumstances underlying the claim.  That court found that:

---

[73] Respondent answers the claim in the context of whether counsel was ineffective for failing to object to Jones's alleged presence in the courtroom.  Doc. no. 52, at 23-24; doc. no. 53, at 17.  In his reply brief, Giles *insists* that his allegations are made in support of the substantive claim of prejudice from Jones's presence in the courtroom — not a related claim of ineffective assistance of counsel for failure to object to Jones's presence in the courtroom.  Doc. no. 57, at 56 (The ineffectiveness "claim does not appear in Mr. Giles' [sic] habeas corpus petition. . . .[It] is unclear why the State is addressing [it] but [it] is not presently before this court.")) (alterations supplied).

The court notes, however, that the state court record citations Giles relies upon as proof that the substantive claim was raised during post-conviction proceedings consistently show that Giles only raised the underlying allegations in support of an ineffective assistance claim.  Doc. no. 45, at 12.  *See also* C.R. Vol. 40, Tab. 68, at 67; *id.*, at Vol. 52, Tab. 71, at 97; *id.*, at Vol. 54, Tab. 75, at 36.  Further, the Rule 32 court did not consider it to be anything more than an ineffective assistance claim, *see* R. Vol. 56, Tab. 87, at 118, and the state appellate court found that Giles had waived the ineffective assistance claim on collateral appeal because it was made as part of a laundry list of issues for which "Giles failed to assert any legal argument or supporting legal authorities."  *Giles v. State*, 906 So. 2d 963, 988 n.14 (Ala. Crim. App. 2004).

There is no evidence in this proceeding to support this claim and it is, therefore, denied.

Both defense counsel failed to recall this event. [Defense attorney Dennis] Balske noted that if Jones had been brought into the courtroom he would have noticed that event, he would have objected and his objection would have been reflected in the record. (Balske I 62-63) Neither the alleged event or [sic] Balske's objection is noted in the record of the 1982 proceeding.

At the evidentiary hearing before this Court, counsel for Giles asked one of the 1982 jurors about this event. The juror, Wayne Galegly, testified that a young black man wearing handcuffs and wearing a jacket was brought into the courtroom at some point during Giles'[s] trial but he could not identify that person as Aaron Jones. (Galegly Testimony, 373-378) Giles failed to prove that he is entitled to relief on this claim. This claim must fail for lack of proof. Giles failed to carry his burden of pleading and proving by a preponderance of the evidence that Aaron Jones was brought into the courtroom during Giles'[s] trial or that Giles was prejudiced by the alleged action. The claim is, therefore, denied.

(Rule 32 C.R. Vol. 38, at 118-19 (alterations supplied)). The statements quoted above accurately reflect the testimony at the Rule 32 hearing. Juror Galegly testified that a young black man in handcuffs was brought into Giles's trial four or five times, and that he "assumed" the man was Jones. The man never testified or said anything. On the other hand, defense counsel Dennis Balske had no recollection of Jones being brought into the courtroom, and would have objected if it had occurred. Based on that testimony, the Rule 32 court found that Giles failed to prove that Jones was, in fact, brought into the courtroom during the trial.

That finding of fact is entitled to a presumption of correctness under § 2254(d)(2), unless Giles can show that it is unreasonable in light of the other evidence in the record. He has not done so. Although there may be some testimony that an unidentified black man was brought into the courtroom, there is no evidence that the man was, in fact, Aaron Jones. Juror Wayne Galegly makes very clear that he only *assumed* the young man was Jones; no one ever actually identified the man as such.

More so, it is not clear how the presence of the man, even if he was Jones, prejudiced Giles. The evidence of Giles's guilt was overwhelming, including his own confession, so there is no reasonable probability that the presence of Jones in the courtroom, even if it occurred, caused Giles to be convicted. Further, his sentence from the 1982 trial was vacated on appeal. Because there is no prejudice that Giles can point to warranting *habeas* relief, the claim is due to be denied.

### 3. *Petitioner was denied effective assistance of counsel*

#### a. **Guilt phase trial counsel ineffective for failing to present a mental health defense (Doc. no. 44, at 19-20) (Doc. no. 57, at 51-52, 53-54, 75) (Doc. no. 45, at 13-14)**

Giles alleges that his trial counsel were ineffective because they failed to present a mental health defense: specifically, that Giles was so intoxicated at the time of the offense that he could not form the requisite intent to commit the crime. (Doc.

117

no. 45, at 13-14).   Respondent answers that the claim is procedurally defaulted because Giles abandoned it on collateral appeal.  (Doc. no. 52, at 25 (citing *Brownlee v. Haley,* 306 F.3d 1043, 1066 (11th Cir. 2002) (holding that a claim raised in a Rule 32 petition and abandoned on appeal is defaulted)).  Giles replies that the "claim was briefed [and fairly presented to] the Alabama Court of Criminal Appeals." (Doc. no. 57, at 51-52, 53-54) (citing Rule 32 C.R. Vol. 52, Tab. 71, at 85-89, 96) (alteration supplied).  He also contends that the appellate court "did not find" the claim to be procedurally barred, *id.,* and that the Rule 32 court's decision to dismiss the claim as insufficiently pled was arbitrary and capricious.  *Id.* at 75.

Contrary to Giles's argument, his brief on collateral appeal did not "fairly present" this claim to the Alabama Court of Criminal Appeals.  (*See* Rule 32 C.R Vol. 52, Tab. 71, at 85-89, 96).  Page 85 of the brief addresses a claim denominated as "J," the title of which reads:   "FAILURE  TO  SEEK  FUNDS  FOR INVESTIGATION  AND  EXPERT  WITNESSES."   The first paragraph of that section asserts:  "The Court's dismissal of this claim is erroneous because it fails to account for the need for experts to explain the psychiatric effects of Giles' [sic] PCP use as well as the need for experts to challenge the result from the court-ordered competency test."  *Id.* at 85-89 (alteration supplied).  The remaining argument concerns whether Giles's attorneys were ineffective for failing to challenge the

State's mental health experts regarding Giles's competency to stand trial.  *Id.*  Not

once does his collateral appellate brief argue, or even mention, the specific mental

health defense he now discusses in this petition:  *i.e.*, an affirmative defense of legal

intoxication that affected his state of mind and ability to form the requisite, specific

intent to kill at the time of the offense.  Because this claim is procedurally defaulted,

and because Giles has not attempted to offer "cause and prejudice," or to make a

showing of a fundamental miscarriage of justice, to excuse the default, the claim is

due to be dismissed.

> **b.   Counsel were ineffective for failing to challenge the State's competency exam and failing to investigate mental health issues (Doc. no. 44, at 19-20) (Doc. no. 45, at 14-18) (Doc. no. 57, at 30-31)**

Giles admits in his petition that both aspects of this claim were raised for the

first time in the third amended Rule 32 petition, filed after entry of the judgment

denying Rule 32 relief.  (Doc. no. 45, at 14).  He reaffirms that admission in his reply

brief.  (Doc. no. 57, at 30-31).  The Alabama Court of Criminal Appeals refused to

consider the claim because Giles did not file the third amended petition before the

trial court entered a final judgment in the matter.  As such, the claim has not been

presented to the state courts, and is procedurally defaulted.  Giles has not offered

either "cause and prejudice," or a showing of a fundamental miscarriage of justice, to excuse the default. Accordingly, federal review of this claim is precluded.

Moreover, the claim is without merit. It is based on counsel's failure to challenge the finding after an examination at Bryce Hospital that Giles was competent to stand trial, despite Giles's diagnosis of Anti-Social Personality Disorder. Giles contends that his trial attorneys were ineffective in not challenging that determination because the diagnosis of Anti-Social PersonalityType was facially invalid due to his age.[74] Regardless of whether the diagnosis was valid, it has nothing to do with whether Giles met the standard for competency to stand trial established by the Supreme Court's opinion in *Dusky v. United States*, 362 U.S. 402 (1960). Thus, counsel's failure to attack the validity of petitioner's diagnosis of Anti-Social Personality Disorder did not result in prejudice to petitioner, in the sense that he was incorrectly found to be competent to stand trial. The claim is due to be denied.

   c.   **Counsel ineffective for failing to investigate Carl Nelson's drug dealing to Arthur Giles (Doc. no. 44, at 20) (Doc. no. 45, at 19-31) (Doc. no. 57, at 4-7)**

---

[74] Giles argues that, under the Diagnostic and Statistical Manual ("DSM"), a diagnosis of Anti-Social Personality Disorder requires that the symptoms of anti-social behavior manifest themselves before the age of 15, *and remain present for at least five years*. Because Giles was only 19 at the time of the crime, he asserts that he could not have met the criteria for the diagnosis. He ignores the fact that, if the Disorder had an onset date prior to age 14, he met the diagnostic criteria.

Giles alleges that his defense attorneys did not conduct a reasonable investigation into the relationship between him and Carl Nelson. (Doc. no. 45, at 19). He argues that

> an investigation into the relationship between Carl Nelson and Arthur Giles would have revealed much mitigating evidence concerning Giles [sic] drug addiction and Carl Nelson's drug dealing. Defense counsel's failure to investigate Mr. Giles'[s] history of drug addiction deprived the Petitioner of his 6th Amendment right to counsel. *Brownlee v. Haley*, 306 F.3d 1043 (11th Cir. 2002).

> Counsel's failure to investigate the role of drugs in this crime and present evidence of Petitioner's intoxication and extreme emotional disturbance violated Petitioner's right to present mitigating evidence. *See Williams v. Taylor*, 529 U.S. 362 (2000) (habeas petitioner's constitutionally protected right to provide the jury with mitigating evidence was violated by his counsel's failure to discover evidence.).[75]

(Doc. no. 44, at 20).

Giles does not allege that counsel's purported failures constituted ineffectiveness at the guilt phase of his trial.[76]   Plainly, the claim focuses on the assertion that counsel failed to investigate the relationship as a source of potential mitigating evidence relevant to the sentencing phase of the 1982 trial.[77]   Because the

---

[75] This paragraph is repeated in Giles's reply brief. Doc. no. 57, at 7.

[76] Moreover, in his brief on collateral appeal, Giles restricted his argument to the sentencing phase of trial, *see* Rule 32 C.R. Vol. 52, Tab. 71, at 79-80, and the appellate court considered it within that context. *Giles v. State*, 906 So.2d 963, 984-86 (Ala. Crim. App. 2004).

[77] The structure of the Second Amended Petition dictates that reading. Petitioner has separated his claims between those arising from the 1982 trial, and those arising from the 1991 re-sentencing trial. The instant claim appears to relate to the 1982 trial because petitioner makes a similar claim with respect to the 1991 re-sentencing trial later in the Second Amended Petition, at

1982 death sentence was reversed on appeal, any failure of counsel to investigate,

marshal, and present mitigating evidence at that time is moot.

The Alabama Supreme Court reversed the death sentence Giles received upon

his second capital conviction in 1982. *See Giles v. State*, 554 So. 2d 1089 (Ala. Crim.

App. 1987). Giles was afforded a re-sentencing trial that occurred in 1991. As such,

any claims of ineffective assistance of counsel in connection with the penalty and

sentencing phases of his 1982 trial are moot. It was not the sentencing proceedings

in 1982 that resulted in the death sentence he is now under; instead, that sentence is

the product of the 1991 re-sentencing trial. Because any issues arising from the 1982

sentencing hearing are moot, the claim is due to be dismissed.

> **d.    Defense counsel ineffective for failing to investigate Giles's PCP use and present expert testimony on its impact (Doc. no. 44 at 21-31) (Doc. no. 45 at 32) (Doc. no. 57 at 7-14, 57-61, 75)**

Defense attorney Dennis Balske testified that, while he was aware that Giles

had been "partying" with alcohol and marijuana on the night of the murders, he was

not aware that Giles had used PCP; *and*, *if* he had known that Giles used PCP on the

night of the crimes, he "would have sought out an expert." (Balske, Dep. I, R. Vol.

59, at 69). Giles alleges that Balske's lack of "awareness" can be attributed to his

---

paragraphs 307-313. Thus, this court reads the instant claim as focusing on the alleged
ineffectiveness of counsel at the 1982 trial and sentencing. As noted in the text, the 1982 death
sentence was reversed and remanded for a new sentencing hearing by the Alabama Supreme Court.

failure to "sufficiently" investigate the case. (Doc. no. 45 at 32). He argues that Mr. Balske's failure to investigate and, thereby, to learn that Giles had used PCP, and to present expert testimony about its impact on a user's mental state — particularly the possibility of drug-induced psychosis — constituted ineffective assistance of counsel. *Id.*

Giles does not specifically state whether he is attacking his defense attorney's performance at the guilt or sentencing phases of the 1982 trial. Instead, his reply brief states only that

> the failure of Petitioner's counsel in 1982 to present evidence of Arthur Giles' [sic] serious use of PCP at the time of this crime was not a "strategic choice" resulting from a reasonable investigation. *Jackson v. Herring*, 42 F.3d 1350, 1367 (11th Cir. 1995) (counsel must be informed of available options to make a reasonable decision about whether to present certain mitigating evidence).

(Doc. no. 57 at 8). Giles is responsible for clearly and succinctly stating the nature and parameters of his claim in accordance with the rules governing *habeas* proceedings.

In the brief Giles filed on collateral appeal, he restricted his argument on the issue to the *sentencing phase* of trial (see Rule 32 C.R. Vol. 52, Tab 71, at 79-82), but the appellate court looked at the issue both ways: that is, as an allegation that defense counsel had been ineffective for failing to investigate a potential defense to the

substantive question of Giles's guilt, as well as for failing to present mitigating evidence during the sentencing phase of trial. *See Giles v. State*, 906 So. 2d 963, 982-88 (Ala. Crim. App. 2004).

Thus, assuming that Giles is once again asserting the ineffectiveness of defense counsel during the *sentencing phase* of trial, that issue is moot, because his 1982 death sentence was reversed by the Alabama Supreme Court. Accordingly, such a contention is due to be dismissed.

Since Giles has not explicitly stated otherwise when framing his claim, however, this court will assume that he also is alleging that his defense attorney provided ineffective assistance during the *guilt phase* of his 1982 trial. If that is the case, then Giles cannot show that the state courts' rejection of the claim was contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence before them. The Rule 32 trial court made extensive factual findings, supported by record citations to evidence pertinent to the claim in the context of the 1979 and 1982 trials. (Rule 32 C.R. Vol. 56, Tab. 87, at 67-83). Those findings are set out below:

> Giles was represented at both his first and second trials by John Carroll and Dennis Balske. During pre-trial proceedings for the 1979 trial, the trial court made a record concerning Giles'[s] representation by Carroll and Balske. (1st T. 403-409) The Court noted that counsel had been appointed to represent Giles. Appointed counsel were relieved of

124

representation when Giles chose to be represented by Carroll and Balske. Giles acknowledged, in open court, that he selected Carroll and Balske as his attorneys and stated that, if he had money of his own to hire attorneys, Balske and Carroll would be the attorneys he would hire. (1st T. 405) During the discussion, Carroll informed the court that he and Balske had discussed their experience with Giles. Carroll stated he and Balske had already handled a large number of capital murder cases. (1st T. 406-407) Carroll, alone had tried twelve such cases, three in Alabama and the remainder in the Southeastern United States. He had handled [an] even a larger number of capital cases on appeal. Balske had tried five capital cases, one in Alabama, and handled a larger number of capital cases since 1974. (1st T. 407) Carroll and Balske were admitted to the bar in 1974, Balske in Ohio and Carroll in Alabama. (1st T. 408) Giles, however, waived the five-year requirement for appointed counsel under § 13-11-8, Code of Alabama (1975). (1st T. 406, 409) The court noted that Carroll had tried more capital cases than any other lawyer in Alabama had at that time. (1st T. 407)

In his deposition, Carroll testified that, from 1975 to 1984, when he entered private practice, he spent fifty percent of his time defending death penalty cases, although he could not remember exactly how many such cases he tried. (Carroll Deposition 5) Carroll estimated that the number of cases he worked on was between 25 and 50. (Carroll 30) He trained other lawyers to work in capital trials and developed manuals for use in death penalty cases. (Carroll 6-7) At seminars, Carroll taught capital case defense, especially conducting voir dire and preparing for the penalty phase of a capital case. (Carroll 7) The subject matter of the seminars and manuals was developed from Carroll's own experience.

John Carroll testified that he could not specifically recall very much at all about this case. At the time of his deposition, he had not seen the trial records in years. (Carroll 8) It was his practice at the time, however, as an attorney defending capital murder cases, to investigate the use of drugs, types of drugs and effects of the drugs used. He stated that this information would be used in forming the trial strategy for the defense. (Carroll 10, 20) At the time these trials occurred, Carroll was

125

familiar with the drug PCP but, at his deposition, he could not recall if he knew about "blues" and "T's." (Carroll 19)

Carroll testified that the defense presented at trial was the defense he and Balske decided to use after considering the facts and circumstances and forming a defense strategy. (Carroll 14-15) He stated that, whether he used evidence of drug and alcohol use as a mitigating factor, depended entirely on the facts and circumstances of each case. (Carroll 10) The same would be true for use of a social worker as an expert witness. (Carroll 12-13) Carroll also stated that it was his practice in preparing capital murder trials to investigate every fact he could uncover. (Carroll 31)

Balske and Carroll represented Giles aggressively. In preparation for trial, they conducted extensive investigations into Giles'[s] drug use and mental health background. The record is replete with indications that such an investigation was performed.

In his deposition in this case, Balske recalled he discussed drugs with Giles. Balske recalled pursuing the drug issue, talking with Giles and reading reports from people doing the investigation of the facts for the defense. He recalled pursuing the issue to determine the types of drugs Giles was using. (Balske I 45) He remembered that he knew more about Giles'[s] drug use at the second trial and specifically remembered there was more than one kind of drug being used. (Balske I 45-46) More specifically Balske recalled Giles telling defense counsel about 'partying' the night of [the] murders. Balske recalled learning that alcohol and marijuana, and maybe other drugs, had been used. (Balske I 70) In discussing his drug use, Giles could have told Balske he used PCP, but Balske could no longer remember if Giles did tell him. Balske did recall, however, being told about other drugs by other witnesses. (Balske I 70) Balske believed that, if he knew about PCP, he would have pursued obtaining an expert to learn about effects of that drug. (Balske I 69)

At the evidentiary hearing in this matter, Dr. William A. Morton, Jr., Doctor of Pharmacy, a professor of pharmacy at the University of

South Carolina, testified for the Petitioner as an expert in pharmacology and the effects of certain drugs on human beings. In his testimony, Dr. Morton confirmed that defense records showed Giles'[s] drug use was extensively investigated. Morton stated he learned of Giles'[s] drug use from three sources, the medical records from Bryce hospital, Giles'[s] self-reporting, and notes of interviews supplied to him by Giles's present attorney Ms. Wessels. Morton testified he also learned about the drug use in part, from

> [t]he records from previous trial notes, from interviews with other people that knew him, girlfriends, other — I'm not sure exactly who they were. I didn't — I didn't know that that would be admissible. So, I didn't really pay too much attention, because they were someone else's notes. And I didn't know that data could be useful. But it was clear that a lot of work had gone into his past drug use. And it looks like it was in '79 and '80. I'm surprised it was never brought up.

(Morton testimony 89-90) Morton mentioned more specifically that some of the information on Giles'[s] drug use came from Giles'[s] 1978 and 1982 attorneys' notes from interviews with Melinda Faye Fisher and Brenda King. (Morton testimony 98)

Bernard Harcourt, one of Giles'[s] last appellate counsel, verified that an extensive investigation was conducted and experts were consulted. Harcourt testified that, from his review of the defense files, Balske had done a lot of work developing mitigation evidence. Harcourt confirmed that investigators spoke to a lot of witnesses and that the files contained a lot of 'mental health work-up.' (Harcourt Dep. 9)

Prior to trial, Balske and Carroll also took the depositions of Dr. Thomas L. Smith and Dr. James C. Thompson, the psychiatrists who examined Giles for the Lunacy Commission Report. From Dr. Thompson, they learned that Giles did not suffer from any mental illness or extreme emotional disturbance. Dr. Thompson believed that Giles was capable of assisting in his own defense and knew right from wrong at the time of the offense. (Thompson Deposition 14-15) Dr. Thompson

noted that Giles was under the influence of alcohol at the time of the murders but found that Giles was able to recall the events in some detail[78] and understood the difference between right and wrong at the time of the offense. (Thompson 14)  He found that Giles acknowledged being an active participant in the murders, [and] acknowledged that he was aware that he killed people.  (Thompson 8)  Giles reported to Thompson that he used only scotch and beer on the evening of the offense. (Thompson 12) Dr. Thompson also testified that Giles suffered from a character or personality disorder, "anti-social personality disorder," indicated by his trouble with the law, immediate need gratification, "short fuse", and impulsivity.  Thompson also noted that Giles does not usually benefit from punishment.  (Thompson 10) Thompson found that the disorder did not have anything to do with the ability to distinguish right from wrong and that Giles was not suffering from any irresistible influence at the time of the offense. (Thompson 15)

Balske and Carroll also learned information from Dr. Thomas D. Smith's deposition.  Smith took a personal history from Giles. (Deposition of Thomas L. Smith 11)  Giles denied being abused as a child.  (Smith 12)  He admitted to some disruptive behaviors and disciplinary problems with his peers and teachers during his school days. Giles also told Smith about his stabbing a fellow student when Giles was 13 years old. (Smith 13) Giles reported to Smith that he was a weekend drinker, using mostly scotch and beer.  (Smith 13-14) Giles admitted to Smith that he had used some drugs, i.e., LSD, marijuana, some stimulants, and some sedatives.  Giles also acknowledged some intravenous use of drugs.  He denied dependency on any of these substances, however. (Smith 14) Giles told Smith that he had no severe depression, hallucinations or delusional periods.  (Smith 16)  After conducting a psychiatric examination of Giles, Smith diagnosed a personality disorder, anti-social type, 301.7 D.S.M. II.  (Smith 19-21)

---

[78] The trial court inserted footnote number "23" at this point in its opinion, which reads:

Giles['s] description of the defense contradicted his confession in that Giles reported to the physicians that he went to the Nelson home to buys drugs.  He reported he was not able to obtain the drugs and an altercation broke out.  (Thompson 8-9) Giles had told Blount County officers that he went to the Nelson home to commit a robbery. [Alteration supplied.]

This is a behavioral problem rather than a mental problem and is not subject to treatment at Giles'[s] age. (Smith 37-38) The disorder has nothing to with patient's mental condition. (Smith 64)

In the deposition, defense attorneys questioned Smith at length about the diagnosis. (Smith 22-25) Smith stated, among other things, that impulsiveness is characteristic of the disorder. He stated that a person with the disorder is more easily provoked and less able to control his impulses. Smith noted, however, that such persons tend to put themselves in situations where they have to act out to solve their problems. (Smith 24) In response to a defense questions, Smith noted that, in this type of disorder, drugs or alcohol would tend to decrease impulse control. (Smith 39-40) He did not, however, equate this disorder or intoxication on drugs or alcohol with "acting under extreme mental or emotional disturbance." (Smith 40-41) Smith agreed that all peoples' control of impulsiveness decreases with sedatives or alcohol but not to the point that they cannot control the impulse to steal, kill, rape or rob other people. (Smith 59)

Smith stated that 'emotional' means manic depression or a similar condition. (Smith 41) Based on the examination, Smith found that Giles was not clinically depressed at the time of the crime. Smith did not equate Giles'[s] sadness over his marital separation with clinical depression. (Smith 42) Smith also equated "extreme mental or emotional disturbance" with acute schizophrenic process or a thought disorder, i.e., acting under a delusional system. As an example of acting under a delusional system, Smith described a situation where a person might feel like there is someone out to kill the person and responds to that belief. (Smith 43) Smith did not find that Giles suffered from any "thought disorder." (Smith 32) An example of impulsivity noted by Smith was Giles'[s] taking another patient's medicine without knowing how the drug reacts when ingested. (Smith 40)

Smith told defense attorneys that he did not check for intravenous drug use because Giles'[s] history did not indicate an addiction. He would have checked if the need had been indicated. Giles'[s] self-reported use of drugs, however, was an episodic use rather than an

addiction.  (Smith 28)  He noted that Giles'[s] drug and alcohol abuse was not sufficient to interfere with work.  (Smith 50-51)

Smith stated that he had a good deal of experience with drug users.  (Smith 46)  He discussed Giles as the type of person who took drugs to "feel better."  (Smith 46)  In the deposition, Balske asked Smith about the effects of certain drugs including [T]alwin, "Blues", and marijuana.  (Smith 47-49)  A report of Giles shooting Valium and Talwin in jail was also noted.  (Smith 49-50)

Like Thompson, Smith determined that Giles understood the nature of the charges against him and was mentally competent to stand trial.  (Smith 61)  Smith found that Giles did not suffer from any mental disease or defect that would have interfered with his ability to distinguish right from wrong at the time this crime occurred.  (Smith 61-62)  Smith believed Giles could distinguish right from wrong.  He also found that, at the time of the offense, Giles did not suffer from any delusions whereby he could not control himself.  (Smith 62)

The defense at the first two trials, according to Balske, made a strategic decision not to pursue the drug angle at trial.  Balske testified the defense felt that, 'from what we knew, that it would be viewed more — as more aggravating than mitigating, and therefore, I think we purposely steered away from the drugs.  That's my recollection of what we did.'  Trial counsel decided that a drug use defense would only inflame the jury and work against gaining any sympathy from the jury.  Counsel, for this reason, made a conscious strategic decision not to pursue drugs as a defense.  This decision was based on counsel's thorough investigation of Giles'[s] drug use.

The defense also decided, based on what they knew, that Giles did not have any defense to the capital murder charges.  Carroll stated that, in his view, the guilt evidence was open and shut, including a full confession and testimony by surviving eye-witnesses.  (Carroll 46, Balske I 33)

. . . .

130

In preparation for [the] first trial, the defense subpoenaed Isophine Snow; Isaac Hull; Lawrence Scott; Haddie Washington; Faye Fisher; Michael Fisher; Glenn Jones; Theodore Scott; and Sallie Ann Giles. In addition, just prior to the beginning of the trial defense counsel requested and received permission to interview all of the State's witnesses before the trial began the next morning. (1st 1478-1479) Counsel, thus, had the opportunity to assess the State's witnesses before trial and to exercise a judgment concerning whether to cross-examine them. After interviewing the Nelson family member just prior to trial, defense counsel chose not to cross-examine them, except for Charlie Nelson. The defense used Charlie to present his opinion that, on the night of the offense, Giles'[s] eyes were red and Giles was acting crazy.

. . . .

At the judge sentencing stage, the defense introduced the deposition of Dr. Thompson, and the Probation (now Pre-sentence) Report and argued in additional mitigation that Giles was under the influence of alcohol at the time of the crimes. The judge sentenced Giles to death. This conviction was overturned on the authority of *Beck v. Alabama* and *Ritter v. State*.

(Rule 32 C.R. Vol. 56, Tab. 87 at 69-78) (alterations supplied, some footnotes omitted).

The Rule 32 trial court made additional findings regarding Giles's second capital trial.

Giles'[s] second trial took place in December 1982. . . . Prior to the beginning of the 1982 trial, Balske had tried between 15 to 20 capital cases and Carroll had tried between 20 and 30 capital cases. (2nd T. 72) Both Balske and Carroll were seasoned and experienced capital trial attorneys.

. . . .

131

At the second trial, the defense team followed a similar strategy to that used at the first trial. This strategy included acknowledgement that the guilt phase of the trial was hopeless, an open and shut case for conviction. (Balske I 33, Carroll 46) All of the evidence pointed to the defendant's guilt. There was a full confession and testimony by surviving eyewitnesses who knew Giles. (Carroll 46) Balske felt this was a particularly difficult case because of the number of people killed and wounded and the fact that two child witnesses survived and testified. The case was a very emotional one. (Balske I 57) Balske stated, "[W]e had no defense to present." (Balske I 66)

Carroll testified in deposition that the defense did not cross-examine witnesses in the 1982 trial because

> Our feeling was there was no guilt phase defense and we felt the worst thing we could do would be to antagonize the jury and therefore it was too risky to cross-examine — It wasn't like . . . we were going to be able to punch holes in the victim's stories.

> Our view was that in order to maintain credibility with this jury particularly, the best thing to do was to be as nice and kind and gentle to these people as we could be.

[( )Carroll 48) Balske also felt that, to try to save Giles'[s] life, it was important to try to maintain credibility with the jury. (Balske I 33) The decision not to cross-examine witnesses in the guilt phase of trial, was therefore, a strategic one, made by counsel after talking to witnesses and, again, after having tried the case once before.

In closing argument at the 1982 guilt phase trial, defense counsel asked the jury merely to do its duty. (2nd T. 654) Defense counsel chose not to antagonize the jury by arguing for Giles'[s] innocence or that Giles was not culpable for his actions. The jury, as expected, returned a verdict of guilty of capital murder. (2nd T. 682) After a 30 minute recess, the court moved directly to the sentencing phase trial. (2nd T. 683)

(Rule 32 C.R. Vol. 56, Tab. 87, at 78-81 (alterations supplied)).

The last set of findings pertinent to this issue by the Rule 32 trial court read as

follows:

> At the sentencing phase of the second trial, . . . counsel told the jury to remember that "Little Charlie" had testified that on the night of the offense, Giles was high.
>
> The State presented no additional evidence for sentencing but relied on the evidence presented at trial.  (2nd T. 689)  The defense presented three witnesses:  Michael Fisher, who had been with Giles before Jones and [G]iles left Birmingham to go to Blount County; Isophine Snow, Giles['s] mother; and Patty Washington, a registered nurse and family friend. . . .  Fisher testified that he was with Giles and Jones on November 9, 1978, the day before the murders.  Giles came over to Fisher's house around noon and they drank for a couple of hours.  (2nd T. 691-693)  After drinking awhile, they drove over to Jones'[s] house.  Giles was driving and was weaving and driving too fast.  Fisher left at about 6:00 p.m. and went home.  (2nd T. 694)  Giles came back to Fisher's home at about 7:00 p.m. and was pretty high.  (2nd T. 694-95)  Fisher saw Giles smoke a coup[l]e of joints of "bo" marijuana.  (2nd T. 694)  Giles and Jones left Fisher's home together.  Fisher did not know where they went.  (2nd T. 697)  Fisher did not see Jones or Giles after 7:00 p.m. on November 9, 1978.  (2nd T. 699)  Fisher testified that he was surprised that Giles would be involved in a killing.  (2nd T. 698).

(Rule 32 C.R. Vol. 56, Tab. 87, at 82-83 (alterations and redaction supplied)).

The Rule 32 court also made further determinations as to Giles's separate but

substantially related ineffectiveness claims regarding trial counsels' alleged failure

to investigate his PCP use, and failure to seek and present expert testimony regarding

that matter at the guilt phase of trial.  *Id.* at 90-95, 103-05, 107-09.  In each instance,

133

the court found that Giles's claims were not sufficiently specific under Rule 32.6(b),

and that the claims were without merit.  *Id.*  The findings underlying the court's

decision as to each sub-claim are substantially similar, and will be set out in such a

manner as to be comprehensive without being repetitive.

As to the claim that trial counsel was ineffective at the guilt phase of the 1982

trial for allegedly failing to investigate and present evidence of Giles's PCP use, the

Rule 32 court found:

> This claim is stated in such conclusory fashion, it is difficult to
> determine whether the claim is meant to apply to guilt phase counsel,
> sentencing phase counsel, or both.  Giles completely fails to state the
> facts on which he bases his claim that counsel failed to investigate and
> argue his prolonged drug addiction, his chronic use of PCP, "his
> diminished capacity, lack of intent and drug induced hallucinations and
> psychosis at the time of the killings."  This claim is, therefore, dismissed
> because Giles failed to provide "full disclosure" of the factual basis of
> this claim as required under Rule 32.6(b), ALA. R. CRIM. P.
>
> In addition, guilt phase counsel testified that they deliberately
> chose not to pursue Giles'[s] involvement in drugs.  In making that
> determination, counsel had before them the depositions of Drs.
> Thompson and Smith who examined Giles for the Lunacy Commission
> Report.  Both doctors found from the history provided by Giles that
> Giles had no history of drug addiction, was capable of standing trial and
> assisting in his own defense, and understood what he was doing and the
> consequences of his acts at the time of the crime.  Dr. Smith also
> testified specifically that Giles was not suffering from any delusion or
> delusional malady at the time of the offense.
>
> In addition, according to Bernard Harcourt, [one of Giles's last
> appellate attorneys,] who reviewed the guilt stage defense files, the files
> contained an extensive "drug work-up."  These were the files generated

by Balske and Carroll in preparing to defend this case. This Court has no doubt that this issue was carefully considered by the guilt phase defense counsel, who also represented Giles at the first sentence phase hearings in this case. The question then becomes, whether their strategic decision not to pursue drug use as a defense in court was a reasonable strategy.

Drug use or intoxication is not a defense to murder unless the ingestion of drugs or alcohol renders the defendant insane and unable to distinguish the difference between right and wrong. *Ex parte Bankhead*, 585 So. 2d 112, 121 (Ala. 1991). To constitute a defense under Alabama law, intoxication must be so extreme as to render a defendant "incapable of rational action." *Ray v. State*, 258 Ala. 418, 421, 59 So. 2d 582 (1952). "Mere drunkenness, voluntarily produced, is never a defense against a criminal charge. . . ." *Gautney v. State*, 284 Ala. 82, 88, 252 So. 2d 175 (1969) *accord, Ray v. State*. "Partial intoxication will not avail to disprove the specific intent; the intoxication must be of such character and extent as to render the accused incapable of discriminating between right and wrong — stupefaction of the reasoning faculty." *Crosslin v. State*, 446 So. 2d 675, 681-82 (Ala. Crim. App. 1983), *cert. denied*, 446 So. 2d 675 (Ala. 1984).

There has been no evidence presented to this Court to prove that Giles, at the time of the offense, was so intoxicated as to meet this definition. The findings of the State's experts are to the contrary. In addition, even Dr. Morton, Giles'[s] expert who testified in this proceeding, could not testify that the drugs that may been used by Giles on the night of the crime rendered Giles unable to distinguish between right and wrong. Certainly none of the supporting literature offered during Morton's testimony would support a conclusion of insanity. Dr. Morton stated only that he would be surprised if Giles could distinguish between right and wrong at the time of the offense.

While Giles called Melinda Fay Fisher to testify by deposition in this proceeding, this Court presumes that Ms. Fisher's testimony was known to trial counsel and trial counsel decided not to use that testimony. Trial counsel, as noted above, decided not to pursue drug use at trial. Ms. Fisher was subpoenaed to the 1979 trial and not to the 1982

135

trial.  The Court notes that Dr. Morton obtained his information about Giles'[s] drug use from notes from an interview with Ms. Fisher.  These notes came from defense counsel's files and, according to Morton, appeared to have been generated for the 1979 or 1980 trial.  It is, therefore, apparent to this court that Ms. Fisher's knowledge was known to the defense team at trial.

In her deposition in this proceeding, Melinda Faye Fisher testified concerning Giles'[s] drug use on the night of the murders.  This Court does not find Ms. Fisher's testimony to be credible.  That testimony is, therefore, discounted by this Court.  Ms. Fisher was 15 years old in 1978.  According to Ms. Fisher, she spent a good part of the evening with Giles.  She was Aaron Jones's girlfriend and partied with Jones and Giles the evening before the murders.  She said she last saw Giles at 9:30 or 10:00 p.m. the evening before the killings.  She also said that her brother Michael, made her go inside and would not let her go with Giles and Jones to Blount County because they had been drinking too much and 'shooting up.'  Ms. Fisher said her brother then came in the house and told her Giles and Jones had asked him to go with them and he had refused.  Ms. Fisher's testimony about the time of this event contradicts Michael Fisher's trial testimony.  Ms. Fisher says she last saw Giles with Michael around 9:30 or 10:00 p.m.  Michael testified that he last saw Giles and refused to ride with him at 7:00 p.m.  Ms. Fisher's testimony also contradicts the testimony of Giles'[s] mother, Isophene Snow, who testified that she last saw Giles at around 9:00 p.m. the evening before the murders and he was neither drinking nor drunk at that time.  Ms. Snow also saw him early the next morning, before his arrest, and he did not appear drunk at that time.  Ms. Fisher testified in deposition that she also did not testify at any of the legal proceedings against Aaron Jones, whom this Court notes has also been convicted and sentenced to death for these murders.  According to Ms. Fisher's deposition in this case, her testimony about drug use would have been similar for Aaron Jones.  Apparently, defense counsel for both refused to present this witness to the jury.

Even if the Court did believe the testimony of Ms. Fisher, there is still no evidence of significant drug or alcohol use by Giles at the time of the murders.  Ms. Fisher stated that she last observed Giles['s] drug

use at around 9:30 or 10:00 p.m. the evening before the murders. Michael Fisher placed the last drug or alcohol use at around 7:00 p.m. Ms. Snow found Giles to be sober at around 9:00 p.m., and Giles has never admitted to any significant use of drugs or alcohol on the night of the murders.  He only admitted to drinking some Scotch and beer.  In addition, the psychiatrists who examined Giles for the Lunacy Commission Report also did not find that Giles was under the influence of drugs or alcohol at the time of the murders.  Based on this evidence, the Court finds that defense counsel acted reasonably in failing to argue Giles's drug or alcohol use as a defense to the capital murder charges.

(Rule 32 C.R. Vol. 56, Tab. 87 at 90-95 (alterations supplied)).  The Rule 32 trial

court also found that

no credible evidence has been produced to show that Giles suffered from a "prolonged addiction to 'Blue's and T's'" or chronic use of PCP or any drug induced malady at the time of the crime.  Giles attempted to prove this claim through the deposition of Melinda Faye Fisher and the testimony of Ricky Davis at the evidentiary hearing.  This Court does not find the testimony of these individuals to be credible.  Melinda Faye Fisher has been addicted to drugs for twenty years.  She was known to Giles'[s] original trial counsel, interviewed by someone for the defense, and subpoenaed by the defense for the 1979 trial, yet she testified in deposition that no one had ever contacted her about testifying or talking to her.  (Fisher 16)  Also, her testimony conflicted with that of Ms. Snow, Giles's mother, who saw him on the night of the murders and, again, early the next morning and the testimony of Michael Fisher.

Ricky Davis[79] was transported to this Court from the Birmingham Jail, where he was incarcerated for possession of drug paraphernalia,

---

[79] The trial court inserted a footnote numbered "30" at this juncture, and it reads:

Ricky Davis testified concerning Giles's drug use beginning at age 13.  This testimony contradicts that of Ms. Snow.  In addition, calling this witness to discuss Giles's background could also have opened the door to testimony concerning Giles's fatal stabbing of a classmate when Giles was 13.  The defense decided to keep that evidence from the jury and worked hard to do so.

and brought to Blount County to testify in this proceedings.  His testimony contradicted Giles'[s] history given by Giles and his family members to the doctors and staff at Bryce Hospital where Giles was examined prior to trial.  These records are before this Court.  Drs. Thompson and Smith, licensed psychiatrists, testified in their pre-trial depositions that they found no evidence of drug addiction in Giles'[s] history and no evidence of any drug induced incapacity at the time of the offense.

The strategy of the defense team is supported by the record. . . . The evidence presented to this Court in this proceeding, when considered along with the records of the prior proceedings would not result in a different verdict or sentence.  Counsel is not found ineffective under this claim.

(Rule 32 C.R. Vol. 56, Tab. 87 at 96-97 (footnote alteration and redaction supplied)).

Further, with regard to the question of whether trial counsel was ineffective for failing to seek expert testimony regarding Giles's alleged use of PCP during the guilt phase of trial, the Rule 32 court, after initially determining that the claim did not meet the specificity requirements of Alabama Rule of Criminal Procedure 32.6(b), also rejected the claim based on its previous findings regarding the claim's investigative aspect, and the additional findings of fact and conclusions of law that follow:

Carroll testified that, while he did not remember specifically what investigation was performed or what experts were obtained it was his general practice to seek funds for experts and, if funds were denied, a means of obtaining the necessary expert would have been found. (Carroll. 21)   Carroll further testified that it was his practice in defending death penalty cases to investigate every fact "we could uncover."  (Carroll. 31)

Balske, although he too had very little specific recollection of the trial and preparing for the case, recalled that he did talk to a number of witnesses. In addition, Dr. William Morton reviewed notes from defense files prior to testifying in this proceeding and verified that the attorneys in 1979 and 1982 had done an extensive drug work-up on Giles. (Morton testimony 90)

This Court also notes that, prior to the first trial in this matter, the defense subpoenaed nine witnesses including Isophine Snow, Giles'[s] mother; Isaac Hull; Giles'[s] grandfather, Lawrence Scott; Haddie Washington; Faye Fisher; Michael Fisher; Glenn Jones; Theodore Scott; and Sallie Ann Giles, Giles'[s] wife. (1st C. 1979) . . . . It is apparent that an extensive investigation was conducted by defense counsel in this case and there is no evidence that additional investigation or expert assistance would have changed the strategy of counsel or had any effect on the result of the proceedings.

(Rule 32 C.R. Vol. 56, Tab. 87, at 104-05 (alterations supplied)).

Finally, with regard to the question of whether trial counsel was ineffective for failing to present expert testimony regarding Giles's alleged use of PCP during the guilt phase of trial, the Rule 32 trial court, after initially determining once again that the claim did not meet the specificity requirements of Rule 32.6(b), also rejected the claim based on its previous findings regarding the claim's investigative aspect, and the additional findings of fact and conclusions of law that follow:

As shown above, guilt phase counsel, after much investigation, decided not to pursue a drug defense. . . . In addition, no credible evidence of prolonged use of PCP was presented to this court. Giles relies on the testimony of Ms. Fisher and Ricky Davis to establish a prolonged use of PCP. As stated earlier, the court does not find the testimony of these witnesses to be credible. Ms. Fisher's testimony conflicted with that of other witnesses and with Giles'[s] self reporting

to the staff at Bryce Hospital. Ricky Davis appeared before this Court, and this Court had the opportunity to observe him while he testified. His testimony differs from Giles'[s] drug use as self-reported to the staff at Bryce Hospital and from other medical records submitted to this court in these proceedings. From his demeanor and because his testimony conflicts with Giles'[s] own self reporting, this Court did not find Ricky Davis a credible witness.

In addition, this Court notes that counsel's decision not to pursue drugs as a defense or in mitigation constitutes a reasonable strategy. As set out above, courts have recognized that defense lawyers are justifiably skeptical of asserting drug use as an excuse or as mitigation evidence. While Balske testified that he had seen the PCP defense in one death penalty case, that case differed significantly from this one. Balske stated that case involved a robbery-murder where the victim was killed. That defendant originally intended to rape the victim and ended up robbing the victim instead. (Balske I 54-55) Balske acknowledged that the present case was very difficult and highly emotional. (Balske I 57) Here two parents were brutally murdered, two . . . children were viciously stabbed (one of them shot at close range), an elderly woman was shot, and a twenty-year-old man was shot twice. The two cases do not compare.

At the evidentiary hearing on this matter, Giles presented the testimony of Dr. William Morton, a Ph.D. expert in pharmacology, the study of the reaction of drugs on the human body. (Morton 9-10) Dr. Morton testified concerning the history and effects of PCP usage. He also testified that PCP use can lead to impulsive, unpredictable violence in some people. From the facts of the crime, he deduced that Giles was on PCP at the time the offenses were committed. (Morton 84) He decided that Giles used PCP based on evidence never presented in court, i.e., [a] previous attorney interview with potential witnesses[80] and Giles'[s] self-reporting to him for twenty minutes before Morton testified in this hearing. (Morton 45, 65) The psychiatrists, medical doctors trained [to] diagnose based on a full patient history and

---

[80] At this juncture, the court inserted footnote number "35," and it reads: "Melinda Faye Fisher did testify in this proceeding by deposition." *Id.* at 109.

> psychiatric exam, found to the contrary. This Court finds defense
> counsels' strategy was reasonable. . . . Even if the strategy were second-
> guessed at this time, Dr. Morton's testimony does not undermine the
> fairness or reliability of the verdict. . . in this case.

(Rule 32 C.R. Vol. 56, Tab. 87, at 108-10 (alterations supplied)).

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the

decisions of the Rule 32 trial court. *Giles v. State*, 906 So. 2d 963, 982-84, 986-87

(Ala. Crim. App. 2004). In addition to adopting the Rule 32 court's findings of fact

and conclusions of law on the issue of whether defense attorney Dennis Balske's

investigative efforts constituted ineffective assistance of counsel, the appellate court

also surmised that

> Giles may not have informed his attorneys about his alleged use
> of PCP on the night of the murders.
>
>> "The reasonableness of counsel's investigation and
>> preparation . . . often depends critically upon the
>> information supplied by the defendant. *E.g.
>> Commonwealth v. Adhere*, 550 Pa. 389, 706 A. 2d 334,
>> 340-41 (1998) (collecting cases). Counsel cannot be found
>> ineffective for failing to introduce information uniquely
>> within the knowledge of the defendant and his family
>> which is not provided to counsel."
>
> *Commonwealth v. Bond*, 572 Pa. 588, 609-10, 819 A. 2d 33, 45-46
> (2002). Giles failed to satisfy the *Strickland* test.

*Giles*, 906 So. 2d at 984.

The intermediate appellate court also adopted the Rule 32 court's findings regarding Giles's defense attorney's failure to hire an expert regarding PCP, saying:

> Carroll stated that funds for experts were available to him even if not approved by the circuit court and that it was a strategic decision not to present evidence of Giles's drug use given the fact that such evidence may be viewed by some jurors as aggravating and by some as mitigating — it was double-edged evidence. "[It] is not our function to second-guess the strategic decisions made by counsel." *Smith v. State*, 756 So. 2d 892, 910 (Ala. Crim. App.1997), *aff'd*, 756 So. 2d 957 (Ala. 2000). As the United States Supreme Court stated in *Strickland v. Washington*:
>
> > "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."
>
> 466 U.S. at 690-91, 104 S. Ct. 2052.
>
> > "*See Hernandez v. Johnson*, 108 F.3d 554, 562-64 (5th Cir. 1997); *West v. Johnson*, 92 F.3d 1385, 1410 (5th Cir. 1996), *cert. denied*, [520] U.S. [1242], 117 S. Ct. 1847, 137 L. Ed. 2d 1050 (1997); *Woods v. Johnson*, 75 F.3d 1017, 1035 (5th Cir.), *cert. denied*, [519] U.S. [854], 117 S. Ct. 150, 136 L. Ed. 2d 96 (1996); *Callins v. Collins*, 998 F.2d 269, 278 (5th Cir. 1993), *cert. denied*, 510 U.S. 1141, 114 S. Ct. 1127, 127 L. Ed. 2d 435 (1994) (all rejecting

ineffective-assistance claims where alleged failures to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence available)."

*Cockrum v. Johnson*, 119 F.3d 297, 304-05 (5th Cir.1997).

The record shows that Carroll and Balske did a thorough investigation before Giles's trial, were thoroughly prepared at trial, and put on an aggressive defense. However, the evidence against Giles was overwhelming. Counsel's strategic choice not to present evidence of Giles's drug use was not unreasonable. Giles failed to satisfy the *Strickland* test.

*Giles v. State*, 906 So. 2d 963, 986-88 (Ala. Crim. App. 2004) (alterations in original).

It is apparent that the Court of Criminal Appeals considered the claim two ways: *both* as an allegation of ineffective assistance for failing to investigate a possible defense to the substantive guilt of the accused, *and* for failing to present mitigation evidence at sentencing. The court's conclusion that counsel was not ineffective in either instance is neither contrary to, nor an unreasonable application of, Supreme Court precedent. The state court used the proper legal standard from *Strickland*, and applied that standard in an objectively reasonable manner.

As long as fair-minded jurists can debate the correctness of the state court finding, the finding is not "objectively unreasonable." *See Harrington v. Richter*, __ U.S.__, 131 S. Ct. 770, 786 (2011). The assessments made by the state court — that

143

is, (*a*) that Giles's defense counsel conducted a thorough pre-trial investigation of Giles's drug usage prior to the crimes, (*b*) that only after doing so did counsel decide as a strategic matter to not make his drug usage an issue at trial, and (*c*) that for those reasons, defense counsel's representation did not constitute ineffective assistance — are not objectively unreasonable.   The state court's conclusions are entitled to deference.

Giles contends that the finding of the Alabama Court of Criminal Appeals that there was no credible evidence of his PCP use at the time of the offense is an unreasonable determination of the facts in light of the evidence before it.  (Doc. no. 44 at 21-22).  He argues that "[t]he court's disqualification of Melinda Fisher as a credible witness is a conclusion so lacking in support in the evidence that to give it effect would work that fundamental unfairness that is at war with due process."  *Id.* at 22 (citing *Lisenba v. State of California*, 314 U.S. 219, 238 (1941)).  His argument revolves around alleged findings made by the court (*i*) pertaining to Fisher's age in 1978, (*ii*) that Fisher had a prior addiction, and (*iii*) that Fisher's testimony contradicted that of other witnesses.  *Id.*[81]

---

[81] Giles argues that Melinda Fisher's deposition testimony was corroborated by the evidentiary hearing testimony of Ricky Davis and Dr. Alexander Morton.  (Doc. no. 44, at 24-31).  However, the trial court discredited the testimony of those witnesses.  (*See* Rule 32 C.R. Vol. 56, Tab. 87, at 105-06, in which Dr. Morton's statements concerning Giles's drug use and state of mind at the time of the offense are discredited).  Giles does not dispute the deference owed to the trial court's credibility findings regarding those witnesses.

Giles also relies on the purported affidavits of Leon Miller and Marvin Shine (Doc. no 44

On collateral appeal, the Alabama Court of Criminal Appeals affirmed the Rule

32 court's rejection of Ms. Fisher's testimony.

> Giles specifically argues that the circuit court erroneously
> discounted the testimony of Melinda Fisher that Giles was using PCP on
> the day and night of the murders.  As noted in the circuit court's
> thorough order, Fisher's testimony was in direct conflict with Giles's
> mother's testimony.  As we stated recently in *Jenkins v. State*, [972 So.
> 2d 111] (Ala. Crim. App. 2004):
>
> > "'The resolution of . . . factual issues required the
> > trial judge to weigh the credibility of the witnesses.  His
> > determination is entitled to great weight on appeal. . . .
> > "When there is conflicting testimony as a factual matter .
> > . ., the question of the credibility of the witnesses is within
> > the sound discretion of the trier of fact.  His factual
> > determinations are entitled to great weight and will not be
> > disturbed unless clearly contrary to the evidence."'"
>
> *Id*. at 142 (quoting *Calhoun v. State*, 460 So.2d 268, 269-70 (Ala. Crim.
> App. 1984)).

*Giles*, 906 So. 2d at 984.

> In the present *habeas* case, Giles suggests that this court should not afford the

Rule 32 trial court's refusal to credit Melinda Fisher's testimony the factual deference

---

at 28 (citing Rule 32 C.R. Vol. 58, at Ex. 30)).  There are no affidavits at this citation.  The affidavit
of Giles's wife, Sallie Giles Canady, is offered to corroborate the discredited testimony, and Giles's
wife did not attest she ever saw Giles drink or take drugs.  *Id.,* Vol. 58, at Ex. 23.

Finally, Giles contends that the State's own Lunacy Commission Report corroborates
Fisher's testimony.  *Id.*  The trial court and appellate court adequately addressed the content of the
Lunacy Commission Report in connection with that claim, and neither the report, nor the deposition
testimony of Drs. Thompson and Smith, the mental health professionals who examined Giles at
Taylor-Hardin, and were responsible in part for the creation of the Lunacy Commission Report,
corroborate Giles's contention.  (*See* Rule 32 C.R. Vol. 62, Depositions of Dr. Thomas Smith and
Dr. James Thompson, taken on July 13, 1979).

it is due because Ms. Fisher testified by way of deposition and, as such, the trial court was not in a position to judge her demeanor. Giles's suggestion is rejected. The Alabama Rules of Criminal Procedure explicitly allow evidence to be offered by deposition. Moreover, the state court did not discredit Ms. Fisher's testimony based upon her *demeanor*, but upon contradictions between that testimony and other evidence. Giles asked the Rule 32 trial court to consider the deposition evidence and, as such, he asked the court to make a credibility determination based upon it.

In any event, Giles alleges that the trial court discredited Fisher's testimony because she was 15 years old in 1978. (Doc. no. 44 at 23-24). That allegation is false. The trial court simply observed that Fisher was 15 years old at the time of the murder. *Id.* at 24. As pointed out by Giles, the trial court also pointed out the ages of Brenda and Charlie Nelson at the time of the murders. *Id.* The trial court did not make credibility determinations based on the ages of the witnesses. Instead, such observations merely were statements of fact. Moreover, the trial court's criticism of Melinda Fisher as a twenty-year-old drug addict was made in the following context:

> [T]his court finds no credible evidence has been produced to show that Giles suffered from a "prolonged addiction to 'Blue's and T's'" or chronic use of PCP or any drug induced malady at the time of the crime. Giles attempted to prove this claim through the deposition of Melinda Fay[e] Fisher and the testimony of Ricky Davis at the evidentiary hearing. This court does not find the testimony of these individuals to

be credible.[82]   Melinda Faye Fisher has been addicted to drugs for
twenty years.  She was known to Giles'[s] original counsel, interviewed
by someone for the defense,[83] and subpoenaed by the defense for the
1979 trial,[84] yet she testified in deposition that no one had ever
contacted her about testifying or talked to her.  (Fisher 16)[85]  Also, her
testimony conflicted with that of Ms. Snow, Giles'[s] mother, who saw
him on the might of the murders and, again, early the next morning[,]
and the testimony of Michael Fisher.

(Rule 32 C.R. Vol. 56, Tab. 87, at 92) (alterations and footnotes supplied)).

Giles contends that Melinda Fisher's testimony about events that occurred on

the night of the murders was not contradicted — and, in fact, was reinforced — by

the testimony of Michael Fisher.  *Id.* at 26.  On the other hand, Giles concedes that

there are discrepancies between the testimony given by Melinda Fisher and Ms.

Isophine Snow, but he argues that the discrepancies should be resolved in Fisher's

favor because Ms. Snow was his mother, and she "was desperately trying to save her

son's life by minimizing his life's troubles." *Id.*

---

[82] Giles does not challenge the trial court's finding that Ricky Davis was not a credible witness.

[83] The trial court cited Dr. Alexander Morton's testimony at the Rule 32 hearing that "some of the information on Giles's drug use came from Giles's 197[9] and 1982 attorneys' notes from interviews with Melinda Faye Fisher and Brenda King."  (Rule 32 C.R. Vol. 56, Tab. 87, at 67 (citing Morton testimony (R. Vol. 49, at 98)) (alterations supplied).  The notes were dated November 30, 1982.  *Id.*, Vol. 49, at 98.

[84] (*See* Rule 32 order, Vol. 56, Tab. 87, at 73 (citing R. Vol. 8, at 1478 (the 1979 trial transcript)).

[85] The trial court's conclusion is supported by Melinda Fisher's own deposition testimony. She admitted that she had been subpoenaed to testify.  (Rule 32 C.R. Vol. 60, Melinda Fisher dep., at 16-17).

The testimony of Michael Fisher was taken during the *sentencing* phase of the 1982 trial.  He admitted that he was with Giles around 12:30 p.m. on the day of the murder.  (R. Vol. 15, Tab. 17, at 692).  Giles was drinking Scotch with him at Fisher's house.  *Id.* at 693.  They drank "for about a couple of hours."  *Id.*  The two were together until approximately 6:00 p.m.  *Id.*  During that time, Fisher saw Giles smoke "two joints."  *Id.*  Michael Fisher described the marijuana joints as "bo," and explained that "bo joints" were "stronger" than "regular marijuana."  *Id.* at 693-94.  At approximately 5:00 p.m., Giles and Fisher departed Fisher's house and began driving in Giles's automobile to Aaron Jones's home.  Fisher testified that Giles's condition was not good, and that he was driving very fast and weaving over the road.  *Id.* at 694.  For those reasons, Fisher persuaded Giles to allow him to take control of the automobile.  *Id.*  Fisher returned to his own home around 6:00 p.m.  *Id.*  Giles drove back to Fisher's house around 7:00 p.m., and, at that time, Giles was "very high."  *Id.* at 695.[86]  Michael Fisher repeatedly testified that he did not see Giles again after 7:00 p.m. that evening.  *Id.* at 696, 699.[87]

---

[86] The testimony summarized in the five sentences preceding this marginal note beg the following questions:  *If*  Fisher and Giles *together* drove in Giles's automobile to Aaron Jones's home, then how did (*i*) Fisher return to his own home around 6:00 p.m. (R. Vol. 15, Tab. 17, at 694), *and* (*ii*) Giles drive back to Fisher's house around 7:00 p.m. (*id.* at 695) ?  This court has scoured the record, but failed to find satisfactory answers.

[87] This testimony also begs a question:  Where did Giles (or Fisher) go after 7:00 p.m.? Again, the record does not provide a satisfactory answer.

Giles argues that *Melinda Fisher's* testimony — to the effect that Giles and Aaron Jones left the Fisher residence together at 9:30 p.m. or 10:00 p.m. — is not consistent with *Michael Fisher's* testimony. That is not plausible. Melinda Fisher testified that Michael Fisher would not allow her to get into the automobile with Giles and Jones when those two left the Fisher house that evening. (R. Vol. 50, Melinda Fisher Dep., at 15-16). Since Michael Fisher testified that he last saw Giles at 7:00 p.m., and Melinda Fisher testified that Michael would not allow her to leave with Giles and Jones, the 7:00 p.m. and 9:30-10:00 p.m. time periods are contradictory. The trial court resolved that factual contradiction, and was not unreasonable in doing so.

Ms. Isophine Snow also testified during the *sentencing* phase of the 1982 trial.[88] In its order denying Rule 32 relief, the state trial court summarized Ms. Snow's testimony as follows:

> Mrs. Snow did not know Giles'[s] habits for drinking or using drugs. (3rd. T. 481)[89] She had[,] however, never seen him when he was drunk or on drugs. *Id.* On the night of the murders, Giles was at his mother's house at around nine or ten o'clock p.m. He was not drinking

---

[88] Ms. Snow was deceased by the date of the third, 1991 re-sentencing trial, so her testimony from the second trial was read into the record. (R. Vol. 15, Tab. 17, at 705-15).

[89] Defense counsel asked Ms. Snow if she knew whether Giles "took any drugs or smoked any marijuana or anything like that," and Ms. Snow responded: "Well, I couldn't say that. All I can say, he never did do it to my face." *Id.* at 713. Counsel then asked: "So he wasn't known as a drug addict or drunkard, as far as you know?" Ms Snow responded: "As far as I know. I wasn't among his friends. I couldn't verify what he did then." *Id.*

or drunk at that time, nor was he on drugs or smoking marijuana at her house. *Id.* There did not seem to be anything wrong with him. (3rd T. 482-483) The next morning, November 10, 1978, Giles returned to his mother's home "before day." (3rd T. 483) He made Ms. Snow's breakfast that morning and made her lunch for her to go to work. (3rd T. 483) He was still sober at that time. Ms. Snow noted,

> But he was, he seemed as though he was doing something for me as though it was going to be the last time because this was something he didn't usually do, fix my lunch or fix [my] breakfast.

(3rd T. 483-484) She also stated, "But he wasn't drunk."

(Rule 32 C.R. Vol. 56, Tab. 87, at 20) (alterations supplied)).

Giles contends that his mother's testimony should not be believed because she also testified that she gave birth to him when she was 15 — when, in fact, she was 14 years of age. (Doc. no. 44, at 26). Further, Ms. Snow attested that Giles attended school until age 17, but he actually quit school at 14 because the Birmingham school system would not allow him to attend. *Id.* Giles's mother made insignificant errors in assessing her age or her son's age during certain events. Such errors do not indicate that she was altogether unworthy of belief. Moreover, the judge and jury were free to infer what they chose from Ms. Snow's testimony regarding Giles's drug and alcohol use. If anything, the fact finder was left with the impression that Giles's mother was aware of, or at least suspected, his drug and alcohol use.

In short, the state court made no unreasonable determinations with regard to the testimony of either Michael Fisher or Ms. Snow.  As such, even if the sentencing phase aspect of this claim was not moot, and the guilt phase aspect of the claim had been properly raised, Giles still has failed to demonstrate that the state court's rejection of the claim was either contrary to, or an unreasonable application of, clearly established federal law.

For all of the foregoing reasons, the claim that Giles's attorneys provided ineffective assistance during his 1982 trial is moot as to the sentencing phase, and without merit as to the guilt phase.

> **e.     Counsel ineffective for failing to investigate the issues of self-defense and intoxication, and seek a jury instruction on manslaughter (Doc. no. 44, at 31-35) (Doc. no. 45, at 32-35) (Doc. no. 57, at 14-15, 52, 61-62, 75)**

Giles provides three additional examples of how his 1982 trial attorneys allegedly failed to provide effective assistance: *i.e.,* counsel failed to investigate the possibility of interposing the affirmative defense of self-defense; counsel failed to investigate the defense of intoxication; and, counsel failed to request a jury instruction on the lesser included offense of manslaughter.  It is best to begin with an examination of those claims as alleged in Giles's second amended Rule 32 petition, and adjudicated in the Rule 32 court's decision.  The Rule 32 trial court used verbatim quotations of Giles's statements of the first of the foregoing claims (self-

defense) as **boldface headings**, preceding those portions of the judge's opinion discussing the contentions. Thus,

> **4. Counsel failed to adequately investigate and present evidence of self-defense, including the fact that Carl Nelson was armed when Giles shot Nelson, and that Carl Nelson had warned Giles that "if he didn't leave he would leave in a pine box."**

This claim is a bare conclusory allegation that is unsupported by fact and is, therefore, dismissed pursuant to Ru1e 32.6(b)[,] Ala. R. Crim. P. Even if this claim had been reviewed by this Court, the claim would have been denied. Giles failed to argue this claim and failed to advise this Court of any facts in support of this claim. In addition, this Court has found no authority supporting this claim under the facts and circumstances of this case. Under the facts of this case, any attempt to argue such a defense borders on the ludicrous. Giles'[s] actions fall completely outside the scope of self-defense.

In Alabama, the requirements of the defense of self-defense are set out in Section 13A-3-23(a) Code of Alabama (1975), in pertinent part, as follows:

> (a) A person is justified in using physical force upon another person in order to defend himself or a third person from what he reasonably believes to be the use or imminent use of unlawful physical force by that other person, and he may use a degree of force which he reasonably believes to be necessary for the purpose. A person may use deadly physical force if the actor reasonably believes that such other person is:

> (1) Using or about to use unlawful deadly physical force . . .

> (b) *Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force upon another person if it reasonably appears or he knows that he can avoid the necessity of using such force with complete safety:*

152

( 1) *By retreating*

(c) *Notwithstanding the provisions of subsection (a), a person is not justified in using deadly physical force if:*

(1) *With intent to cause physical injury or death to another person, he provoked the use of unlawful physical force by such other person; or*

(2) *He was the initial aggressor, except that his use of physical force upon another person under the circumstances is justifiable if he withdraws from the encounter and effectively communicates to the other person his intent to do so, but the latter nevertheless continues or threatens the use of unlawful physical force . . . .*

In this case, Giles could have avoided shooting anyone if he had left the Nelson homestead the first time he left the Nelson home, even considering the circumstances under which he entered the home, intent on robbing the occupants. Instead, he left the home; went to his car; armed himself with a loaded gun; re-entered the home and murdered Carl and Willene Nelson. Self-defense was not an option available to the defense.

**5. Counsel failed to request a jury instruction on imperfect self-defense to mitigate the element of malice in Carl Nelson's murder**.

This claim is a bare conclusory allegation that is unsupported by fact and is, therefore, dismissed pursuant to Rule 32.6(b)[,] Ala. R. Crim. P. Even if this claim had been reviewed by this Court, the claim would have been denied. Giles failed to argue this claim and failed to advise this Court of any facts in support of this claim. In addition, this Court has found no authority supporting this claim under the facts and circumstances of this case.

By his own admission, Giles entered the home of the victims, uninvited, while the household was asleep, in the early hours of the morning. He woke family members and was ordered by Mr. Nelson to leave the house or Mr. Nelson would "blow my brains out." (2nd. T. 587) Giles left the house, went to his car, got his gun, and headed back into the Nelson home. Giles said that before he shot Tony Nelson, who had not left the home, Tony said "he was gonna kick my ass and I turned around and shot him." Giles had not re-entered the home when he shot Tony. After shooting Tony, Giles proceeded into the house and continued the shooting spree, in which Giles shot everyone in the home, except Charlie Nelson. Giles ran out of bullets and left the house again. Giles then re-entered the home a third time, this time with Aaron Jones, at which time Carl and Willene Nelson were stabbed. (2nd. T. 590-596)

By his own admission, Giles exercised a choice not to leave the property after being warned to do so. Instead, he chose to arm himself and to go back inside the house where he was sure to be confronted. These facts, admitted by Giles, leave no room to argue the existence of any kind of self-defense claim, imperfect or otherwise. There was no evidence presented at trial and none presented at the hearing in this proceeding that supports a jury charge on self-defense, reducing these murders to manslaughter.

(Rule 32 C.R. Vol. 56, Tab. 87, at 96-98) (alterations supplied, emphasis in original).

On collateral appeal from the denial of Rule 32 relief, Giles appears to have combined the preceding Rule 32 claims. *He then further argued, for the first time, that his state of extreme intoxication and/or PCP use should have been among the facts underlying his claim*. Thus, the brief submitted by Giles to the Alabama Court of Criminal Appeals introduced *an entirely new contention* (extreme intoxication as a defense) in the second paragraph of the following argument:

I.    FAILURE TO INVESTIGATE EVIDENCE OF IMPERFECT
      SELF-DEFENSE AND REQUEST JURY CHANGE [(sic)]

The Court erred in finding that Petitioner presented no evidence
that Carl threatened to kill Arthur Giles.  Nelson was armed with a gun
and ready to shoot Giles when Giles first shot him.  There was further
evidence that Giles was using PCP which creates an exaggerated sense
of danger and threat.

*In light of Giles extreme intoxicated state*, and the subjective
standard adopted in Section 13A-3-23(a) Code of Alabama (1975),
defense counsel's failure to investigate this testimony and present
evidence of imperfect self-defense was ineffective.  Arthur Giles further
appeals the Court's dismissal of a claim challenging counsel's failure to
request a jury change [sic] on imperfect self-defense.

(Rule 32 C.R. Vol. 52, Tab. 71, at 85) (emphasis and alteration supplied).[90]

The Alabama Court of Criminal Appeals affirmed the Rule 32 court's decision

denying relief on this claim, noting that Giles had effectively abandoned the claim by

not presenting supporting evidence during the Rule 32 hearing in the trial court.  "The

record shows that neither of Giles's trial attorneys was questioned concerning this

issue."  *Giles v. State*, 906 So. 2d 963, 986 (Ala. Crim. App. 2004).  The appellate

---

[90] In his reply brief, Giles also insists that he fairly presented the claim on other pages of his
brief on collateral appeal, specifically citing the pages appearing at Rule 32 C.R. Vol. 52, Tab 71,
at 76-86, and 89.  This is untrue.  Pages 76-79 are dedicated to the argument that the trial court erred
when it found that Faye Fisher's testimony regarding Giles's drug use was not credible.  Pages 79-80
are dedicated to the argument that the trial court erred when it refused to consider hearsay evidence
of the alleged drug-dealing relationship between Giles and Nelson at the evidentiary hearing.  Pages
80-81 and 89 are portions of an argument that counsel were ineffective for failing to investigate the
drug connection between Giles and Nelson, and to seek funds for an investigative witness.

court further observed that there was no evidence showing that Carl Nelson had threatened to harm Giles, or that Nelson had pointed a weapon at Giles.

Even if that is an erroneous factual finding,[91] the remainder of the appellate court's opinion shows that, under the circumstances, Giles could not have presented an imperfect self-defense argument. The appellate court did not directly address the imperfect self-defense instruction, and did not address Giles's allegations of drug abuse. Even so, and laying aside the one arguably erroneous finding discussed above,[92] all other factual findings made by the intermediate state appellate court regarding the lack of evidence to support the defense of imperfect self-defense, and the lack of evidence showing that Giles was under the influence of PCP at the time of the offense, are entitled to deference. The state courts' assessment that counsel were not ineffective on these grounds is not contrary to, or an unreasonable application of, *Strickland*.

Even if the ineffective assistance of counsel claims discussed above were not subject to rejection on the grounds of procedural default, or the deferential standards of the AEDPA, the claims are without merit and due to be denied. For the reasons

---

[91] Even if Carl Nelson did threaten to harm Giles, Giles's own evidence showed that, after Nelson did so, Giles left the home. He then retrieved a gun and intentionally reentered the Nelson home, where he shot family members as he walked past. Thus, even if Carl Nelson had a gun in his hand when Giles approached him, this court does not find that the circumstances supported a self-defense theory.

[92] See the foregoing footnote and accompanying text.

explained by the Rule 32 court, Giles could not plausibly claim self-defense after illegally entering the Nelson home, confronting Carl Nelson, leaving the home , walking to his automobile, retrieving a gun from the vehicle, walking back to the house, and then attacking the Nelson family with the gun and a knife.  His trial attorneys were not ineffective for failing to explore the defense of self-defense under those undisputed facts.

Likewise, Giles's state of intoxication clearly was not sufficiently severe to render him incapable of forming the criminal intent necessary to support a charge of capital murder.  Giles drove to the Nelson home with a firearm in his automobile; he left the home at least once, to retrieve the firearm; and he instructed his co-defendant to stab several members of the Nelson family after he shot them.

Finally, the evidence did not support a manslaughter instruction.  If the instruction had been requested, it is inconceivable that it would have been given.  Defense counsel, therefore, were not ineffective for failing to request such an instruction.

> **f.    Counsel ineffective for abandoning defense and conceding guilt (Doc. no. 44, at 35-37) (Doc. no. 45, at 35-37) (Doc. no. 57, at 31-32)**

Giles admits that he raised this claim for the first time in his third amended Rule 32 petition, which was rejected by the Rule 32 court as untimely, and he does

not dispute that he failed to raise the claim on collateral appeal.  (Doc. no. 57, at 31-32).  The claim, therefore, was procedurally defaulted.  It also is meritless.  The record of the 1982 trial reflects skilled, well- prepared, and zealous representation of Giles by Dennis Balske and John Carroll.  Faced with an overwhelming showing of Giles's guilt, it was not unreasonable for counsel to acknowledge that the principal issue for trial was sentencing.  Eyewitnesses, who were themselves attacked by Giles, testified against him.  His own confession to the killings as part of a robbery also was offered into evidence.  Counsel had to acknowledge the weight of the evidence of guilt, and focus their attention on the sentencing phase, at which they were successful in obtaining a jury verdict recommending that the trial judge impose a sentence of life without parole.  Accordingly, the claim is due to be denied.

     **4.**     ***Petitioner's conviction was tainted by prosecutorial misconduct***

        **a.**     **Double murder indictment obtained by false and misleading testimony that Willene Nelson's death was caused by her gunshot wound (Doc. no. 44, at 37-38) (Doc. no. 45, at 37-39) (Doc. no. 57, at 32)**

      Giles concedes that the claim is procedurally defaulted because it was not raised in state court, but argues that circumstances underlying the claim necessitate that the miscarriage of justice exception be applied to excuse the default.  (Doc. no. 57, at 32).  In order to satisfy the actual innocence exception, Giles must show that

no reasonable jury, grand or petit, would have indicted or convicted him of a capital offense.

Giles contends that "the State knowingly obtained a capital murder indictment by false and misleading testimony." (Doc. no. 45, at 38). Specifically, Giles asserts that, prior to his indictment for capital murder, law enforcement possessed a statement from him in which he admitted shooting Willene Nelson, but denied that he had stabbed her or caused her death. Giles contends that, in order to firmly link him to Mrs. Nelson's death — despite the fact that the prosecution possessed a pathologist's report which concluded that Mrs. Nelson's gunshot wound was superficial, and that her death was caused by multiple stab wounds — the State called an incompetent witness (the county coroner) to testify before the grand jury that Willene Nelson's death was the result of her gunshot wound. Giles alleges that a "strategic choice to present false, unqualified information, rather than official, qualified information in order to obtain an indictment [for capital murder] reaches the level of government misconduct that the 11th Circuit [sic] has identified as warranting a dismissal of an indictment." (Doc. no. 44, at 38 (citing *United States v. Hyder*, 732 F.2d 841, 845 (11th Cir. 1984)) (alterations supplied). He also argues that

> A conviction resting on false evidence is void under the 14th Amendment [sic]. *Mooney v. Holohan*, 294 U.S. 103, 112 (1935); *Napue v. Illinois*, 360 U.S. 264, 269 (1959). "[T]he dignity of the

> United States Government will not permit the conviction of any person on tainted testimony." *Mesarosh v. U.S.*, 352 U.S. 1, 9 (1956).

*Id.* at 37.

The crux of Giles's argument lies in the Blount County coroner's qualifications (or lack thereof) to testify about the cause of Willene Nelson's death before the grand jury. Giles contends the coroner testified falsely when he stated that: "'in my opinion the bullet wound along with the numerous stab wounds . . . caused death from the shock and hemorrhaging.'" (Doc. no. 57, at 32 (quoting R. Vol. 54, at 857-58))[93]. Yet, at trial, Dr. Joseph Embry, the State pathologist who conducted Mrs. Nelson's autopsy, concluded that she died of stab wounds, and that the bullet wound was "'superficial.'" *Id.* (quoting R. Vol. 15, at 624; *id.*, Vol. 48, at 1654-55; *id.*, Vol 48, at 1791).

Even if the coroner testified as Giles suggests, he did not present false testimony under oath. Instead, he stated an opinion as to the cause of Willene Nelson's death. The court declines Giles's invitation to declare the coroner's testimony a legal falsehood because the coroner was not qualified as a medical expert to state an opinion as to the cause of Mrs. Nelson's death, or because his opinion differed from that of the State's forensic pathologist. There is no dispute that Willene

---

[93] This court has examined the record citation at the volume and page numbers Giles suggests, but the pages do not contain the coroner's "testimony."

Nelson was shot and stabbed.  The coroner testified before the grand jury that he believed the cause of death to be the shock and hemorrhaging caused by a combination of knife and gunshot wounds.  At trial, the pathologist testified definitively that Mrs. Nelson's death was the result of her stab wounds.

The guilt evidence against Giles pertaining to Willene Nelson and Giles's use of the gun and/or knife is overwhelming.  In his statement, Giles admitted shooting Mrs. Nelson.  Brenda Nelson and Charlie Nelson each testified that they either watched Giles stab Mrs. Nelson and/or heard Giles order Aaron Jones to stab Mrs. Nelson.  Giles himself admits that the grand jury issued an indictment against him that alleges that he "did by one act or a series of acts, unlawfully and with malice aforethought intentionally kill Willene Nelson, a human being, by shooting her with a pistol or cutting her with a knife . . . ."  (Doc. no. 45, at 38 (citing R. Vol 15, at 21)).

Under the circumstances, the coroner's testimony had no cognizable effect on the validity of the indictment issued against Giles.  Further, Giles cannot establish that he is actually innocent of the crime for which he was charged or convicted, such that a miscarriage of justice will occur if the claim is not decided on the merits.  The claim is procedurally defaulted, meritless, and due to be dismissed.

      **b.**    **Prosecutor's *voir dire* comment about appeal diminished juror responsibility (Doc. no. 44, at 38) (Doc. no. 45, at 32-35)**

Giles alleges that, during *voir dire* at the 1982 trial, an individual from a thirteen- juror panel asked the prosecutor if the jurors were responsible for making the final decision as to whether Giles should be sentenced to life without parole or death. (Doc. no. 45, at 39). Giles contends the prosecutor initially answered "yes," but then said, "Well, when we say final, of course, there is always appeal and things like that. And the judge would make a decision after y'all make a decision." *Id.* (quoting R. Vol. 12, Tab. 3, at 107-08). The trial court overruled defense counsel's objection and request all members of that panel be excused.[94] *Id.* at 40 (citing R. Vol. 12, Tab. 3, at 109). Giles contends that two members of the panel eventually were seated on the jury.[95] *Id.*

Respondent answers that Giles is not entitled to *habeas* relief because he cannot show that the rejection of the claim on its merits by the Alabama Court of Criminal Appeals was contrary to, or an unreasonable application of, Supreme Court precedent. (Doc. no. 52, at 35 (citing *Giles v. State*, 554 So. 2d 1073, 1078 (Ala. Crim. App. 1984))).

---

[94] The appellate court found that "the trial court acknowledged the potential harm, but denied appellant's request in favor of giving curative instructions to the jury." *Giles*, 554 So. 2d at 1078.

[95] The appellate court found that only one individual from the panel served on the jury. *Giles*, 554 So. 2d at 1078. Giles has not overcome that presumption by clear and convincing evidence. Moreover, Giles's brief on direct appeal clearly represents that only one member of that panel — namely, juror Chatham — was seated on his jury. R. Vol. 28, Tab. 40, at 9.

On direct appeal, Giles argued the claim solely as involving constitutional error arising from the prosecutor's comment improperly diminishing the jurors' responsibility at the *sentencing* phase of his trial. (R. Vol. 28, Tab. 40, at 7-9 (citing *Lockett v. Ohio*, 438 U.S. 586 (1978)). The issue does not raise a claim of constitutional error affecting the *conviction*. Giles's 1982 death sentence was overturned by the Alabama Supreme Court. *See Ex parte Giles*, 554 So. 2d 1089 (Ala. 1987). As such, any impact that the statement may have had upon the jurors' understanding of their responsibility for setting the penalty evaporated. There is no basis for granting relief on the claim. To the extent that Giles now attempts to argue, for the *first time*, that the comment somehow affected the guilt phase of his trial (doc. no. 44, at 39), it is procedurally defaulted. The claim is due to be denied.[96]

> ### c. State suppressed evidence that petitioner repeatedly invoked his *Miranda* rights while interrogation continued (Doc. no. 44, at 40-41) (Doc. no. 45, at 40-43) (Doc. no. 57, at 80)

Giles contends that police continued to interrogate him after his arrest, even though he expressly invoked his *Miranda* rights three times. As such, he contends that his post-arrest statements should not have been used as evidence against him in

---

[96] Even if it were not procedurally defaulted, the claim is without merit insofar as Giles now attempts to argue, for the *first time*, that the comment somehow affected the guilt phase of his trial (doc. no. 44, at 39). The holdings of the constitutional cases Giles relies upon for support, *Caldwell v. Mississippi*, 472 U.S. 320, 330 (1985), and *Lockett v. Ohio*, 438 U.S. 586 (1978), apply to the jury's responsibilities at the sentencing phase of trial.

either the 1982 trial, or the 1991 re-sentencing trial.[97]  Respondent answers that the

claim is procedurally defaulted because it was raised for the first time in the third

amended Rule 32 petition — a pleading that the Alabama Court of Criminal Appeals

refused to consider on the basis of an adequate and independent state procedural rule.

(Doc. no. 52, at 36).  Giles admits that the *Miranda* claim was not raised until the

untimely third amended Rule 32 petition, but he, nonetheless, contends that "the facts

of this claim demonstrate a miscarriage of justice, and, but for this error, no

reasonable jurors would have found Mr. Giles guilty of double murder."  (Doc. no.

45, at 40) (citing 28 U.S.C. § 2254(e)(2)(B)).

Giles contends that the State improperly suppressed the grand jury testimony

of law enforcement officer Tom Ed Dickie.  (Doc. no. 45, at 42).  He claims Dickie's

testimony revealed that Giles had "invoked his right to remain silent three (3) times

and police continued their interrogation."  (Doc. no. 44, at 40).  However, Giles does

not argue, or attempt to satisfy his burden of showing by clear and convincing

evidence, that the state court's findings of fact to the contrary are unreasonable in

---

[97] Once again, the precise nature of Giles's claim is not clear.  While the claim seems to read as a traditional *Miranda* claim — *i.e.*, that he continued to be interrogated even after invoking his *Miranda* rights — it also hints that the evidence relevant to the repeated interrogation was suppressed from counsel and, therefore, is a *Brady* claim.  *See* doc. no. 44, at 40-41.  Of course, a *Brady* claim fails on the merits because Giles himself knew of the repeated interrogation, meaning that this evidence was not "suppressed" from him.  *See Parker v. Allen*, 565 F.3d 1258, 1277 (11th Cir. 2009) ("[T]here is no suppression if the defendant knew of the information or had equal access to obtaining it.") (alteration supplied).  He could have informed his counsel of the circumstances.

light of the evidence before it.  (Doc. no. 45, at 41).  During the Rule 32 collateral

proceedings, the Alabama Court of Criminal Appeals adopted the historical factual

findings made by the trial court in connection with this claim, explaining as follows:

> The circuit court stated the following about this issue:
>
>> "Exhibit 5 is a transcript of the grand jury testimony of Investigator Tom Ed Dickie.  That portion of exhibit 5 which Giles claims includes a violation of *Brady* is Dickie's testimony that, after the *Miranda* warning given Giles at the car, Giles 'didn't wish to give a statement at that time.'  This information was known to the defense at the Motion to Suppress hearing prior to Giles's first trial.  At that hearing, Fred Allcorn testified that, when Giles was taken to the car to be transported from the place of his arrest, Giles was Mirandized and did not say anything but did indicate that he understood his rights.  In any event, the statement does not constitute *Brady* material because it does not and would not lead to any different result in this case, either on the motion to suppress, discussed above, or any other issues in this trial."
>
> (Supplemental record, p. 47.)  This information was not suppressed. This evidence was introduced at Giles's first and second trials during the suppression hearings.
>
> The evidence showed that Giles never invoked his right to counsel and that he initiated contact with police and was read and waived his *Miranda* rights.  Dickie's grand jury testimony was not inconsistent with the evidence presented at trial and would have had no effect on the admissibility of Giles's confession.

*Giles v. State*, 906 So. 2d 963, 978 (Ala. Crim. App. 2004).

The claim is procedurally defaulted because Giles filed his third amended petition after the final judgment was entered, and neither the trial court nor the state appellate court would consider it. *Giles v. State*, 906 So. 2d 963, 978 (Ala. Crim. App. 2004). There will be no miscarriage of justice if the claim is not considered because the historical record clearly shows that counsel were privy to all of the information about which Giles complains as early as the very first suppression hearing on the matter in *1979*. Therefore, insofar as Giles attempts to assert a *Brady* claim, it is factually and legally meritless.

To the extent that Giles alleges a *Miranda* claim, it was resolved by the state courts at both the original 1979 trial and 1982 retrial. The state courts found that Giles did not explicitly invoke his right to remain silent or his right to counsel during continued questioning. The conclusion that no *Miranda* violation occurred was not then, and is not now, objectively unreasonable. As the Supreme Court pointed out in *Berghuis v. Thompkins*, _ U.S. _ , 130 S. Ct. 2250, 2264 (2010), "after giving a Miranda warning, police may interrogate a suspect who has neither invoked nor waived his or her Miranda rights." The claim is due to be denied.

<blockquote>

d.    **State suppressed exculpatory evidence of Carl Nelson's recent drug prosecution and an "anonymous informer" (Doc. no. 44, at 41-42) (Doc. no. 45, at 42-45)**

</blockquote>

Giles alleges that "[t]he State suppressed evidence that Carl Nelson had been prosecuted three months before this crime for growing a large field of marijuana, and that there was an 'anonymous informer' in the case." (Doc. no. 45, at 42 (alteration supplied)). As support for this contention, Giles claims that "the District Attorney's files for the prosecution of the petitioner contained a motion made by the attorney for Carl Nelson's prosecution seeking identification of the anonymous informer." *Id.* at 44 (footnote omitted). Giles contends that "Nelson's prosecution on a major drug charge just three months before the crime likely played a decisive role in the events of that night." *Id.* at 42. He asserts that, if his defense attorneys had been privy to such information, it would have led them to question whether Giles was engaging in farm work during the time period he had lived with the Nelsons, or was instead "working in Carl Nelson's illegal drug operation." (Doc. no. 44, at 41).

The Alabama Court of Criminal Appeals affirmed the trial court's rejection of that claim on Rule 32 collateral appeal, and held as follows:

> Giles first argues that the prosecution suppressed exculpatory evidence of a motion filed in an unrelated case involving one of the victims, Carl Nelson, to discover the identity of the "anonymous informer" involved in Nelson's arrest for a controlled-substance violation. Giles argues that this motion was critical to his capital-murder case because, he says, it would tend to establish a connection between Nelson's prosecution for a drug offense and the murders. Giles implied in the postconviction proceedings that the murders were drug-related and that Giles was the anonymous informer.[FN9]

FN9.  The record shows that the charges against Nelson had been dismissed.

The circuit court made the following findings of fact in regard to this issue:

"In discovery in these proceedings, the defense obtained from the prosecution files a motion to disclose the identity of an unidentified informant filed in another prosecution.  The other prosecution was against Carl Nelson for possession of marijuana.  The motion was apparently filed on Carl Nelson's behalf.  On its face, this motion was part of a public record filed in the district court of Blount County and as such was available to both the defense and the prosecution. In addition, the fact that a prosecution was brought against Nelson and dismissed was known to defense counsel, at least at the 1991 sentence hearing.  In that hearing, defense counsel brought out through Billy Irvin, a prosecution witness, that Nelson had been charged criminally concerning a large amount of marijuana growing on his property and that case had been dismissed.  Defense counsel then asked the witness if he knew the charges were dismissed because of a bad search warrant, but the witness did not know the answer.  In addition, Giles failed to prove how this information was material or could have affected the outcome of the trial.  Giles gave a full confession.  He admitted that he went to the Nelson's home, after an absence of two years, to rob them.  He admitted that he went into the home, uninvited at 3:00 a.m. when the family was sleeping and woke up family members.  He admitted that, upon being instructed to leave the residence, he did so, only to return with a gun and begin shooting the family members.

"While, during these proceedings, Giles did present some hearsay evidence that he had been involved in drug dealings with Carl Nelson, he presented no evidence to

support a theory that these murders were related to any such dealings or were in any way related to a Carl Nelson drug prosecution.  By his own admission, Giles was at the Nelson home to commit a robbery.  There is no evidence that there was any other motive for the murders or that Giles acted in self-defense.  He was reentering the Nelson home with a loaded gun in his hand, after being told to leave, when he began the shooting spree that resulted in the deaths of Carl and Willene Nelson, the maiming of Brenda Nelson, and the wounding of Charlie Nelson, Tony Nelson, and Anne Nelson.  The *Brady* claim as to the motion to disclose the identity of an unidentified informant in the Carl Nelson drug case is denied.  The motion was neither suppressed by the State nor material to the defense."

(Supplemental record p. 37-39.).

The circuit court's conclusions are supported by caselaw.  It appears that the defense was aware that Carl Nelson had been arrested for a controlled substance violation.[FN10]  The defense had access to the records of Nelson's case and could have obtained a copy of anything in the court file.   Also, if Giles was the anonymous informer, this information was certainly known to Giles.  As we have stated:

FN10.  One witness was cross-examined about this at the third sentencing hearing.

"'There is no *Brady* violation where the information in question could have been obtained by the defense through its own efforts.'  *Johnson* [*v. State* ], 612 So. 2d [1288] at 1294 [ (Ala. Crim. App. 1992) ]; *see also Jackson v. State*, 674 So. 2d 1318 (Ala. Cr. App. 1993), *aff'd in part and rev'd in part on other grounds*, 674 So. 2d 1365 (Ala. 1995).   ' "Evidence is not 'suppressed' if the defendant either knew . . . or should have known ... of the essential facts permitting him to take advantage of any exculpatory evidence."  *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir.1982)[, *cert. denied*, 459 U.S. 1174, 103

> S. Ct. 823, 74 L. Ed. 2d 1019 (1983) ].'  *Carr v. State*, 505
> So. 2d 1294, 1297 (Ala. Cr. App. 1987) (noting, 'The
> statement the appellant contends was suppressed in this
> case was his own, and no reason was set forth to explain
> why he should not have been aware of it.').  Where there is
> no suppression of evidence, there is no *Brady* violation.
> *Carr*, 505 So. 2d at 1297."
>
> *Freeman v. State*, 722 So. 2d 806, 810-11 (Ala. Crim. App. 1998).
> There was no *Brady* violation.  *See Parris v. State*, 885 So. 2d 813, 825
> (Ala. Crim. App. 2002).

*Giles v. State*, 906 So. 2d 963, 974-75 (Ala. Crim. App. 2004) (alterations in

original).

Giles takes issue with the state court's dismissal of the claim on the "grounds

[that Nelson's criminal file] could not be suppressed as it was a public document."

(Doc. no. 44, at 42 (alteration supplied)).  Giles alleges that the information was

exculpatory pursuant to *Brady*, and that  "access to evidence cases stand for the

'general goal of establishing procedures under which criminal defendants are

acquitted or convicted on the basis of all the evidence which exposes the truth.'"  *Id.*

(quoting *Kyles v. Whitley*, 514 U.S. 419, 440 (1995) (in turn quoting *U.S. v. Leon*, 468

U.S. 897 (1984) (internal quotations omitted by Giles)).  He infers that a *carte*

*blanche* rule holding that all public records are exempt from *Brady* threatens the very

reason that *Brady* was instituted — *i.e.,* to reduce gamesmanship and establish a

procedure whereby convictions or acquittal are obtained on "'evidence which exposes

the truth.'" (Doc. no. 44, at 42 (citing *Bell v. Bell*, 512 F.3d 223, 241 (6th Cir. 2008) (dissenting opinion)).

This court cannot discern whether Giles is arguing that the state court's decision is based on an unreasonable legal, or an unreasonable factual, determination. Regardless, the claim is without merit. The state court's factual determinations underlying this claim are entitled to deference, unless Giles can show by clear and convincing evidence that those findings are unreasonable in light of the evidence of record. The legal conclusions also are entitled to deference, unless they are contrary to, or an unreasonable application of, federal law. Giles has failed to make either showing. He offers no evidence that the court file containing the motion was suppressed, or not available to him at the time of his 1982 trial. He certainly has not shown that Supreme Court precedent supports a *Brady* claim where the defense knows of, or has access to, the allegedly suppressed evidence. The claim is due to be denied.

> **e.    State suppressed evidence of "marijuana theory" for crime (Doc. no. 44, at 42-43) (Doc. no. 45, at 45-46)**

Giles alleges that the prosecutor's *voir dire* notes from the 1982 trial contained an underlined notation stating "that a [certain] juror 'would buy a marijuana theory. Victim owed defendant.'" (Doc. no. 45, at 45 (quoting Rule 32 C.R. Vol. 60, Fitzhugh Burttram Dep., at 10-11; Vol. 57, at Ex 3)) (alteration supplied). The

prosecutor testified in a post-conviction deposition that he wrote the note because "he was anticipating a defense theory that drugs were involved in the crime," and thought the juror might be swayed by such a defense theory. *Id.* (quoting *id.*, Burttram Dep., at 23-24).

Petitioner argues that the "marijuana theory" was favorable to the defense and should have been disclosed because counsel then would have examined the relationship between Nelson and Giles which, in turn, "would have led to a wealth of mitigation evidence about Mr. Giles's drug dependency," which may have influenced the jury to conclude that Giles did not deserve the death penalty. (Doc. no. 44, at 43). Instead, defense counsel had to contend with the prosecution's presentation of "the case to the jury as if this crime was some random act of violence." *Id.* at 3.

Respondent answers that the claim is procedurally defaulted because Giles failed to present it on collateral appeal. (Doc. no. 52, at 39). Giles argues that the claim was fairly raised. (Doc. no. 57, at 53 (citing Rule 32 C.R. Vol. 52, Tab. 71, at 45-47)). A review of the brief shows that the "marijuana theory" was argued, but not as a separate claim. Instead, it was proffered as corroborative evidence in support of Giles's claim that the state suppressed exculpatory evidence of Carl Nelson's recent drug prosecution and an anonymous informer. (Rule 32 C.R. Vol. 52, Tab. 71, at 45-

47).  The *Brady* claim was not fairly raised on collateral appeal.  Alternatively, it is redundant to the previous claim.

In any event, the claim is meritless with respect to the 1982 guilt trial.  If Giles had drug dealings with Carl Nelson, he was aware of those facts and, thus, there was no suppression of evidence for purposes of *Brady*.  Insofar as the phrase "marijuana theory of the case" suggests some prosecution strategy or theme, that would be work product, not evidence or factual material subject to disclosure.  The claim is meritless and due to be denied.

> **f.     State suppressed analysis of co-defendant Jones's bloody clothes (Doc. no. 44, at 43-44) (Doc. no. 57, at 41-43) (Doc. no. 45, at 47)**

Giles argues that the state performed a forensic analysis on the clothing of his co-defendant, Aaron Jones, which revealed the presence of Willene Nelson's blood, but failed to disclose that evidence.  Giles contends that if the evidence had been disclosed, it could have been used to show that Jones, and not Giles, had killed Willene Nelson.  Giles concedes that the *Brady* claim was raised for the first time in his untimely, third amended Rule 32 petition, but asserts that he also filed a contemporaneous motion asking the claim to be considered as newly discovered evidence of actual innocence.  (Doc. no. 45, at 47).  He asks this court to examine the claim under the miscarriage of justice exception to procedurally defaulted claims, and

argues that, had this error not occurred, he would not have been convicted of capital murder. *Id.*

There is no reasonable probability that Giles would have been found innocent of capital murder, even if Jones's bloody clothes and the forensic analysis conducted on them had been provided to defense counsel. Even assuming for the sake of discussion that only co-defendant Jones stabbed Willene Nelson, that fact would not, alone, absolve Giles of his participation in and complicity for the murders. The eyewitness testimony clearly showed that Giles first shot Mrs. Nelson, even if that gunshot wound did not prove fatal, and that Giles was present while Aaron Jones stabbed her, repeatedly. Indeed, eyewitnesses testified that Files handed the knife that was used to stab Mrs. Nelson to Aaron Jones, and instructed him to kill her. For all of those reasons, Giles clearly acted in concert with Jones. Giles cannot satisfy the miscarriage of justice exception to a procedural default due to his clear, factual guilt aiding and abetting the double murder. This claim is due to be denied and dismissed.

### g. State presented misleading testimony on bloody clothes and trial court erred in refusing to grant mistrial (Doc. no. 44 at 44-45) (Doc. no. 45 at 48-49) (Doc. no. 57 at 44)

Giles argues that, if the prosecution had not suppressed Aaron Jones's blood-stained clothing and the forensic report detailing the presense of Willene Nelson's

blood on that clothing, he could have established that it was Jones who stabbed and killed Willene Nelson. Giles argues that, if he had been permitted to show that it was Aaron Jones who *alone* stabbed and killed Willene Nelson, and not him, then he could have established that he was not guilty of the capital offense of killing two or more people in one transaction. (Doc. no. 44 at 43).

Giles admits that this claim was not raised until his untimely, third amended Rule 32 petition, but again argues that a miscarriage of justice will occur if the claim is not considered. For all of the reasons addressed in the immediately preceding part of this opinion, there is no reasonable probability that Giles would have been found innocent of capital murder, even if Jones's bloody clothes, and the forensic analysis conducted on them, had been provided to defense counsel. The evidence of Giles's guilt, consisting of eyewitness identification and his own confession, is overwhelming.

Further, no miscarriage of justice will occur if the claim is not considered, because the testimony Giles complains about did not mislead the jury, or even give an impression of misleading the jury. At Giles's 1982 trial, Sergeant Phillip Tipton testified that he found the guns used in the murders, wrapped in bloody clothes, at Aaron Jones's home. (R. Vol. 14, Tab. 5, at 542-50). Moreover, Officer Mann testified that no evidence was collected from Giles's home when Giles was arrested.

*Id.* at 537.  That testimony clearly informed the jury that Giles's clothing contained no forensic evidence, while Jones's clothing was "bloody."[98]

The claim is procedurally defaulted and due to be dismissed.  Further, to the extent that Giles claims the trial court erred when it refused to declare a mistrial, he admits the claim is procedurally barred because it could have been, but was not, raised on direct appeal.  (Doc. no. 57 at 44).  As such, it too is procedurally defaulted and due to be dismissed.  He has offered no "cause" for why the claims could not have been raised sooner, nor "prejudice" for his failure to do so.  Moreover, he cannot plausibly argue a fundamental miscarriage of justice because the evidence of his guilt is overwhelming.  Finally, the claim is meritless because there was nothing misleading about the testimony concerning the bloody clothes.

### h. State suppressed witness statements that Giles was innocent of Willene Nelson's stabbing death (Doc. no. 44, at 46-49) (Doc. no. 45, at 49-53) (Doc. no. 57, at 15-17)

Giles contends that the prosecution suppressed statements by Brenda Nelson and Charlie Nelson that it was Aaron Jones who stabbed their mother, and that Giles was not present during the stabbing.  He asserts that a miscarriage of justice will occur if the claim is not addressed because, absent "this error, no reasonable juror

---

[98]  The two police investigators testified at trial that they went to Giles's home, arrested him, and found no evidence of forensic value.  They then went to Jones's grandmother's home and, with her permission, recovered two weapons wrapped in bloody clothing under a couch in her basement. The clear implication was that the bloody clothing was Jones's, not Giles's.

would have found Mr. Giles guilty of capital murder": *i.e.*, killing two or more people in one transaction. (Doc. no. 45 at 49). Specifically, Giles contends that the prosecution suppressed an interview note showing that Brenda Nelson told investigators that she saw only Aaron Jones stab her mother. *Id.* Moreover, Brenda Nelson testified at Aaron Jones's 1982 trial (one day after her testimony in Giles's case) that Jones alone stabbed her mother, and Charlie Nelson testified he did not hear Giles say anything to Jones while Jones was stabbing his parents. Finally, at court proceedings in 1979 and 1982, Tony Nelson testified that he had known Giles on a social basis for four years before the crime.

Giles's allegations regarding Brenda Nelson's prior statement to investigators were raised in Giles's second amended Rule 32 petition and on collateral appeal. (*See* Rule 32 C.R. Vol. 40, Tab. 68, at 6; *id.* Vol. 52, Tab. 71, at 50). The remaining allegations concerning Brenda and Charlie Nelson's *testimony* at Aaron Jones's 1982 trial, and Tony Nelson's testimony during a 1979 preliminary hearing and 1982 trial, were not raised as a *Brady* claim until the filing of Giles's untimely, third amended

petition.  As such, to the extent that Giles raises the *testimony* of Brenda,[99] Charlie,[100] or Tony Nelson[101] as a basis for this *Brady* claim, it is procedurally defaulted and due to be dismissed.  There will be no miscarriage of justice if the claims are not heard because there is not a reasonable probability that, had the information been available to defense counsel, Giles would have been acquitted of capital murder.[102]

---

[99] At Aaron Jones's trial, Brenda was subjected to examination and cross-examination by opposing counsel.  She testified that Giles "stood there watching" while Jones stabbed her parents.  R. Vol. 46, at 1368.  When asked what she saw Giles do that night, Brenda answered:  "He shot my Daddy; he shot me; he stabbed my mother; he knocked me in the head."  *Id.* at 1373.  Brenda did maintain that she did not hear Giles direct Jones to stab her mother, but she also testified that Giles used the knife first and then handed it to Jones.  *Id.* at 1374-76.

[100] Giles's assertion that Charlie Nelson denied that Giles instructed Jones to harm the family when testifying at Jones's trial misrepresents the record of Charlie's entire testimony.  The record of the 1982 Jones trial shows that, on cross-examination, a 14-year old Charlie initially answered that he did not hear Giles say anything while Jones was stabbing his family.  R. Vol. 46, at 1353.  On redirect, the prosecutor asked Charlie Nelson if he recalled testifying at an earlier proceeding.  *Id.* at 1356.  After refreshing his recollection, the prosecutor asked if he remembered whether Giles was talking to Jones, and Charlie Nelson answered:  "Yes, sir."  *Id.* at 1357.  He could not recall exactly what Giles was saying to Jones, but agreed that Giles was telling Jones things to do in a "mean ugly manner" that frightened Charlie.  *Id.* at 1357-58.  That testimony is virtually identical to Charlie's testimony at Giles's 1979 trial, except that Charlie testified that he heard Giles tell Jones to stab him and his family.  R. Vol. 9, at 1745-50.

[101] The information testified to by Tony Nelson as to the social history between the Nelson family and Giles is not new, except that Giles contends that Tony Nelson stated that he had visited Giles in Birmingham.

[102] None of the information would establish Giles's actual innocence such that the miscarriage of justice exception should be applied.  The court has examined the testimony Giles complains about in the three preceding footnotes.  There is no information in the testimony that is exculpatory to Giles.  The witnesses did not present different testimony or make contrary accusations at separate proceedings.  The witnesses were children who were traumatized by an extremely violent and horrendous crime.  They were subjected to the same cross-examination techniques at both trials to test their memories of the events, which certainly at times may not have been consistent.  Nonetheless, it was before counsel and the juries.

What Giles is attempting to do is make much of piecemeal portions of their testimony.  However, when the witnesses' testimony at all proceedings are viewed individually and in their entirety, the testimony consistently establishes that Giles stabbed Mrs. Nelson himself and/or

178

Since the Alabama Court of Criminal Appeals adequately addressed the facts underlying the claim based upon an investigator's note of a pre-trial statement made by Brenda Nelson, analysis begins with that court's findings.

Giles argues that the circuit court erred in denying him relief on his claim that the State suppressed witnesses' statements to the effect that Giles did not stab Willene Nelson. He argues in his brief to this Court that there was no evidence indicating that he actually stabbed anyone; therefore, his culpability in the murders was not as great as that of his codefendant's — Aaron Jones.

Seldom is there a capital-murder case where you have more direct evidence against an accused than what was presented at Giles's trials. Four members of the Nelson family testified at Giles's second trial. Tony Nelson, who was 20 years old at the time of the murders, testified that Giles and Jones came into his family's house early in the morning of November 10, 1978. He knew Giles, he said, because he had worked with his father on his father's farm. He testified that his father told the two to leave and they walked out the back door. He said that as he was standing by the back door after they had left the house he was shot in the head and chest. Tony testified that Giles then went into the house and he heard gunshots. Anne Nelson, Carl Nelson's 86-year-old mother, testified that Giles and Jones entered the house and Giles shot her in the face and then went to her son's room and shot him twice. Brenda Nelson, who was 13 years old at the time of the murders, testified that Giles stabbed her mother and stabbed her in the back and that when Jones came into the bedroom where she was with her mother and father Jones also stabbed her mother and her brother Charlie.[FN11] Charlie Nelson, who was 10 years old at the time of the murders, testified that

directed Jones to do so. If Giles's counsel had the information (from the Jones proceeding) that he complains about at Giles's 1982 trial, and then utilized it to cross-examine Brenda and Charlie Nelson at Giles's 1982 trial, he would have accomplished nothing more than to repeatedly highlight just how guilty Giles was of Mrs. Nelson's murder and just how horrific the crime was. The import of Tony Nelson's testimony concerning a "social history" between himself and Giles is nil; it provides no exculpatory or favorable information that could have been used by Giles at trial.

179

Giles had a gun and Jones had a knife.  He said that Giles told Jones, "Kill them" and that Jones stabbed his mother repeatedly and then stabbed his father.  The coroner testified that Willene Nelson died from multiple stab wounds and a gunshot wound and that Carl Nelson died from two gunshot wounds — one of which entered his heart — and stab wounds to his throat and abdomen.

> FN11.  Brenda Nelson was shot above one eye and lost her left eye as a result of the shooting.

Giles confessed to participating in the murders.  His confession was introduced into evidence at both of his trials.  He said that he did shoot the Nelsons but that he did not stab any of them.  Giles said that Jones stabbed all of the victims.  However, in Jones's confession, which was entered into evidence at Jones's trial, Jones stated that Giles had already stabbed some of the victims before he handed the knife to Jones.  This statement was consistent with Brenda Nelson's testimony that both Giles and Jones stabbed her mother.

Giles argues that the circuit court erred in finding that comments contained in an investigator's notes about an interview with Brenda Nelson did not constitute exculpatory evidence.  He asserts that the note contained a reference that Brenda Nelson told the investigator that Jones stabbed Willene Nelson to death.

The circuit court made the following findings:

> "Giles also claims that he was denied *Brady* material because the State did not turn over to the defense a handwritten note found in the prosecution files during discovery in this proceeding.  He claims that note, 'Interview with Brenda Nelson 4/14/79,' contained a statement useful to the defense and the statement was not turned over to defense counsel.  Giles claims this statement exonerates him from the murder of Willene Nelson.  The statement is ambiguous, is not inconsistent with Brenda's testimony, and does not exonerate Giles.  Even if read to be inconsistent with Brenda's testimony that Giles, not Jones,

killed Willene Nelson, the statement, when considered with the rest of the evidence, does not diminish Giles's criminal culpability for the deaths of both Carl and Willene Nelson. [Defense counsel] recalled that he did know that Charlie remembered that Jones, not Giles, stabbed Willene Nelson. [Defense counsel] also recognized that, regarding the double murder aggravator, it did not really matter who did the stabbing if Giles was either wielding the knife himself or ordering that the killing be done.  [Defense counsel] recognized the law in Alabama that an accessory to a crime is equally liable with his principal.  This state does not distinguish between the liability of an accessory and a principal participating in a crime.  Ala.Code § 13A-2-23 (1975); *Ritter v. State*, 375 So.2d 270 (Ala. 1979) (a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself); and *Ex parte Raines*, 429 So.2d 1111, 1112 (Ala.1982), *cert. denied*, 460 U.S. 1103 (1983).  '[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.'

"'Giles alleges in his second amendment to the petition that the note contained the following statement:

"'[Giles] went back out and got the other fellow and he came in and stabbed my mother to death and stabbed me twice in the back and my brother twice in the back and left.'

"'(Second Amendment to the Petition at p. 6) In fact, that note . . . was as follows:

"'Went to bed about 9:30

"'Slept her mama

181

"'Daddy in the other bed in the same room

"'Charlie and Tony slept together in another room

"'She heard Tony and Giles talking

"'Her daddy went in there

"'He told the Lee guy to leave

"'Lee went outside

"'We went back to bed

"'Lee came back in and shot Tony

"'He came in our bedroom and shot my daddy, shot my mama and shot me.

"' *He went back out and got a butcher knife and stabbed my mama almost to death — went back out and got the other fellow and he came in and stabbed mother to death and stabbed me twice in the back and my brother twice in the back and left.*

"'I just laid down and played like I was dead.

"'After they left, Tony came back in and we went to the hospital.'

"(Emphasis added.)  The Court reads these notes to be the recounting by unknown person who wrote them, apparently six months after the murders, that 'Lee' (Giles) shot Carl Nelson, shot Willene Nelson, and shot Brenda.   That person (Giles) then got a butcher knife and stabbed Willene

Nelson 'almost to death.' That person then, 'went back out and got the other fellow and he (Giles or Jones?) stabbed mother to death and stabbed me twice in the back and my brother twice in the back and left.' It thus appears that the note-taker is writing that, according to Brenda, both Giles and 'the other fellow' stabbed Willene Nelson. The State pathologist, who did the autopsy on Willene testified at the first trial that Willene Nelson died from a 'gunshot wound and multiple stab wounds.' It is, therefore, clear that both types of wounds contributed to her death. In addition, for purposes of criminal liability, it does not matter which one of the codefendants killed Mrs. Nelson. Both actively participated in the events that caused her death. There is evidence that both participants intended to kill the victims. The claim concerning this statement is, therefore, denied."

(Supplemental record, p. 41-44, emphasis in original.)

A review of the investigator's notes as quoted above fails to support Giles's rendition of the facts. The note does not state that Brenda Nelson told the investigator that Jones stabbed Willene Nelson to death. Brenda Nelson testified that both Giles and Jones stabbed her mother. Her testimony appears to be consistent with the investigator's notes. The circuit court correctly denied relief on this ground.

Moreover, though Brenda and Charlie Nelson's statements appeared to differ as to whether Giles had stabbed Willene Nelson, both statements were consistent concerning Giles's active participation in the murders. Neither statement would exonerate Giles. Under Alabama law an accessory may be charged and convicted as a principal. *See* §13A-12-23, Ala.Code 1975.

Last, it appears from reading Brenda and Charlie's trial testimony that their statements about who stabbed their mother were not inconsistent. Brenda testified that she was in the bedroom with her parents before Charlie entered the room. She said that Giles stabbed her mother first. Charlie entered the room after Jones had entered and

> Charlie said that Jones stabbed his mother.  A careful review of the
> record fails to show any conflict.  There was no *Brady* violation here.

*Giles v. State*, 906 So. 2d 963, 975-78 (Ala. Crim. App. 2004) (emphasis and

alterations in original).

Giles cannot show that the state court's factual or legal findings are contrary

to, or an unreasonable application of, clearly established federal law.  Further, on the

merits, it is clear that the witness statements by Brenda and Charlie Nelson were not

exculpatory or favorable to Giles and, therefore, cannot be *Brady* material supporting

a claim for *habeas* relief.  While there may be confusion and inconsistencies in the

testimony of the two Nelson children (Brenda was 13 and Charlie was 10 at the time

of the murders in 1978), given at different proceedings over a four-year period (police

interviews, Giles's and Jones's preliminary hearings, grand jury proceedings, Giles's

and Jones's initials trials, and their 1982 retrials),[103] their basic description of Giles

shooting their parents and either stabbing or directing Jones to stab them remains

clear.  Under either version, Giles remains guilty of the murder of Willene Nelson.

The claim is due to be denied.

---

[103] Brenda Nelson testified to the events of the murders at Giles's 1979 trial (R. Vol. 8, p. 1573), Jones's preliminary hearing (R. Vol. 45, p. 1081), Jones's 1979 trial, Jones's 1982 retrial (R. Vol. 46), p. 1362, and Giles's 1982 retrial (R. Vol. 14, p. 520).  Likewise, Charlie Nelson testified at the same preliminary hearings and trials.  *See* R. Vol. 9, p.1742; R. Vol. 44, p. 1014; R. Vol. 15, p. 640; R. Vol. 46, p. 1338.

### i.   Counsel ineffective for failing to review previous witness testimony (Doc. no. 45, at 53)

Giles admits the claim was raised for the first time in his untimely, third amended Rule 32 petition.  (Doc. no. 45, at 3).  Accordingly, it is procedurally defaulted, and he has not identified any "cause and prejudice" to excuse the default.  Likewise, there is no fundamental miscarriage of justice involved in declining to consider the claim because Giles's guilt is overwhelmingly shown by the evidence.  Finally, even if considered on the merits, Giles cannot show that he suffered any prejudice under the *Strickland* standard.  A review of the many times the witnesses testified to the events of the murder has not revealed any inconsistency or "new evidence" that might have changed the outcome of the 1982 guilt determination.  The claim is due to be denied.

### j.   State suppressed exculpatory evidence despite defense requests (Doc. no. 44, at 56) (Doc. no. 45, at 54) (Doc. no. 57, at 44-45)

Giles admits that he raised the claim in his untimely third, amended petition. (Doc. no. 45 at 54).  Accordingly, the claim is procedurally defaulted.  Moreover, it also is a compilation of the *Brady* claims raised in the *habeas* petition and addressed above.  Because the individual *Brady* claims have been addressed, the claims adds nothing, and there is no reason to consider it further.  The claim is due to be denied.

### k.    State presented inconsistent prosecutions of co-defendants Giles and Jones (Doc. no. 44, at 52-56) (Doc. no. 45, at 55-57)

Giles admits that the claim was raised for the first time in his untimely, third amended petition, and was not considered by the state courts, but he argues that it should be considered because "the facts of this claim demonstrate a miscarriage of justice, and but for this error, no reasonable juror would have found Mr. Giles guilty of the offense of double murder." (Doc. no. 45 at 55). The allegations supporting the claim are the same allegations concerning the 1982 testimony of Brenda Nelson and Charlie Nelson at Jones's trial that this court discussed and dismissed above. In essence, Giles contends that the evidence presented by the prosecution at his trial differed materially from that offered at the trial of his co-defendant, Aaron Jones. He specifically contends that the testimony of Brenda and Charlie Nelson at Jones's trial indicated that Jones alone stabbed Willene Nelson, but their testimony at his trial suggested that he also stabbed her.

The claim is procedurally defaulted and due to be dismissed. It was not raised in a timely manner in state court, and Giles has not shown "cause and prejudice" to excuse the default. The evidence of Giles's guilt is so overwhelming that there can be no fundamental miscarriage of justice in refusing to consider the merits of the contention. Even if the claim were to be considered on its merits, it would be found meritless. The essential testimony of Brenda and Charlie Nelson has remained

consistent that Giles shot their parents and either stabbed them or directed Jones to do so. Any apparent inconsistencies are the result of taking testimony out of context, or failing to recognize all that the witness said. The claim is due to be denied.

> **l.  State improperly argued punishment at guilt phase of trial, and counsel was ineffective for failing to object (Doc. no. 44, at 56) (Doc. no 45, at 58) (Doc. no. 57, at 33)**

Giles concedes that the portion of the claim asserting ineffective assistance of counsel was never raised in state court and, thus, is procedurally defaulted. (Doc. no. 57 at 33). Giles asserts that the substantive aspect of the claim — *i.e.,* that the prosecution improperly argued punishment at the guilt phase of trial — was raised on direct appeal. In fact, Giles did not raise the claim on *direct appeal* from his 1982 trial, but on appeal from his *1991 re-sentencing trial*. (Doc. no. 45 at 58 (citing C.R. Vol. 29, at 39-42)). The Alabama Court of Criminal Appeals recognized that Giles was attempting to raise a claim that necessarily arose from — and, therefore, should have been asserted on direct appeal from — *the 1982 guilt phase trial*. That couart accordingly held:

> Although the appellant points out alleged errors that purportedly occurred during the guilt phase of his trial, as well as in the Supreme Court's decision remanding this case for a third sentencing hearing, this court will not "revisit" these issues. The Alabama Supreme Court affirmed the appellant's conviction, but reversed as to the death sentence and remanded the cause with instructions that a new sentencing hearing be held. *Ex parte Giles*, 554 So. 2d 1089 (Ala. 1987). Pursuant to those orders for remand, this cause was sent to the trial court for a new

187

sentencing hearing. *Giles v. State*, 554 So. 2d 1094 (Ala. Cr. App. 1987). It is that sentencing hearing only that is under review. *See Magwood v. State*, 548 So. 2d 512, 515 (Ala. Cr. App.), *affirmed*, 548 So. 2d 516 (Ala. 1988), *cert. denied*, 493 U.S. 923, 110 S. Ct. 291, 107 L. Ed. 2d 271 (1989).

*Giles v. State*, 632 So. 2d 568, 576 (Ala. Crim. App. 1992). The decision of the appellate court is based upon an adequate and independent state procedural rule. Giles could have, but did not, raise this claim on direct appeal from his 1982 trial and conviction. As such, the claim is procedurally defaulted and due to be dismissed.

Furthermore, to the extent that Giles contends the prosecutor's punishment arguments resulted in an erroneous verdict of guilt, that is precisely the type of contention that should have been, but was not, raised on direct appeal from his 1982 conviction. Insofar as Giles contends that the punishment arguments during the 1982 trial resulted in an unconstitutional *sentence*, that sentence was vacated on direct appeal,[104] resulting in a new 1991 re-sentencing trial. The claim is meritless on that ground.

> **m.    Improper closing argument by State included personal opinion and vouching by District Attorney (Doc. no. 44, at 56-57) (Doc. no 45, at 58-59)**

---

[104] Thus, even if the ineffective assistance of counsel aspect of the claim were not procedurally defaulted, it is moot.

Respondent asserts, and Giles does not deny, that he failed to raise the claim on direct appeal from his 1982 conviction. (Doc. no. 52 at 49-50).[105] When Giles attempted to raise the claim during post-conviction proceedings, the state court dismissed the claim as procedurally defaulted because Giles failed to raise it on direct appeal as required by Rule 32.2(a)(5) of the Alabama Rules of Criminal Procedure. (*See* Rule 32 C.R. Vol. 37, Tab. 65, at 558). The Alabama Court of Criminal Appeals affirmed the trial court's dismissal of the claim on procedural grounds. *Giles v. State*, 906 So. 2d 953, 990 (Ala. Crim. App. 2004).

The claim is procedurally defaulted and due to be dismissed. Giles has offered no showing of "cause and prejudice" as to why the claim was not raised on direct appeal, and the default of the claim does not involve a fundamental miscarriage of justice because the evidence of Giles's guilt is overwhelming.

Furthermore, on the merits of the claim, the only remark made by the prosecutor now challenged by Giles is found in Volume 15, Tab R-10, at pages 663-64. *See* Doc. no. 44, at ECF 79.[106] That remark was:

---

[105] In his initial brief, Giles argues that the state court dismissed the claim on the grounds that prosecutorial error "was harmless because the jury recommended life without parole." Doc. no. 44 at 56-57 (citing *Giles v. State*, 632 So. 2d at 574; *Ex parte Giles*, 632 So. 2d at 585). However, those citations are to the state courts' opinions on direct appeal from Giles's 1991 re-sentencing trial.

[106] "ECF" 79 refers to the page number assigned by the court's electronic filing system. The page number on the actual written brief is 56.

I submit to you as sincerely as I ever talked to twelve people in my life, that we have shown you everything that we told you we would at the beginning of this trial, everything. And now when His Honor charges you and gives you some rules — we refer it as rules — things to help you in your deliberations, you are going to go back and you are going to deliberate and you are going to discuss and talk about all that you have heard, and you are going to reach a decision. And I'm asking you twelve people to come back here and bring back a verdict of guilty of capital murder, guilty of capital murder.

This argument by the prosecutor was not improper vouching. It pointed to no specific evidence or witness for purposes of bolstering. At most, it was a request for the verdict the prosecution wanted. It did not invite the jury to disregard the evidence or the law; indeed, it asked the jury to carefully discuss the evidence and the instructions to be given by the court. There was nothing improper about the argument. At worst, it was harmless, and did not affect the outcome of the jury's deliberations. The claim is due to be denied.

5.  ***Due Process and Reliable Determination of Guilt Denied by Court's Rulings and Jury Instructions***

   a.  **Counsel ineffective for failing to object to jury instruction on reasonable doubt as "moral certainty" (Doc. no. 44, at 57-59) (Doc. no. 45, at 59-60)**

Giles alleges that the attorneys who represented him during his 1982 trial were constitutionally ineffective because they failed to object to the trial court's jury instruction equating reasonable doubt with a "moral certainty." He asserts that he raised the claim during his Rule 32 proceedings, but the citation he points to in his

first amended petition pertains only to a claim that the trial court's instruction on reasonable doubt was erroneous — not that his lawyers rendered ineffective assistance by failing to object to it.  (Doc. no.  45 at 59 (citing Rule 32 C.R. Vol. 37, Tab. 64, at 14)).

The claim in his *habeas* petition initially appears to be dedicated to a substantive reasonable doubt claim as well.  *Id.* at 59-60.  It is not until the second page of that section of his initial brief (page 58) that Giles mentions counsel being ineffective for failing to object to the trial court's instruction.  (Doc. no. 44 at 58). He also states:  "The court dismissed this claim as procedurally barred because it was not raised on direct appeal.  The court erred in failing to enter findings on Giles's claim that counsel's *failure to appeal this issue* was ineffective assistance of counsel."  *Id.* at 58 (emphasis supplied).

Respondent answers that the claim is procedurally defaulted because Giles failed to raise it on *collateral* appeal from denial of his Rule 32 petition.  (Doc. no. 52).  Giles counters that he fairly raised the ineffectiveness claim on collateral appeal. (Doc. 57 at 53 (citing Rule 32 C.R. Vol. 52, Tab. 71, at 135)).[107]  Although Giles is correct that the substantive jury-instruction claim was raised on collateral appeal, the

---

[107] Although this is the citation given by Giles, his initial brief on collateral Rule 32 appeal actually is found in Vol. 51, Tab 70.  He filed a supplemental brief on appeal, found in the current *habeas* record in Vol. 52, Tab 71.

court does not agree that he fairly presented the analogous claim that his defense attorneys were ineffective for failing to object to the instruction.

A fair reading of that section of petitioner's collateral appeal brief makes plain that he argued *only that* the giving of the instruction itself violated due process. The very last sentence of that section of the appeal brief added: "The court erred in failing to enter findings on Giles' [sic] claim that counsel's *failure to appeal this issue* was ineffective assistance of counsel" (emphasis supplied). This court is skeptical that the foregoing statement fairly presented *any* ineffective assistance claim. The most that can be said for it is that it raised a claim of ineffective assistance of *appellate counsel*, for failing to appeal the issue, but not ineffective assistance of *trial counsel,* for failing to make the objection, which is the issue now being argued to this court.

Even though Giles raised the ineffectiveness claim in his *second amended* Rule 32 petition, Rule 32 C.R. Vol. 40, Tab. 68, at 68, and the Rule 32 trial court addressed the claim on the merits, *id.*, Vol. 56, Tab. 87, at 125, it is not surprising that the Alabama Court of Criminal Appeals never addressed it. The claim is not fairly raised, presented, or argued in Giles's collateral appeal brief. (*See* Rule 32 C.R. Vol. 51, Tab 70, at 120-121 and Vol. 52, Tab 71, at 135).

Because the claim of ineffective assistance of trial counsel was not fairly raised and argued on collateral appeal, it is procedurally defaulted in this court, as alleged

by Respondent.  Giles has made no showing of "cause and prejudice" to excuse the default, nor does failure to consider the claim result in a fundamental miscarriage of justice.

Even if the claim of ineffective assistance of trial counsel had been fairly raised and argued on collateral appeal, it still would be meritless.  Again, *assuming* that it was fairly raised on appeal, but overlooked by the appellate court, the Rule 32 trial court's opinion assists in addressing the merits of the claim for *habeas* review.  That court began its discussion of the issue by quoting the paragraph number and heading of the claim in Giles's second amended Rule 32 petition (*see* Rule 32 C.R. Vol. 40, Tab. 68, at 68), and then proceeded to state the following:

> 23.   Counsel failed to properly object at trial to the court's instruction on reasonable doubt and failed to properly raise the issue on appeal.

> The Court assumes this claim is based on the facts alleged in claim A(4)(C) [the erroneous reasonable doubt instruction claim] of the first amended petition.  The merits of that claim have been discussed earlier in this Order and need not be repeated here.  Because the claims regarding the confession were due to be denied on the merits, Giles cannot meet the second part of the *Strickland* test.  He cannot show he was prejudiced by counsel's actions.  This claim is, therefore, denied.

Rule 32 C.R. Vol. 50, at 125 (alteration supplied).[108]   Strangely, the Rule 32 trial

court concluded that Giles's trial attorneys had not provided ineffective assistance

when failing to object to the trial court's reasonable doubt instruction because Giles's

"confession" claims had been denied on the merits.   This court fails to see the

connection between the present ineffective assistance claim and the merits of Giles's

confession claims.

Nevertheless, the Rule 32 trial court's reference to "the facts alleged in claim

A(4)(C)" pointed to the substantive contention that the trial judge's instruction

violated due process by equating the concept of "a reasonable doubt" with "a moral

certainty."  The Rule 32 trial court dismissed that claim because Giles could have, but

did not, raise it at trial or on direct appeal as required by Rules 32.2(a)(3) and (5) of

the Alabama Rules of Criminal Procedure.   Alternatively, the Rule 32 trial court

rejected the claim on the merits, because the claim

> concerning the guilt phase jury instructions on reasonable doubt would
> have been denied on its merits.  In this claim, Giles states that his right
> to due process was denied because the trial court gave an instruction on
> reasonable doubt which violates the mandates of the Supreme Court of
> the United States in *Cage v. Louisiana*, 498 U.S. 39 (1990).  The trial
> court's jury instruction is not comparable to the instruction disapproved
> in *Cage*.  While *Cage* does recognize the importance of the jury
> instruction on reasonable doubt as a requirement of due process,

---

[108] For some reason not apparent to this court, the Rule 32 court's final order denying Rule 32 relief can be found in two places in the *habeas* record, both at Vol. 50 and at Vol. 56, Tab 87.  Both orders appear to be identical.

subsequent decisions make clear there is no special language required in fashioning an instruction on reasonable doubt. *See Victor v. Nebraska*, [511] U.S. 1, 5 (1994). The correct determination is not whether certain specific language was used in the reasonable doubt instruction but whether "there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet [constitutional standards]." [511] U.S. at 6. In *Victor*, the Court approved jury instructions that contained the phrases "moral certainty" and "substantial doubt" because the instructions left no likelihood that the jury misunderstood the State's burden of proof. Likewise, no such likelihood exists here.

The jury instruction on the State's burden of proof and reasonable doubt in Giles'[s] 1982 guilt phase trial was stated as follows:

> The burden of proof is on the State of Alabama in this case. A Defendant is always presumed to be innocent. And the fact that he has been arrested and indicted and brought before the bar of justice does not create any presumption against him at all. But he comes into court clothed with the presumption of innocence. And that presumption of innocence remains with him throughout the trial until it is overcome by evidence which proves his guilt to each one of you beyond a reasonable doubt and to a moral certainty. And the burden is on the State of Alabama to show the guilt of the Defendant, from the evidence, of the offense charged in the Indictment beyond a reasonable doubt and to a moral certainty, before you would be authorized to convict him. And when I say the offense charged in the Indictment, that includes any offense embraced in that, any lesser offense, embraced in that Indictment.

> Now you would want to know what a reasonable doubt is. It is rather difficult to define. Sometimes an attempt to define it is more confusing than if the judge leaves off the definition altogether. But when I say the State is under the burden of proving guilt beyond a

reasonable doubt and to a moral certainty that does not mean that the State must prove an alleged crime beyond every imaginable or speculative doubt or beyond all possibility of mistake, because that would be impossible. But a reasonable doubt means an actual, substantial doubt arising out of the testimony, or from a lack of testimony in the case. It is a doubt for which a reason can be assigned. And the expression to a moral certainty means practically the same thing as beyond a reasonable doubt, because it [sic] you are convinced to the point where you no longer have a reasonable doubt, then you are convinced to a moral certainty.

(2nd. T. 672-673)

This charge does not impose the "grave uncertainty" standard disapproved in *Cage*. Instead, this instruction distinguishes a doubt based on the evidence from one based on mere speculation or caprice. The Supreme Court of the United States in *Victor* specifically approved similar charges. Giles would not have been entitled to relief on this claim.

(Rule 32 C.R. Vol. 56, Tab. 87, at 46-48) (alterations supplied)).

When the Rule 32 court's opinion regarding Giles's ineffectiveness claim is viewed in totality, it is obvious that the court found the reasonable doubt instruction to be constitutionally sound; and, as such, counsel was not objectively deficient for failing to object to the instruction at trial or on appeal. There is nothing problematic about the Rule 32 trial court's interpretation and application of federal constitutional law to the reasonable doubt instruction given in Giles's case. Moreover, the court properly explained that the phrase "moral certainty" was "a synonym for 'proof

196

beyond a reasonable doubt.'"   *Victor*, 511 U.S. at 14.   There is no reasonable likelihood that the jury interpreted the instruction to lower the prosecution's burden of proof.

Since the reasonable doubt instruction in Giles's case was not constitutionally infirm, counsel cannot be said to have been deficient for failing to object to it, or to complain about it on direct appeal.   Nor can Giles establish that he was prejudiced. Even more fundamentally, and assuming the Rule 32 trial court's analysis was objectively unreasonable (which it is not), trial counsel cannot be faulted for failing to anticipate, in 1982, the Supreme Court's holding in *Cage* in 1990.   Counsel's performance must be judged in light of the circumstances at the time it occurs, and not in the distorting light of subsequent events.   At the time of Giles's trial in 1982, when counsel were faced with the court's jury instruction, *Cage* was another eight years in the future.   It was not unreasonable for counsel to lack the clairvoyance to predict the *Cage* decision.   Thus, at the time of trial, counsel's performance in that regard was not beyond the scope of what a reasonable lawyer would have known and done.   The claim is due to be denied.

> **b.    Presumed malice jury instruction (Doc. no. 44, at 59-62) (Doc. no. 45, at 60-61) (Doc. no. 57, at 17-18)**

As he did on direct appeal from his 1982 conviction, Giles argues that the trial "court improperly instructed the jury on malice" and, in doing so, shifted the burden

of proof to Giles to show the absence of malice.  (Doc. no. 45, at 61).  The instruction

read to the jury by the trial court was:  "'Now every intentional and unlawful killing

of a human being is presumed to be done with malice aforethought.'"  (Doc. no. 44,

at 59) (quoting R. Vol. 15, at 668).  According to Giles, that instruction violated his

Fourteenth Amendment right to due process of law.  (Doc. no. 45, at 60-61).

The Alabama Court of Criminal Appeals addressed the issue on direct appeal

in the following manner:

> The appellant further challenges certain guilt-phase instructions
> given by the trial court in its oral charge to the jury.  He claims that a
> general "presumption of malice" instruction and a general "conspiracy"
> instruction collectively deprived him of due process by removing the
> state's burden of proving "malice" and a particularized "intent to kill."
> These claims are without merit.  They are not supported by the record.
>
> The trial court's oral charge, when read as a whole, properly
> informed the jury as to the state's burden of proof for the capital murder
> charge, and for the lesser included offenses of first-degree and
> second-degree murder.   Any ambiguity in the general, isolated
> statements challenged by the appellant was harmless in light of the
> entire oral charge.  *See, Van Antwerp v. State*, 358 So. 2d 782 (Ala. Cr.
> App.), *cert. denied*, 358 So. 2d 791 (Ala.1978).  Contrary to appellant's
> assertions, the jury was properly instructed on the applicable elements
> of capital murder, including "malice" and "intent to kill."
>
> Furthermore, appellant's own attorney in his opening statement
> to the jury conceded "that he [the appellant] is at the very least guilty of
> murder."  Moreover, the state's evidence overwhelmingly proved that
> the appellant acted with "malice" and with a specific "intent to kill"
> when he actively participated in the double murder of Willene and Carl
> Nelson.  The evidence that he "unloaded" two pistols at or into the
> bodies of his two victims and that he participated in the stabbing of the

victims was sufficient proof of "malice" and "intent to kill." In light of this evidence against him, the appellant presented no evidence in his behalf, no evidence that he acted either without malice or without the intent to kill.

   For the reasons outlined above, appellant's capital murder conviction must be affirmed.

*Giles v. State*, 554 So. 2d 1073, 1080 (Ala. Crim. App. 1984) (alteration in original).

That resolution of the claim is entitled to deference unless it is contrary to, or an unreasonable application of, binding Supreme Court precedent. To be an unreasonable application of Supreme Court precedent, it must be objectively unreasonable, not just incorrect. If it is fairly debatable among reasonable jurists, it is not objectively unreasonable.

   The United States Supreme Court has made clear that, in the context of jury instructions,

   [t]he only question for [this court] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736-37, 52 L. Ed. 2d 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). It is well established that the instruction "may not be judged in artificial isolation," but must be considered in the context of the instructions as a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147, 94 S. Ct., at 400-01. In addition, in reviewing an ambiguous instruction such as the one at issue here, we inquire "whether there is a reasonable likelihood that the

jury has applied the challenged instruction in a way" that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380, 110 S. Ct. 1190, 1198, 108 L. Ed. 2d 316 (1990).[FN4]   And we also bear in mind our previous admonition that we "have defined the category of infractions that violate 'fundamental fairness' very narrowly." *Dowling v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 674, 107 L. Ed. 2d 708 (1990).  "Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation." *Ibid*.

> FN4  In *Boyde*, . . . we made it a point to settle on a single standard of review for jury instructions — the "reasonable likelihood" standard — after considering the many different phrasings that had previously been used by this Court.  494 U.S., at 379-380, 110 S. Ct., at 1197-1198 (considering and rejecting standards that required examination of either what a reasonable juror "could" have done or "would" have done).  So that we may once again speak with one voice on this issue, we now . . . reaffirm the standard set out in *Boyde.*

*Estelle v. McGuire*, 502 U.S. 62, 73 (1991) (first two alterations supplied, other alterations in original).  *See also Jones v. United States.*, 527 U.S. 373, 389-90 (1999).

The record shows that the resolution of that issue by the Alabama Court of Criminal Appeals is entitled to deference.  That court not only found that the evidence (taken in part from Giles's own confession) overwhelmingly proved that Giles was guilty of murder, but it also expressly relied on the fact that Giles's own counsel conceded that he was guilty of murder.  Therefore, regardless of whether the partial instruction about which Giles complains was improper, there is no reasonable likelihood that the jury applied it in such manner as to relieve the prosecution of the

burden of proving legal malice.  The appellate court correctly noted that the trial court's entire instruction repeatedly told the jury that the prosecution had to prove beyond a reasonable doubt that Giles intentionally and willfully killed both Carl and Willene Nelson.  The evidence of his intentional and malicious killing of the victims was so clear and overwhelming — including the testimony of three eyewitnesses and petitioner's own confession — that there is no likelihood that the jury relied on any presumption of malice.  Because the conclusion reached by the Alabama Court of Criminal Appeals is entitled to deference under § 2254(d), the claim is due to be denied.

> **c.      Instructions denied jury the opportunity to render individual verdicts for each victim; counsel failed to challenge instructions (Doc. no. 44, at 62-64) (Doc. no. 45, at 61-62) (Doc. no. 57, at 34)**

As before, Giles appears to allege both a substantive claim concerning the trial court's jury instruction, and a claim of ineffective assistance of counsel for failing to object to the instruction.  Both claims are procedurally defaulted, because neither was raised during state court proceedings, a fact that Giles admits.  (Doc. no. 57 at 34).  Giles contends that a miscarriage of justice will occur if the claim is not addressed by this court.  Even so, there is no reasonable probability that, absent the alleged error, a reasonable jury would have found Giles innocent of Willene Nelson's murder.  Notwithstanding Giles's argument that it was Aaron Jones who stabbed Willene

Nelson, the eyewitness testimony clearly showed that Giles first shot her (even if not fatally), and that Giles was present while Jones stabbed her repeatedly. Eyewitnesses testified that Giles gave Jones the knife with which Mrs. Nelson was stabbed and directed him to kill her. That is more than sufficient to reject the notion that the jury might not have convicted Giles of the murder of Willene Nelson. Counsel's failure to object to the instruction did not result in prejudice because the evidence overwhelmingly showed Giles's guilt in the murder of Mrs. Nelson. The claim is due to be dismissed.

> **d.    Jury instruction on accomplice liability violated Fifth, Sixth, and Fourteenth Amendments (Doc. no. 44, at 64-66) (Doc. no. 45, at 63) (Doc. no. 57, at 18-19)**

Giles argues that the state courts never addressed the claim on the merits. (Doc. no. 57, at 18). However, the Alabama Court of Criminal Appeals did so in combination with Giles's complaint about an allegedly erroneous "presumptive malice" jury instruction. (*See* Claim V.A.5(b), *supra* (quoting *Giles v. State*, 554 So. 2d 1073, 1080 (Ala. Crim. App. 1984))). The trial court repeatedly told the jury that the state had to prove that Giles intended to kill. There is no reasonable probability that the jury mistakenly believed that they could convict Giles on evidence less than that he intended to kill both Willene and Carl Nelson. For the same reasons set out above, the claim is due to be denied.

202

**B.     Claims Arising Out of the 1991 Penalty-Phase Trial**

The next group of claims asserted by Giles allege constitutional violations with respect to his 1991 re-sentencing trial and death sentence.

      **1.     *Death Sentence Obtained Under Unconstitutional Alabama Death Penalty Law***

            **a.     Petitioner denied due process in third sentencing trial because law of the case required life without parole sentence; counsel ineffective for failing to object to remand for third sentencing[109] (Doc. no. 44, at 66-67) (Doc. no. 45, at 63-64) (Doc. no. 57, at 62)**

Giles alleges that, under "the law of the case" doctrine, the re-sentencing court was required to sentence him to life without parole when the 1991 jury could not reach a unanimous decision.  (Doc. no. 45 at 64).  He argues that, when the Alabama Supreme Court reversed his 1982 death sentence and remanded the case for a new sentencing trial, that Court cited *Beck v. State*, 396 So. 2d 645, 663 (Ala. 1980), for the proposition that, if the jury failed to reach a unanimous verdict on the penalty, the trial court would be required to impose a sentence of life without parole.

---

[109] Contrary to the express language of his *habeas* petition, Giles insists in his reply brief that the petition does not raise a claim that his counsel was ineffective for failing to object to remand for the third sentencing.  Doc. no. 57 at 6.  As such, the court finds that the remand allegations were not raised or, in the alternative, have been expressly abandoned by Giles.  To comply with *Clisby v. Jones*, 960 F.2d 925 (11th Cir. 1992), any claim of ineffective assistance of counsel that *might* be raised in this allegation is DENIED.

Giles additionally contends that the Alabama Court of Criminal Appeals "repeated" his version of the *Beck* decision "with approval in the *Giles* case." (Doc. no. 45 at 64). Relying on his faulty version of the Alabama Supreme Court's post-*Beck* decision, and the erroneous assertion that the Alabama Court of Criminal Appeals adopted it, Giles concludes that the law of the case doctrine required the trial judge to sentence him to life without parole when his 1991 re-sentencing jury deadlocked, and that the trial judge's failure to do so denied him due process of law. (Doc. no. 44, at 67).

Giles alleges that he raised this issue on direct appeal, but the state appellate court did not address it. (Doc. no. 45, at 64). However, the opinion of the Alabama Court of Criminal Appeals clearly shows that the court rejected the claim, because the issue already had been "thoroughly discussed and decided otherwise" by the Alabama Supreme Court. *See Ex parte Giles*, 632 So. 2d 577, 580 (Ala. 1993) (citing *Ex parte Hays*, 518 So. 2d 768, 775 (Ala. 1986)).

At the outset, the claim raises only a question of Alabama law; a federal constitutional error is not asserted. The question of whether Alabama recognizes and would apply the "law of the case" doctrine under those circumstances is an issue of state law. *Habeas* relief is not available for errors of state law, unless it deprives the petitioner of a fundamentally fair sentencing decision. Because the claim does not

involve an error of federal law, the court has no jurisdiction to provide relief.  *See Pulley v. Harris*, 465 U.S. 37, 41-43 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law.").  Even so, the Alabama Supreme Court has explained that

> The language from *Beck* . . . means nothing more than that *the jury's sentence recommendation* shall be life without parole if the jury cannot agree on a sentence of death.  *The language was not intended to be construed as making the judge's ultimate sentence bound by the recommendation of the jury*.  Indeed, to place such a construction on this language would be contrary to the recognition in this state that the judge, and not the jury, is the final sentencing authority in criminal proceedings.  We reiterated this principle in *Beck* when we noted that "[a]s this Court, the Court of Criminal Appeals, and the federal courts have all held, under Alabama's statute *the trial judge and not the jury is the sentencing authority*."  *Id.* at 659.  Our holding in *Beck* does not alter this principle.

> Although we did not address the issue of the trial judge's authority to override the jury's recommendation of a sentence of life without parole in *Beck*, we are of the opinion that this authority is implied as a necessary and logical consequence of our holding in that case.  It is conceded that the death penalty statute made no express provision for the trial judge to override the jury's recommendation of life imprisonment.

*Ex parte Hays*, 518 So. 2d 768, 775 (Ala. 1986) (emphasis supplied).  The foregoing quotation from the *Hays* opinion makes clear that the present issue is solely one of state law, as the Eleventh Circuit recognized in *Hays v. Alabama*, 35 F.3d 1492 (11th Cir. 1996).  When the Alabama Supreme Court's decision in *Ex parte Hays* was addressed by the Eleventh Circuit in *Hays v. Alabama*, that Court held that:

Petitioner is due no relief on the grounds that Alabama has misinterpreted its own law. *See Pulley v. Harris*, 465 U.S. 37, 41-43, 104 S. Ct. 871, 875, 79 L. Ed. 2d 29 (1984) ("A federal court may not issue the writ on the basis of a perceived error of state law."). *See also Parker v. Dugger*, 498 U.S. 308, 327, 111 S. Ct. 731, 742, 112 L. Ed. 2d 812 (1991) (White, J., dissenting) ("It is axiomatic that . . . the views of the State's highest court with respect to state law are binding on the federal courts.") (citing cases) (internal quotation marks omitted). And even if we, as did the Court in *Pulley*, assume for the sake of argument that some errors of state law might be so "egregious" as to offend the due process or equal protection clause, we conclude that the Alabama Supreme Court in *Ex parte Hays* committed no such error in reading the relevant language from *Beck*. A sufficient reason for our conclusion is that *Beck* decided nothing about whether a judge could impose death when the jury had voted for life imprisonment: that question was not presented in *Beck*.[FN5] And to say the least, no egregious error glares out of *Ex parte Hays's* ultimate conclusion that the death penalty law under which Hays was sentenced permitted upward override.[FN6] Thus, the state courts' alleged misinterpretation of Alabama law gives rise to no ground on which the writ might issue.

FN5. As Chief Justice Marshall wrote in *Cohens v. Virginia*, 19 U.S. (6 Wheat) 264, 399, 5 L. Ed. 257 (1821):

> It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason for this maxim is obvious. The question actually before the Court is investigated with care, and considered in its full extent.

FN6. After discounting the *Beck* dictum, Alabama's Supreme Court persuasively explained why upward

206

override is permitted.  First, the court explained that the quoted language could be squared with *Beck*'s holding — that ultimate sentencing authority lay with the judge — only by interpreting the quoted language to mean that if the jury cannot unanimously agree on death, the jury shall recommend a sentence of life imprisonment.  *Ex parte Hays*, 518 So. 2d 768, 775 (Ala. 1986).

Second, the court also explained why the 1975 Alabama death penalty act explicitly allows the judge to override in favor of life but not in favor of death.  This seeming omission is because as initially drafted, the capital sentencing statute simply did not allow a jury to recommend life imprisonment without parole in the first place.  Once the *Beck* decision permitted juries to recommend life, judges impliedly became permitted to override in favor of death.  *See id.* at 775-76.

As the district judge pointed out, there are other instances when Alabama law can most plausibly be read to afford the jury ultimate sentencing authority, but where such is not the case (because the judge can override).  The instant circumstances present another one of those cases.  Thus, we decline to hold that erroneous application of state law to the petitioner violated the Fourteenth Amendment.

*Hays v. Alabama*, 85 F.3d at 1500-02.  In sum, the interpretation of Alabama law urged by Giles in this court has been addressed by the Eleventh Circuit and found not to violate federal due process.

Further, Giles's assertion of the "law of the case" doctrine is factually wrong. When reversing and remanding the 1982 imposition of the death penalty upon Giles, the Alabama Supreme Court did *not* announce as a holding in the case, binding on lower courts, that a sentence of life without parole was mandated if the jury in the re-

sentencing trial were not able to reach a unanimous verdict.  In the Giles appeal from

the 1982 sentence, the Alabama Supreme Court framed the question this way:

> The defendant contends that the trial court erred in requiring the deadlocked jury to return the next morning for further deliberations.  He argues that the trial court instead should have entered a sentence of life without parole.   He also argues that the trial court's actions impermissibly suggested to the jury that the trial court favored a death sentence in the case.  *We agree with the latter contention.*

*Ex parte Giles*, 554 So. 2d 1089, 1092 (Ala. 1987) (emphasis supplied).   The

Alabama Supreme Court did not direct the lower court on remand to *impose* a

sentence of life without parole if the sentencing jury became deadlocked.  Instead,

after finding that the 1982 sentence had to be vacated because the actions of the trial

judge in the 1982 trial "impermissibly suggested to the jury that the trial court [judge]

favored a death sentence in the case," the Alabama Supreme Court held that a trial

judge should not require a deadlocked jury to continue deliberating until it reached

a unanimous sentencing recommendation.   Rather, the proper procedure was to

construe a non-unanimous verdict of the jury as *recommending* a life-without-parole

sentence, *subject to* the judge's right to override if the aggravating circumstances

outweighed the mitigating circumstances.  Thus, there was no mandate from the

Alabama Supreme Court that was not followed by the subsequent 1991 sentencing

court in violation of the "law of the case" doctrine.

For the foregoing reasons, Giles fails to raise a claim subject to *habeas* review, and, as such, this sub-claim is due to be dismissed pursuant to 28 U.S.C. § 2254(a).

      **b.**    **The 1981 death penalty law did not authorize upward judicial override, and overrides do not apply to conduct that occurred before July 1, 1981 (Doc. no. 44, at 67-70) (Doc. no. 45, at 64-65)**

      **c.**    **Upward judicial override allowed in *Ex parte Hayes* should not be applied retroactively (Doc. no. 45, at 65-66) (Doc. no. 57 at 19-21)**

When framing these claims, Giles states:

> The old 1975 Alabama death penalty law [in effect at the time of the 1978 crime in his case] did not include a "rule of court override."' Alabama trial judges did not have authority to implement an "override" of a jury verdict until 1981, and, even then, overrides could only be applied to criminal cases arising after 1981.

(Doc. no. 45, at 64-65) (alterations supplied). Moreover, Giles contends that an *upward* judicial override (as distinct from a *downward* override) of the sentence recommended by the jury's verdict did not become law in Alabama "until *Ex Parte Hays*, 518 So. 2d 768 (Ala. 1986), when the Alabama Supreme Court again engaged in the work of the legislature, that Alabama adopted by judicial fiat the upward judicial override of a jury verdict." (Doc. no. 45, at 65). Finally, Giles asserts that the upward departure allowed in *Ex parte Hayes* should not be applied retroactively to his case. *Id.* at 65-66.

Giles argues these *habeas* claims as though the state courts did not address them. However, the Alabama Supreme Court did so, and held:

> Giles contends that Ala. Code 1975, §§ 13-11-1 to -8, the sentencing scheme in effect at the time of the murders in this case, did not expressly authorize the trial judge to override the jury's *de facto* sentence of life imprisonment. Therefore, he insists, the death sentence cannot be imposed.
>
> In *Ex parte Hays*, 518 So. 2d 768 (Ala. 1986), we addressed arguments substantially identical to those propounded by Giles. In that case, we held that §§ 13-11-3 and -4 authorized the trial judge to override the jury's recommendation of imprisonment, if, after independently reviewing the mitigating and aggravating factors, he concluded that the death penalty was warranted. 518 So. 2d at 775-76. Because Giles's arguments have been thoroughly discussed and decided, we will not revisit those contentions here.

*Ex parte Giles,* 632 So. 2d 577, 580 (Ala. 1993).

This court also will forego an extensive examination of *Ex parte Hays*, 518 So. 2d 768 (Ala. 1986), because the Eleventh Circuit approved the Alabama Supreme Court's reasoning concerning the propriety of an upward judicial override of a jury's verdict recommending life when the *Hays* decision was presented during federal *habeas* proceedings. *See Hays v. Alabama*, 85 F.3d 1492 (11th Cir. 1996). The pertinent portions of the Eleventh Circuit's opinion in that case read as follows:

> Petitioner next contends the Alabama Supreme Court's decision in *Ex parte Hays* (holding application of the death penalty to be proper) functions as an *ex post facto* law. As the district court held, and as we have discussed earlier, however, the Alabama Supreme Court's decision clarified, rather than altered, the meaning of the Alabama death penalty

statute pursuant to which *Hays* was sentenced.   In view of this conclusion, no need exists to address Petitioner's argument that the change in the law was substantive, not procedural, under *Dobbert v. Florida*, 432 U.S. 282, 292-94, 97 S. Ct. 2290, 2298, 53 L .Ed. 2d 344 (1977).

*Hays*, 85 F.3d at 1500-02.  This court notes that, like Giles, the defendant in *Hays* committed a murder prior to the effective date of the 1981 capital statute, yet the Alabama Supreme Court used the appeal to affirm the retroactive application of an *upward* judicial override to crimes committed before July 1, 1981.  In doing so, the Alabama Supreme Court wrote:

> Both the old and the new death penalty statutes clearly embody the principle that the judge is the final sentencing authority and may, therefore, override the recommendation by the jury.  Although our decision in *Beck* has been construed to have altered the sentencing autonomy of the trial judge if the jury renders a sentence of life without parole, *see* J. Colquitt, *The Death Penalty Laws of Alabama*, 33 Ala. L. Rev. 213, 324 (1982), this result was not our intention in *Beck*.  In order to uphold the legislative intent expressed in the old death statute that the judge be empowered to override the only sentence that could be recommended by the jury [*i.e.,* death], we hold that the trial court is empowered to override the jury's sentence recommendation of life without parole which we judicially grafted onto the old death statute as an alternate sentence recommendation.  We are of the opinion that our holding in the instant case is supported by the United States Supreme Court's decision in *Dobbert v. Florida*, 432 U.S. 282, 97 S. Ct. 2290, 53 L. Ed. 2d 344 (1977).  In *Dobbert*, the Supreme Court held that there is no *ex post facto* violation of Article I, § 10, of the Constitution by sentencing a defendant to death under a statutory sentencing scheme in effect at the time of the defendant's trial, but not in effect at the time the crime was committed, which allowed the trial court judge to override a jury's sentencing recommendation of life imprisonment, although the trial court judge had no authority under the statutory sentencing scheme

in effect at the time of the commission of the crime (which provided that the death penalty was mandatory unless a majority of the jury recommended mercy) to override the jury's sentence of life imprisonment.   In rejecting the Constitutional challenge to the application of the new sentencing scheme, the *Dobbert* court stated:

> [T]he change in the statute was clearly procedural. The new statute simply altered the methods employed in determining whether the death penalty was to be imposed; there was no change in the quantum of punishment attached to the crime.

432 U.S. at 293-94, 97 S. Ct. at 2298.

> Our decision in *Beck v. State* altered the procedures by which the sentence was imposed under the old Alabama death penalty statute, just as the Florida legislature altered the sentencing procedure under Florida law by enacting the new death penalty statute at issue in *Dobbert*.  Our holding in the instant case, interpreting our decision in *Beck v. State* as allowing for the trial court judge to override the jury's recommendation of life imprisonment, comports with constitutional requirements generally, and is constitutional as applied specifically to Hays in this case.

*Ex parte Hays*, 518 So. 2d 768, 775-76 (Ala. 1985) (first alteration supplied, second alteration in original).  As discussed above, the Eleventh Circuit has accepted this reasoning.  *See Hays*, 85 F.3d at 1500-02.

Nevertheless, Giles argues that his case is factually distinguishable from *Hays* and *Dobbert*. (Doc. no. 57, at 20).  He writes:

> In *Dobbert*, the change in the role of the judge and jury in the imposition of the death sentence in Florida occurred between the time of the murder and the time of the trial.  In addition, in both cases judicial override was already in existence at the time of the trial.  In Giles'[s]

212

> case, the change in the law allowing override did not occur until 1981, two (2) years after his first trial. At the time of Giles'[s] first trial in 1979, there was no judicial override, either upward or downward. Giles should not have had a change in the death penalty law concerning the imposition of the death penalty used against him in subsequent trials. This violates the *ex post facto* ban.

*Id.* This court disagrees.[110]   To the contrary, the very same issue was raised in *Dobbert* and *Hays* as has been raised by Giles in this case. In both *Dobbert* and *Hays,* the change in state law occurred between the date of each defendant's offense and his trial. Although it is true that Giles's first trial was in 1979, that conviction and sentence were set aside entirely on appeal on the basis articulated in *Beck*. The 1979 trial and sentence count for nothing. By the time of his second trial in 1982, the new sentencing procedure was in place. In any event, as the Alabama Supreme Court explained in *Hays*, *the override authority already existed under Alabama's old 1975 capital-sentencing statute*. The *Hays* decision merely clarified that the authority extended to whatever sentencing recommendation the trial jury made, regardless of whether the jury's verdict recommended death or life without parole.

Furthermore, the Alabama Supreme Court's decisions on judicial override authority and rejection of an *ex post facto* claim were laid down in *Ex parte Hays* in

---

[110] Hays committed his offense on March 21, 1981. *Ex parte Hays*, 518 So. 2d 768, 771 (Ala. 1986). As Giles himself points out, Alabama's 1975 death penalty statute was legislatively repealed, and a new death penalty statute was codified, effective July 1, 1981. (Doc. no. 57, at 21 (quoting *Baldwin v. Alabama*, 472 U.S. 373 n.1 (1985))) (quotation omitted).

1986, at least five years before Giles's 1991 re-trial.  There was no "unforeseeable judicial enlargement of a criminal statute, applied retroactively," as Giles alleges. (Doc. no. 57 at 20 (quoting *Bouie v. City of Columbia*, 378 U.S. 347, 352 (1964)).[111]

In *Dobbert*, the Supreme Court found that changes in Florida's hybrid sentencing scheme — very similar to the changes in Alabama law discussed in this part of the opinion — did not offend the *ex post facto* clause because the changes were procedural and ameliorative.  432 U.S. at 278-88, 292.  The *Dobbert* court explained:

> In *Beazell v. Ohio*, 269 U.S. 167, 169-170, 46 S. Ct. 68, 70 L. Ed. 216 (1925), Mr. Justice Stone summarized for the Court the characteristics of an *ex post facto* law:
>
> > "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as *ex post facto*."
>
> It is equally well settled, however, that "[t]he inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried,

---

[111] This court rejects Giles's contention that the change in the Alabama death penalty statute was substantive, rather than procedural, simply because the United States Supreme Court acknowledged that a change in the statute had occurred.  Doc. no. 57 at 21 (quoting *"Baldwin v. Alabama*, 472 U.S. 373 n.1 (1985), where the Court determined that the Alabama death penalty law 'was repealed in its entirety and replaced by new death penalty provisions . . . effective July 1, 1981.'").

> in all respects, by the law in force when the crime charged was
> committed." *Gibson v. Mississippi*, 162 U.S. 565, 590, 16 S. Ct. 904,
> 910, 40 L. Ed. 1075 (1896). "[T]he constitutional provision was
> intended to secure substantial personal rights against arbitrary and
> oppressive legislation, *see Malloy v. South Carolina*, 237 U.S. 180, 183,
> 35 S. Ct. 507, 59 L. Ed. 905, and not to limit the legislative control of
> remedies and modes of procedure which do not affect matters of
> substance." *Beazell v. Ohio*, *supra*, at 171, 46 S. Ct., at 69.
>
> Even though it may work to the disadvantage of a defendant, a
> procedural change is not *ex post facto*. For example, in *Hopt v. Utah*,
> 110 U.S. 574, 4 S. Ct. 202, 28 L. Ed. 262 (1884), as of the date of the
> alleged homicide a convicted felon could not have been called as a
> witness. Subsequent to that date, but prior to the trial of the case, this
> law was changed; a convicted felon was called to the stand and testified,
> implicating Hopt in the crime charged against him. Even though this
> change in the law obviously had a detrimental impact upon the
> defendant, the Court found that the law was not *ex post facto* because it
> neither made criminal a theretofore innocent act, nor aggravated a crime
> previously committed, nor provided greater punishment, nor changed the
> proof necessary to convict. *Id.,* at 589, 4 S. Ct., at 210.

*Dobbert v. Florida*, 432 U.S. 282, 293 (1977) (alterations in original). The same is
true of the procedural changes debated here, as acknowledged by the Eleventh
Circuit. In 1978, when the killings were committed, they were capital crimes for
which a death sentence could be imposed. The judicially-clarified procedures neither
made a previously innocent act a crime, nor made the sentence harsher than was
authorized at the time of the offense, and they did not lessen the State's burden in
proving the offense.

For the foregoing reasons, Giles cannot show that the state courts' rejection of these claims is contrary to, or an unreasonable application of, clearly established federal law, or an unreasonable determination of the facts in light of the evidence before the state courts.  The claims are due to be denied.

**2.**     ***Petitioner Denied a Fair Trial by an Impartial Judge and Jury***

   **a.**     **Jury selection method was unconstitutional and jury pool underrepresented blacks (Doc. no. 44, at 70-71) (Doc. no. 45, at 66-67)**

Giles alleges that the manner in which Morgan County selected jurors at the time of his 1991 re-sentencing trial was unconstitutional, and did not ensure criminal defendants a jury that represented a fair cross section of the community.  (Doc. no. 45, at 66-67).  He contends that:

> Defense counsel objected to the under-representation of blacks on the jury pool on numerous occasions.  Vol. 17 p. 71; Vol. 18 pp. 243, 228. The percentage of black persons in Morgan County constituted 10.59% [out] of the total population (10,252 black persons [out] of a total 96,806 population).  Vol 17 p. 71.  In contrast, the record reflects that the master list for Morgan County for the 1990-92 jury cycle was composed of 7.43% black persons (4,702 black persons [out] of a total 63,281 master list).  Vol 27 p. 66.  Moreover, the jury venire that was originally called for Giles'[s] trial was composed of only 6.34% black persons. Vol 17 pp. 71-72.  The statistical evidence established that blacks had been systematically and historically underrepresented on the jury rolls in Morgan County prior to and during the period of Arthur Giles'[s] retrial.

(Doc. no. 45, at 67) (alterations supplied).

On direct appeal from his 1991 re-sentencing, the Alabama Court of Criminal Appeals affirmed the trial court's denial of Giles's motion challenging the jury venire. It found that the record showed no evidence to support the claim and, thus, Giles had "failed to establish a *prima facie* violation of the fair cross-section requirement of the constitution." *Giles v. State*, 632 So. 2d 568, 574 (Ala. Crim. App. 1992) (citing *McMillian v. State*, 594 So. 2d 1253 (Ala. Cr. App. 1991), *remanded*, 594 So. 2d 1288 (Ala. 1992), *on remand*, 594 So. 2d 1289 (Ala. Crim. App. 1992)).

Giles does not deny that, laying aside the bare bones and statistically unremarkable showing he presents here, he offered no evidence to support the claim before the state trial court. The Supreme Court established the rule that "[r]eview under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits" in *Cullen v. Pinholster*, _ U.S. _ , 131 S. Ct. 1388, 1398 (2011). Thus, in examining this claim under § 2254, this court is limited to the sparse record before the state court.

To show a violation of the Equal Protection Clause in the context of jury selection, a defendant must demonstrate that "the procedure employed resulted in substantial underrepresentation of his race or of the identifiable group to which he belongs." *Castaneda v. Partida*, 430 U.S. 482, 494 (1977). To make such a showing, a defendant must first show that the group is a "recognizable, distinct class, singled

out for different treatment under the laws, as written or applied." *Id.* The defendant

must then show the degree of underrepresentation by comparing the proportion of the

group in the total population to the proportion of the group chosen to serve as grand

or *petit* jurors over a significant period of time. *Id.* Finally, a selection process that

is prone to abuse, or one that is not racially neutral, supports a presumption of

discrimination. *Id.* After *Castenada*, the Court again addressed discriminatory jury

underrepresentation in *Duren v. Missouri*, 439 U.S. 357 (1979), where it expressed

the analysis as follows:

> The defendant must show (1) that the group alleged to be excluded is a
> "distinctive" group in the community; (2) that the representation of this
> group in venires from which juries are selected is not fair and reasonable
> in relation to the number of such persons in the community; and (3) that
> this underrepresentation is due to systematic exclusion of the group in
> the jury-selection process.

*Id.* at 364; *see also Bowen v. Kemp*, 769 F.2d 672, 684 (11th Cir. 1985).

Likewise, the Sixth Amendment right to a fair and impartial jury is violated

when *petit* juries are not drawn from a source fairly representative of the community.

*Taylor v. Louisiana*, 419 U.S. 522, 538 (1975). The same three-part analysis applies

in the Sixth Amendment context. *Duren v. Missouri*, 439 U.S. 357, 364 (1979); *Valle*

*v. Secretary for Department of Corrections*, 459 F.3d 1206, 1215-16 (11th Cir. 2006).

When examining the second element, the Eleventh Circuit has established an

"absolute disparity" of ten percentage points as the minimum for showing unfair

underrepresentation.  For example, in *United States v. Grisham*, 63 F.3d 1074 (11th

Cir. 1995), the court explained:

> To examine the second element, we must compare the difference
> between the percentage of the distinctive group among the population
> eligible for jury service and the percentage of the distinctive group on
> the QJW [*i.e.*, "Qualified Jury Wheel"]. [*United States v. Pepe*, 747 F.2d
> 632, 649 (11th Cir.1984)]; *United States v. Esle*, 743 F.2d 1465,
> 1479-80 n.3 (11th Cir.1984) (Tjoflat, J., concurring).  If the absolute
> disparity between these two percentages is 10 percent or less, the second
> element is not satisfied.

*Id.* at 1078-79 (citing *United States v. Rodriguez*, 776 F.2d 1509, 1511 (11th Cir.

1985); *United States v. Tuttle*, 729 F.2d 1325, 1327 (11th Cir. 1984), *cert. denied*,

469 U.S. 1192 (1985)) (alterations supplied); *see also United States v. Carver*, 422

F. App'x 796, 807 (11th Cir. 2011).

Giles does not deny that he offered no evidence pertaining to the Morgan

County selection process.  Accordingly, he has failed to show that the state court's

denial of the claim entitles him to *habeas* relief under a fair cross-section or equal

protection theory.  But even looking at the statistical evidence that was presented, it

is evident that Giles cannot satisfy the requirement of showing an absolute disparity

of ten percent between the black population of Morgan County and the number of

African-Americans on the jury venire.  African-Americans constituted 10.59% of the

population of Morgan County, and they amounted to 7.43% of the master jury list and

6.34% of the actual *venire* from which Giles's jury was selected.  Neither comparison

— 10.59% compared to 7.43%, nor 10.59% compared to 6.34% — involves an *absolute disparity* of more than 10 percent.  Thus, Giles cannot show an unfair underrepresentation of blacks for fair cross-section analysis.  The claim is due to be denied.

### b.   Court improperly excused black venire member (Doc. no. 44, at 72) (Doc. no. 45, at 67-68) (Doc. no. 57, at 21-22)

Giles complains the trial court improperly excused Ms. Jacqueline Watkins, "one of the only black veniremembers,"[112] over defense counsel's objections.  Giles contends that the trial court's action violated his right to due process, equal protection, and a jury representative of a fair cross-section of Morgan County, Alabama, under *Batson v. Kentucky*, 476 U.S. 79 (1986).  (Doc. no. 44, at 72) (Doc. no. 45, at 67-68).

As the factual basis for his claim, Giles argues that the court excused Ms. Watkins despite her assurances that she could serve on the jury and make arrangements for childcare.  (Doc. no. 44, at 67-68 (citing R. Vol. 17, Tab. 28, at 58)).  However, "the court refused to excuse Richard Childers, who unequivocally stated that as a manager of a million dollar company with personal [sic] problems, he could

---

[112] In his supporting brief and reply brief, Giles asserts that Ms. Watkins was the only black veniremember in the 1991 pool.  Doc. no. 44 at 72; doc. no. 57 at 21-22, 34-35.  That assertion is false based upon Giles's own pleadings.

be gone no more than one or two days." (Doc. no. 45, at 68 (citing R. Vol. 17, Tab. 28, at 49-50, 64)).

Respondent answers that the question of whether the trial court properly excused Ms. Watkins was raised on direct appeal (doc. no. 52, at 65-67), but not in the context of a *Batson* claim. Respondent argues that, because Giles never fairly presented a *Batson* claim, it is procedurally defaulted. *Id.*

Giles does not deny that he failed to present his claim in the context of a *Batson* challenge on direct appeal, but contends that he should, nonetheless, be able to argue the claim here because his "case was on direct review when *Batson v. Kentucky*, 476 U.S. 79 (1986), was decided, [and] the ruling in *Batson* applies retroactively to this case. *Griffith v. Kentucky*, 479 U.S. 314 (1987)." (Doc. no. 57, at 21 (alteration supplied)). This argument is without merit. Giles's re-sentencing trial began in 1991, which is several years after the *Batson*/*Griffith* decisions were handed down. Thus, Giles offers no real explanation for why the *Batson* claim was not raised during the appeal from his 1991 sentencing trial, at which the jury selection occurred. The *Batson* claim is procedurally defaulted.

As mentioned, the Alabama Court of Appeals did examine the trial court's discretionary decision to excuse Ms. Watkins, and wrote the following:

> The appellant also argues that a black juror was improperly excused, on the ground that she was the sole caretaker of a five-year-old

child and six-week-old baby. The record indicates that defense counsel objected to the trial court's decision to excuse this veniremember, stating, "If you want to do it I understand why with a six-week old child. For the record, I feel I need to object to it." The trial court is vested with broad discretion to excuse potential jurors from service, pursuant to § 12-16-63, Code of Alabama 1975. We find no error or prejudice to the appellant based on the excuse of this juror.

*Giles v. State*, 632 So. 2d 568, 574 (Ala. Crim. App. 1992).

The record also establishes that Ms. Watkins responded in the affirmative when the trial judge asked the venire whether jury service would be a hardship and inconvenience. (R. Vol. 17, Tab. 28, at 42). Contrary to Giles's assertion, Ms. Watkins did not offer "repeated" assurances that she could make childcare arrangements that would allow her to serve on the jury. When the court asked whether she had someone to take care of the children, she said that she was divorced, and she guessed that her mother, who worked at a day care, could help, but Ms. Watkins added that she felt her six-week-old child needed her. *Id.* at 57-59. Out of the fourteen venirepersons who responded affirmatively to the hardship question, the trial court excused thirteen who had personal/family health problems or young children, such that it would be an extreme hardship to serve. *Id.* at 39-64. Only the fourteenth venireperson, Mr. Childers, was not excused. *Id.* at 63. His only hardship was that he was a manager at a business with some *personnel* (not "personal") problems, and he agreed that he could be sequestered at night. *Id.* at 49-50. The trial

222

court's exercise of discretion was fair and neutral across the board. Moreover, there is no indication that Ms. Watkins was excused *because of* her race. Numerous white jurors were excused for similar reasons. The claim is due to be denied.

### c. Trial court improperly allowed the State more peremptory strikes (Doc. no. 44, at 72) (Doc. no. 45, at 68-69)

Giles complains that his defense attorneys were forced to exercise peremptory strikes from an odd number of prospective jurors (41) at his 1991 re-sentencing trial (Doc. no. 45, at 68). After refusing defense counsel's timely request for an extra strike, the trial court gave the prosecution fourteen strikes, while allowing the defense only thirteen. (Doc. no. 45, at 68-69 (citing R. Vol. 18, at 260; *id*., Vol 20, at 720)).

When the issue was raised on direct appeal, the Alabama Court of Criminal Appeals found that Giles's argument already had "been resolved adversely" to him. *Giles v. State*, 632 So. 2d at 568 (citing *Brooks v. State*, 471 So. 2d 507, 509 (Ala. Crim. App. 1984) (observing that Alabama statutory law allows the District Attorney the first strike, and contains no requirement that the prosecution and defense have an equal number of strikes[113]). On *certiorari* review, the Alabama Supreme Court found

---

[113] The opinion of the Alabama Court of Criminal Appeals in *Brooks* states, in part, that:

there is no requirement that each side have an equal number of strikes. Section 12-16-100, Code of Alabama states:

". . . the district attorney shall be required first to strike from the strike list the name of one juror, and the defendant shall strike one, and they shall continue to strike off names alternately until only 12

that Giles could not have been prejudiced by any errors in the allocation of strikes because the jury recommended a sentence of life without parole. *Ex parte Giles*, 632 So. 2d 577, 586 (Ala. 1993).

Respondent answers that this claim presents a matter of state law only; or, in the alternative, that the state courts' rejection of the claim is not contrary to federal law. Giles does not deny that the trial court correctly applied Alabama statutory law, and makes no argument that the rejection of the claim by both the Alabama Court of Criminal Appeals and the State's Supreme Court offends § 2254(d). Instead, he contends that the application of *Brooks v. State* "to the facts of his case [by the Alabama Court of Criminal Appeals] was contrary to clearly established federal law." (Doc. no. 44, at 73 (alteration supplied) (citing *Pointer v. United States.*, 151 U.S. 396, 408-11 (1894) (acknowledging the importance of peremptory strikes, but holding that the Constitution does not require a State to "exhaust all of its peremptory challenges before [a defendant] peremptorily challenged any juror," so that the defendant would have knowledge of the names of the jurors that the prosecution would have liked to sit on the jury)).

---

jurors remain on the strike list and these 12 jurors thus selected shall be the jury charged with the trial of the case."

*Brooks v. State*, 471 So. 2d 507, 509 (Ala. Crim. App. 1984).

The important point, however, is that the Alabama Supreme Court, not the Alabama Court of Criminal Appeals, was the last state court to address the claim on the merits. As such, its ruling controls for purposes of *habeas* review, and that ruling was simply that Giles can show no prejudice with respect to the allocation of peremptory strikes between Giles and the State because the jury recommended a sentence of life without parole. Thus, regardless of whether the Alabama Court of Criminal Appeals' application of *Brooks* was contrary to, or an unreasonable application of, federal law, Giles makes no such argument with respect to the holding by the Alabama Supreme Court. Moreover, the Supreme Court case he relies upon does not support his position. *Pointer* does not clearly establish that a capital defendant is entitled to an equal number of peremptory strikes during the selection of the sentencing jury.[114] Giles has failed to state a claim upon which relief can be granted. The claim is due to be denied.

> **d.    Juror Sharon Elliott lied in *voir dire* about not being a crime victim, prejudiced other jurors, and was unable to listen to evidence. (Doc. no. 44, at 73-80) (Doc. no. 45, at 69-72) (Doc. no. 57, at 22-26)**

Giles alleges that juror Sharon Elliott lied when she failed to acknowledge that she had been the victim of a crime because, in fact, she had been the victim of a

---

[114] To be clear, if the question is purely one of Alabama state law, Giles is not entitled to *habeas* relief under § 2254.

vicious stabbing less than one year before Giles's re-sentencing trial.  (Doc. no. 45, at 69-92).  Giles contends, moreover, that Elliott informed two other jurors about the stabbing, and expressed her distress to those jurors.  *Id.*  Finally, Giles contends that Ms. Elliott admitted that she could not listen impartially and decide his sentence based on the evidence presented in court because she was so upset about her own near death-experience.  *Id.*

When this claim was raised on direct appeal, the Alabama Court of Criminal Appeals found that Giles could not establish any prejudice because the jury recommended that Giles be sentenced to life without parole.  *See Giles v. State*, 906 So. 2d at 979.  Giles argues that such an approach to the issue is contrary to clearly established federal law because, "Elliott's prosecutorial bias was a 'structural defect in the constitution of the trial mechanism' that is not harmless and justifies a presumption of prejudice."  (Doc. no. 44, at 75 (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 240 (2nd Cir.1998), and citing *Chapman v. California*, 386 U.S. 18, 23-24 (1967) (holding that certain errors undermine rights "so basic to a fair trial" that they can never be treated as harmless error[115])).

Giles's contention that jury misconduct claims are considered "structural errors" is without merit.  The Supreme Court has recognized that

---

[115] *Chapman v. California* addressed trial error in the admission of involuntary confessions, not juror misconduct claims.

"most constitutional errors can be harmless." [*Arizona v.*] *Fulminante*, [499 U.S. 279] at 306, 111 S. Ct. 1246. "[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other [constitutional] errors that may have occurred are subject to harmless-error analysis." *Rose v. Clark*, 478 U.S. 570, 579, 106 S. Ct. 3101, 92 L. Ed. 2d 460 (1986). Indeed, we have found an error to be "structural," and thus subject to automatic reversal, only in a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997) (citing *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963) (complete denial of counsel); *Tumey v. Ohio*, 273 U.S. 510, 47 S. Ct. 437, 71 L. Ed. 749 (1927) (biased trial judge); *Vasquez v. Hillery*, 474 U.S. 254, 106 S. Ct. 617, 88 L. Ed. 2d 598 (1986) (racial discrimination in selection of grand jury); *McKaskle v. Wiggins*, 465 U.S. 168, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (denial of self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 104 S. Ct. 2210, 81 L. Ed. 2d 31 (1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (defective reasonable-doubt instruction)).

*Neder v. United States*, 527 U.S. 1, 8 (1999) (first two alterations supplied, remaining alterations in original).

Giles has failed to establish that the juror misconduct claim he raises here has ever been deemed a "structural error" and, thus, subject to automatic reversal. Therefore, he cannot show that the state court's decision, whether correct or not, is contrary to, or an unreasonable application of, clearly established federal law. There is no clearly established Supreme Court precedent holding that juror misconduct during the *voir dire* or sentencing phase of a capital case is beyond the reach of harmless error analysis. Indeed, circuit precedent suggests otherwise: "A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life

227

instead of death." *Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009) (citing *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir.1994)) (*per curiam*).  Further, and even though the Supreme Court's recent decision in *Skilling v. United States*, _ U.S. _ , 130 S. Ct. 2896 (2010) did not involve the *exact* issue as the one before this court, the *Skilling* opinion *suggests* that juror misconduct during *voir dire* remains subject to harmless error analysis, at least in the sense that a defendant must show that he was harmed by the misconduct.  Even earlier, in *Smith v. Phillips*, 455 U.S. 209 (1982), the Supreme Court did not hold that potential juror bias gave rise to *presumed* prejudice.  Rather, the defendant must make a showing of *actual bias* against him.

Here, Giles has not demonstrated that he suffered actual harm as a result of Elliott's misrepresentations.  The 1991 jury seated for the purpose of making a sentencing recommendation could choose either death or life without parole.  The most lenient option Giles could legally expect was a verdict recommending a sentence of life without parole, and that is the verdict that his 1991 jury returned.  In no sense did juror Elliott's crime-victim experience, or her difficulty with impartially evaluating the evidence, cause any perceivable prejudice to Giles.  There also is no indiction that Elliott harbored actual bias against Giles.  Even if it could be said that a presumption of prejudice arose as a result of Elliott's alleged misconduct, the recommendation returned by the jury refuted that presumption.  Giles received the

most favorable outcome he could legally expect from the jury.  The claim is due to be denied.

### e.   Juror Jeffrey Lipscomb was unqualified for jury service and the trial court failed to remove him for cause (Doc. no. 44, at 80-83) (Doc. no. 45, at 72-73) (Doc. no. 57, at 26)[116]

This claim was raised in some form on direct appeal from Giles's 1991 re-sentencing trial, and again during post-conviction proceedings.  The Alabama Court of Criminal Appeals twice addressed the claim on the merits.  On the first occasion, the State's intermediate appellate court observed that Giles had argued "that a veniremember should have been struck because he indicated he could not consider age as a mitigating circumstance and because it was unclear whether he had a prior conviction for the sale of marijuana."  *Giles v. State,* 632 So. 2d 568, 574-75 (Ala. Crim. App. 1992).  The court rejected the claim, saying:  "the record indicates that defense counsel objected to the removal of this veniremember from the panel and thereby invited any error which he now claims."  *Id.* at 575 (citing *Rogers v. State*, 630 So. 2d 78 (Ala. Cr. App. 1991), *reversed on other grounds*, 630 So. 2d 88 (Ala. 1992)).

---

[116] In his initial brief, Giles attempts to embed arguments that counsel was ineffective for objecting to Lipscomb's removal.  Doc. no. 44 at 80.  Those allegations are not being considered because they are not pleaded in the *habeas* petition, but only in Giles's supporting brief.

On the second occasion, the intermediate appellate court mistakenly concluded that the record did not show that Lipscomb had served as an actual juror. Notwithstanding that erroneous conclusion, the Court also ruled that, *even if Lipscomb had served as a juror*, Giles was due no relief for the following reasons:

> The circuit court cites well-established caselaw that holds that error in a jury sentencing hearing in a capital case is harmless when the jury returns a recommendation of life imprisonment without parole — the more lenient of the two available sentences for a capital conviction. In fact this Court quoted this principle in *Giles v. State*, 632 So. 2d 568, 574 (Ala. Crim. App. 1992). Accordingly, because any error was harmless, Giles cannot show that he suffered any prejudice. The circuit court's order denying relief on these claims is consistent with the law — it is not clearly erroneous. *Giles*, 632 So. 2d at 574.
>
> Moreover, Giles specifically argues that he is entitled to a new trial because one of the juror's [sic] at his 1991 sentencing hearing was not qualified to serve as a juror in Alabama because he had been convicted of a felony and had had his civil rights revoked. Giles appears to argue that this juror's service on the venire tainted the verdict.
>
> We have examined the record of Giles's 1991 sentencing hearing.[FN13] The juror that Giles challenges in this postconviction proceeding did not sit on Giles's jury. The record shows that this juror was questioned during *voir dire* examination and candidly admitted that he had previously been convicted of a felony and that he was on probation for that offense. However, the record fails to show whether this juror was ultimately excused by the circuit court for that reason or whether this juror was struck by use of a peremptory strike. The record does contain a strike list; however, the list does not correspond to the names of the jurors involved in Giles's 1991 case. All we do know from examining the record is that this juror did not serve on Giles's jury.

FN13.  This Court may take judicial notice of our prior records on appeal.  *Ex parte Salter*, 520 So. 2d 213, 216 (Ala. Crim. App. 1987).

Section 12-16-60, Ala. Code 1975, contains the qualifications for jury service in Alabama. Section 12-16-60, states, in part:

"(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:

". . . .

"(4) Has not lost the right to vote by conviction for any offense involving moral turpitude."

The lack of a qualification in § 12-16-60 is a valid ground to strike a juror for cause.  *Poole v. State*, 497 So. 2d 537 (Ala. 1986).  The Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike.  *Bethea v. Springhill Mem'l Hosp.*, 833 So. 2d 1 (Ala. 2002).

Last, this issue does not raise a jurisdictional defect that would void the proceedings in the circuit court.  As the Alabama Supreme Court stated in *Ex parte Toyota Motor Corp.*, 684 So. 2d 132 (Ala. 1996):

"Under Alabama law, a '[f]ailure to timely challenge a juror for cause may result in a waiver of the right to do so if the fact of disqualification is either known or, through the exercise of due diligence, should be known.' *Watters v. Lawrence County*, 551 So. 2d 1011, 1016 (Ala. 1989) (citing *Williams v. Dan River Mills, Inc.*, 286 Ala. 703, 246 So. 2d 431 (1971))."

684 So. 2d at 136 (footnote omitted). A jurisdictional error cannot be waived. "'Nonjurisdictional issues can be waived; jurisdictional issues cannot.'" *Baker v. State*, 819 So. 2d 87, 89 (Ala. Crim. App. 2001), quoting *Mitchell v.* State, 777 So. 2d 312, 313 (Ala. Crim. App. 2000), citing in turn *Lancaster v. State*, 638 So. 2d 1370, 1374 (Ala. Crim. App. 1993) (Bowen, P.J., dissenting). Relief was correctly denied on this ground.

*Giles v. State,* 906 So. 2d 963, 979-80 (Ala. Crim. App. 2004) (first alteration supplied, second alteration in original).

This court also has examined the *voir dire* of juror Lipscomb in its entirety. (*See* R. Vol. 17, Tab. 28, at 38-39, 73, 78-78; R. Vol., Tab 28, at 247-49). The *voir dire* reveals that Lipscomb was painfully honest regarding his prior conviction for marijuana. He admitted that he believed it was a felony. He also stated he had not been sentenced to prison, but had been placed on probation. Lipscomb acknowledged that he had never taken any steps to have his voting rights restored but, nevertheless, believed that they had been restored because he had voted since his conviction and no one had ever stopped him from doing so. Discussion then occurred among defense counsel, the prosecutor, and the trial court concerning Lipscomb's situation. (R. Vol. 18, at 244). It appears that the parties concluded that Lipscomb had a prior felony conviction and that he had lost his voting rights. Further, the district attorney commented that purging voter lists of convicted felons "still goes unchecked in a lot of cases still today in our circuit." *Id.* at 249. The logical inference from Lipscomb's

testimony is that he did not understand that his felony conviction meant that he had lost his voting rights.

Giles's defense counsel had all the information he needed to make a decision on whether to strike juror Lipscomb because he was unqualified to serve as a juror. Defense counsel knew that Lipscomb probably was not qualified but, nonetheless objected to Lipscomb's removal from the venire, thereby waiving his challenge to Lipscomb's service. Juror Lipscomb was not stricken by either party and ultimately served on Giles's sentencing jury.[117]

Giles argues that his right to a fair and impartial jury is one that cannot be waived by counsel. (Doc. no. 44 at 80). However, the Supreme Court cases he cites do not provide a basis for a reasoned argument in support of that contention. *See id.* at 80-81 (citing *Johnson v. Zerbst,* 304 U.S. 458 (1938);[118] *Fay v. Noia,* 372 U.S. 391

---

[117] The finding by the Alabama Court of Criminal Appeals that the record was silent as to whether Lipscomb actually served is mistaken. At R. Vol. 18, Tab 28, p. 265, Lipscomb's name clearly appears among those selected after the parties completed their strikes. The factual finding by the state court that Lipscomb did not serve on the jury is unreasonable in light of the record evidence.

[118] In *Johnson v. Zerbst*, 304 U.S. 458, 465 (1938), the Supreme Court held:

> The constitutional right of an accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused — whose life or liberty is at stake — is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused. While an accused may waive the right to counsel, whether there is a proper waiver should be clearly determined by the trial court, and it would be fitting and appropriate for that determination to appear upon the record.

(1963)).  He has not shown this court any case, nor has the court's independent research revealed any authority, holding that the act of allowing a juror to serve on a jury in violation of *state* juror-qualification law raises a *federal* constitutional issue — at least not in the absence of proof that the juror was not impartial.[119]  To the contrary, in *Rogers v. McMullen*, 673 F.2d 1185 (11th Cir. 1982), the Eleventh Circuit held that a *habeas* petitioner was not entitled to relief when he objected in his criminal trial to the fact that one of the jurors was only seventeen years old.  The court pointed to the former Fifth Circuit's opinion in *Ford v. United States*, 201 F.2d 300 (5th Cir. 1953), in which a convicted felon served on a federal criminal jury, as a guide to its analysis, saying:

> Because of his felony convictions, this juror was disqualified by statute from jury service.  However, no objection was raised until Ford filed a motion for a new trial.  The defendant first discovered the facts relating to this juror's criminal record after the verdict.  The former Fifth Circuit noted that where the objection is not asserted until after the verdict, even though the defendant was not previously aware of the facts which would support the disqualification, a new trial must be granted only if the defendant demonstrated "actual prejudice or other fundamental incompetence" of the juror in question.  201 F.2d at 301.  Finding no actual prejudice or fundamental incompetence on the facts of that case, the court affirmed Ford's conviction.

---

[119] It should be noted that Giles makes no argument that juror Lipscomb harbored any bias against him.  It is also clear, of course, that the claim does not involve an assertion that a juror was *prevented* from serving due to any form of invidious discrimination.

*Rogers,* 673 F.2d at 1189. *See also United States v. Crockett*, 514 F.2d 64, 69 (5th Cir. 1975); *United States v. Silverman*, 449 F.2d 1341, 1344 (2d Cir. 1971), *cert. denied*, 405 U.S. 918 (1972); *Gomez v. United States*, 245 F.2d 346 (5th Cir. 1957). Although these cases were decided under federal juror-qualification law, the Eleventh Circuit applied the rule in a *habeas* case involving a state conviction, saying: "While *Ford* does not purport to determine whether it is unconstitutional for a felon to serve on a jury, it follows logically that if such service is permissible in the federal system, 'the due process clause of the Fourteenth Amendment cannot possibly require more of a state court system.'" *Rogers*, 673 F.2d at 1189 (quoting *Smith v. Phillips*, 455 U.S. 209 (1982)).

In this case, it is clear that the challenge to Lipscomb's service was not raised until after the jury returned its sentencing recommendation, and that Giles's counsel knew of the concerns over Lipscomb's qualifications to serve, but affirmatively objected to his removal from the jury. Thus, under *Rogers*, Giles would be entitled to *habeas* relief "only upon a showing that the juror was actually biased or incompetent." *Rogers*, 673 F.2d at 1190. Giles has neither alleged nor proven actual bias on Lipscomb's part. Finally, Giles presents no authority showing the state court's decision regarding prejudice was either contrary to, or an unreasonable

application of, clearly established federal law.  This claim is without merit and due to be denied.

        **f.**     **A trial court officer informed juror Lipscomb of Giles's prior death sentence (Doc. no. 44, at 83) (Doc. no. 4, at 73-74) (Doc. no. 57, at 49-50)**

Giles alleges that, while the jurors were sequestered, juror Jeffrey Lipscomb drank a beer at a hotel lounge.  (Doc. no. 45, at 75).  He was approached by a bailiff who told him that he was not permitted to drink alcohol.  *Id.*  The bailiff also told Lipscomb that Giles had "previously been sentenced to death but got a re-trial, and that she did not want this jury to 'screw up' the trial."  *Id.*  Giles does not allege that Lipscomb was affected by the comment, nor does he contend that Lipscomb shared the information with any other jurors.  Instead, he contends the court officer's conduct violated due process.  *Id.* at 74.

Giles admits that the claim was raised for the first time in his untimely, third amended Rule 32 petition.  (Doc. no. 45, at 73 (citing Rule 32 C.R. Vol 43, at 787)).  He argues that the claim should be considered, nevertheless, because "Lipscomb was prepared to offer this testimony [at the Rule 32 hearing,] but the Rule 32 court refused to allow him to testify."  (Doc. no. 45, at 74 (citing R. Vol. 33, Tab. 60, at 4) (alteration supplied)).

236

That assertion of the circumstances existing at the time Lipscomb was offered as a witness during the Rule 32 hearing is misleading. It is true that the trial court refused to allow Giles's Rule 32 counsel to call *Lipscomb* as a witness during Rule 32 proceedings; but, at that time, counsel represented to the court that Lipscomb was being called in support of a claim that he had been untruthful about a prior felony marijuana conviction and his qualifications to serve as a juror. (R. Vol. 33, Tab. 60, at 4). Indeed, the attorney for Giles explained to the Rule 32 court the three juror-misconduct claims she intended to present as follows:

> MS. WESSELS: This is the penalty phase. We will claim it as jury misconduct, but there was a convicted felon on the jury, on the '91 sentencing jury who admitted plainly and openly during *voir dire* that he had a felony conviction. And there was a very short discussion during *voir dire* about whether his civil rights had ever been restored and wether [sic] they had ever been taken away. And we will produce exhibits that show that he was struck by the Circuit Clerk of Morgan County from the voting rolls and that he never ever petitioned the Board of Pardon and Paroles to have his civil rights restored. He was ineligible to sit on this jury and he will testify.

(C.R. Vol. 33, Tab. 60, at 4) (alteration supplied). At no time during that proffer did Giles's Rule 32 attorney assert that Lipscomb was being called to testify that he had been given improper extrinsic information by the trial court's bailiff, or that he had been informed about Giles's prior death sentence. That potential evidence was not brought to the attention of the Rule 32 court judge before he prevented Lipscomb's testimony.

This claim is procedurally defaulted.  The state courts have determined that the claims raised for the first time in Giles's third amended petition were not timely presented because the trial court dismissed the Rule 32 petition, and there was nothing left to amend.  Giles has offered no showing of "cause and prejudice" to excuse his failure to raise the claim in the earlier versions of his Rule 32 petition.

But even if the claim had not been defaulted, it still would be meritless.  The sentencing jury on which Lipscomb sat returned a recommendation of life in prison without parole, the least severe of the alternatives available to it.  That fact demonstrates that any comment made to Lipscomb by the bailiff caused no prejudice to Giles, who received the very recommendation he sought from the jury.

Because the claim is both procedurally defaulted and meritless, it is due to be denied.

### g.	Trial court improperly denied *voir dire* on non-statutory mitigating evidence (Doc. no. 44, at 83) (Doc. no. 45, at 74-75)

Giles complains that his attorneys attempted to investigate the views of prospective jurors on the *non-statutory* mitigating evidence that defense counsel intended to present at the 1991 sentencing trial, but that the trial court only permitted counsel to question the jurors about their views concerning statutory mitigating circumstances.  (Doc. no. 45, at 64 (citing R. Vol. 17, Tab 28, at 94, 96)).  Giles argues that the trial court violated his rights because jurors must be able to consider

both non-statutory and statutory mitigating circumstances in order to guarantee a fair

trial by an impartial jury and ensure individualized sentencing.  (Doc. no. 44, at 84

(citing *Hitchcock v. Dugger*, 481 U.S. 393, 394 (1987); *Turner v. Murray*, 476 U.S.

28, 33-38 (1986); *Skipper v. South Carolina*, 476 U.S. 1, 4 (1986)).

Respondent answers that Giles cannot show that the state court's rejection of

the claim on direct appeal merits *habeas* relief.  (Doc. no. 52, at 74-76 (citing *Giles

v. State*, 632 So. 2d at 575; *Ex parte Giles*, 632 So. 2d at 585-86) (finding that any

error on that ground was harmless because Giles's jury returned a verdict of life

without parole and, as such, he was not prejudiced)).

As an initial matter, Giles's allegations are based on a mischaracterization of

the record.  The transcript reveals that during the first panel *voir dire*, defense counsel

asked the court to instruct the jury on statutorily enumerated and non-enumerated

mitigating factors.  The trial judge responded:

> THE COURT:  Let me say this to you [addressing the jury panel]:
> The two [mitigating factors] that counsel has mentioned, the age and no
> significant prior criminal record are mitigating circumstances which are
> set out in the Code of the State of Alabama.  And you are required to
> consider those mitigating circumstances if they are supported by the
> evidence.  There may be other mitigating circumstances you can take
> into consideration if you feel that those matters are proper mitigating
> circumstances and have evidence to support them.

(R. Vol. 17, Tab. 28, at 94-95) (alteration supplied).

After that instruction, Mr. Sparks (one of Giles's defense attorneys) thanked the court, and co-counsel, Mr. Prickett, spoke to the jury.  *Id.* at 95.

> MR. PRICKETT:  Let me, to try to do this briefly, the mitigating circumstances that we intend to introduce evidence about [includes, first, the fact that] the defendant's age was eighteen at the time of the incident.[120]  Within forty-eight hours of the incident he cooperated with the police.  At the time of the incident he had no significant criminal record history.  His background as a child was less than ideal.  He has since the time —
>
> MR. DAVIS:  Excuse me.  I apologize for interrupting.  I'm not so sure this is proper.  I would ask just ask them would they consider anything as a mitigating circumstance that Your Honor has charged them they have a right to consider.
>
> THE COURT:  Right.  Sustained.  Without going into what you expect the evidence to be, just ask them the question.

*Id.* at 95-96 (alteration and footnote supplied).

Although defense counsel took exception to the trial court's ruling, he thereafter presented his questions to the jury in the manner requested by the court. For example, he asked whether any members of the venire "think that the fact that the defendant has demonstrated and he is genuinely sorry for his participation in this event, any of [you] think that has anything to do with what he should receive for a sentence?"  *Id.* at 97 (alteration supplied).  There was no objection to that question, and the jurors were allowed to respond.

---

[120]  This statement is incorrect.  Giles was nineteen at the time of the offense.

240

The trial court did not refuse to allow Giles to *voir dire* the jury regarding non-statutory mitigating factors. In fact, it instructed the jury concerning the matter and offered defense counsel the opportunity to question the jurors about whether they would consider any of the mitigating factors upon which defense counsel intended to offer evidence. Although the trial court refused to allow counsel to argue the mitigating evidence it intended to show during the *voir dire*, the court instructed counsel to *voir dire* the jury about the mitigating circumstances in the proper manner (*i.e.*, to ask questions that would determine whether the jurors would consider all mitigating circumstances that the trial judge instructed them they could take into account). Although counsel took exception to the court's ruling, he obviously understood the court's direction and purpose, because he queried the jury in the proper manner from that point forward (and without objection) as to whether they would consider certain evidence to be mitigating, and that questioning included both statutory and non-statutory mitigating circumstances.

On direct appeal from the new capital sentence, the state courts concluded that any error was harmless, because the jury returned a verdict recommending a sentence of life without parole, rather than a death sentence. That rejection of the claim is neither contrary to, nor an unreasonable application of, clearly established federal

law.  There was no constitutional error and, therefore, no possible prejudice to Giles.

The claim is without merit and due to be denied.

> **h.    Counsel ineffective for failing to *voir dire* juror Bobby Sanders on bias (Doc. no. 45 at 75) (Doc. no. 44 at 84)**

Giles alleges that juror Bobby Sanders was a member of a "community watch"

organization that worked closely with police, and that counsel should have questioned

him concerning bias.  Respondent asserts (doc. no. 52, at 76 n.6), and Giles does not

deny, that the claim was never raised in state court.  Accordingly, the claim is

procedurally defaulted.  It is also meritless because the sentencing jury on which

Sanders sat (R. Vol. 18, Tab 28, at 265) returned a recommendation of life without

parole, which was the most lenient option available to it.  Thus, any failure by counsel

to question or challenge Sanders caused no prejudice that is cognizable under the

*Strickland* standard.  The claim is due to be denied.

> **i.    Prospective juror Lavine Woodall improperly excluded without clarifying death penalty position (Doc. no. 44, at 84) (Doc. no. 45, at 75-76)**

Giles alleges that, "[w]hen prospective juror Lavine Woodall was asked

whether she would automatically vote against the death penalty, she stated that 'it

depends on what the evidence was.'" (Doc. no. 44, at 84-85 (quoting R. Vol. 17, Tab.

28, at 152)) (alteration supplied).  He asserts that the trial court improperly removed

Woodall for cause without first attempting to clarify her opinion and determine

whether she could follow the instructions of the court. *Id.* He concludes that the trial court erred because there was insufficient evidence that Ms. Woodall was unable to set aside any concerns she had about the death penalty. (Doc. no. 44, at 84 (citing *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968) (holding that "a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction")).

When Giles raised that claim on appeal from the 1991 death sentence, the Alabama Court of Criminal Appeals rejected it because "the record indicates that the appellant did not request further *voir dire* examination or undertake any himself. Based on the juror's responses, we find no error in her being excused, pursuant to *Witherspoon v. Illinois*, 391 U.S. 510, 88 S. Ct. 1770, 20 L. Ed. 2d 776 (1968)." *Giles v. State*, 632 So. 2d 568, 575 (Ala. Crim. App. 1992). Further, the Alabama Supreme Court rejected the claim due to a lack of prejudice, because "the jury did not recommend death. Indeed, Giles was ultimately sentenced, not by the jury, but by the court." *Ex parte Giles*, 632 So. 2d 577, 586 (Ala. 1993).

Moreover, Giles has mischaracterized Ms. Woodall's responses during *voir dire*. The record shows the following exchange between her and one of the district attorneys:

243

MR. WILLIAMSON:   Are there any of you that because of religious or moral convictions that [sic] would refuse to invoke the death penalty?  Are you morally opposed to the death penalty?

PROSPECTIVE JUROR:  *I would vote against it*; it depends on what the evidence was.

MR. WILLIAMSON:  *Regardless of what the trial revealed?*

PROSPECTIVE JUROR WOODALL:  *Yes, sir.*

. . . .

MR. WILLIAMSON:  Do any of you feel like you cannot sit on a jury and if the facts support it and if the Judge says the law supports it return a verdict of the death penalty; could any of you not do that?

PROSPECTIVE JUROR WOODALL:  *I don't think I could.*

(R. Vol. 17, Tab. 28, at 151-53 (emphasis supplied)).

Giles cannot show that a *Witherspoon* violation occurred based upon the foregoing exchange during *voir dire*.  First, he predicates his claim on the incorrect legal assumption that the *trial court* was responsible for questioning Ms. Woodall concerning the full extent of her bias against the death penalty, and whether she could follow Alabama law.  It is not the responsibility of the trial court to *voir dire* jurors. That questioning, instead, is the responsibility of defense counsel.

As with any other trial situation where an adversary wishes to exclude a juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, through questioning, that the potential juror lacks impartiality.  *See Reynolds v. United States*, 98 U.S. 145, 157, 25 L. Ed. 244 (1879).  It is then the trial judge's duty to determine

whether the challenge is proper.  This is, of course, the standard and procedure outlined in *Adams*, but it is equally true of any situation where a party seeks to exclude a biased juror.  *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1036, 104 S. Ct. 2885, 2891, 81 L. Ed. 2d 847 (1984) (where a criminal defendant sought to excuse a juror for cause and the trial judge refused, the question was simply "did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestations of impartiality have been believed").

*Wainwright v. Witt*, 469 U.S. 412, 423-24 (1985) (alteration in original).  It was defense counsel's responsibility to ask additional questions of Ms. Woodall in order to determine whether her position on the death penalty was "automatic," and whether she had the ability to follow her duties as a juror.  Based upon Ms. Woodall's testimony during *voir dire,* the trial court did not abuse its discretion in excusing her.

Even assuming that it was a violation of *Witherspoon* to exclude juror Woodall without some further questioning by the court, Giles suffered no prejudice as a result of that violation.  The jurors who were selected and seated (excluding juror Woodall) returned a recommendation of life without parole, not the death penalty.  The claim is due to be denied.

> **j.  Jury foreperson relied on scripture in deliberations (Doc. no. 44, at 85-86) (Doc. no. 45, at 76)**

Giles alleges that James Hurst, the juror who served as foreperson of the jury's deliberations following Giles's 1991 re-sentencing trial, "improperly interjected an

extraneous factor into jury deliberations" and, thereby, violated his Fourteenth Amendment right to due process of law. (Doc. no. 45 at 76).  He alleges:

> Upon information and belief,[121] in 1991 the foreman of the jury improperly influenced the jury verdict by recounting the crucifixion of thieves in the Bible to obtain votes for a death sentence.  James Hurst served as foreman. . . .  During jury deliberations, Mr. Hurst led prayers and recounted the crucifixion of thieves in the Bible to specifically guide the jury verdict.  Mr. Hurst urged other jurors that "even thieves were hung on the cross when Jesus Christ was crucified."

*Id.* (footnote supplied).  The Alabama Court of Criminal Appeals affirmed the trial court's rejection of this claim on collateral review, stating that:

> The circuit court cites well-established caselaw that holds that error in a jury sentencing hearing in a capital case is harmless when the jury returns a recommendation of life imprisonment without parole — the more lenient of the two available sentences for a capital conviction. In fact this Court quoted this principle in *Giles v. State*, 632 So. 2d 568, 574 (Ala. Crim. App. 1992).  Accordingly, because any error was harmless, Giles cannot show that he suffered any prejudice.  The circuit court's order denying relief on these claims is consistent with the law — it is not clearly erroneous.  *Giles*, 632 So. 2d at 574.

*Giles v. State*, 906 So. 2d 963, 979 (Ala. Crim. App. 2004).

Giles cannot show that the state court's decision is contrary to or an unreasonable application of clearly established federal law.  "A petitioner cannot

---

[121] Giles placed a footnote numbered "30" at this point in his brief, and it reads as follows: "Jeffrey Lipscomb was prepared to offer this testimony, but the Rule 32 court refused to allow him to testify." That assertion is untrue. Giles did not make an offer of proof regarding that claim at the evidentiary hearing, and he certainly did not assert that Jeffrey Lipscomb would provide any testimony concerning the claim. R. Vol. 33, Tab. 60, at 2-24. Counsel told the Rule 32 court that Lipscomb was being called to testify only about his own prior marijuana conviction.

show sentencing phase prejudice when the jury recommends a sentence of life instead of death." *Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009) (citing *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir. 1994) (*per curiam*)).   The state court resolution of the claim is fairly debatable among reasonable jurists and, consequently, it is not "objectively unreasonable." *See Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (holding that a "state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurist could disagree' on the correctness of the state court's decision") (quoting *Yarbrough v. Alvarado,* 541 U.S. 652, 664 (2004)).

Moreover, the claim lacks merit.  Giles does not allege that a Bible or other extraneous materials were brought into the jury room, but only that, during deliberations, the foreperson referred to Bible stories.  "[T]he reading of Bible passages invites the listener to examine his or her own conscience from within.  In this way, the Bible is not an 'external' influence. . . . [T]he situation where a juror quotes the Bible from memory. . . assuredly would not be considered an improper influence." *Perkins v. State*, No. CR-08-1927, 2012 WL 5381345, *94 (Ala. Crim. App. Nov. 2, 2012) (alterations supplied) (quoting *Robinson v. Polk*, 438 F.3d 350, 363-64 (4th Cir. 2006)); *see also Burch v. Corcoran*, 273 F.3d 577, 591 (4th Cir. 2001) (affirming the denial of *habeas* relief where the district court reasoned that

247

"Bible quotes, whether stated from memory or read from the book, were . . . statements of folk wisdom or of cultural precepts"); *Lenz v. Warden of the Sussex I State Prison*, 267 Va. 318, 330-31 (Va. 2004) (citing *Burch*, 273 F.3d at 591) (denying *habeas* relief where "a juror recited, by memory, the location of a Bible passage relating to the appropriate punishment for murder").

Indeed, "'[j]urors are not expected to come into the jury box and leave behind all that their human experience has taught them.'" *Beck v. Alabama*, 447 U.S. 625, 642 (1980) (alteration supplied). In other words, "[i]ndividuals are not expected to ignore as jurors what they know as men[.]" *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 149 (1994) (O'Connor, J., concurring) (alterations supplied). Without an oppressive *post-hoc* critique of all the comments and arguments made during jury deliberations — a critique that would radically invade the secrecy of the deliberations — it is not possible for a court to ensure that a juror did not recite from memory a Bible verse, or a childhood story, or an adult experience, or a misguided opinion. The Eleventh Circuit

> "has repeatedly emphasized the important policy considerations that require the shielding of juries from public scrutiny of their deliberations." Mindful of those policy considerations, [the Circuit has] "caution[ed] district courts to be careful about invading the secrecy of the jury's deliberations and to err on the side of too little inquiry as opposed to too much."

*United States v. Augustin*, 661 F.3d 1105, 1132-33 (11th Cir. 2011) (alterations

supplied) (quoting *United States v. Abbell*, 271 F.3d 1286, 1304 n.20. (11th Cir.

2001)).  For all of the foregoing reasons, the claim is denied.

### 3.    *Petitioner Denied Effective Assistance of Counsel*

#### a.    **Counsel ineffective for failing to investigate petitioner's childhood (Doc. no. 44, at 86-90) (Doc. no. 45, at 77-89) (Doc. no. 57, at 67-79).**

Giles alleges that his "defense counsel failed to conduct any mitigation

investigation." (Doc. no. 45, at 77).[122]  He then sets out evidence of his childhood and

young adulthood adduced from witnesses who testified at the post-conviction

hearings, or who provided affidavits.  *Id.* at 77-86.  (*See also* doc. no. 44, at 86-90).

He also sets out portions of the testimony given by his trial attorneys, which, Giles

contends, show that defense counsel failed to investigate and present mitigation

evidence out of an unreasonable fear of opening the door to other, less favorable

information concerning Giles's past.  *Id.* at 86-89.  (*See also* doc. no. 44, at 86-90).

Giles asserts that avoidance of his childhood and social history in favor of "finding

out [and presenting] all the good things" he had done was a faulty mitigation strategy

and constituted ineffective assistance of counsel.  *Id.* at 86 (quoting Mr. Sparks, a

---

[122] Giles lists, without comment or descriptive discussion, the Supreme Court's decisions in *Rompilla v. Beard*, 545 U.S. 374 (2005); *Williams v. Taylor*, 529 U.S. 362 (2000); *Strickland v. Washington*, 466 U.S. 668, 690 (1984).  *Id.*

defense attorneys whose testimony appears at Rule 32 R. Vol. 33, Tab. 60, at 79) (alteration supplied).

Respondent asserts that the claim was abandoned because it not raised on collateral appeal. (Doc. no. 52, at 81-82 (citing *Giles v. State*, 906 So. 2d at 989-90)). Further, respondent argues that "[t]he Rule 32 Court found that this claim failed to comply with Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure." *Id.* (citing Rule 32 C.R., Tab. 87, at 106, 108, 115) (alteration supplied).[123] Alternatively, respondent asserts that the trial court properly dismissed that claim for Giles's failure to adequately plead the claim in accordance with Rule 32.6(b). *Id.* (citing Rule 32 C.R. Vol. 56, Tab. 87, at 106, 108, 115).

Giles responds that the claim was fairly presented in his brief to the Alabama Court of Criminal Appeals on collateral appeal. (Doc. no. 57, at 53 (citing Rule 32 C.R., Vol. 52, at 89-96)). A review of the record shows that the pages cited by Giles are located within sub-heading "J" of Giles's brief on collateral appeal, which is titled: "THE COURT ERRED IN DISMISSING THE CLAIM THAT DEFENSE COUNSEL FAILED TO SEEK FUNDS FOR INVESTIGATION AND EXPERT WITNESSES." *Id.* at 5, 85. Pages 85-89 under that heading contain argument that

---

[123] As an additional alternative argument, Giles contends that the Alabama Court of Criminal Appeals found that Giles waived appellate review of the judgment by failing to provide argument as required by Rule 28(a)(10) of the Alabama Rules of Appellate Procedure. *Id.* (citing *Giles*, 906 So. 2d at 989-90). However, respondent is incorrect.

is consistent with the title of subheading J. However, pages 89-96 of the brief inexplicably address a totally unrelated contention: *i.e.*, the claim that is made here, that counsel were ineffective in failing to investigate Giles's childhood for the purpose of presenting mitigation evidence. *Id.* at 96.

This court finds that Giles's dedication of seven pages of his collateral brief to the issue was sufficient to fairly apprise the Alabama Court of Criminal Appeals of that claim. Since that court failed to acknowledge or rule upon the claim, however, the Rule 32 trial court became the last state court to address it. Under *Ylst v. Nunnamaker*, 501 U.S. 797, 803 (1991), the reasoning used by the Rule 32 court is presumed to be the same ground used by an affirming appellate court. *See Ward v. Hall*, 592 F.3d 1144, 1156 n.5 (11th Cir. 2010). Although that presumption is rebuttable, it requires "strong evidence" to do so. *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1317 (11th Cir. 2006) (quoting *Ylst*, at 804); *see also Owen v. Secretary for Department of Corrections*, 568 F.3d 894, 908 (11th Cir. 2009) ("When the last state court rendering judgment does not explain its reasoning, we look through to the last reasoned opinion by a state court on the claim to determine whether the claim is procedurally barred.") (citing *Ylst*, at 803-05)).

To that end, Giles takes issue with the Rule 32 trial court's use of Rule 32.6(b) as the basis for the dismissal of the claim because the trial court already had

conducted evidentiary hearings and allowed Giles to present evidence in support of the claim at the hearings before finding that the claim was not sufficiently pled. (Doc. no. 57, at 67-79). He also alleges that the claim, as pled before the Rule 32 court in his second amended petition, was sufficiently specific under the holdings of other Alabama cases. (*Id.* at 73). He argues as follows:

> This procedural default defense should fail because there is no evidence Giles has actually violated an applicable procedural rule on the specificity of pleading. Giles'[s] claims of ineffectiveness are at least, if not more specific, than the claims in *Payne v. State*, 791 So. 2d 383 (Ala. Crim. App. 2000). For instance, in *Payne* the Alabama Court of Criminal Appeals found these claims of ineffectiveness to be sufficiently specific:
>
> > 1. That appellate counsel failed to argue on appeal that trial counsel was ineffective for failing to "obtain and competent psychiatric and utilize psychological assistance" when presenting his defense.

(*Id.* at 73-74 (citing *Payne v. State*, 791 So. 2d 393)).

The court has examined the quotation and citation by Giles. The question posed by the parties is whether, as a matter of federal law, the state courts' invocation of the pleading-specificity rule is "adequate" as a basis for a procedural default. To be "adequate," the rule must be firmly established and regularly applied, although that does not mean that there can never be any variance from the rule.

As discussed earlier in this opinion, recent Eleventh Circuit precedent holds that application of Rule 32.6(b) is not a procedural bar, but an analysis of the merits

of a claim.  *See Borden v. Allen*, 646 F.3d 785, 812-13 (11th Cir. 2011); *Powell v. Allen*, 602 F.3d 1263, 1273 (11th Cir. 2010).  Reading the pleading-specificity requirement of Rule 32.6(b) as a "holding on the merits" of a claim means that the rule itself is not a "procedural rule," or at least is one that cannot serve as a basis for application of the procedural-default doctrine.

Because a state-court's rejection of a claim under Rule 32.6(b) is regarded by federal law as an adjudication on the merits of the claim, this court must address the merits.  The determination that Giles's Rule 32 petition failed to sufficiently plead facts to state a claim of ineffective assistance of defense counsel is subject o deference under the AEDPA, unless it is contrary to, or an unreasonable application of, *Supreme Court* precedent.  In making that assessment, the Eleventh Circuit has stated that the reviewing court can look only to the facts pleaded in the state Rule 32 petition.  For example, in *Powell*, the court said:

> [The] AEDPA limits our review to whether the state court's determination that [the petitioner] failed to plead sufficient facts in his Rule 32 petition to support a claim of ineffective assistance of counsel was contrary to or an unreasonable application of Supreme Court precedent.  Thus, we look only to the allegations in [petitioner's] Rule 32 petition and whether those allegations sufficiently state a claim for ineffective assistance of counsel.

*Powell*, 602 F.3d at 1273 (alteration supplied); *see also Borden*, 646 F.3d at 816-17 (citing *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011) ("We now hold

that review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits."). The correct AEDPA analysis, therefore, is to determine whether the state court's conclusion that a certain claim did not sufficiently plead an entitlement to relief under constitutional standards was "contrary to," or an "unreasonable application of," binding Supreme Court holdings existing at the time that the state court conclusions were reached.

Giles raised a form of that ineffective assistance of counsel claim in each of his Rule 32 petitions: *i.e.*, his original, first amended, and second amended petitions. In the instance currently under discussion, however, the allegation is conclusory and lacking in factual support. For example, in Giles's original Rule 32 petition, the allegations that arguably addressed the efforts of defense counsel to investigate mitigation evidence related to Giles's childhood were the following:

> 24. Counsel failed to adequately investigate and present at trial mitigating circumstances.
>
> . . . .
>
> 30. Counsel failed to adequately investigate the background, education, social and family history of Arthur Giles and failed to adequately present a compelling case in mitigation of the death penalty.
>
> 31. Counsel failed to conduct an adequate pre-trial investigation; counsel failed to perform the sensitive and in-depth interviews with family members and other witnesses who could have provided mitigation evidence and failed to adequately present evidence at the guilt and penalty phase.

(Rule 32 R. Vol. 35, Tab 61, at 33-37).  Giles subsequently incorporated those allegations virtually *verbatim* into his first amended Rule 32 petition. (*Id.*, Vol. 37, Tab 64, at 20-21).  The allegations were renumbered, reworded, and consolidated in his second amended Rule 32 petition (*id.*, Vol. 40, Tab 68, at 7-10), as follows:

> 9.   Counsel failed to conduct any mitigation investigation whatsoever, including a failure to look into Petitioner's childhood, to even go into the neighborhood where petitioner grew up and lived, to obtain school, psychological, medical, employment and juvenile records. Counsel failed to contact or even attempt to contact any neighbors, friends, relatives or teachers who could have and would have offered useful evidence in mitigation.

> 10.   Counsel failed to investigate Petitioner's family history and social history, which would have yielded evidence that Petitioner endured a childhood of extreme neglect and abuse, that Petitioner was born to a 14 year old girl and never had any adult care for and parent him, and that Petitioner spent his childhood first in a "shotgun" bootleg whiskey house, then nursing and caring for his great-grandmother, an amputee.

*Id.*, Vol. 40, Tab 68, at 7-8.

Giles has failed to show that the state court's dismissal of the claim for lack of factual specificity was either contrary to, or an unreasonable application of, Supreme Court precedent.  The issue for AEDPA deference is whether the state court's conclusion that the foregoing allegations failed to state specific facts to show that Giles was entitled to relief under *Strickland v. Washington* was "so lacking in justification that there was an error well understood and comprehended in existing

law beyond any possibility for fairminded disagreement." *See Harrington*, 131 S. Ct. 770, 787. Stated differently, the state court's rejection of Giles's *Strickland* claim is not an "objectively unreasonable" application of clearly established federal law unless no fairminded jurist would agree with the state court's decision. *Id.* at 786.

It is fairly debatable whether the allegations quoted from Giles's Rule 32 petitions are sufficiently specific to state a claim of ineffective assistance. As discussed in Part IV.F of this opinion ("Introduction to Ineffective Assistance of Counsel Claims"), *supra*, a claim of ineffective assistance requires an allegation and proof that counsel committed an error of omission or commission so egregious as to be beyond the scope of representation by reasonable counsel, *and*, that the error resulted in prejudice in the sense that it undermines confidence in the outcome of the proceeding. *See Strickland v. Washington,* 466 U.S. 668 (1984). Counsel's actions are presumptively reasonable, and the court must avoid judging counsel's decisions through the distorting lense of hindsight. In order to sufficiently plead a claim of ineffective assistance of counsel, the petitioner must allege facts that show the nature of the error by counsel, and facts demonstrating how the error undermines confidence in the outcome of the proceeding.

In the context of a claim that counsel was ineffective for failing to investigate potential mitigating evidence, the issue has been described this way:

> [W]e must determine whether the facts pled in [petitioner's] Amended
> Petition establish that, had his counsel conducted a reasonable
> investigation and presented additional mitigating evidence, there is a
> reasonable probability that the jury would have recommended — and the
> judge would have imposed — a sentence of life without parole.  Or,
> more accurately, we must determine whether the Court of Criminal
> Appeals's determination that [petitioner's] Amended Petition failed to
> sufficiently plead such facts — in light of Alabama's fact pleading
> post-conviction regime discussed in part II.A, *supra*—was "contrary to,
> or involved an unreasonable application of, clearly established Federal
> law."

*Borden*, 646 F.3d at 820 (first alteration supplied, other alterations in original).

The Rule 32 court explicitly found that Giles's amended petition failed to

sufficiently plead specific facts showing that he was entitled to relief.  The Alabama

Court of Criminal Appeals — though presented with the question of whether that was

a correct ruling — never addressed the claim when affirming the trial court's denial

of Rule 32 relief.  Even though AEDPA deference applies only to "decisions," and

not opinions by state courts,[124] deference to that determination "on the merits" of

Giles's claim remains.  The decision reached by the state courts — that Giles failed

to plead specific facts demonstrating his entitlement to relief under *Strickland* — was

---

[124] *See Gill v. Mecusker*, 633 F. 3d 1272, 1292 (11th Cir. 2011) ("[T]he statutory language
[of 2254(d)] focuses on the result, not the reasoning that led to the result.") (alterations supplied);
*Harrington v. Richter*, 131 S. Ct. 770, 783-84 (Since Section 2254(d) "refers only to a 'decision,'
which resulted from an 'adjudication, . . . . determining whether a state court's decision resulted from
an unreasonable legal or factual conclusion does not require that there be an opinion from the state
court explaining the state court's reasoning.") (redaction supplied); *Allen v. Secretary of the
Department of Corrections*, 611 F.3d 740, 748 (11th Cir. 2010) (quoting *Parker v. Secretary of the
Department of Corrections*, 331 F.3d 764, 776 (11th Cir.2003) ("All that is required under §
2254(d)(1) is an adjudication on the merits, not a full state court opinion.")).

257

not objectively unreasonable where the allegations failed to identify the "useful" evidence or testimony left undiscovered by counsel, and failed to show how the presentation of such evidence probably would have changed the outcome of the sentencing trial — in other words, how that evidence probably would have persuaded the trial judge to impose a sentence of life without parole.

The Rule 32 court made findings regarding the general performance of Herb Sparks and Thomas Prickett during the 1991 re-sentencing trial, and those findings shed light on the factual sufficiency of the present allegation in Giles's Second Amended Petition.[125]  That court found that:

> Giles was represented at the 1991 sentence phase trial by attorneys Herb Sparks and Thomas Prickett of Oneonta, Alabama. Prickett was an experienced criminal trial attorney. Prior to accepting appointment in this case, Prickett had tried about 176 felony cases. (Thomas Prickett's testimony 164)  This was Sparks' first death penalty case.
>
> Sparks and Prickett investigated the case and formed a defense strategy.  In preparation for trial, they poured over the transcript from the two previous trials. (Herbert Sparks testimony 71)  They discussed the case with Giles and asked for names of possible witnesses and interviewed witnesses. (Sparks 69)  They were familiar with Giles's[s]

---

[125]  As explained above, the fact that the Rule 32 court held a hearing cannot be regarded, under the circumstances of this case, as a finding that the allegations in the second amended petition passed muster under Rule 32.6(b). Nonetheless, the findings made by the Rule 32 court following an evidentiary hearing confirm that counsel's investigation was not professionally unreasonable. As the Eleventh Circuit noted in *Borden*, "[A]n evidentiary hearing — where counsel, [petitioner's] family members, treating physicians, and other potential witnesses would testify regarding the thoroughness of the investigation — would settle this matter decisively." *Borden,* 646 F.3d at 819.

background (Sparks 88-90) and discussed Giles'[s] drug use with him. (Sparks 102, 107-108)   They talked to Giles'[s] previous attorneys, Dennis Balske and John Carroll.   (Sparks 81)   Sparks testified that he reviewed several boxes of the files of Giles'[s] prior counsel.   (Sparks 82)   They were aware of the fact that Giles, at age 13, had stabbed a classmate to death.   (Prickett 150)   They were also aware of the neighborhood where Giles was reared and its reputation as a very poor, high-crime neighborhood.   (Sparks 92; Prickett 152, 153)   The time records turned in to the State to claim attorney fees were not complete and did not represent all of the time spent on the case by the attorneys. (Sparks 68-69; 116)

Sparks described the defense decision not to use more evidence of Giles'[s] childhood and juvenile records.

I did not investigate deep into his criminal background.   I was more interested in finding out all I could about the good things that he had done as opposed to dredging up lots of court records and prior histories.   I didn't think that was going to help us any to show that he had a long criminal history.

* * *

I thought it was up to the prosecution to present the bad history and criminal offenses and so forth.   It was not going to be exculpatory for him to drag up thick stacks of documentation that he had been in and out of trouble from the time that he was a child.

* * *

And I investigated various aspects of [his life and childhood].   I did not investigate his criminal background hard.   I knew that there were prior problems.   I was more interested in the fact that he took care of his mother and grandmother, or whoever it was, and waited on these old ladies than I was about criminal offenses.   I thought it was

259

much more advantageous to devote my time to those sorts
of things than digging around in his criminal life.

(Sparks 78-80)

Concerning why the defense used Ms. Snow's former testimony
to show Giles'[s] background, Sparks testified

My recollection was that the testimony that his
grandmother or mother, whoever it was, had given before
was very good.  She had said very little derogatory about
him, and I thought I would do as good as I could do using
that testimony as evidence, and so forth, about his life as
child.  And then to try and get Mr. Godfried or any other
witnesses, and we didn't find any more, to talk about all the
things that had happened to him in the last — at that point
it had been thirteen years that he had been in prison.

(Sparks 85)

Sparks further noted

We investigated [Giles's social history and past], we
looked at it, we put the evidence on from the (sic)
grandmother.  And, again, you know, it has been a long
time.  But I don't recall that anybody at the original hearing
of this case (unintelligible) Isophene Snow didn't get any
hard cross examination questions, as I recall this transcript.
I figured any other witness that we produced stood to get
a lot of real hard questions.  It was a judgment call as to
whether you want to try and present a whole lot of other
stuff and take a chance of having a bad cross examination
or go on with what you have.

(Sparks 112-113)

Prickett also described the defense decision not to present more
evidence of Giles'[s] rough childhood

. . . . He had had very little opportunity and a very hard time. I did not investigate that in detail. We chose to paint that in broad terms. That was a value judgment on my part. I talked to Arthur about drug use and the relevance at the crime, at the Carl Nelson crime. And I asked him what he had ingested at that time and I didn't get any answer from him that I wanted to use. I did not develop that and that was a deliberate decision on my part.

(Prickett 156-157) To show Giles'[s] adjustment problems, the defense used the testimony of Giles'[s] mother from the previous trial. (Sparks 101)

Prickett and Sparks developed a defense strategy for the 199[1] sentence hearing.

The strategy would have been or was, as I remember it, to minimize the presentation of the State's evidence of the details of the crime. And by that I mean that we minimized our cross examination for fear of emphasizing it. The second phase of the strategy or one of the things was don't do anything to remind the State about the previous record, because we didn't have that before us, I didn't think. The third thing that I saw to do was to try to present Arthur as a human being and to maybe try to get the jury to see that there is not a tremendous amount of difference between Arthur and me. But for our initial circumstances, and that maybe simplistic, but that was generally it.

(Prickett 161-162)

A fourth strategy was to let the jury know that eleven years had passed since the commission of this crime and Giles had changed. (Prickett 162) Another primary strategy was to keep the fact of the previous killing from the jury. (Prickett 151, 161, 169) Sparks stated that, if the juvenile records had been produced, he would have tried to suppress them to keep them from the jury. Sparks believed that, if part

261

of the juvenile records or the information in those records were used, the subject of the prior killing would also have to be or would be more likely to be introduced.  (Sparks 87,88)

Concerning the juvenile stabbing, Sparks stated

I wanted everything I could do to keep that from getting in front of the jury.  The last thing I wanted was this jury to have evidence that he had done something like this before.  My recollection is, again, there was no evidence whatever of any prior criminal activity at all on his part, and I wasn't about to bring up the fact that he killed somebody already when he·was young.

(Sparks 99-100)

Following defense strategy, the defense decided to present two witnesses at the 199[1] hearing.  These were Giles'[s] mother and a minister who got to know Giles while Giles had been in prison. Giles'[s] mother's previous testimony was used because she did not get any hard cross-examination and she succinctly told about Giles'[s] life growing up.  The minister's testimony described Giles as a person whose life was worth saving, a person who could contribute to society while in prison by helping others to handle prison life or avoid the actions which lead to prison life.  The defense strategy was successful. Sparks and Giles won a life without parole sentence from the jury. (Prickett 162)

(Rule 32 C.R. Vol. 56, Tab. 87, at 81-86) (footnotes omitted) (alterations in original, except for 1991 hearing date).

After determining the facts counsel asserted as underlying their performance, the Rule 32 court addressed Giles claims as follows:

**9. Counsel failed to conduct any mitigation investigation whatsoever, including a failure to look into Petitioner's childhood,**

**to even go into the neighborhood where petitioner grew up and lived, to obtain school, psychological, medical, employment and juvenile records.**

This claim is dismissed.  Giles has failed to state the facts on which the claim is based as required by Rule 32.6(b), ALA. R. CRIM. P.  He states no facts that show that such additional investigation would have produced evidence that was not presented at trial or that was not known to defense counsel and if known would have been presented. Giles has completely failed to allege or prove how counsel's alleged actions violate the *Strickland* standard. The claim is, therefore, dismissed pursuant to Rules 32.3 and 32.6(b) ALA. R. CRIM. P.

Had this Court considered this claim, the claim would have been denied.  It is apparent from the testimony and depositions of counsel and the evidence introduced at the various trials in this matter that defense counsel were aware of Giles'[s] background.  Counsel made a strategic choice to play down certain parts of Giles'[s] background, especially anything that would lead to evidence that Giles had murdered another child when Giles was 13 years old.  Counsel chose instead to show that Giles

> Had (1) adjusted well to prison life; (2) experienced a religious conversion since the crime; (3) had an exemplary childhood; (4) experienced remorse; and (5) cooperated with authorities.  [They] also urged the jury to consider as a mitigating factor the length of time that had elapsed between the act and the sentencing.

Giles has presented no evidence in this Rule 32 proceeding to show that counsels' previous investigations were inadequate or that counsel's strategic decision not to present extensive evidence of Giles'[s] past problems undermined the reliability of his trial or sentencing proceedings.  The Alabama Court of Criminal Appeals set out the law concerning an analysis of an ineffective assistance of counsel claims based on an allegation that counsel failed to investigate or present additional mitigating evidence.

"'In determining whether [counsel] was ineffective at original sentencing, . . . we recognize that the

> "two-pronged *Strickland* analysis applies whether the ineffectiveness complained of occurred in the defendant's trial or in a subsequent adversarial sentencing proceeding. However, in a challenge to the imposition of a death sentence – the prejudice prong of the Strickland inquiry focuses on whether 'the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'"

*Stevens v. Zant*, 968 F. 2d 1076, 1081 (11th Cir. 1992) (citation omitted), *cert. denied*, 507 U.S. 929, 113 S. Ct. 1306, 122 L. Ed. 2d 695 (1993).

We also recognize that

> "[w]hile '[i]t should be beyond cavil that an attorney who fails altogether to make any preparations for the penalty phase of a capital murder trial deprives his client of reasonably effective assistance of counsel by any objective standard of reasonableness,' *see Blake v. Kemp*, 758 F. 2d 523,533 (11th Cir.1985), it is unclear how detailed an investigation is necessary to provide a defendant with the effective assistance of counsel. *Strickland* only requires that counsel's actions fall within the wide spectrum of what can be considered reasonable assistance of counsel."

*White v. Singletary*, 972 F. 2d 1218, 1224 (11th Cir.1992). The principles regarding an attorney's duty to conduct an investigation into mitigating evidence have been summarized as follows:

> "An attorney has a duty to conduct a reasonable investigation, including an investigation of the defendant's background, for possible mitigating evidence. *Thompson v. Wainwright*, 787 F. 2d 1447,1451 (11th Cir.1986). First, it must be determined whether a reasonable investigation

should have uncovered such mitigating evidence. If so, then a determination must be made whether the failure to put this evidence before the jury was a tactical choice by trial counsel. If so, such a choice must be given a strong presumption of correctness, and the inquiry is generally at an end. *Funchess v. Wainwright*, 772 F. 2d 683, 689-90 (11th Cir. 1985). If, however, the failure to present the mitigating evidence was an oversight, and not a tactical decision, then a harmlessness review must be made to determine if there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. Thus, it must be determined that defendant suffered actual prejudice due to the ineffectiveness of his trial counsel before relief will be granted."

*Middleton v. Dugger*, 849 F.2d 491,493 (11th Cir. 1988).

*Daniels v. State*, 650 So. 2d 544, 568-569 (Ala. Crim. App. 1994), *cert. denied*, 514 U.S. 1024 (1995).

In addition, it is noted that

. . . counsel is not necessarily ineffective simply because he does not present all possible mitigating evidence. 'Although the failure to conduct a reasonable investigation of possible mitigating evidence may constitute ineffective assistance of counsel,' counsel may make a reasonable strategic judgment to present less than all possible available evidence in mitigation."

*Stanley v. Zant*, 697 F. 2d 955, 965 (11th Cir. 1983), *cert. denied*, 467 U.S. 1219, 104 S. Ct. 2667, 81 L. Ed. 2d 372 (1984). Cited in *Lundy v. State*, 568 So. 2d 399, 403 (Ala. Crim. App. 1990).

"'When a decision to not put on certain mitigating evidence is based on a "strategic choice," courts have always found no ineffective performance. *Moore v.*

> *Maggio*, 740 F.2d 308 (5th Cir.1984), *cert. denied*, 472
> U.S. 1032, l05 S. Ct. 3514, 87 L. Ed.2d 643 (1985);
> *Lowenfield v. Phelps*, 817 F.2d 285 (5th Cir.1987), *affd*,
> 484 U.S. 231, 108 S. Ct. 546, 98 L. Ed.2d 568 (1988).  No
> two lawyers would try a case exactly the same way.
>
> "'We cannot say that counsel's performance is
> deficient because he failed to call more witnesses at the
> sentencing phase.  The decision not to call a particular
> witness is usually a tactical decision not constituting
> ineffective assistance of counsel." *Oliver v. State*, 435 So.
> 2d 207, 208 (Ala. Crim. App. 1983).

*State v. Tarver*, 629 So. 2d 14, 21 (Ala. Crim. App. 1993).

In the present case, counsel, both at the guilt and sentence phase of his trial, were aware of the events of Giles'[s] background. According to Bernard Harcourt, Balske and Carroll had developed an extensive file on mitigation for this trial.  According to Sparks, he reviewed this file, consisting of a number of boxes, and talked to Balske and Carroll while preparing for the [sic] Giles'[s] sentence phase trial. Both Sparks and Prickett acknowledged they were aware of the major events in Giles'[s] background.  After investigation, defense counsel made a strategic decision to paint Giles'[s] background with a "broad brush" and to rely instead on the "good" aspects of his life and character and on the fact that he had led, and would continue to lead, a usefu1life in prison.

This strategy was successful and won a recommendation of life without parole from the jury.  To suggest now that a different strategy should have been used is exactly the kind of second-guessing *Strickland* warns against.  In addition, it is inconceivable to this Court that counsel should abandon a successful strategy, used in the jury sentencing phase, and use a contradictory strategy in the judge sentencing phase of a capital murder trial.  Such a change in strategy would undermine the reliability and mitigating effect of the jury recommendation of life without parole.

II

This Court finds, based on the evidence, that defense counsel performed an adequate investigation into Giles'[s] background. Their investigation led to a successful sentence phase defense before the jury. Additional evidence suggested by Giles'[s] during the present proceedings does not undermine the reliability of the sentence of death imposed by the trial judge in this case and would not have resulted in a sentence other than death. Giles, therefore, failed to prove that his trial counsel erred or that he was prejudiced by counsel's actions. Relief based on this claim would, therefore, be denied.

**10. Counsel failed to investigate Petitioner's family history and social history, which would have yielded evidence that Petitioner endured a childhood of extreme neglect and abuse, that Petitioner was born to a 14-year old girl and never had an adult care for and parent him, and that Petitioner spent his childhood first in a "shotgun" bootleg whiskey house, then nursing and caring for his great-grandmother, an amputee**.

Giles is not due to be granted any relief based on this claim. He fails to allege and has not argued how this claim constitutes ineffective assistance of counsel. The claim is, therefore, dismissed pursuant to Rule 32.6(b), ALA. R. CRIM. P. In addition, if this Court ruled on the merits of this claim, the claim would be denied because Giles failed to carry his burden of pleading and proof as required by Ru1e 32.3 ALA. R. CRIM. P.

Defense counsel knew the facts alleged in this claim at both the guilt and sentence phases of Giles'[s] trials. Counsel testified that they were aware of many of these facts and deliberately decided not to pursue them. In addition, sentence phase counsel were familiar with the transcripts of the previous proceedings. Much of this information is available in those transcripts and was introduced at the sentence hearing through the testimony of Ms. Snow.

Ms. Snow testified that she was 15 years old when Giles was born and that Giles spent his early years in a shot house. (3rd. T. 472) She

described Giles'[s] childhood taking care of his invalid, amputee, great grandmother after school each day while his mother worked. (3rd. T. 473-474)

In addition, counsel was familiar with the previous testimony of Patty Washington who described how Giles lived with his mother and her grandmother and took care of them. According to Ms. Washington, Giles had to become the man of the house at a very early age. (2nd. T. 701) She described the neighborhood where Giles lived as a low, wicked place filled with gambling and alcohol. (2nd. T. 702)

Counsel also testified in this proceeding that they were aware that Giles had grown up in a "shot-house" and had a rough upbringing. The matters raised in this claim were known to defense. Giles, therefore did not prove that counsel failed to sufficiently investigate Giles'[s] background and social history. Counsel understood his background and social history and, strategically, decided to paint that history with a broad brush. This strategy was successful with the jury and resulted in a jury recommendation of life without parole. Counsel did not err in failing to investigate further because counsel made a strategic decision not to offer in depth evidence of these aspects of Giles'[s] life.

(Rule 32 C.R. Vol. 56, Tab. 87, at 112-15).

This court has examined thirteen pages' worth of factual allegations that Giles contends should have been discovered and presented at the 1991 re-sentencing trial. (Doc. no. 45, at 77-90). Much of that information concerns Giles's childhood and social history; it is taken directly from the evidentiary hearings; and it paints a harsh picture of Giles's upbringing. *Id.* Even so, that information does not change the fact that the 1991 jury was made aware of Giles's piteous childhood — even though the picture presented to jurors was painted, as a matter of trial strategy, with broad brush

strokes.  Much of the evidence that Giles purports to offer would merely repeat that information, or would be cumulative to the facts presented to the jury.  Admittedly, some compelling information was not presented to the jury.  The most compelling, perhaps, was that Giles grew up in a house of prostitution, and that he may have been molested by a male relative.  Nevertheless, Giles's 1991 defense counsel admitted that he was aware of that information, but made a deliberate choice to not delve into it, in part, for the purpose of preventing the jury from discovering that Giles had stabbed someone to death when he was thirteen years of age.  He also chose to concentrate on Giles's remorse and behavior during his eleven years on death row.  Counsel presented the testimony of a prison minister to the effect that Giles could lead a useful life assisting and counseling others in prison.

In the initial brief presented to this court, Giles contends that

> his claim was dismissed on grounds that counsel was aware of this information and decided not to pursue it as a matter of strategy.  This is an utterly unreasonable determination of the facts.  28 U.S.C. § 2254 (d)(2).  *Supra* at p.___.[126]  The Alabama Court of Criminal Appeals held this claim of ineffectiveness harmless because the jury recommended the more lenient sentence which was subjected to judicial override.[127]  This is contrary to clearly established federal law.  28 U.S.C. § 2254 (d)(1).  *Supra* at p.___.[128]

(Doc. no. 44 at 90).  This court disagrees.

---

[126] Giles omitted this page number.

[127] Giles does not provide a citation.

[128] Giles omitted this page number.

The state Rule 32 trial court's decision was not an unreasonable determination of the facts in light of the evidence before it. Defense counsel was aware of the most egregious aspects of Giles's childhood, and chose not to delve deeper because of the very real possibility that more harmful information would have also been made known to the jury. Counsel's Rule 32 hearing testimony made clear that they were sufficiently aware of Giles's childhood and background to make a reasonable, strategic choice. While the jury *was* given a "broadbrush" rendering of Giles's deprived and pitiful childhood, counsel were aware (and afraid) that a more detailed examination of his youth would reveal the fact that he killed a schoolmate when he was just thirteen years old. Counsel were successful in convincing the jury to recommend a sentence of life without parole. A petitioner cannot show sentencing phase prejudice under those circumstances. *See, e.g., Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir. 1994) (*per curiam*). The claim is due to be denied.

The state courts' determination that Giles's ineffective assistance of counsel claim for failing to investigate his childhood lacks merit is entitled to deference under § 2254(d). The Supreme Court recently stressed that a state court's analysis of a claim of ineffective assistance involves a double layer of reasonableness. *See Harrington*, 131 S. Ct. at 785-87. To reject a state court finding that counsel was not ineffective, the federal *habeas* court must be able to say not only that counsel acted

in a professionally unreasonable manner under the *Strickland* standard, but also that the state court's determination of the issue was itself "objectively unreasonable." It is a "rare" circumstance when that occurs. *Johnson v. Secretary of the Department of Corrections*, 643 F.3d 907, 910-11 (11th Cir. 2011). This is not one of those times. The claim is due to be denied.

> **b.    Counsel ineffective for failing to challenge State's competency exam, failing to investigate and present mental health issues, and failing to secure funds for expert  (Doc. no. 44 at 90-91) (Doc. no. 45 at 90)**

Given the structure of Giles's *habeas* petition, this court assumes that the present claim relates to the alleged ineffectiveness of counsel during the 1991 re-sentencing trial, as opposed to the performance of a different set of attorneys during the 1982 guilt trial. Insofar as Giles intends to retread his claim that the attorneys who represented him during the 1982 trial rendered ineffective assistance, that claim is procedurally defaulted for the reasons set out in this court's earlier discussion of the various components of Claim V.A.3, *supra*. In this section, the court will address the claim only in the context of the 1991 re-sentencing trial.

Giles admits in his *habeas* petition that both aspects of the claim were raised for the first time in his third amended Rule 32 petition, filed after the judgment denying Rule 32 relief. (Doc. no. 45, at 90). The Alabama Court of Criminal Appeals refused to consider the claim because Giles did not file the third amended

petition before the trial court entered a final judgment in the matter.  As such, the claim has not been presented to the Alabama state courts, and it is procedurally defaulted.  A procedural default precludes federal review, and Giles has not demonstrated "cause and prejudice" to excuse the default.  Nor can he show a fundamental miscarriage of justice.  He is not factually innocent of the capital murder for which he was convicted and sentenced.

Even if this court were to address the merits of the present claim, it does not warrant relief.  Petitioner argues that his 1991 counsel were ineffective because they did not challenge the finding of competency made more than nine years earlier, at the 1982 guilt trial, or seek funds to hire an expert to challenge that finding, or to raise mental health issues in mitigation of the 1991 sentence.  There is no evidence, however, that Giles had been mentally incompetent at the time of the 1991 re-sentencing trial.  Counsel were aware that Giles was found competent to stand trial in 1982, following a Lunacy Commission examination at Bryce Hospital which concluded that he suffered from Anti-Social Personality Disorder, and not a psychotic mental disease or defect.  Counsel were aware of and offered evidence concerning Giles's good behavior during the nine years that he had been incarcerated on death row following his 1982 conviction.  They offered the testimony of a prison ministries pastor concerning Giles's good attitude and works while in prison.  There is no

272

evidence suggesting that counsel unreasonably failed either to investigate the possibility that Giles was incompetent to proceed with the re-sentencing trial, or to present evidence of mental-health issues as mitigation.  Counsel reasonably steered clear of raising mental health issues because that course only led to the unfavorable diagnosis of Anti-Social Personality Disorder being put before the jury.  Counsel acted reasonably under *Strickland*, and Giles has offered nothing to show otherwise.

Even if counsel could be faulted for not more thoroughly investigating and pursuing mental health issues as mitigating evidence for the 1991 re-sentencing trial, Giles suffered no prejudice because the jury returned a recommendation of life without parole.  Giles received the most favorable recommendation that the jury could return, leaving no reasonable probability that presentation of mental health evidence as mitigation would have resulted in a more favorable outcome.

In sum, the claim is due to be dismissed as both procedurally defaulted and without merit.

> **c.    Guilt phase trial counsel ineffective for failing to investigate and present a mental health defense (Doc. no. 44, at 90-91) (Doc. no. 45, at 90) (Doc. no. 57, at 75)**

This allegation is yet another example of the disorganized and shifting nature of the claims asserted by petitioner in this court.   Giles expressly pleads ineffectiveness by his "guilt phase trial counsel," but he places the claim in the

context of his 1991 re-sentencing trial, and complains that counsels' ineffectiveness harmed his mitigation case. (Doc. no. 44, at 90). Insofar as the claim is intended to challenge the effectiveness of the representation provided by Giles's 1982 guilt phase attorneys, it is procedurally defaulted for the same reasons set out in this court's discussion of the claim addressed in Part V.A.5(c), *supra*. To the extent that it is intended to challenge the effectiveness of those attorneys who represented Giles during his 1991 re-sentencing trial, Giles cannot show *Strickland* prejudice because the jury returned a recommendation of life without parole, rather than death. In short, regardless of how the claim is cast or considered, it is due to be dismissed as both procedurally defaulted and lacking merit.

> ### d. Counsel ineffective for failing to investigate the Nelson/Giles relationship (Doc. no. 44, at 91-92) (Doc. no. 45, at 90-91)

Giles alleges that the attorneys who represented him during his 1991 re-sentencing trial were ineffective because they failed to investigate the "drug relationship" between Giles and Carl Nelson, presumably as a form of mitigation evidence. (Doc. no. 45, at 90-93). Giles asserts that, if his attorneys had conducted a proper investigation, they "would have discovered that Carl Nelson was dealing drugs to the teenage Giles." (*Id*. at 93).

The factual and evidentiary findings made by the Alabama Court of Criminal Appeals pertaining to this claim are as set out below. The first four paragraphs of the appellate court's opinion are quoted from the opinion of the Rule 32 trial court.

> "Giles stated in his confession that he had a prior relationship with the Nelson family. He stated that he had worked for Carl Nelson on his farm. Giles stated that Nelson had, at some point, offered to sell him an acre of marijuana, assuming he had the money because Giles drove a nice car. Giles also stated he had left Nelson's employ because of a misunderstanding concerning some money that Giles was accused of stealing. All of this information was in Giles's confession and known to defense counsel at every stage of Giles's trial. No admissible evidence of any additional relationship has been submitted in this proceeding.

> "Giles presented two witnesses who testified concerning a drug-dealing relationship between Giles and Carl Nelson, one of the victims. These two witnesses testified concerning hearsay knowledge of Giles's relationship with Carl Nelson. Both witnesses acknowledged they had never seen Giles with Mr. Nelson or buy drugs from Mr. Nelson. They were only reporting what they said Giles told them. Giles did not testify in this proceeding and offered no direct evidence to support this claim.

> "Dennis Balske testified that he did not recall looking into the history between Nelson and Giles. Nor did Balske recall Giles telling counsel anything that counsel should pursue. Even if such a relationship did exist, it escapes this Court how such a relationship could have been used to affect the outcome of this proceeding. Giles murdered not only Mr. Nelson but also Mrs. Nelson. Giles injured four other family members, including two

275

children and an elderly woman, in the attack.  There is no evidence, even hearsay, that any of these other victims had had a drug-dealing relationship with Giles.

"In his confession, Giles stated he and Jones went to the Nelson home to commit a robbery, not because of any drug-dealing relationship.  Giles entered the home at 3:00 a.m., uninvited, and was told to leave.  Instead of leaving, he came back inside and shot everyone in the home, except little Charlie Nelson.  Giles went back outside and returned with his codefendant, Aaron Jones.  Giles and Jones participated in stabbing four of the family members.  Two of these victims died from his unprovoked attack.  Giles and Jones went outside the home, but one of them returned immediately to finish the robbery.  The Court finds, and Giles proved, no theory pursuant to which evidence of a dealer/gopher relationship could have aided the defense in this case.  Giles had therefore failed to prove either part of the *Strickland* test as to this claim.  This claim is, therefore, denied."

(Supplemental record, p. 98-99.)

Giles specifically argues that the circuit court erroneously failed to consider the hearsay testimony of two witnesses as to what Giles told them about a drug relationship between him and Carl Nelson.  Giles argues that the circuit court misapplied the evidentiary rules governing capital sentencing because hearsay evidence is admissible at the sentencing portion of a capital-murder trial.

However, what Giles fails to consider is whether the Rules of Evidence apply to Rule 32 proceedings.  *See* Rule 101, Ala. R. Evid., and Rule 1101(a), Ala. R. Evid., which states, in part, "these rules of evidence apply in all proceedings in the Courts of Alabama. . . ."  Rule 1101(b), Ala. R. Evid., lists the proceedings exempt from application of the Rules of Evidence.  Those proceedings include proceedings concerning preliminary questions of fact, grand jury proceedings, extradition proceedings, preliminary hearings in criminal cases,

sentencing or probation revocation hearings, proceedings related to the issuance of a warrant of arrest, criminal summonses, or search warrants, bail proceedings, and contempt proceedings.

> The Rules of Evidence apply to postconviction proceedings. *See DeBruce v. State*, 890 So. 2d 1068 (Ala. Crim. App. 2003). Rule 804, Ala. R. Evid., specifically excludes hearsay evidence. The circuit court correctly applied existing law and excluded the hearsay statements presented concerning an alleged drug relationship between Giles and one of the victims. After excluding the hearsay evidence, the circuit court was left with no lawful evidence to support this contention. Relief was correctly denied on this ground. *See DeBruce*, *supra*.

*Giles v. State*, 906 So. 2d 963, 984-86 (Ala. Crim. App. 2004) (alteration supplied).

Giles does not deny that the Rules of Evidence apply to post-conviction proceedings, and he does not deny that the evidence he desired to submit was hearsay.

> The standard of review for state evidentiary rulings in federal habeas corpus proceedings is a narrow one. Only when evidentiary errors "so infused the trial with unfairness as to deny due process of law" is habeas relief warranted. *Lisenba v. California*, 314 U.S. 219, 228, 62 S. Ct. 280, 286, 86 L. Ed. 166 (1941), *quoted and applied in*, *Estelle v. McGuire*, 502 U.S. 62, 75, 112 S. Ct. 475, 484, 116 L. Ed.2d 385 (1991); *accord Baxter v. Thomas*, 45 F.3d 1501, 1509 (11th Cir.) (evidentiary ruling claims reviewed only to determine whether the error "was of such magnitude as to deny fundamental fairness"), *cert. denied*, 516 U.S. 946, 116 S. Ct. 385, 133 L. Ed. 2d 307 (1995); *Kight v. Singletary*, 50 F.3d 1539, 1546 (11th Cir.1995), *cert. denied*, 516 U.S. 1077, 116 S. Ct. 785, 133 L. Ed. 2d 735 (1996). Such a determination is to be made in light of the evidence as a whole.

*Felker v. Turpin*, 83 F.3d 1303, 1311-12 (11th Cir. 1996).

Thus, the state courts' factual findings are entitled to deference. It cannot be said that Giles's Rule 32 hearing on collateral review was rendered fundamentally

unfair by the state court's proper application of its evidentiary rules against hearsay evidence. Of course, insofar as the hearsay that was proffered and rejected consisted of out-of-court statements made by Giles himself about his alleged drug dealings with Carl Nelson, Giles could have testified at the Rule 32 hearing about those matters.

Furthermore, testimony given by Giles's 1991 trial attorneys during the collateral appeal proceedings confirmed that they were aware of the facts that Carl Nelson had been charged with growing marijuana, and that Giles worked on Nelson's farm. They knew that the charge against Nelson had been dismissed when a motion to suppress the evidence of a search of Nelson's farm was granted. Because counsel were aware of those facts, and decided strategically that they did not want to use them at the sentencing trial, the decision not to investigate further was professionally reasonable. There was no need to waste valuable time and effort investigating a line of evidence that showed Giles was involved in other criminal activity that created yet another motive for his killing of Nelson. Counsel could and did reasonably conclude that evidence of Giles's criminal history and activities was not mitigating in nature.

For the foregoing reasons, Giles cannot show that the state courts' rejection of the claim is contrary to, or an unreasonable application of, clearly established federal law. The claim is due to be denied.

278

> **e.    Trial court improperly limited defense cross-examination on Carl Nelson's drug charges (Doc. no. 44, at 92) (Doc. no. 45, at 93)**

As best this court can understand Giles's petition and brief, this allegation is not yet another claim of ineffective assistance of counsel. Instead, it appears that Giles contends that the trial court improperly limited his attorneys' ability to cross-examine a police witness (Billy Irvin) during the 1991 re-sentencing trial. Giles admits the claim was raised for the first time, many years later, in his third amended Rule 32 petition. (Doc. no. 57, at 93). When Giles attempted to raise the claim on collateral appeal, the Alabama Court of Criminal Appeals would "not consider the allegations . . . because they were never properly before the circuit court." *Giles v. State*, 906 So. 2d 963, 973 (Ala. Crim. App. 2004) (citing *Allen v. State*, 825 So. 2d 264 (Ala. Crim. App. 2001), *aff'd*, 825 So. 2d 271 (Ala. 2002)). The state appellate court's ruling is a decision based on adequate and independent state procedural grounds. As such, federal review of the claim is necessarily precluded.

This court notes, nevertheless, that during the direct appeal from Giles's 1991 re-sentencing trial, no issue was raised or argued on the present ground. (*See* R. Vol. 29, Tab 46). Giles could and should have argued that the trial court's limitation of the cross-examination of the police witness deprived him of a fair sentencing trial. The failure to raise it then, coupled with the state courts' refusal to hear it as part of

279

the untimely third amended Rule 32 petition, means that the claim has never been presented to any state court. There is no showing of "cause and prejudice," or a "fundamental miscarriage of justice," to excuse either default. The claim is procedurally defaulted and due to be dismissed.

The claim also is meritless. Immediately after a prosecution objection to cross-examination of the police witness was sustained, counsel proceeded to ask the witness about a large patch of marijuana found and destroyed on Carl Nelson's property. In other words, the information that Giles sought to elicit was brought out. Giles was not prevented from showing the jury that Nelson was involved in growing marijuana. (*See* Rule 32 R. Vol. 19, at 437-38). Thus, the claim also is due to be denied on the merits.

### f.    Counsel ineffective for failing to investigate Giles's PCP use (Doc. no. 44, at 93) (Doc. no. 45, at 94) (Doc. no. 57, at 57-61)

This claim, as stated in Giles's *habeas* petition, reads in its entirety: "[D]efense counsel failed to investigate Giles's drug addiction and failed to discover Giles's chronic use of PCP. This evidence would have built a case in mitigation." (Doc. no. 45, at 94) (alteration supplied). Giles's initial brief in support of his *habeas* petition adds only the following gloss:

280

As argued above at pp. ___,[129] Arthur Giles was chronically using PCP at the time of this crime, including the night of the crime. Counsel's failure to investigate Giles'[s] drug use and its psychotic effect was ineffective assistance of counsel.  The Rule 32 Court dismissed claims that Giles'[s] attorneys were ineffective for their failure to investigate Giles'[s] use of the drug phencyclidine (PCP or "angel dust").  The court held it found no credible evidence of PCP use. For the reasons set forth above at pp.___[130] the court's "credibility" findings are premised on unreasonable determination of facts in light of the evidence presented at Rule 32.

The court's disqualification of Melinda Fisher as a credible witness is a conclusion that is "so lacking in support in the evidence that to give it effect would work that fundamental unfairness which is at war with due process." *Lisenba v. People of State of California*, 314 U.S. 219, 238 (1941).

(Doc. no. 44, at 93).

As discussed earlier in this opinion, *supra*, the state court properly discredited the testimony of Melinda Fisher.  There was no other evidence, even from Giles himself, establishing his use of PCP the night of the murders.  Further, no evidence was offered to show how such use may have served as mitigation evidence. Counsel's strategy at the 1991 re-sentencing trial was to humanize Giles, and show his remorse and rehabilitation in the thirteen years after the murders.  As such, Giles cannot show that the state court's rejection of the claim entitles him to *habeas* relief. The claim is due to be denied.

---

[129] Page numbers omitted by Giles.

[130] *Ditto*.

**g.      Counsel in 1991 ineffective for failing to learn and apply mitigation law (Doc. no. 44, at 94-96) (Doc. no. 45, at 94-95)**

**h.      Counsel in 1991 ineffective for presenting false testimony detracting from mitigation issues (Doc. no. 44, at 97) (Doc. no. 45, at 96-97)**

**i.      Counsel in 1991 ineffective for presenting evidence of Giles's prior death sentence to jury (Doc. no. 44, at 97) (Doc. no. 45, at 97-98)**

Giles admits that the three claims stated above were raised for the first time in his untimely third amended Rule 32 petition.  He did not file his third amended petition until after the Rule 32 trial court had entered its final judgment on collateral review, and the Alabama Court of Criminal Appeals refused to address the claims on appeal for that reason.  (Doc. no. 45, at 94, 96, 97).  Because the claims were not properly presented to the state courts, they were procedurally defaulted and due to be dismissed.

In any event, all of those claims, regardless of whether they are read separately or together, are meritless.  Giles accuses his 1991 lawyers of failing to understand that the reasonableness of strategy decisions turns on the reasonableness of the background investigation upon which the decisions are based.  He contends that, because his attorneys did not investigate his childhood and background, they could not make sound, reasonable strategy decisions.

This court already has rejected the claim that the lawyers failed to conduct a reasonable investigation.  Without repeating the details of that discussion, suffice it to say that Giles's 1991 re-sentencing lawyers knew that he was born to a very young girl, did not know his father, had trouble in school, lived in a house of prostitution and a "shot house," lived in a very rough and crime-filled neighborhood, had juvenile charges, had killed a classmate by stabbing him to death, was involved with drugs and alcohol at an early age, might have been sexually abused by a male relative, and was principally responsible for caring for his amputee great-grandmother.  They also knew that he had been examined by a Lunacy Commission at Bryce Hospital and diagnosed with Anti-Social Personality Disorder.  They knew that he had worked for one of the victims, Carl Nelson, who had been charged with growing marijuana on the farm where Giles worked.  Thus, defense counsel possessed sufficient information about Giles's childhood and background to enable them to form a reasonable strategy for the re-sentencing trial, and also to make a reasonable determination that no other investigation was necessary.  Counsel reasonably concluded that, given the time span of thirteen years between the murders and the 1991 re-sentencing trial, canvassing Giles's North Birmingham neighborhood for witnesses likely would not prove fruitful.  Giles himself provided counsel with precious few leads to potential witnesses, identifying only two unnamed women in Iowa and Washington.  Indeed,

Giles has not provided this court with any childhood or background information of significance that was not know to his attorneys in 1991. It is not true that counsel did not conduct a reasonable investigation of Giles's childhood and background for mitigation evidence. Their strategy decisions, choosing to focus on his remorse and rehabilitation since the murders, were reasonable.

Counsel did not present "false" testimony, but called Giles's mother, Isophine Snow, to the stand to describe his childhood in broad strokes. To the extent that her testimony differed from other information possessed by counsel, they reasonably believed that placing Giles's mother on the stand was consistent with their strategy and beneficial to him. In fact, the strategy worked: the jury recommended a sentence of life without parole, rather than death. Only hindsight now allows second guessing of the strategy employed.

Finally, Giles suffered no prejudice from the fact that another witness called to the stand by defense counsel, Mr. Godfrey, testified that he met Giles on "death row." The jury was aware that Giles had been convicted of capital murder, although they had not been told of his previous death sentence. In any event, the jury recommended life without parole — plainly proving that Godfrey's revelation did not cause any prejudice. The claim is due to be denied.

> **j.    Counsel ineffective for failing to secure Giles's presence at "critical stage" of trial (Doc. no. 44, at 97-98) (Doc. no. 45, at 98) (Doc. no. 57, at 35)**

Giles admits that the claim is procedurally defaulted because it was not raised in state court.  (Doc. no. 57, at 35).  But even if the claim were not procedurally defaulted, it would be denied as meritless.  The transcript of the 1991 re-sentencing proceeding indicates that, at the beginning of one trial day, after the prosecution completed the presentation of its case-in-chief, but before the defense began its case, the trial court met with the lawyers to discuss two subjects:  an identification of the aggravating and mitigating circumstances relied upon by the parties; and the admissibility of a transcript of the testimony given at the 1982 trial by Giles's mother, Isophine Snow, who was dead at the time of the 1991 trial.  The jury was not present.  Giles initially was not present, but he appeared in the middle of the conference.  (*See* R. Vol. 19, at 445-50).

Although the Sixth Amendment guarantees a criminal defendant the right to be personally present at all "critical stages" of the proceedings against him, *see Illinois v. Allen*, 397 U.S. 337, 338 (1970), it does not confer the right to be present at *every* conference.  The Eleventh Circuit attempted to explain the distinction in *United States v. Vasquez*, 732 F.2d 846 (11th Cir. 1984), saying that:

> The right to be present at every stage of trial does not confer upon the defendant the right to be present at every conference at which a

285

matter pertinent to the case is discussed, or even at every conference
with the trial judge at which a matter relative to the case is discussed.
*See United States v. Howell*, 514 F.2d 710, 714 (5th Cir.), *cert. denied*,
423 U.S. 914, 96 S. Ct. 220, 46 L. Ed. 2d 143 (1975). In *Howell*, the
Court stated that the defendant had no right to be present at a conference
with the judge and a juror on the subject of the attempted bribery of the
juror, or at an in camera conference with the judge and all counsel in the
case at which the earlier conference was discussed. *Id.* The Court
concluded that these in camera conferences were not critical stages in
the trial proceedings and therefore the defendant had no right to be
present. *Id.*; *see also United States v. Jorgenson*, 451 F.2d 516, 521
(10th Cir.1971), *cert. denied*, 405 U.S. 922, 92 S. Ct. 959, 30 L. Ed. 2d
793 (1972) (defendant has no right to be present at in camera conference
on evidentiary matters when his lawyer was present at the conference).
Similarly, we conclude that a bench conference, attended by appellant's
counsel and called to discuss an evidentiary matter relative to
appellant's own cross-examination, is not a critical stage of the trial
proceedings at which appellant has a right to be present.

*Id.* at 848-49. The conference in this case between the court and the lawyers, without

the jury, was not a "critical stage" of the trial. The purpose of the conference was to

gain a clarification of the positions of the parties, not to hear evidence or even make

a ruling. The claim is due to be denied.

> **k.    Counsel ineffective for failing to articulate why Giles's life
> should be spared (Doc. no. 44, at 99) (Doc. no. 45, at 99-100)
> (Doc. no. 57, at 54)**

Giles admits the claim is procedurally defaulted because it was not raised in

state court. (Doc. no. 57, at 54). Accordingly, it is due to be dismissed. But even if

it had not been procedurally defaulted, it still would be denied. Counsel at the 1991

re-sentencing trial argued extensively and passionately that Giles was a changed man

from the one convicted of the murders years earlier, and that his life could still be useful, even to those in prison with him.  For example, Giles's attorney stated to the jury in his opening:

> Mitigating circumstances we think are these, and these are what the evidence will show you.  At the time of the crime Arthur Lee Giles was eighteen years old.  At the time of the crime he was with another fellow named Aaron Jones who was twenty-six years old.  Since that time twelve years have passed.  Arthur has been in prison awaiting this sentencing for twelve years.  And the fellow situated at that table is twelve years older and I submit to you not the same person.  He is the same person, but he has been a long way and he has changed.  He has demonstrated that he is truly sorry for what he has done.  He has demonstrated, and I think the evidence will show you, that he has been useful in talking to other prisoners telling them how to turn their lives around. . . .  The point of everything we are doing is to say this:  Our mitigating circumstances must demonstrate to you that his life is worth saving and not something that should be taken.

(R. Vol. 18, Tab 30, at 304-06).

In their closing arguments, counsel repeated those themes.  They reminded the jury that Giles is a human being, and that all human beings occasionally make serious mistakes.  They discussed how hard Giles's childhood and upbringing had been without a father, "fighting with drugs, fighting the streets"; that the underlying robbery motive might have had "to do with taking drugs"; and that in the twelve years since the murder, there had been "pretty good evidence that Arthur can do something productive for the rest of his life."  They argued that Giles could talk to other convicts and teach them by example to stay away from drugs.  Then, they begged for mercy.

(*See* R. Vol. 19, Tab 34).  Ultimately, those appeals proved successful, for the jury returned a recommendation of life without parole.  The claim of ineffectiveness is demonstrably meritless, and due to be denied.

> **l.     Counsel ineffective for failing to object to "heinous, atrocious and cruel" aggravator (Doc. no. 44, at 99-100) (Doc. no. 45, at 100-01)**

Giles does not dispute respondent's assertion that the claim was never raised during Rule 32 proceedings.  Accordingly, the claim is procedurally defaulted and due to be dismissed.  But even if it had not been procedurally defaulted, the claim still would be denied as meritless.  Giles's underlying theory is that the "heinous, atrocious, and cruel" aggravator was improper because it was Aaron Jones, and not Giles, who stabbed the victims; and, thus, the failure of his 1991 re-sentencing attorneys to object to the use of the aggravator amount to ineffective assistance.  That argument overstates the evidence.  There is no dispute that Giles shot several Nelson family members, and stabbed at least two others.  The evidence pertaining to the question of whether he participated in the stabbing of Willene Nelson is confused, but there is no doubt that he was present when it occurred, and that he intended (and may have directed) it to occur, despite his arguments in this court.  Because there was sufficient evidence upon which the aggravator could be based, it was not ineffective

assistance for Giles's counsel to fail to object to it. Giles suffered no prejudice from their failure to object. The claim is due to be denied.

### 4. *Giles Was Sentenced to Death by Prosecutorial Misconduct*

#### a. Prosecutor's v*oir dire* reference to "advisory verdict" diminished juror responsibility (Doc. no. 44, at 101) (Doc. no. 45, at 101)

Giles asserts that "during the *voir dire* of the first two panels of six jurors summoned for his 1991 re-sentencing trial, "the prosecutor instructed them that their role was to return 'an advisory verdict' to the judge." (Doc. no. 45, at 101 (citing R. Vol. 17, Tab. 28, at 105, 175)). Defense counsel objected, but the trial court refused to disqualify the panels, and four jurors from those two panels ultimately sat on the sentencing jury. (Doc. no. 45, at 101 (citing *Caldwell v. Mississippi*, 472 U.S. 320, 328 (1985) (condemning arguments that diminish the jury's sense of responsibility during the sentencing phase of a capital murder trial)). Giles contends that "[t]he state's suggestion in the 1991 sentencing trial that the jury's work was limited to rendering an 'advisory verdict' denied Petitioner his right to a fair trial before an impartial jury, and his 5th, 6th, 8th and 14th Amendment rights." (Doc. no. 44, at 101) (alteration supplied).

Giles contends that the Alabama Court of Criminal Appeals was "wrong" when it rejected the claim on the ground that "the jury recommended life without parole."

289

(Doc. no. 44, at 101 (citing *Giles v. State*, 632 So. 2d at 575)).  Giles's contention that the state court was "wrong" fails to state a claim upon which *habeas* relief can be granted, but this court will construe the assertion as arguing that the appeals court's decision was contrary to, or an unreasonable application of, Supreme Court precedent.

"To establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989).  Alabama's hybrid system, which vests ultimate sentencing authority in the trial judge, but also requires the judge to consider the jury's advisory verdict, is constitutional.  *Harris v. Alabama*, 513 U.S. 504, 515 (1994).  Thus, the words "advisory" and "recommendation" are correct statements of Alabama law.  The prosecutor did not belabor the point, and Giles does not deny that the trial court properly instructed the jury on its duties.

The rationale of *Caldwell* is that arguments reducing the jury's sense of responsibility increase the likelihood of a jury returning a death verdict without careful consideration of the evidence.  That did not happen here.  The jury recommended life without parole.  Thus, if error occurred, it was harmless. The claim is due to be denied.

> **b.    State suppressed evidence that interrogation continued after petitioner repeatedly invoked his *Miranda* rights (Doc. no. 44, at 101-02) (Doc. no. 45, at 101-02) (Doc. no. 57, at 80)**

The claim raises the same *Miranda* issue previously discussed in Part V.A.4(c) of this opinion, *supra,* but here it is tied to the argument that Giles's statements should not have been introduced at his 1991 re-sentencing trial.   For the reasons already discussed in Part V.A.4(c), the claim is both procedurally defaulted and meritless.   The state courts' finding that Giles never expressly invoked his *Miranda* rights is not unreasonable in light of the record evidence, and Giles has not shown otherwise by clear and convincing evidence.   *See* 28 U.S.C. § 2254(d)(2) and (e)(1). The claim is due to be denied.

> **c.    State suppressed exculpatory evidence of Carl Nelson's recent drug prosecution and an "anonymous informer" (Doc. no. 44, at 102) (Doc. no. 45, at 102)**

For the reasons set out in Part V.A.4(d) of this opinion, *supra*, the claim is due to be denied.   The claim is also due to be denied because the record reflects that the attorneys who represented Giles during his 1991 re-sentencing trial became aware of Carl Nelson's drug prosecution, and the anonymous informer, when the information was brought out during questioning at the 1991 sentencing trial.   *See Giles v. State*, 906 So. 2d 963, 974-75 (Ala. Crim. App. 2004).   Such knowledge renders Giles's

*Brady* claim legally and factually impossible.  The claim is meritless and due to be denied.

### d.    State suppressed evidence of "marijuana theory" for crime (Doc. no. 44, at 102) (Doc. no. 45, at 102-03)

For the reasons discussed Part V.A.4(e) of this opinion, *supra*, the claim is due to be denied.  By the time of the 1991 re-sentencing trial, defense counsel were aware of Carl Nelson's arrest for growing marijuana.  The evidence was not suppressed, and the claim is meritless.

### e.    State suppressed analysis of co-defendant Jones's bloody clothes (Doc. no. 44, at 103) (Doc. no. 45, at 104) (Doc. no. 57, at 80)

For the same reasons discussed in Part V.A.4(f), *supra*, the claim is due to be dismissed as procedurally defaulted.  The claim also is meritless because it is irrelevant to the sentencing issues raised in the 1991 trial.  By then, the question of guilt had been resolved against Giles.  It did not matter whether Aaron Jones's clothes were bloody, or whether the analysis of those clothes had been suppressed.  The 1991 trial only addressed evidence of aggravating factors and mitigating circumstances. The court recognizes that Giles has argued that the "heinous, atrocious, and cruel" aggravator was improper, and that proof of Jones being the person who stabbed Willene Nelson would assist in refuting that aggravator.  But this court also has rejected that argument.  Giles both shot and stabbed the victims and other Nelson

family members.  Moreover, because the jury recommended life without parole, the alleged suppression of evidence concerning forensic analysis of Jones's clothing did not result in prejudice to Giles, or cause him to be improperly sentenced to death. Thus, the claim also is meritless, and due to be denied on that basis.

<blockquote>

**f.**     **State suppressed witness statements that Giles was innocent of Willene Nelson's stabbing death (Doc. no. 44, at 104) (Doc. no. 45, at 105)**

</blockquote>

For the same reasons discussed in Part V.A.4(h), *supra*, this claim is due to be dismissed as procedurally defaulted or, in the alternative, as lacking any merit.  At the 1991 re-sentencing trial, Giles had already been determined to be guilty of Willene Nelson's murder.  In any event, the jury recommended life without parole, so any suppression of evidence concerning his role in the murder of Willene Nelson — as that evidence may have impacted the jury's sentencing recommendation — did not prejudice Giles.  The claim is meritless and due to be denied.

<blockquote>

**g.**     **State presented inconsistent prosecutions of co-defendants Giles and Jones (Doc. no. 44, at 104) (Doc. no. 45, at 106) (Doc. no. 57, at 45-47)**

</blockquote>

For the same reasons discussed in Part V.A.4(k), *supra*, the claim is due to be dismissed as procedurally defaulted.  The claim is also meritless with respect to the 1991 re-sentencing trial.  By that time, Giles had been found guilty of the murders of Carl and Willene Nelson.  As explained above in Part V.A.4(k), there was no

inconsistency in the prosecutions of Giles and Jones leading to Giles's conviction. The aggravating circumstances advocated by the prosecution at the 1991 re-sentencing trial were (*i*) that Giles created a great risk of danger to many people, (*ii*) that he killed during the course of a robbery, and (*iii*) that the killings were especially heinous, atrocious, and cruel.  There was no inconsistency relevant to those things that the prosecution was required to prove.  Indeed, Giles disputes only the last aggravator on the theory that Jones alone stabbed Willene Nelson, but the court has rejected that theory.  Thus, the claim also is due to be denied as lacking merit.

### h.   Counsel ineffective for failing to review previous witness testimony (Doc. no. 45, at 107)

Giles admits that he did not raise the claim until his untimely third amended Rule 32 petition.  (Doc. no. 45, at 107).  Accordingly, the claim was never properly presented to the state courts, and it is procedurally defaulted and due to be dismissed. It also is meritless, because the attorneys who represented Giles during his 1991 re-sentencing trial (Sparks and Prickett) clearly testified during the Rule 32 hearing that they obtained and read the transcripts of both the 1979 and 1982 trials, the files of defense counsel from those trials, and the "open file" discovery provided by the district attorney prior to the 1991 re-sentencing trial.  Sparks described it as thousands of pages in many boxes, which is true, based on the court's observation of the record in this case.  Therefore, the claim also is due to be denied as lacking merit.

294

> i.   **State suppressed exculpatory evidence despite defense requests (Doc. no. 44, at 104) (Doc. no. 45, at 107-08) (Doc. no. 57, at 44-45)**

For the same reasons discussed in Part V.A.4(j), *supra*, the claim is procedurally defaulted and due to be dismissed. It also is meritless. Giles has failed to identify any evidence sought in connection with the 1991 re-sentencing trial that was withheld from him. To the extent that he implies that he never received the forensic report on Jones's bloody clothing, that evidence is not exculpatory or material in the context of the issues addressed in the 1991 re-sentencing trial. The claim, therefore, also is due to be denied.

> j.   **Improper closing argument by State included personal opinion and vouching by district attorney (Doc. no. 44, at 105) (Doc. no. 45, at 107) (Doc. no. 57, at 27-28)**

> k.   **State's improper closing argument warned jury not to extend sympathy and used prejudicial photographs (Doc. no. 44, at 105-07) (Doc. no. 45, at 107-08) (Doc. no. 57, at 27-28)**

Giles alleges that the prosecutor made improper closing arguments during his 1991 re-sentencing trial. When those claims were raised on direct appeal from the new sentence, the Alabama Supreme Court entered the following findings of fact and conclusions of law:

> Giles challenges a number of remarks made by the state in its closing jury arguments. However, the jury did not recommend death. Indeed, Giles was ultimately sentenced, not by the jury, but by the court. Because we cannot discern how Giles could have been prejudiced by

295

errors relating to the jury, we must reject his arguments for reversal on these grounds.

*Ex parte Giles,* 632 So. 2d 577, 585-86 (Ala. 1993).

Giles cannot show that the State Supreme Court's rejection of these claims is contrary to, or an unreasonable application of, clearly established federal law.

> A petitioner cannot show sentencing phase prejudice when the jury recommends a sentence of life instead of death. *Routly v. Singletary*, 33 F.3d 1279, 1297 (11th Cir.1994) (*per curiam*). Parker cannot, therefore, demonstrate that, but for the prosecutor's death penalty argument the outcome of the sentencing phase would have been different. The district court did not err in finding that the Alabama courts' decisions were neither contrary to nor an unreasonable application of the law, and were not based on an unreasonable determination of the facts.

*Parker v. Allen*, 565 F.3d 1258, 1275 (11th Cir. 2009). For the same reasons, this court cannot say that the resolution of the claims by the Alabama Supreme Court is objectively unreasonable. Given the jury's recommendation, any errors by the prosecutor were harmless. The claims are without merit and due to be denied.

### 5. *Due Process and Reliable Determination Of Sentence Denied By Court's Rulings and Jury Instructions*

#### a. **Sixth Amendment right to counsel violated by Alabama limits on court appointed compensation (Doc. no. 44, at 107-08) (Doc. no. 45, at 109) (Doc. no. 57, at 35-36)**

Giles admits that the claim was raised for the first time in his untimely third amended petition. (Doc. no. 57, at 35-36 (citing Rule 32 C.R. Vol. 43, at 723-25)).

When he raised the claim on collateral appeal (*id.*, Vol. 52, Tab. 71, at 110), the Alabama Court of Criminal Appeals would "not consider the allegations contained in that petition because they were never properly before the circuit court." *Giles v. State*, 906 So. 2d 963, 973 (Ala. Crim. App. 2004) (citing *Allen v. State*, 825 So. 2d 264 (Ala. Crim. App. 2001), *aff'd*, 825 So. 2d 271 (Ala. 2002)). As discussed in Part IV.B.2 of this opinion, *supra*, the state appellate court's ruling is a decision based on adequate and independent state procedural rules. As such, federal review of the claim is precluded, absent a showing of "cause and prejudice," or a fundamental miscarriage of justice. Because Giles has shown neither, the claim is procedurally defaulted and due to be dismissed.

Further, the claim is meritless. Giles contends that the state attorney compensation limits deprived him of effective assistance of counsel, but he does not attempt to show how the compensation limits actually adversely impacted his defense. *Strickland* requires a showing of both a professionally unreasonable error by counsel *and* prejudice to the defense caused by that error. Under that theory, Giles has shown neither. While the court does not dispute that Alabama severely limited the compensation his court-appointed attorneys could claim for representing him, that fact does not alone show that counsel failed to conduct a reasonable investigation, or to marshal the evidence material to Giles's penalty determination, or to otherwise

carefully and professionally represent him.  Giles must point to actual instances of failures, errors, or shortcomings by counsel that are directly attributable to the compensation limits.  He has not done so.  The claim as pleaded does not meet Rule 2 of the *Rules Governing § 2254 Cases*, requiring that the facts supporting a claim be clearly stated in detail.  Because the claim lacks factual support, it is meritless and due to be denied.

### b.    Trial court failed to grant funds for a psychologist or mitigation expert (Doc. no. 45, at 110)

Giles asserts that this "claim was raised in State post-conviction" proceedings. (Doc. no. 45, at 110 (citing Rule 32 C.R. Vol. 37, Tab. 64, at 434; *id.*, Vol 52, Tab. 71, at 135)).  However, a review of the record citations shows that, during the Rule 32 proceedings, Giles complained that his conviction was obtained by the trial court's failure to grant funds for a psychologist and mitigation expert during his *1982* guilt trial.  *Id.*  He has not alleged such an error with respect to the *1991* re-sentencing trial. A review of the post-conviction record shows that such a claim was not raised. Accordingly, the claim is procedurally defaulted and due to be dismissed.

But even if the claim had been raised in Giles's Rule 32 petitions, it is plainly meritless.  Regardless of whether Giles was given funds for a psychologist or mitigation specialist, the jury returned a verdict recommending that he be sentenced to life without parole, not death.  Counsel at the 1991 re-sentencing trial were

reasonably aware of the facts of Giles's childhood, upbringing, and criminal history, including his assessment by the Lunacy Commission at the time of his 1982 trial. There is no indication that a psychologist or mitigation expert could have helped them better discover or present those facts, either to the jury or the judge. Failure to provide funds for such an expert did not deprive Giles of the ability to fairly and fully present the facts necessary for the jury and court to properly determine his sentence. The claim is due to be denied.

### c. Trial court improperly refused residual doubt jury instruction (Doc. no. 44, at 108-09) (Doc. no. 45, at 110)

Giles asserts that his "5th and 14th Amendment due process rights and right to a fair trial" were denied when the trial court refused to give the jury a residual doubt instruction. (Doc. no. 44, at 108 (citing *Lockett v. Ohio*, 438 U.S. 586 (1978) (holding that a defendant convicted of acting in concert with others to rob and kill could introduce at the sentencing stage of a capital trial evidence showing that he had played a minor role in the crime)). Giles argues that he was "severely prejudiced" by the lack of a "residual doubt instruction" because there "existed considerable doubt about whether [he] participated in Willene Nelson's stabbing, or even intended that she be killed." *Id.* at 109 (alteration supplied).

The last state court to address this claim on the merits was the Alabama Supreme Court in the appeal following the 1991 re-sentencing trial, and the pertinent portion of its opinion reads:

> Giles advances a number of arguments relating specifically to the jury. For example, he . . . challenges various instructions given the jury. . . . However, the jury did not recommend death. Indeed, Giles was ultimately sentenced, not by the jury, but by the court. Because we cannot discern how Giles could have been prejudiced by errors relating to the jury, we must reject his arguments for reversal on these grounds.

*Ex parte Giles*, 632 So. 2d 577, 585-86 (Ala. 1993).

Giles argues that the state court's resolution of the claims "is incorrect." (Doc. no. 44, at 109-10). Pursuant to 28 U.S.C. § 2254(d), however, Giles is required to show that the decision is either *contrary* to, or an *unreasonable* application of, clearly established federal law, not merely that it is "incorrect." He has failed to do so. For this reason alone, the claim is due to be denied.

Moreover, the United States Supreme Court has made it clear that, in the context of jury instructions,

> [t]he only question for [the *habeas* court] is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147, 94 S. Ct. 396, 400-01, 38 L. Ed. 2d 368 (1973); *see also Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S. Ct. 1730, 1736-37, 52 L. Ed. 2d 203 (1977); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643, 94 S. Ct. 1868, 1871, 40 L. Ed. 2d 431 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous, or even "universally condemned," but that it violated some [constitutional right]'"). It is well

300

established that the instruction "may not be judged in artificial
isolation," but must be considered in the context of the instructions as
a whole and the trial record. *Cupp v. Naughten*, *supra*, 414 U.S., at 147,
94 S. Ct., at 400-01. In addition, in reviewing an ambiguous instruction
such as the one at issue here, we inquire "whether there is a reasonable
likelihood that the jury has applied the challenged instruction in a way"
that violates the Constitution. *Boyde v. California*, 494 U.S. 370, 380,
110 S. Ct. 1190, 1198, 108 L. Ed. 2d 316 (1990). And we also bear in
mind our previous admonition that we "have defined the category of
infractions that violate 'fundamental fairness' very narrowly." *Dowling
v. United States*, 493 U.S. 342, 352, 110 S. Ct. 668, 674, 107 L. Ed. 2d
708 (1990). "Beyond the specific guarantees enumerated in the Bill of
Rights, the Due Process Clause has limited operation." *Ibid*.

*Estelle v. McGuire*, 502 U.S. 62, 72-73 (1991) (footnote omitted, first two alterations

supplied, other alterations in original). *See also Jones v. United States*, 527 U.S. 373,

389-90 (1999) (reaffirming the standards set out in *Estelle*, particularly in the context

of an instruction to which there had been no objection).

The absence of a residual doubt instruction did not render Giles's 1991 re-

sentencing trial fundamentally unfair. His assertion that there was not a considerable

quantum of evidence showing that he either stabbed Willene Nelson, or intended her

death, is completely belied by the historical record. As previously recorded in this

opinion, the record shows that Giles and Aaron Jones stabbed Willene Nelson, and/or

that Giles commanded Jones to stab her. Beyond that, the Alabama Supreme Court

is correct in noting that the jury's recommendation demonstrates that Giles was not

deprived of a fundamentally fair trial, because he received the most favorable penalty

recommendation available under the law.  The claim is due to be denied.

> **d.    Trial court improperly refused life option jury instruction
> (Doc. no. 44 at 109-10) (Doc. no.  45 at 111-12)**

Giles also asserts that the trial court erred when it refused to instruct the jury

that the jurors could "vote for life without parole regardless of the weight of

aggravating and mitigating circumstances."  (Doc. no. 44, at 109).  The instruction

desired by defense counsel, but refused by the trial court, read as follows:

> Even if you find one or more aggravating circumstances beyond
> a reasonable doubt, you may impose a sentence of life in prison without
> parole for any reason or for no reason at all.  You need not find a
> mitigating circumstance in order to impose a sentence of life
> imprisonment.  Nothing in the law forbids you from extending mercy
> out of compassion or belief that life imprisonment is sufficient
> punishment under all the circumstances.

(Doc. no. 45, at 111 (quoting C.R. Tab. 39, Vol. 20, at 728).  Giles does not contend

that the instruction is a correct statement of Alabama law.  He also does not mention

the extensive instructions on Alabama sentencing law given by the trial judge.  (*See*

R., Vol. 20, at 605-47).  Instead, Giles simply states that:

> "The eighth and fourteenth amendments require that the trial
> judge 'clearly and explicitly instruct the jury about mitigating
> circumstances and the option to recommend against death.'"  *Moore v.
> Kemp*, 809 F.2d 702 (11th Cir. 1987) (*en banc*) quoting *Spivey v. Zant*,
> 661 F.2d 464, 471 (5th Cir. 1981), *cert. denied*, 458 U.S. 1111 (1982).
> The 11th Circuit has repeatedly recognized that jurors must be told that
> they may sentence a defendant to life imprisonment even if they have

found him or her eligible for the death penalty under the state's
sentencing scheme.  *See Westbrook v. Zant*, 704 F.2d 1487 (11th Cir.
1983); *Goodwin v. Balkcom*, 684 F.2d 794, 801-2 (11th Cir. 1982).

(Doc. no. 44, at 109-10).

Forty-two pages of the trial record are dedicated to the trial judge's explanation

of Alabama sentencing law, the jury's choice of life without parole or death, *and* how

that choice was dependent upon their finding and weighing aggravating and

mitigating circumstances.  (*See* R. Vol. 20, at 605-47).  Giles does not deny that the

instructions were *explicit and accurately reflected Alabama sentencing law* — which

included the jury's option to recommend a sentence of life without parole.  The

sentencing instructions satisfied the Eighth and Fourteenth Amendment concerns

argued by Giles.

More to the point, there is no reasonable likelihood that Giles's 1991 trial was

rendered fundamentally unfair by the trial court's refusal to give the isolated life

without parole jury instruction he requested, because the jury returned a

recommendation of life without parole.  The claim is due to be denied.

> **e.   Trial court improperly denied Giles's right to address jury
> (Doc. no. 44, at 110-11) (Doc. no. 45, at 112)**

Giles alleges that, before opening statements began at his re-sentencing trial,

defense counsel requested that Giles be allowed to address the jury on his own behalf.

(Doc. no. 45, at 112 (citing R., Vol. 19, at 464)).  However, "[t]he trial court denied

the request, and ruled that Mr. Giles was not entitled to address the jury unless he took the witness stand." *Id.* (citing R. Vol. 19, at 465).[131]  Giles now contends that "the trial judge disregarded Arthur Giles' [sic] right under Alabama common law — as well as three centuries of Anglo-American common law — to make his own plea for mercy." *Id.* (citing *Green v. United States*, 365 U.S. 301, 304 (1961) (acknowledging that common law and federal statutory law required a court to inquire of, and afford the defendant personally an opportunity to speak *before imposing sentence*) (emphasis supplied)).  Giles does not deny that he was afforded an opportunity to speak to the trial judge before his punishment was pronounced — that is, that he was accorded an opportunity to allocute — but he argues that the opportunity should have been expanded to include the jury because the jury was responsible for a sentencing recommendation.  (Doc. no. 44, at 110).

When the claim was raised on direct appeal from Giles's 1991 re-sentencing trial, the Alabama Supreme Court held that it could not "discern how Giles could have been prejudiced" because the jury recommended a sentence of life without parole. *Ex parte Giles*, 632 So. 2d 577, 585-86 (Ala. 1993).  In response, Giles once again contends only that the Alabama Supreme Court's decision is "incorrect." (Doc.

---

[131] The record reflects that the trial court granted the State's objection to Giles's desire to address the jury because Giles had not filed a motion requesting permission to be considered co-counsel.  R. Vol. 20, at 464-65.

no. 44 at 111). As previously stated on numerous occasions, however, 28 U.S.C. §
2254(d) requires that Giles show that the state court's rejection of the claim is
contrary to, or an unreasonable application of, clearly established federal law — *not*
that it was merely "incorrect." One again, he has not done so. For that reason alone,
the claim is due to be denied.

Moreover, the United States Supreme Court in *Green* did not *hold* that there
is a *federal* **constitutional** *right* to allocution before the jury, as opposed to the
sentencing judge. Even if it had done so, there is no justification for extending that
right in the manner Giles suggests, particularly when he received a jury verdict of life
without parole. The claim is meritless and due to be denied.

> **f.  Trial court improperly relied on pre-sentence report
> containing hearsay; defense counsel ineffective for failing to
> object to and exclude pre-sentence report, offer contradictory
> evidence, or raise issue on appeal (Doc. no. 44, at 111-12)
> (Doc. no. 45, at 112-13) (Doc. no. 57, at 62)**

There is no dispute that, after the jury returned a verdict recommending that
Giles be sentenced to life without parole, the trial judge was required to hold a
sentencing hearing. At that hearing, the court and parties received a typewritten pre-
sentence investigation report prepared by the Alabama Board of Pardons and Paroles.
Giles contends that the court's reliance on certain hearsay within that report was
improper.

### (i).   *Trial error*

This aspect of Giles's claim boils down to a concern about two aspects of his criminal history as documented in the pre-sentence investigation report. (Doc. no. 45, at 113). First, Giles asserts that the report recited a conviction and life-without-parole sentence for assault with intent to murder four of the Nelson family members. Giles contends that he was, in fact, sentenced to twenty years on that charge, and that the offense underlying the conviction occurred at the same time as the capital murders of Carl and Willene Nelson. *Id.* Second, he complains that the report erroneously stated that he was charged with murder at the age of 13, and that it failed to report that the juvenile court reduced the charge to manslaughter without malice, or that the manslaughter charge was never adjudicated. *Id.*

On direct appeal from the 1991 re-sentencing trial, the Alabama Court of Criminal Appeals addressed these contentions in the following manner:

> The appellant argues that the trial court erred in considering his presentence report before sentencing him. The appellant raises a number of grounds for this argument, including that the report contains hearsay and other inadmissible evidence, such as his record of prior arrests . . . However, hearsay evidence was admissible during sentencing under the former statute. § 13-11-3, Code of Alabama 1975. Furthermore, the appellant was provided with the opportunity to rebut any statements contained in this report. *Ex parte Davis*, 569 So. 2d 738 (Ala. 1990), *cert. denied*, 498 U.S. 1127, 111 S. Ct. 1091, 112 L. Ed. 2d 1196 (1991).

The inclusion in the report of prior arrests on charges that were either unadjudicated or dropped was not error because they were included under the heading of "RECORD OF ARREST(S)." *See Kuenzel v. State*, 577 So. 2d 474, 530 (Ala. Cr. App. 1990), *affirmed*, 577 So. 2d 531 (Ala.), *cert. denied*, 502 U.S. 886, 112 S. Ct. 242, 116 L. Ed. 2d 197 (1991). The appellant was not prejudiced by the trial court's consideration of the report, which included the record of these arrests, because the trial court found, as a mitigating circumstance, that he had no significant history of prior criminal activity.

A review of the presentence report contained in the record reveals no statutory deficiency. Therefore, the trial court did not err in considering the presentence report prior to sentencing the appellant to death.

*Giles v. State*, 632 So. 2d 568, 576 (Ala. Crim. App. 1992) (alteration supplied).

First, it appears that the present claim raises only issues of state law, not federal law. This court has no jurisdiction to grant *habea*s relief as to state-law errors, only errors arising under federal law. Thus, the claim is due to be dismissed as failing to allege a federal claim within the court's *habeas* jurisdiction.

Second, even if the court had jurisdiction under § 2254, Giles cannot show that the state court's adjudication of the claim was contrary to, or an unreasonable application of, clearly established federal law. Contrary to his argument, Giles was "'not sentenced on the basis of assumptions concerning his criminal record which were materially untrue.'" (Doc. no. 44 at 111 (quoting *Townsend v. Burke*, 334 U.S. 736, 741 (1948)). Giles admits he was arrested for murder at age 13, and even admits that the record of arrest is allowed by Alabama statute. *Id.* at 111-12. Moreover,

Giles was convicted of assault with intent to murder four people as part of the same crime that led to his conviction for capital murder. Even if the report was in error when describing his sentence for the assault as life without parole, instead of 20 years, that error is essentially immaterial under the circumstances. Most importantly, Giles was permitted to offer evidence rebutting those portions of the pre-sentence report to which he objected. Moreover, in view of the fact that the trial judge found the lack of a significant criminal history to be a mitigating factor, he clearly rejected the "arrests" portion of the pre-sentence report.

There is nothing in the criminal history recited in the pre-sentence report that violated Giles's right to due process or rendered the trial judge's sentencing decision unreliable. Indeed, as noted above, the trial judge found that Giles did not have a significant criminal history. This court also notes that the pre-sentence report did not violate Giles's Sixth Amendment right to confrontation, because the information contained in the report was not "testimonial." Records of prior criminal history are not "testimonial" in nature and, therefore, do not affront the Confrontation Clause. *Cf. Crawford v. Washington,* 541 U.S. 36, 56 (2004) (holding that "by nature" business records are "not testimonial"). The claim is due to be denied.

### (ii).    *Trial and Appellate Counsel Ineffective*

308

On collateral appeal, Giles alleged that his trial and appellate attorneys were ineffective for failing to object to errors in the pre-sentencing report. (Doc. no. 57, at 62 (citing Tab. 52, at 100)).[132] The Alabama Court of Criminal Appeals found that Giles had waived the claim on the grounds that "[i]n his brief Giles merely identifies each issue[,] but fails to make any argument or citation to authority in support of each issue. . . . . Because Giles failed to assert any legal argument or supporting legal authorities for each of these issues, Giles has waived these arguments on appeal." *Giles v. State*, 906 So. 2d 963, 988-89 (Ala. Crim. App. 2004) (alteration supplied). The appellate court's decision is based upon an adequate and independent state procedural rule. Therefore, the ineffectiveness claims are procedurally defaulted and due to be dismissed.

Furthermore, the claims are meritless. Giles admits that his 1991 trial attorneys, in fact, objected to consideration of the pre-sentence investigation report. *See* doc. no. 45, p. 113, ¶ 375; R. Vol. 20, Tab 33, at 666. Because trial counsel objected, they could not have been ineffective. Appellate counsel were not ineffective because the issue was not of such merit that they can be faulted for failing to raise it on appeal. If there was any error in considering the pre-sentence

---

[132] Giles points to page 119 of the same brief, but that page contains only a vague, general, and conclusory assertion that the pre-sentencing report contained inadmissible hearsay and undocumented criminal history.

investigation report, it was harmless and played no role in Giles's sentencing, as

shown by the fact that the judge found no significant criminal history as a mitigating

factor.  Appellate counsel were not ineffective for choosing to focus on other issues.

The claim is due to be denied.

> **g.    The trial court improperly diminished Giles's significant mitigating evidence; counsel ineffective for failing to object to court's refusal to find *Skipper* evidence mitigating (Doc. no. 44, at 113) (Doc. no. 45, at 114-16) (Doc. no. 57 at 36)**

> **(i).    *Trial court improperly diminished significant mitigating evidence* (Doc. no. 44, at 113-14[133]) (Doc. no. 45, at 114-15)**

Giles asserts that the trial court refused to consider evidence that "demonstrated

that [he] was a caring, loving, polite and considerate child before this crime happened

and that the crime and violence was totally out of character for [him]."  (Doc. no. 45,

at 114) (alteration supplied).  Even the pre-sentence report by the state probation

officer related that Giles's neighbor, Hattie Washington, stated that she had known

Giles his entire life and "'considers him a wonderful boy who always kept to himself

and never bothered anybody.'"  *Id.* (quoting R., at 734).  To Giles, the court

additionally diminished (or failed to consider) evidence of his demonstrated good

---

[133] At page 114 of his initial brief, Giles attempted to add a claim: "Trial Court Failed to Find Only Aggravating Circumstance Averred in the Indictment."  The claim was not in his petition or reply brief.  Respondent did not recognize it as a claim.  Giles is responsible for properly pleading his claim for *habeas* purposes.  He failed to do so.  As such, the claim is due to be dismissed for failing to comply with the *Rules Governing Habeas Corpus Proceedings*.

character while serving his sentence on death row.  *Id.   See Skipper v. South Carolina*, 476 U.S. 1, 6 (1986).

When Giles raised the claim on direct appeal following his 1991 re-sentencing trial, the Alabama Supreme Court made the following findings of fact and conclusions of law:

> Giles contends that the trial court failed to find the existence of facts, which, he insists, were uncontroverted and supported his arguments in favor of mitigation of the sentence.  Specifically, Giles offered evidence that he had (1) adjusted well to prison life; (2) experienced a religious conversion since the crime; (3) had an exemplary childhood; (4) experienced remorse; and (5) cooperated with authorities.  He also urged the judge and the jury to consider as a mitigating factor the length of time that had elapsed between the act and the sentencing.  The upshot of his arguments, as we understand them, is that this evidence, as a matter of law, counterbalances the aggravating factors and requires mitigation of the sentence.

> We disagree with Giles's factual and legal conclusions.  In his sentencing order, the trial judge stated:

>> "After consideration of the evidence presented at the jury phase of the sentence hearing, the presentence investigation report and after hearing and considering the arguments both for aggravating circumstances and mitigating circumstances in this case, the court makes the following findings concerning those circumstances:

>> ". . . .

>> "H.  In addition to the mitigating circumstance[s] listed under [§] 13A-5-51 the defendant has argued as [a] mitigating circumstance the fact that a long time has elapsed since the commission of the capital offense. . . .

311

And the court does find that a long time has elapsed . . . , but does not find that it is a mitigating circumstance *or that it is entitled to any weight*.

"I.   As far as the remorse of the defendant is concerned, this has not necessarily been prov[en] to the court's satisfaction although there was at least one witness who testified to the change in attitude of the defendant. The court does not find that this has been sufficiently established.

"J.   As to cooperation of the defendant with the authorities after the crime by giving a statement, it might be and is noted by the court that at the time the statement was given the *defendant already realized that four of the victims of the crime had survived and were able to identify him*.

"*Having considered all* of the statutory aggravating circumstances and the statutory mitigating circumstances and the additional mitigating circumstances *and evidence offered by the defendant*, the court now finds and is convinced beyond a reasonable doubt that the aggravating circumstances as heretofore stated and brought before this court *outweigh any mitigating circumstances as presented by the evidence*."

(Emphasis added.)

Reading the trial judge's order in its entirety, we are compelled to conclude that he found the existence of all but one of these factors — Giles's claimed remorse — and weighed each of them in his deliberations. We are aware of no authority for Giles's legal proposition that these factors, assuming they were conclusively established, mandate a sentence of life imprisonment. Although evidence of nonstatutory factors, such as that presented by Giles, cannot be *excluded* from the sentencing tribunal, *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), such evidence is only "*potentially* mitigating."

312

> *Skipper v. South Carolina*, 476 U.S. 1, 7, 106 S. Ct. 1669, 1672, 90
> L. Ed. 2d 1 (1986) (emphasis added).  The sentencing tribunal, and, on
> appeal, the reviewing court, determines the weight to be assigned to
> each factor.  *Ex parte Hart*, 612 So. 2d 536 (Ala.1992), *cert. denied*,
> *Hart v. Alabama*, 508 U.S. 953, 113 S. Ct. 2450, 124 L. Ed. 2d 666
> (1993); *Smith v. State*, 407 So.  2d 894 (Fla. 1981), *cert. denied*, 456
> U.S. 984, 102 S. Ct. 2260, 72 L. Ed. 2d 864 (1982).

*Ex parte Giles,* 632 So. 2d 577, 585-86 (Ala. 1993) (alterations and emphasis in

original).

At the outset, the question of whether the trial judge (the ultimate sentencing

authority) failed or refused to consider all of the mitigating circumstances advocated

by the petitioner is a mixed question of fact and law.  When the state appellate court

finds that the sentencer *did* consider all mitigating factors advocated by a defendant,

that is a finding of fact entitled to a presumption of correctness under § 2254(d)(2),

*unless* the petitioner can overcome that presumption by "clear and convincing"

evidence showing that the finding is unreasonable in light of all of the evidence of

record.  *See* 28 U.S.C. § 2254(e)(1); *Ferguson v. Secretary for Department of*

*Corrections*, 580 F.3d 1183, 1199 (11th Cir. 2009); *Quince v. Crosby*, 360 F.3d 1259,

1266 (11th Cir. 2004).

In this case, Giles has not shown that the finding on that point is unreasonable

in light of the evidence of record.  The trial judge heard the testimony offered on

those mitigation points during the re-sentencing jury trial.  The trial judge's oral and

313

written sentencing orders explicitly referred to evidence of non-statutory mitigating factors. His orders expressly stated that he considered *all* of the evidence presented on aggravating circumstances, as well as the evidence addressing both statutory and non-statutory mitigating factors. It is not clear whether the reference to the petitioner's remorse was intended to cover the entire mitigation argument relating to his religious conversion and rehabilitation while in prison, but that arguably is the case.[134] The fact that the trial judge's sentencing orders did not explicitly refer to Giles's childhood or his religious conversion and rehabilitation does not preclude the possibility that he considered those factors along with the others. The finding of fact made by the Alabama Supreme Court is not unreasonable in light of the record evidence, and certainly Giles has not shown it to be so by clear and convincing evidence.

Giles cannot show that the Alabama Supreme Court's affirmance of the trial court's decision was contrary to, or an unreasonable application of, clearly established federal law because the Constitution only requires the trial court to *consider* evidence offered as mitigating factors by a capital defendant: *i.e., acceptance* "is not constitutionally required; the Constitution only requires that the

---

[134] Evidence concerning remorse, religious conversion, and rehabilitation all came from the same source, Curtis Dean Godfrey, Sr., Prison Ministry Director. It is not unreasonable to conclude that the trial court's reference to remorse was meant to discuss the whole of Dr. Godfrey's mitigation evidence.

sentencer *consider* the factors." *Atkins v. Singletary*, 965 F.2d 952, 962 (11th Cir. 1992) (emphasis in original).  In Giles's case, the trial judge did so.

Given the finding of fact by the Alabama Supreme Court that the sentencing court considered and weighed all of the mitigating factors, but found them insufficient to outweigh the aggravating circumstances, there was no error.  The claim is due to be denied.

> ### (ii).   Re-sentencing counsel were ineffective because they failed to object when the trial court failed to find Skipper evidence (Doc. no. 57, at 36)

After a careful reading of the text of Giles's *habeas* petition (doc. no. 45, at 114-15), and the brief supporting it (doc. no. 44, at 113-14), it becomes clear that he actually has not asserted a claim similar to that stated in the heading to the present section.  Stated differently, there is not one fact alleged in Giles's petition, or one legal argument stated in his supporting brief, that supports a claim that defense counsel rendered ineffective assistance by failing to object to the trial judge's rejection of so-called "*Skipper* evidence" — a term derived from the Supreme Court's opinion in *Skipper v. South Carolina*, 476 U.S. 1 (1986), emphasizing the import of the Court's prior decisions in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), and *Lockett v. Ohio*, 438 U.S. 586 (1978).  Specifically, the *Skipper* opinion observed that:

> There is no disputing that this Court's decision in *Eddings* requires that in capital cases "'the sentencer . . . not be precluded from

considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Eddings*, *supra*, 455 U.S., at 110, 102 S. Ct., at 874 (quoting *Lockett*, *supra*, 438 U.S., at 604, 98 S. Ct., at 2964 (plurality opinion of BURGER, C.J.)) (emphasis in original). Equally clear is the corollary rule that the sentencer may not refuse to consider or be precluded from considering "any relevant mitigating evidence." 455 U.S., at 114, 102 S. Ct., at 877. . . .

*Skipper*, 476 U.S. at 4 (emphasis in original). In short, despite the heading, a claim that the attorneys who represented Giles during his 1991 re-sentencing trial were ineffective for not objecting when the trial court "failed to find *Skipper* [mitigating] evidence" is not supported by factual allegations and legal arguments. Therefore, it is disregarded here.[135]

### h.    Trial court improperly found aggravator "Great Risk of Death to Many" (Doc. no. 44, at 115-17[136]) (Doc. no. 45, at 116)

Giles alleges that the trial court improperly found the "Great Risk of Death to Many" aggravating factor in his case. (Doc. no. 44, at 115 (citing *Ashlock. v. State*,

---

[135] In addition to what is stated in the text, Giles admits that he attempted to raise the claim in his untimely third amended Rule 32 petition, which would subject it to procedural default. (Doc. no. 57, at 36). Since the claim is not pleaded — *i.e.*, *explicated* — in his *habeas* petition, there is no need to analyze whether the failure of postconviction counsel to timely raise the claim during the initial Rule 32 proceedings could establish "cause and prejudice" sufficient to overcome the procedural default pursuant to *Martinez v. Ryan*, __U.S.__, 132 S. Ct. 1309 (2012).

[136] In his brief, Giles also complains that "the trial court failed to properly instruct on 'great risk of death to many,' because it merely "recited" the title of the aggravating factor to the jury without offering any explanation as to its meaning. (Doc. no. 44, at 115-16). The claim was not raised in the petition or reply brief. Respondent did not recognize it as a claim. Giles is responsible for properly pleading his claim for *habeas* purposes. He failed to do so. As such, the claim is due to be dismissed for failing to comply with the *Rules Governing Habeas Corpus Proceedings.*

367 So. 560, 561 (Ala. Crim. App. 1979)).   He further alleges that, under the circumstances, the finding of the "Great Risk" factor violates the Double Jeopardy Clause.  (Doc. no. 44, at 116 (quoting *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969) ("The guarantee against twice being placed in jeopardy for the same offense 'protects against multiple punishments for the same offense.'")).

Respondent answers that Giles cannot show that he is entitled to *habeas* relief from the state court's rejection of the claim.  (Doc. no. 52, at 117 (citing *Ex parte Giles*, 632 So.2d 577, 584, 585-86 (Ala. 1993)).   The Alabama Supreme Court's decision regarding the matter reads as follows:

> Giles further contends that the trial court erred in finding that "[t]he defendant knowingly created a great risk of death to many persons," § 13A-5-49(3), § 13-11-6(3) — a finding based on the injuries intentionally inflicted on the surviving Nelson family members.  Giles insists that this finding was unauthorized, because, he argues, "this aggravating circumstance is intended to reach only the type of situations where a capital defendant creates a great risk of death to persons other than the *intended* victim."  *Brief in Support of Petition for Writ of Certiorari*, at 44 (emphasis added).
>
> We disagree.  It would be anomalous to hold that § 13-11-6(3) allows sentence enhancement where the defendant *unintentionally* endangers persons other than the homicide victims, but disallows enhancement where the defendant *intentionally* threatens the lives of others.  We decline to create such an anomaly.
>
> In this connection, Giles contends that he was convicted on one count of assault arising out of the attacks on the surviving family members, and, therefore, that the enhancement of his sentence on the

basis of those assaults constitutes a violation of his rights against "double jeopardy." We disagree with this contention.

The Double Jeopardy Clause "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S. Ct. 2072, 2076, 23 L. Ed. 2d 656 (1969). The guarantee "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366, 103 S. Ct. 673, 678, 74 L. Ed. 2d 535 (1983).

None of these protections encompasses the circumstances of which Giles complains. Indeed, to accept Giles's argument would force the state to forgo prosecutions for multiple crimes committed in conjunction with murder solely to preserve them for consideration in the sentencing phase of a successful murder prosecution. This result was clearly not the intent of the legislature, which, in at least three statutory provisions, has expressly made other criminal acts relevant considerations for the purposes of sentence enhancement: § 13-11-6(1) ("The capital felony was committed by a person under sentence of imprisonment"); § 13-11-6(2) ("The defendant was previously convicted of another capital felony or a felony involving the use or threat of violence to the person"); § 13-11-6(4) ("The capital felony was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit, rape, robbery, burglary or kidnapping for ransom"). Nor is such a result the purpose of the constitutional provisions prohibiting double jeopardy. Consequently, the trial court's consideration of the aggravating circumstance identical to the one set forth in § 13-11-6(3) did not violate Giles's double-jeopardy guarantees.

*Ex parte Giles*, 632 So. 2d 577, 584 (Ala. 1993) (alterations and emphasis in original).

This court rejects Giles's reliance on *Ashlock v. State*, 367 So. 2d 560, 561 (Ala. Crim. App. 1978). Giles contends that in Alabama, "the aggravator 'great risk of death to many' excludes crime victims." (Doc. no. 44, at 115).[137] A review of that case, however, reveals nothing about the facts surrounding the offense in *Ashlock*. The only discernible fact concerning the capital murder offense in that case is that it involved a murder for hire in which two people were killed. Moreover, Giles was not punished twice for the same offense, and he cannot show that the state court's logical and well-reasoned explanation for that conclusion is either contrary to, or an unreasonable application of, federal law. Indeed, in *Williams v. Oklahoma*, 358 U.S. 576 (1959), the Supreme Court held that the use of a separate crime as an aggravator for sentence enhancement is not a violation of double jeopardy. *Id.* at 586. In *Williams*, the defendant kidnaped and murdered a hostage while escaping after a robbery. He later pleaded guilty to the murder and was sentenced to life in prison. *Id.* at 577-78. After that, he was charged with the capital offense of kidnaping, and the murder of the victim was used as an aggravating factor. *Id.* at 578-79. In response to his argument that using the murder, for which he had been convicted and punished, as the aggravating factor to elevate the kidnaping charge to a capital offense was double punishment for the murder, the Supreme Court said:

---

[137] Of course, insofar as Giles argues nothing more than that a violation of state law occurred, this court has no *habeas* jurisdiction to provide relief.

319

> Certainly one of the aggravating circumstances involved in this kidnaping crime was the fact that petitioner shot and killed the victim in the course of its commission. We cannot say that the sentencing judge was not entitled to consider that circumstance, along with all the other circumstances involved, in determining the proper sentence to be imposed for the kidnaping crime. And in view of the obvious fact that, under the law of Oklahoma, kidnaping is a separate crime, entirely distinct from the crime of murder, the court's consideration of the murder as a circumstance involved in the kidnaping crime cannot be said to have resulted in punishing petitioner a second time for the same offense, nor to have denied to him due process of law in violation of the Fourteenth Amendment.

*Id.* at 586. Other cases have followed this reasoning. *See, e.g., Witte v. United States*, 515 U.S. 389, 399 (1995). This case does not present an instance in which the crime used as an aggravator is a necessary part of the greater offense of capital murder; the assault with intent to murder was not a lesser-included offense of the capital murder.

Given the Supreme Court's holdings in *Williams* and *Witte*, it cannot be said that the conclusion reached by the Alabama Supreme Court in this case was objectively unreasonable. The claim is without merit and due to be denied.

> **i.    Alabama courts denied petitioner fundamental due process by abdicating decision-making and leaving the writing of the court's opinion to the Attorney General (Doc. no. 44, at 117) (Doc. no. 45, at 117) (Doc. no. 57, at 62-67)**

Giles alleges that the Rule 32 trial court violated his constitutional rights because it adopted the Attorney General's proposed final order. (Doc. no. 45, at

117).[138]  Specifically, he complains that  "[j]ust days after receiving the Attorney

General's error-filled proposed order, the Circuit Court signed it."  (Doc. no. 44, at

117) (alteration supplied).  To Giles, the signing of the proposed order is "a complete

abdication of the court's [decision-making] responsibility."  *Id.* at 118 (alteration

supplied).  Even assuming that to be true, the claim fails to challenge the lawfulness

of the capital conviction and sentence.  A challenge to a state's *post*-conviction

procedures raises no claim of defect in the conviction or sentence itself.  *See Spradley*

*v. Dugger*, 825 F.2d 1566, 1568 (11th Cir. 1987) (*Habeas* relief is unavailable when

a claim "goes to issues unrelated to the cause of [a] petitioner's detention.")

(alteration supplied).

Furthermore, the Alabama Court of Criminal Appeals rejected the claim on

collateral appeal and, in doing so, entered the following findings of fact and

conclusions of law:

> Giles   argues   that   the   circuit   court   breached   the
> separation-of-powers doctrine by abdicating the decision-making
> authority to the attorney general.  He specifically argues that the circuit
> court erred in its wholesale adoption of the State's proposed order
> denying postconviction relief.

---

[138] Respondent erroneously asserts that the claim is procedurally defaulted because the state
court found that Giles either abandoned it or failed to properly brief it on collateral appeal.  *Giles v.*
*State*, 906 So. 2d 988-89.  (Doc. no. 52, at 119).  The claim was briefed at length in Giles's brief on
collateral appeal.  (Rule 32 C.R. Vol. 52, Tab. 71, at 136-40).

Giles does not raise a constitutional question with the claim. Of course, it is

true that the United States Supreme Court has

> criticized courts for their verbatim adoption of findings of fact prepared
> by prevailing parties, particularly when those findings have taken the
> form of conclusory statements unsupported by citation to the record.
> *See*, *e.g.*, *United States v. El Paso Natural Gas Co.*, 376 U.S. 651,
> 656-657, 84 S. Ct. 1044, 1047-1048, 12 L. Ed. 2d 12 (1964); *United
> States v. Marine Bancorporation*, 418 U.S. 602, 615, n.13, 94 S. Ct.
> 2856, 2866, n.13, 41 L. Ed.2d 978 (1974). We are also aware of the
> potential for overreaching and exaggeration on the part of attorneys
> preparing findings of fact when they have already been informed that the
> judge has decided in their favor. *See* J. Wright, *The Nonjury Trial —
> Preparing Findings of Fact, Conclusions of Law, and Opinions*,
> SEMINARS FOR NEWLY APPOINTED UNITED STATES DISTRICT JUDGES
> 159, 166 (1962). Nonetheless, our previous discussions of the subject
> suggest that even when the trial judge adopts proposed findings
> verbatim, the findings are those of the court and may be reversed only
> if clearly erroneous. *United States v. Marine Bancorporation*, *supra*, at
> 615, n. 13, 94 S. Ct., at 2866, n. 13; *United States v. El Paso Natural
> Gas Co.*, *supra*, 376 U.S., at 656-657, 84 S. Ct., at 1047-1048.

*Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 572-73 (1985).

Although Giles strenuously argues against the trial court's wholesale adoption

of the order proposed by the State's Attorney General, his only real complaints are

related to grammar and spelling. Contrary to Giles's contention, the state court's

factual findings are entitled to a presumption of correctness. Although he asserts that

the state court made unreasonable determinations of fact in its final order, not once

does Giles point to any factual errors. The circuit court's order was dense and

comprehensive, both in its examination of Giles's claim and its faithful citation to the

voluminous record.  The circuit court's performance certainly was not perfunctory.
The claim is due to be dismissed for failure to state a claim for relief under Rule 2 of
the *Rules Governing Section 2254 Cases*.

> **j.     To execute Arthur Giles after 30 years on death row is cruel and unusual punishment (Doc. no. 44, at 120) (Doc. no. 45, at 119) (Doc. no. 57, at 36)**

Giles admits that the claim was raised in the untimely third amended petition.
(Doc. no. 45 at 119).  The Alabama Court of Criminal Appeals refused to consider the
claim because — as has been many times stated in the previous portions of this
opinion — Giles did not file the third amended petition before the trial court entered
a final judgment in the matter.  The claim is procedurally defaulted and due to be
dismissed.

Although it may be unfortunate for all involved that the legal process for
reviewing death sentences is prolonged, a petitioner can hardly complain about the
fact that such a long time was required to ensure the faithful observance of his
constitutional rights.  The murders in this case occurred in 1978, and petitioner Giles
was first tried for them in 1979.  That conviction was reversed under *Beck*.  A new
trial occurred in 1982, resulting in a conviction and jury recommendation of life
without parole.  The trial court's override of that recommendation and imposition of
a death sentence was reversed on appeal and remanded for a new sentencing trial

before a new jury.  The re-sentencing trial took place in 1991, resulting in another jury recommendation of life without parole.  Again, the trial judge — a different judge from the one presiding in 1982 — overrode the recommendation and imposed a death sentence.  Ultimately, the sentence was affirmed on appeal, and it was in 1996, eighteen years after the murders, that Giles first filed his Rule 32 post-conviction petition.  With amendments and hearings, that petition was not disposed of by the trial court until 2000, and the state court appeals lasted until 2005.  The instant *habeas* action was filed in 2006, another ten years after the conviction and sentence became final, and twenty-eight years after the murders.

For Giles and the surviving victims and family members, the years between the murders, the arrival of the case in this court, and the entry of the present opinion have crawled by.  But Giles cannot complain that the courts have taken so many years to examine all of his claims of error and constitutional violations.  The appeals and collateral reviews were all undertaken at Giles's request, and he cannot now complain that, in reviewing *his* claims of error, the courts have taken a long time.  Recognizing such a claim would lead to the anomalous result of giving petitioners an incentive to drag out the appeals and reviews of their convictions and sentences.  Petitioners facing a sentence of death are entitled to a fair review of their claims; they are not

entitled to file numerous appeals, petitions, and amendments, and then claim that it all took too long.  The claim is meritless and due to be denied.

## VI.  CONCLUSION

All claims in Giles's petition for writ of *habeas corpus* are due to be dismissed or denied.  An order consistent with this memorandum opinion will be entered contemporaneously herewith.

DONE and ORDERED this 3rd day of April, 2013.

_____
United States District Judge

325